IN THE UNITED STATES COURT OF FEDERAL CLAIMS

IN RE DOWNSTREAM ADDICKS AND ) 
BARKER (TEXAS) FLOOD-CONTROL )
RESERVOIRS )
  )
  ) Sub-Master Docket No. 17-cv-9002L
  )
——————————————————— )
  ) Senior Judge Loren A. Smith
THIS DOCUMENT RELATES TO: )
  )
  )
ALL DOWNSTREAM CASES ) *Electronically filed October 15, 2019*
  )
——————————————————— )

**UNITED STATES' REPLY TO PLAINTIFFS' RESPONSE TO THE UNITED STATES' CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant United States submits this reply to Plaintiffs' Reply In Support of Motion for Summary Judgment and Response to United States' Cross-Motion for Summary Judgment, ECF No. 190 ("Pls.' Reply"), and in support of that Cross-Motion, ECF No. 184-1 ("U.S. Cross-Mot."). As set forth in the brief attached hereto, Plaintiffs' Reply confirms that they are applying an incorrect legal standard for causation, and have not even attempted to meet their burden of proving causation, even in the alternative, under the correct legal standard. That failure of proof is fatal to Plaintiffs' claims and compels an entry of summary judgment in favor of the United States. Plaintiffs' failure to meet the requirements of *Ridge Line* and the police powers doctrine provide additional grounds for an entry of summary judgment, separate and apart from the grounds for dismissal set forth in the United States' Motion to Dismiss (ECF No. 48).

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment & Natural Resources Division

KRISTINE S. TARDIFF
WILLIAM J. SHAPIRO
LAURA W. DUNCAN
SARAH IZFAR
Trial Attorneys

United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
603-230-2583 (office)
kristine.tardiff.@usdoj.gov

*Counsel for the United States*

# TABLE OF CONTENTS

I.      Plaintiffs' Failure of Proof on the Element of Causation Requires Summary
        Judgment to be Entered in Favor of the United States............................................ 1

        A.      Plaintiffs' Approach to Causation Conflicts with Binding Precedent ................... 2

        B.      Plaintiffs' Inability to Prove Causation In This Action Does Not Mean the
                Legal Standard Is Incorrect or Impossible ............................................................ 8

II.     The *Ridge Line* Test Remains a Distinct Jurisdictional Test That Plaintiffs Have
        Not Met ..................................................................................................................... 11

III.    The Police Powers Doctrine Applies to the Government's Response to Hurricane
        Harvey....................................................................................................................... 15

IV.     Plaintiffs' Ownership of Property Downstream of the Project Does Not Include a
        Right To Be Free of All Flood Waters That Must Pass Through The Dams.................. 16

V.      The Multi-Factor Liability Test Set Forth in *Arkansas Game* Should Not Be
        Resolved At Summary Judgment................................................................................ 17

VI.     The Significant Benefits that the Project Has Provided to Plaintiffs' Downstream
        Properties Must Be Considered if Plaintiffs' Claims Survive Summary Judgment ........ 19

VII.    Conclusion ................................................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*Accardi v. United States*,
   599 F.2d 423 (Ct. Cl. 1979) ............................................................................................ passim

*Anderson v. United States*,
   146 Ct. Cl. 691 (1959) ...................................................................................................... 9, 10

*Ark. Game & Fish Comm'n v. United States*,
   568 U.S. 23 (2012)....................................................................................................... 5, 11, 12

*Ark. Game & Fish Comm'n v. United States*,
   637 F.3d 1366 (Fed. Cir. 2011) ............................................................................................ 12

*Ark. Game & Fish Comm'n v. United States*,
   736 F.3d 1364 (Fed. Cir. 2013) ..................................................................................... 5, 6, 10

*Ark. Game & Fish Comm'n v. United States*,
   87 Fed. Cl. 594 (2009) .......................................................................................................... 13

*Cary v. United States*,
   552 F.3d 1373 ......................................................................................................................... 5

*Casitas Mun. Water Dist. v. United States*,
   102 Fed. Cl. 443 (2011) ........................................................................................................ 19

*Chi. & Alton R.R. v. Transbarger*,
   238 U.S. 67 (1915).................................................................................................................. 15

*Clearmeadow Investments, LLC v. United States*,
   87 Fed. Cl. 509 (2009) .......................................................................................................... 19

*Coltec Industries, Inc. v. United States*,
   454 F.3d 1340 (Fed. Cir. 2006) .............................................................................................. 3

*Dellew Corp. v. United States*,
   855 F.3d 1375 (Fed. Cir. 2017) ............................................................................................ 12

*Estep v. Sec. of Dept. of Health and Human Servs.*,
   28 Fed. Cl. 664 (1993) ............................................................................................................. 1

*Fromme v. United States*,
   412 F.2d 1192 (Ct Cl. 1969) ................................................................................................. 15

*In re The Adjudication of Water Rights of Brazos III Segment of the Brazos River Basin*,
   746 S.W.2d 207 (Tex. 1988).................................................................................................. 17

*John B. Hardwicke Co. v. United States*,
   467 F.2d 488 (Ct. Cl. 1972) .................................................................................................... 5

*Miller v. Schoene*,
   276 U.S. 272 (1928)................................................................................................................ 16

*Motl v. Boyd*,
   286 S.W. 458, 116 Tex. 82 (Tex. 1926) ........................................................... 16, 17

*Mugler v. Kansas*,
   123 U.S. 623 (1887) ....................................................................................... 15, 16

*Nat'l By-Prods., Inc. v. United States*,
   405 F.2d 1256 (Ct. Cl. 1969) .............................................................................. 14

*Orr v. United States*,
   No. 18-1894L, 2019 WL 4137427 (Fed. Cl. Aug. 30, 2019) ................................ 6, 7

*Precision Pine & Timber, Inc. v. United States*,
   63 Fed. Cl. 122 (2004) ........................................................................................... 1

*Ridge Line, Inc. v. United States*,
   346 F.3d 1346 (Fed. Cir. 2003) ..................................................................... passim

*S. Corp. v. United States*,
   690 F.2d 1368 (Fed. Cir. 1982) .............................................................................. 3

*Sanguinetti v. United States*,
   264 U.S. 146 (1924) .......................................................................................... 4, 9

*Severance v. Patterson*,
   370 S.W.3d 705 (Tex. 2012) ................................................................................ 16

*St. Bernard Parish Gov't v. United States*,
   887 F.3d 1354 (Fed. Cir. 2018) ..................................................................... passim

*State v. Valmont Plantations*,
   346 S.W.2d 853 (Tex. Civ. App.—San Antonio 1961) .......................................... 17

*United States v. Archer*,
   241 U.S. 119 (1916) ..................................................................................... 2, 4, 9

*United States v. Sponenbarger*,
   308 U.S. 256 (1939) ........................................................................................ 4, 13

*Valmont Plantations v. State*,
   163 Tex. 381 (1962) ............................................................................................. 17

*W. Coast Gen. Corp. v. Dalton*,
   39 F.3d 312 (Fed. Cir. 1994) ............................................................................... 12

*Yazel v. United States*,
   118 Ct. Cl. 59 (1950) ............................................................................................. 9

I.      Plaintiffs' Failure of Proof on the Element of Causation Requires Summary Judgment to be Entered in Favor of the United States

The dispute between the parties as to the correct legal standard for causation is a question of law that the Court must decide as a threshold matter.  *See Precision Pine & Timber, Inc. v. United States*, 63 Fed. Cl. 122, 128 (2004) ("As a threshold matter, the Court must determine the proper legal standard for causation."); *Estep v. Sec. of Dept. of Health and Human Servs.*, 28 Fed. Cl. 664, 666 (1993) ("the correct legal standard for demonstrating causation in fact . . . is an issue of law").  Plaintiffs' Reply confirms that their takings claims are premised on an erroneous theory of causation.  To prove causation under the correct legal standard, Plaintiffs must prove that their properties experienced more flooding during Hurricane Harvey than those properties would have experienced had the Corps never built the Project.  Instead, Plaintiffs contend that they can prove causation by isolating one aspect of the government action—the opening of the dam gates to release flood waters during Hurricane Harvey—and showing that this single operational decision, removed from the larger context in which it occurred, caused their flooding.  The Court should reject Plaintiffs' proposed test as conflicting with binding precedent on the element of causation.

The evidence Plaintiffs have prepared, and intend to present at trial, cannot meet their burden of proof under the correct legal standard.  Plaintiffs readily admit to applying a different legal standard, and the facts and expert report Plaintiffs prepared during discovery address causation only under their erroneous legal standard.  This is fatally insufficient.  Plaintiffs have not prepared any expert analysis of causation under the correct legal standard, and they cannot, therefore, present any evidence to support their burden of proof should this matter proceed to trial.  Thus, the parties' cross-motions for summary judgment do not reveal a dispute of material fact or a battle of the experts requiring trial.  Indeed, Plaintiffs agree that "[t]he relevant facts are not in dispute[.]"  Pls.' Reply at 3.  Instead, binding legal precedent establishes a simple and

clear failure of proof on the element of causation that, in turn, compels the entry of summary judgment in favor of the United States.

A. <u>Plaintiffs' Approach to Causation Conflicts with Binding Precedent</u>

There is no dispute that causation is an element of Fifth Amendment takings claims on which Plaintiffs bear the burden of proof.  In addition, the parties agree that "[c]ausation requires a showing of 'what would have occurred if the government had not acted."  *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018) (quoting *United States v. Archer*, 241 U.S. 119, 132 (1916)).  *See* U.S. Cross-Mot. at 24; Pls.' Reply at 12.  The parties' disagreement relates to identifying the correct baseline to be analyzed.  Under *St. Bernard Parish*, that baseline is a world without the Addicks and Barker dams.

Plaintiffs contend that they can prove that the government caused the flooding of their properties by comparing the "flooding Plaintiffs would have experienced had the Government not opened the gates, and flooding Plaintiffs actually experienced because the Government opened the gates."  Pls.' Reply at 12.  They are incorrect.  *St. Bernard Parish* demonstrates that a plaintiff's attempt to narrowly focus on a single, cherry-picked action during a hurricane is legally insufficient.  Plaintiffs' proposed causation standard conflicts with binding precedent, including, but not limited to, *St. Bernard Parish*, that collectively provide that the correct legal standard of causation requires Plaintiffs to prove that their properties experienced greater flooding during Hurricane Harvey than would have occurred had the Corps never constructed the Addicks and Barker Dams.  *See* U.S. Cross-Mot. at 23-33 (citing and discussing cases).  Plaintiffs' various arguments seeking to distinguish or avoid this precedent are not well-founded and should be rejected.

To begin with, even though *St. Bernard Parish,* binding Federal Circuit precedent, clearly articulates the correct legal standard for causation, the United States does not rely on *St. Bernard*

*Parish* alone for articulating the correct legal standard for proving causation.  *St. Bernard Parish* represents the latest of a long-line of decisions that address causation in the context of flooding. These decisions collectively establish that to prove causation in a flooding case such as this, a plaintiff must first show what would have happened if the government had not constructed the project in question.  *See* U.S. Cross-Mot. at 24-28.  This basic test for proving causation has been applied to cases involving government dams, dikes and canals.  *Id*. at 27-28 (citing and discussing such cases).  Plaintiffs fail to address, much less distinguish, these decisions.

For example, Plaintiffs fail to distinguish *Accardi v. United States*, 599 F.2d 423 (Ct. Cl. 1979) (per curiam), one of the many binding cases cited by the United States as articulating and applying the correct legal standard for causation in a flooding context.[1]  *See* U.S. Cross-Mot. at 27-28 (discussing *Accardi*); Pls.' Reply at 11 (discussing only aspects of *Accardi* that do not relate to causation).  There, property owners located downstream of the Trinity Dam in California alleged a taking due to flooding that occurred following the government's release of storm waters from the dam during a severe rainfall event in 1974.  *Accardi*, 599 F.2d at 424-28. The court rejected that claim based on the plaintiffs' failure to prove causation.  *Id*. at 429-30. Significantly, even though the plaintiffs based their takings claims on the government's releases of storm water from the dam, the court's causation analysis did not compare the actual flooding from the 1974 releases with what would have occurred if the government had not made any releases from the dam during that storm.  Instead, the *Accardi* court compared what actually happened during the 1974 storm with what flooding would have occurred if the government had not constructed the Trinity Dam at all.  *Id*. at 429-30.  Applying that test, the court found that

---

[1] The decisions of the United States Court of Claims, which is a predecessor court to the United States Court of Appeals for the Federal Circuit, are binding precedent in the Federal Circuit and in the Court of Federal Claims.  *South Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982); *Coltec Industries, Inc. v. United States*, 454 F.3d 1340, 1353 (Fed. Cir. 2006).

plaintiffs have wholly failed to show that defendant's construction or operation of the Trinity River division subjected their lands to any additional flooding above what would have occurred in consequence of the severe January 1974 storm *had defendant not constructed the division at all*. Indeed, it is fair to find from this record that the flooding which actually occurred in consequence of that storm was far less than would have been the case *had the Trinity River division never been built*. In these circumstances, there has been no taking of plaintiffs' property.

*Id.* (emphasis added). The causation test applied in *Accardi* is fully consistent with prior precedential decisions. *See United States v. Archer*, 241 U.S. 119, 132 (1916) (proof of causation requires a showing of "what would have occurred if the [government] dike had not been constructed"); *Sanguinetti v. United States*, 264 U.S. 146, 147 (1924) (proof of causation requires plaintiffs to show whether their property "would have been flooded if the [government] canal had not been constructed"); *United States v. Sponenbarger*, 308 U.S. 254, 266 (1939) (no liability for a taking where plaintiffs land was not subjected to any "additional flooding" above what would have occurred "if the Government had not acted"). The legal standard articulated by the United States to apply in this case is consistent with this long-line of decisions. The approach to causation advocated by Plaintiffs cannot be reconciled with this binding precedent.

Plaintiffs next contend that *St. Bernard Parish* "does not govern here" because their claims are based on a single moment in time—the release of water from the Addicks and Barker Dams during a single storm event, rather than a series of risk-increasing and decreasing actions taken over time, including the detention of floodwaters immediately before opening the gates. Pls.' Reply at 9-10. There is no support for Plaintiffs' novel reading of *St. Bernard Parish*. Indeed, in articulating the legal standard for proving causation in *St. Bernard Parish*, the Federal Circuit relied on cases such as *Accardi*, in which the plaintiffs alleged that the flooding of their properties downstream of a government dam was caused by the release of water during a severe storm. *St. Bernard Parish*, 887 F.3d at 1363 (discussing *Accardi*). Under both factual scenarios, "the causation analysis requires the plaintiff to establish what [flood] damage would have

4

occurred without government action," *i.e.*, without "the entirety of government actions that address the relevant risk." *Id*. at 1363, 1364.  And in both cases, this was defined as the construction of the government project—a dam in *Accardi*, and the MRGO channel and a levee flood control project in *St. Bernard Parish*—rather than merely the operation of the project in question during the storm.[2]  *Id*. at 1363-64.

Plaintiffs' argument also conflicts with the Federal Circuit's analysis of causation in *Arkansas Game and Fish Commission*.  There, the plaintiff alleged a taking based on actual releases of water from a dam that allegedly increased the seasonal flooding of the plaintiff's downstream property, and the trial court found that the releases had substantially increased flooding compared with historical flooding patterns.  *Ark. Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1370-72 (Fed. Cir. 2013), *on remand from* 568 U.S. 23 (2012).  The Federal Circuit found that "the proper comparison" was between pre-dam conditions and flooding from the releases, but affirmed the trial court's findings because the releases caused greater flooding compared to either baseline.  *Id*. at 1371-72 & n.2.  That approach to causation is consistent with the legal standard later applied to the different fact pattern presented in *St. Bernard Parish*, 887 F.3d at 1364-65, and applies in the instant case as well.

---

[2] This case involves a single flood control project.  Thus, defining the government action does not require the Court to determine whether two government projects that impact flood risk must be considered in the causation analysis.  Nor does it require the Court to consider Plaintiffs' suggestion that *St. Bernard Parish* left open whether that analysis should account for the government's risk-reducing actions that precede the government's risk-increasing actions.  Pls.' Reply at 8, n.7 (citing *St. Bernard Parish*, 887 F.3d at 1367 n.14 (discussing dicta from *John B. Hardwicke Co. v. United States*, 467 F.2d 488 (Ct. Cl. 1972))).  Those questions are inapposite here. Considering the Corps' decision to open the gates without considering the Corps' decision to construct the flood control project in the first place, or even the Corps' actions in storing floodwaters immediately before opening the gates, would be "cherry-pick[ing]" of the most egregious sort.  *See St. Bernard Parish*, 887 F.3d at 1365 (citing *Cary v. United States*, 552 F.3d 1373, 1377 n.* (Fed. Cir. 2009)).

Finally, Plaintiffs base their position on an erroneous interpretation of *Orr v. United States*, No. 18-1894L, 2019 WL 4137427 (Fed. Cl. Aug. 30, 2019), in which the court is allowing the plaintiffs to develop facts on causation based on allegations easily distinguished from the facts here.  Pls.' Reply at 12.  The *Orr* decision does not alter or depart from the legal standard of causation set forth in *St. Bernard Parish* and *Accardi*, nor could it.  To the contrary, the *Orr* court cites both cases in its discussion of causation and accurately describes *Accardi* as rejecting the plaintiffs' takings claims after finding that the downstream flooding that occurred in that case following water releases from the dam was "'far less than would have been the case' *in the absence of the dam* . . . ."  *Orr*, 2019 WL 4137427, at *11 (quoting *Accardi*, 599 F.2d at 423) (emphasis added).  Following the development of further facts through discovery, the issue of causation in *Orr* will be presented for a determination on the merits.  When that occurs, the correct legal standard under precedential decisions such as *St. Bernard Parish* and *Accardi* require a comparison of the flooding that actually occurred with what would have occurred in the absence of the dam.  To the extent that the recent decision in *Orr* suggests a different test that focuses only on the releases from the dam, it is inconsistent with *St. Bernard Parish* and *Accardi*.

That the *Orr* decision discusses causation by reference to releases from the dam at issue is a function of the unusual allegations in that case.  Notably, in finding that the plaintiffs' factual allegations were adequate to survive a motion to dismiss, the *Orr* court looked to and compared those allegations with *Accardi*.  *Orr*, 2019 WL 4137427, at *11.  There, the court found that the reservoir at issue experienced a peak inflow of 107,700 cubic feet per second ("cfs") during the storm, and that the peak releases from the dam were only 14,800 cfs, or less than 15 percent of the peak inflow.  The *Accardi* court concluded on those facts that "[h]ad Trinity Dam not been in operation in January 1974, both the peak inflow and the entire inflow then recorded would necessarily have flowed down the Trinity River."  *Accardi*, 599 F.2d at 427.  By contrast, the *Orr*

6

court noted that the peak inflows into the lake behind Olympus Dam were alleged to be "at times faster than 4,000 cfs" and that the peak releases or outflows from the dam were "more than 5,200 cfs" or "potentially 125% in excess of the peak inflow." *Orr*, 2019 WL 4137427, at *11. The observation that this alleged fact pattern is unlike *Accardi* serves as the foundation of the decision to allow the plaintiffs an opportunity to develop additional facts on causation. *Id.*

Here, Plaintiffs had a full and fair opportunity to develop the facts relevant to causation through fact discovery and the preparation of expert reports. The undisputed facts here are remarkably similar to those that compelled the *Accardi* court to conclude that the plaintiffs there had not met their burden of proof on causation. Specifically, during Hurricane Harvey, the peak inflows to the reservoirs recorded on August 27, 2017, were approximately 70,000 cfs into Addicks, and 77,000 cfs into Barker. Pls.' Appx. at A3157-A3158 (USACE 2017 Annual Report, Galveston District Water Control Activities). The total combined peak releases from the dams of approximately 13,800 cfs were less than 10 percent of the combined peak inflows of approximately 147,000 cfs. Def.'s Ex. 28 (CWMS Report, Aug. 30, 2017) (reporting releases on August 30, 2017).[3] Here, as in *Accardi*, without the dams, the entire peak and cumulative inflows would have flowed down Buffalo Bayou. And here, as in *Accardi*, "it is fair to find from this record that the flooding which actually occurred in consequence of [the] storm was far less than would have been the case had the [Project] never been built." *Accardi*, 599 F.2d at 430. As discussed in the United States' Cross-Motion at 32-33, Plaintiffs did not prepare, and therefore will be unable to present at trial, any expert testimony analyzing the flooding that would have occurred on their properties during Hurricane Harvey in the absence of the dams. Plaintiffs do

---

[3] The Corps' Fiscal Year 2017 Report for the Galveston District reports the peak combined releases at approximately 11,300 cfs. *See* A3157-A3158. This smaller figure is also less than 10 percent of the reported peak inflows to both reservoirs during Hurricane Harvey.

not contend otherwise in their reply, but instead double-down on their attempt to re-write the causation standard.

As the Federal Circuit directed in *St. Bernard Parish*, a decision that, unlike the interlocutory decision in *Orr*, is binding authority on this Court, Plaintiffs' failure of proof on the element of causation under the correct legal standard requires the Court to grant the United States' cross-motion for summary judgment.  887 F.3d at 1363-64 (rejecting plaintiffs' claim because "the plaintiffs failed to present evidence comparing the flood damage that actually occurred to the flood damage that would have occurred if there had been no government action at all" and holding that "plaintiffs' approach to causation is simply inconsistent with governing Supreme Court and Federal Circuit authority, particularly in flooding cases").

In sum, here, as in *St. Bernard Parish*, "[t]he plaintiffs' approach to causation is simply inconsistent with governing Supreme Court and Federal Circuit authority, particularly in flooding cases."  *Id*. at 1364.  Plaintiffs present no evidence that meets their burden of proof under the correct legal standard, even in the alternative.  This failure of proof on a required element is fatal to their takings claims.

B.  <u>Plaintiffs' Inability to Prove Causation In This Action Does Not Mean the Legal Standard Is Incorrect or Impossible</u>

Plaintiffs next contend that requiring them to compare the flooding of their properties during Hurricane Harvey with the flooding that would have occurred on their properties had Addicks and Barker not been constructed requires "impossible evidence."  Pls.' Reply at 14. Plaintiffs premise this flawed argument on the erroneous assertion that, to prove causation under the current legal standard, an expert would be required to: (1) speculate as to the possible "chain of events that would [have] follow[ed] had the United States not built the Addicks and Barker Dams in the 1940s"; (2) make assumptions about alternative flood control measures that might

8

have been built by others over the past 70 years absent those dams; and then (3) analyze whether the flooding during Hurricane Harvey would have been worse under any or all of those speculative alternative scenarios.  Pls.' Reply at 13-14.  There is no legal support for this erroneous interpretation of the causation test.

First, in all Fifth Amendment takings cases, including those based on flooding, "[a]ny liability on the part of the United States . . . must be established by a proper showing by the plaintiff that the action of the United States was the cause of the loss."  *Yazel v. United States*, 118 Ct. Cl. 59, 71 (1950).  When a government structure—such as a dam, canal, or levee—is alleged to have caused flooding, it is necessary for the plaintiffs "to prove that any damage suffered from [the government's action] was the direct result of the activities complained of and there is no liability for damages caused by flooding when it appear that the flooding would have occurred anyway."  *Anderson v. United States*, 146 Ct. Cl. 691, 693 (1959).  Precedential decisions defining and applying the causation standard both prior to and since that time are in full accord.  *See, e.g.*, *Archer*, 241 U.S. at 128-32 (remanding for findings on "what would have occurred if the [government] dike had not been constructed"); *Sanguinetti*, 264 U.S. at 148-50 (no takings liability where land was subject to periodic overflow prior to construction of government canal, and there was no showing that the amount or severity of the overflow was increased by reason of the canal); *Yazel*, 118 Ct. Cl. at 73 (no takings liability where increase in depth and duration of flood waters attributable to government's levee "were not shown to have caused any damage or destruction to plaintiffs' land which otherwise would not have occurred"); *Accardi*, 599 F.2d at 429-30 (causation analysis examined whether plaintiffs' lands were subjected "to any additional flooding above what would have occurred in consequence of the severe January 1974 storm had defendant not constructed the division at all"); *St. Bernard Parish*, 887 F.3d at 1363 (causation analysis required plaintiffs to compare their actual flood

damage during Hurricane Katrina with "the flood damage that would have occurred if there had been no government action at all").

Second, Plaintiffs do not cite a single takings case involving flooding that supports their position that establishing causation requires their experts—and the Court—to speculate as to what other alternative flood control structures might have been built had the Corps not built the dams.  None of the cases cited above include such analysis.  Nor would such an analysis serve the underlying purpose of the causation test, which is to determine whether the United States is responsible for causing the flooding in question by ascertaining whether the "flooding would have occurred anyway" absent government action.  *Anderson*, 146 Ct. Cl. at 693.

For this same reason, the Court should reject Plaintiffs' contention that the existing causation standard amounts to "an impermissible exclusionary rule" because it requires impossible evidence.  Pls.' Reply at 14.  *Arkansas Game*, the only case cited by Plaintiffs on this point*,* lends no support for their contention.  Indeed, the plaintiff in that case successfully established causation even though the "proper comparison [was] between the flooding that occurred prior to the construction of [the dam] and the flooding that occurred [with the dam] during the deviation period."  *St. Bernard Parish*, 887 F.3d at 1364-65 (citing *Ark. Game and Fish Comm'n*, 736 F.3d 1364, 1367 n.2).  Contrary to Plaintiffs' position, it is not impossible to analyze what would have occurred during Hurricane Harvey had the United States not constructed the Project.  The United States' expert undertook just such an analysis and determined the flooding would have been far worse in the absence of the federal project.  Plaintiffs' problem is not that such analyses are impossible; it is that the result of such analyses show that the United States was not the legal cause of the flooding during Hurricane Harvey.[4]

---

[4]In their reply, Plaintiffs also seek to challenge the reliability of the hydraulic modeling used by the United States' expert witness, Dr. Robert Nairn.  Pls.' Reply at 13.  The United States

In sum, the Court should decline Plaintiffs' invitation to reject the standard of causation applied in binding cases spanning over a century, and conclude on the undisputed facts presented in the parties' cross-motions for summary judgment that Plaintiffs have not met their burden of proof on the element of causation.  The Court's analysis of Plaintiffs' claims need not go further.

II.      The *Ridge Line* Test Remains a Distinct Jurisdictional Test That Plaintiffs Have Not Met

As detailed at pages 38 to 45 of the United States' Cross-Motion for Summary Judgment, Plaintiffs have not met their burden of establishing that "treatment under takings law, as opposed to tort law, is appropriate under the circumstances."  *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003).  In response, Plaintiffs acknowledge that the *Ridge Line* test applies, but contend that a "rigid application of the *Ridge Line* test does not survive *Arkansas Game*."  Pls.' Reply at 23.  The United States' application of the *Ridge Line* case is neither unduly rigid nor inconsistent with the merits questions addressed in *Arkansas Game*.  In *Arkansas Game*, the Supreme Court addressed "whether temporary flooding can ever give rise to a takings claim[,]" 568 U.S. at 32, and ruled, "simply and only, that government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection." 568 U.S. at 38.  The Supreme Court then articulated several factors this Court must consider if it reaches the merits of Plaintiffs' claims.  Neither the conclusion that "recurrent flooding, even if of finite duration, are not categorically exempt from Takings Clause liability," nor the identification of a multi-factored merits test, alters or supplants the threshold jurisdictional test

---

disputes those challenges, but they are irrelevant here.  The United States cross-moves for summary judgment because Plaintiffs have not met their burden of proving causation under the correct legal standard.  This cross-motion is based on Plaintiffs' lack of evidence, including the lack of relevant analysis in their own expert's report.  Plaintiffs' failure of proof cannot be cured by attempting to challenge the opinions of the United States' expert, which address the question of causation under the correct legal standard.  Even if the United States had offered no expert opinions, it could and should still prevail because Plaintiffs have not offered proof under the correct standard of causation.

set forth in *Ridge Line* for distinguishing between tort claims and takings claims.  *Id*. at 27.

Indeed, a showing that flooding of a temporary nature is recurrent is one way that a plaintiff can

satisfy the frequency requirement of *Ridge Line*.  Such was the case in *Arkansas Game*, where

the claims were based on recurrent seasonal flooding over a seven-year period.[5]  568 U.S. at 27-

29.  As set forth below and in the United States' Cross-Motion, Plaintiffs have made no such

showing here.

Plaintiffs' contention that their claims survive the *Ridge Line* test is premised on a

misinterpretation of both parts of that test.  To satisfy the first part of the *Ridge Line* test, the

plaintiffs must show that the flooding of their properties was the "direct, natural or probable

result of an authorized activity" and not an incidental or consequential injury.  *Ridge Line*, 346

F.3d at 1355 (citation omitted).  Plaintiffs do not dispute that the Buffalo Bayou and Tributaries

Project, which includes the Addicks and Barker Dams and Reservoirs, was authorized and

constructed as a flood-risk reduction project.  Plaintiffs do not dispute that the Project has served

that intended purpose for over 70 years by protecting the areas downstream of the dams from

flooding, and that their properties are within that area.  On those undisputed facts, the Court

should conclude that the direct, natural, or probable result of constructing and operating this

flood-risk reduction project is not to flood the very areas that the Project is designed to protect.

---

[5] Based on a factual finding that the plaintiff's downstream land had experienced recurrent
seasonal flooding over a seven-year period, the trial court in *Arkansas Game* found that the
plaintiff had met its burden of proving that the Corps' releases from the dam at issue "were
'intermittent, frequent, and inevitably recurring floodings' that support a taking" rather than just
a tort claim.  *Arkansas Game and Fish Comm'n*, 87 Fed. Cl. 594, 619 (2009).  The Federal
Circuit initially reversed that finding on the grounds that the temporary deviations causing the
flooding were not "inevitably recurring," without deciding whether the *Ridge Line* test was
satisfied.  *Arkansas Game & Fish Comm'n v. United States*, 637 F.3d 1366, 1376 (Fed. Cir.
2011).  In reversing the Federal Circuit and concluding "that recurrent floodings, even if of finite
duration, are not categorically exempt from Takings Clause liability[,]" 568 U.S. at 27, the
Supreme Court did not revisit the *Ridge Line* test or the trial court's findings under that test.

In the face of these facts and the conclusion that naturally follows, Plaintiffs erroneously argue that intent and foreseeability must be measured at the time the Corps opened the outlet gates on the dams during Hurricane Harvey.  None of the cases cited by Plaintiffs support this interpretation.  In addition, accepting Plaintiffs' interpretation, and altering the *Ridge Line* test in this manner, would impose takings liability whenever the government becomes aware of an increased risk of flooding due to changing circumstances, but fails to act in response.  The Federal Circuit, however, has made clear that no takings liability can attach to government inaction.  *See St. Bernard Parish*, 887 F.3d at 1360 ("While the theory that the government failed to maintain or modify a government-constructed project may state a tort claim, it does not state a taking."); *Sponenbarger*, 308 U.S. at 265 ("When undertaking to safeguard a large area from existing flood hazards, the Government does not owe compensation under the Fifth Amendment to every landowner which it fails to . . . protect.").

Even assuming that the relevant point in time for determining intent and foreseeability is when the Corps opened the dam outlet gates during Hurricane Harvey, which it is not, Plaintiffs erroneously equate awareness that there would be increased flooding downstream of the dams with an intent to flood.  As is evident from the operation of the Project over 70 years, the authorized government action, the normal operation of the Project, does not require, or result in, the flooding of downstream properties.  Plaintiffs do not dispute that both reservoirs were empty at the time Hurricane Harvey hit, or that, by closing the dams gates, the Corps initially stored stormwaters behind Addicks and Barker Dams that would otherwise have flowed downstream.  But for the occurrence and historic magnitude of the storm, the reservoir conditions that led to the releases of flood water during Hurricane Harvey would not have existed.  The Corps' decision to release flood waters during the storm cannot be divorced from the larger context in which that decision occurred.  In addition, the Corps' awareness that the release of additional

13

flood waters into Buffalo Bayou would impact downstream properties does not prove that the Corps intended to operate this Project in a manner that floods the very areas that the Project is intended to protect. The purpose and operational history of this Project prove otherwise. Such awareness likewise does not "convert an otherwise insufficient injury into a taking." *Nat'l By-Prods., Inc. v. United States*, 405 F.2d 1256, 1275 (Ct. Cl. 1969).

The second part of the *Ridge Line* test requires a showing that the government's interference with any property rights is "substantial and frequent enough to rise to the level of a taking." *Ridge Line*, 346 F.3d at 1357 (citation omitted). Plaintiffs' arguments lack merit and fail to overcome their lack of evidence as to the frequency of the subject flooding.

First, implicitly acknowledging that their claims are based on a single flood that occurred during Hurricane Harvey, Plaintiffs assert that "[t]o the extent . . . that *Ridge Line* suggested that a single flooding event is never a taking, *Arkansas Game* has abrogated it." Pls.' Reply at 28. As noted above, Plaintiffs' attempt to use *Arkansas Game* to read the "frequency" requirement out of the *Ridge Line* test extends the *Arkansas Game* decision well beyond the Supreme Court's narrow holding. *Arkansas Game* involved recurrent flooding of a temporary nature and thus *Ridge Line*'s frequency requirement was not at issue.

Second, Plaintiffs have not met their burden of proving that the flooding they experienced during Hurricane Harvey will inevitably recur. Specifically, there is no dispute that Hurricane Harvey represents the first time that Plaintiffs' downstream properties experienced flooding that they attribute to the Project. The exceedance probability or return period of the rainfall amounts over the Project watersheds is at least 774 to 905 years, and has been estimated by Harris County Flood Control District to be as in the range of a 2000-year to a greater than 5000-year rainfall event. U.S. Cross-Mot. at 14 and 14-15, n.17. The Court need not find the exact recurrence interval to grant summary judgment as Plaintiffs do not dispute the fact that Hurricane Harvey

14

was an extraordinarily large and exceedingly rare rainfall event.  The possibility that such a

rainfall event may occur in the future is insufficient to show that this rainfall and resulting

flooding is "inevitably recurring" within the meaning of the *Ridge Line* frequency requirement.

For example, in *Fromme v. United States*, 412 F.2d 1192 (Ct Cl. 1969), the plaintiffs alleged a

taking based on flooding from a government levee during a period of "unusually heavy rainfall."

*Id*. at 1195.  The court found that the plaintiffs' showing that future flooding might reasonably be

expected to recur at intervals of once every 15 years (on average) was insufficient to show that

such future flooding would be intermittent and frequent enough to constitute a taking.  *Id*. at

1196-97.  The Hurricane Harvey rainfall is far more rare and does not quality as "inevitably

recurring."  On the facts of this case, Plaintiffs have not met their burden of proof on the

frequency requirement of *Ridge Line*.

Finally, Plaintiffs' "no single flood exemption" strawman incorrectly treats the threshold

tort-takings inquiry set forth in *Ridge Line* and the multi-factor liability inquiry set forth in

*Arkansas Game* as a single test.  That is incorrect.  Although some of the facts that are relevant

to the *Ridge Line* test may also be relevant to multi-factor liability test under *Arkansas Game*,

these are distinct tests applied for different purposes.  Here, the Court need not reach the full

*Arkansas Game* liability analysis due to Plaintiffs' failure to meet their burden of proof on both

the element of causation and *Ridge Line*.[6]

III.   The Police Powers Doctrine Applies to the Government's Response to Hurricane Harvey

Supreme Court precedent establishes that all property rights are subject to a fair exercise

of the police power.  *Chi. & Alton R.R. v. Transbarger*, 238 U.S. 67, 77 (1915); *Mugler v.*

---

[6] In addition, there are disputes of material fact that are relevant to the multi-factor liability test.
*See* U.S. Cross-Mot. at 59-60. Thus, if Plaintiffs' claims survive summary judgment on causation
and *Ridge Line*, the Court should deny Plaintiffs' Motion in favor of a trial.

*Kansas*, 123 U.S. 623 (1887).  Plaintiffs' assertion (Pls.' Reply at 17-18) that the Takings Clause exists for situations where the government destroys property for "public needs," and that there is no exception for the police powers doctrine, is inconsistent with that precedent.  Here, the United States' response to a rare and record-setting natural disaster was an effort to prevent harm to the public from the massive flood waters generated by Hurricane Harvey.  Plaintiffs' contention that the police powers does not apply because there was no emergency, Pls.' Reply at 17-18, confuses the necessity defense, which has not been presented at summary judgment, with the police powers doctrine.  There is no legal requirement for an "emergency" before the police powers doctrine applies.  The word "emergency" does not appear in cases such as *Miller v. Schoene*, which states that "[w]hen forced to such a choice, the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another which, in the judgment of the legislature, is of greater value to the public."[7]  276 U.S. 272, 279 (1928).

IV.   <u>Plaintiffs' Ownership of Property Downstream of the Project Does Not Include a Right To Be Free of All Flood Waters That Must Pass Through The Dams</u>

The Texas Supreme Court holds that property rights are limited by the police power, and that flood control is a long-held police power of the state.  *Severance v. Patterson*, 370 S.W.3d 705, 710 (Tex. 2012) (Texas property rights may be limited by police powers); *Motl v. Boyd*, 286 S. 458, 470, 116 Tex. 82, 115-116 (Tex. 1926) (police power to control floods is an ancient right of the state).  Plaintiffs attempt to minimize *Motl v. Boyd*'s recognition of the police power to control floods by claiming it is merely dicta.  Pls' Reply at 32.  It is not.  Nor have Courts

---

[7] Even if relevant, the facts here support a finding that the operation of the Project under the conditions that existed during Hurricane Harvey, a federally and state declared disaster for the counties where the Project is located, constitutes an emergency.  *See* U.S. Cross-Mot. at 13-19.

questioned *Motl*'s longstanding determination of the state's police power to control floods, or *Severance's* determination that Texas property rights are limited by the police power.[8]

V.   The Multi-Factor Liability Test Set Forth in *Arkansas Game* Should Not Be Resolved At Summary Judgment

Plaintiffs' contention that they are entitled to partial summary judgment on liability under the multi-factor analysis required by *Arkansas Game* should be rejected.  Given Plaintiffs' failure to meet their burden of proof on other elements of their claims, the Court should not reach this analysis.  However, if the Court does so consider this case-specific, factually intensive inquiry at summary judgment, enough disputes of material facts have been identified to warrant a denial of Plaintiffs' motion.  *See* U.S. Cross-Mot. at 59-60.

Plaintiffs continue to acknowledge certain disputes of fact that are highly relevant to an *Arkansas Game* analysis in their Reply.  *See* Pls.' Reply at 6 n.5 (noting that "Plaintiffs dispute that the Government's experts' models accurately reflect the levels and duration of inundation Plaintiffs experienced."); *see also* Pls.' Mot. at 17 n.9 (identifying a "dispute of fact" regarding downstream flooding levels, citing the expert reports of Dr. Nairn and Mr. Bardol of Geosyntec).  For certain properties, Plaintiffs also acknowledge that there "is a dispute of fact as to whether the flooding prior to the Government's induced surcharge release was *substantial*."  Pls.' Mot. at

---

[8] As Plaintiffs correctly point out, a later Texas Supreme Court case agreed with a lower court that some statements in *Motl* were dicta and need not be followed.  *Valmont Plantations v. State*, 163 Tex. 381, 383-84 (1962).  But Plaintiffs fail to note that the issues found to be dicta were expressly recognized in the lower court opinion adopted by the Texas Supreme Court, and they involved constructions of Mexican and Spanish law, *not* the recognition of the state's police power to control floods.  *Valmont Plantations v. State*, 163 Tex. 381, 383-84 (1962) (adopting as its own the lower appellate court decision defining issues in *Motl* that were dicta); *State v. Valmont Plantations*, 346 S.W.2d 853, 879 (Tex. Civ. App.—San Antonio 1961) (despite finding certain statements were dicta, recognizing that "*Motl v. Boyd* is stare decisis on many matters which were in issue. On those matters we are bound."); *see also In re The Adjudication of Water Rights of Brazos III Segment of the Brazos River Basin*, 746 S.W.2d 207, 209 (Tex. 1988) (explaining the *Valmont* and *Motl* holdings).

17 n.9 (record citations omitted) (emphasis added).  The assessment of whether the flooding at issue was substantial at various points in time is an inquiry that is partially factual and subjective to the property owner.  Both the facts as to the depth and duration of the flood waters on a particular property, and the plaintiff's testimony about the flooding, go to the issue of severity of impact, which is just one of several factors that are weighed under *Arkansas Game*.  Given the case-specific and fact-intensive nature of the *Arkansas Game* liability inquiry, and the identification of several material factual disputes, Plaintiffs' motion for summary judgment should be denied.

Even if the Court denies Plaintiffs' summary judgment motion, as it should, Plaintiffs alternatively assert the Court should enter an order treating Plaintiffs' Statement of Material Facts ("SUMF") "as undisputed for the entire case," and not merely for the purposes of summary judgment.  Pls.' Reply at 6.  The Court should deny that request for three reasons.  First, Plaintiffs make this request as a blanket statement that apparently applies to all of their fact statements.  However, many of those broad statements are not material to any issue that is before the Court.  As discussed in the United States' Cross-Motion and in this Reply, Plaintiffs have not correctly articulated the law on several required elements of their claims, including causation and the requirements in *Ridge Line*.  Facts stated in support of an erroneously legal standard, and that are not relevant or materials to an element or issue under the correct legal standard, require no response under RCFC 56.  Similarly, the alleged facts asserting the Harvey event did not present an emergency situation, for example within Plaintiffs' SUMF ¶ 30, are not material to any element raised in the parties' cross-motions.  RCFC 56 does not require a party opposing summary judgment to respond to or show that such immaterials facts, which are peppered through Plaintiffs' SUMF, are contested.

Second, portions of Plaintiffs' statements of "material facts" are not facts at all, but are conclusions of law.  For example, and as noted in the United States' Cross-Motion, the portions of Plaintiffs' SUMF relating to causation, Plaintiffs' SUMF ¶¶ 37-47, are conclusions of law, not facts.  U.S. Cross-Mot. at 6 n.5.  Those conclusions are contested.  *See* U.S. Cross-Mot. at 23-35.

Finally, it is entirely appropriate and customary for a party to concede certain facts only for purposes of summary judgment motions, thereby reserving the right to contest them if the motion is denied.  *Clearmeadow Investments, LLC v. United States*, 87 Fed. Cl. 509, 529 (2009); *Casitas Mun. Water Dist. v. United States*, 102 Fed. Cl. 443, 445 n.2 and 451 (2011), *aff'd,* 708 F.3d 1340 (Fed. Cir. 2013) (though United States conceded ownership for purposes of summary judgment, court revisited the element after motion was denied).  Here, if the Court finds that there are any disputes of material fact that preclude a complete resolution of this case on the parties' cross-motions, the Court should allow for a full presentation of the facts at trial.

VI.    The Significant Benefits that the Project Has Provided to Plaintiffs' Downstream Properties Must Be Considered if Plaintiffs' Claims Survive Summary Judgment

Contrary to Plaintiffs' suggestion (Pls.' Reply at 16 n.8), the United States has not "abandoned" any defense to Plaintiffs' claims based on the relative benefits provided to Plaintiffs' downstream properties by the Project.  Rather, consistent with RCFC 56, the United States' cross-motion for summary judgment focuses on those elements of Plaintiffs' claims, including causation, on which Plaintiffs have not met their burden of proof.  There is no question that since the Addicks and Barker Dams were constructed in the 1940s, the Project has provided significant flood control benefits to properties downstream of the dams by reducing peak flows in Buffalo Bayou during and following storm events.  *See* U.S. Cross-Mot. at 51 n.41.  The cumulative benefits from flood damages prevented by Addicks and Barker are estimated to be over $16.5 billion through Fiscal Year 2016 (before Hurricane Harvey), and over $24.9 billion

through Fiscal Year 2017 (including Hurricane Harvey).  Def.'s Ex. 38 at US_SJ_1133 (Corps' Fiscal Year 2016 Annual Water Control Report, Southwestern Division); Pls.' Appx. at A3152 (Corps' Fiscal Year 2017 Annual Water Control Report, Southwestern Division).  Plaintiffs may quibble over how these benefits must be factored into the liability analysis in this case, but they appear to at least tacitly acknowledge that those benefits exist.  *See* Pls.' Reply at 15 (noting that "any benefits the Reservoirs provided were priced into Plaintiffs' reasonable investment-backed expectations").  If the Court denies the United States' cross-motion for summary judgment, the United States will present evidence on the significant benefits of the Project at trial.

VII.    Conclusion

For the reasons set forth in the United States' Cross-Motion for Summary Judgment and in this Reply, the Court should deny Plaintiffs' motion for partial summary judgment on liability and grant the United States' cross-motion for summary judgment.

Dated: October 15, 2019                     Respectfully submitted,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment & Natural Resources Division

*s/ Kristine S. Tardiff*
KRISTINE S. TARDIFF
WILLIAM J. SHAPIRO
LAURA W. DUNCAN
SARAH IZFAR
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL: 603-230-2583
kristine.tardiff@usdoj.gov

*Counsel for the United States*