# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| In re DOWNSTREAM ADDICKS AND BARKER (TEXAS) FLOOD-CONTROL RESERVOIRS | )<br>)<br>)<br>)<br>) Sub-Master Docket No. 1:17-9002L<br>) |
| THIS DOCUMENT RELATES TO: | ) Hon. Loren A. Smith<br>) |
| *Abed-Stephen*, Case No: 19-782L | ) |
| *Alford*, Case No: 19-807L | ) |
| *Allen*, Case No: 19-1924L | ) |
| *Asghari*, Case No: 19-698L | ) |
| *Ashby*, Case No: 19-1266L | ) |
| *Darby*, Case No: 19-1063L | ) |
| *Salo*, Case No: 17-1194L | ) |
| *Williamson*, Case No: 17-1456L | ) |

## STAYED PLAINTIFFS' RESPONSE TO THE UNITED STATES' (CORRECTED) MOTION FOR SUMMARY JUDGMENT

Before this Court in this Response to the United States' Motion for Summary Judgment are 189 Plaintiffs whose cases have been stayed pending the outcome of this motion (Stayed Plaintiffs).[1] Under this Court's case management orders, the Stayed Plaintiffs have been administratively stayed since January 2018.[2]

---

[1] A list of the 189 Plaintiffs on whose behalf this Response is filed is attached as Ex. 1.
[2] *See* Case Management Order No. 5 (Jan. 29, 2018), ECF No. 27; Order Rescinding Amended Case Management Order No. 3 (Sept. 9, 2020), *Downstream* ECF No. 236.

1

The purpose of this Response is not to support either motion in this briefing. Instead, the Stayed Plaintiffs seek protection of their legal rights, including their due process rights. Specifically, the Stayed Plaintiffs ask this Court to allow them to be represented by the attorneys of their choosing to craft pleadings and conduct discovery so that Stayed Plaintiffs can present their evidence and legal arguments in support of their claims. Based on the record presented by the Test Plaintiffs and the United States, the factual issues in this case are disputed, not undisputed. When allowed their day in court, the Stayed Plaintiffs will present evidence, testimony, including expert testimony, and arguments that differ from the evidence and arguments made by the Test Plaintiffs.[3]

Under the Court's earlier procedural order, the test cases were explicitly understood to have preclusive effect only as to the Test Plaintiffs, consistent with due process requirements that parties must consent to or be in privity with other parties to be bound by any substantive rulings in other cases and the Supreme Court's explicit rejection of binding, virtual representations. An understanding that the preclusive effect would only apply to the Test Plaintiffs was consistent with the fact that the Stayed Plaintiffs were not in privity with and had not agreed to be bound by the Court's rulings in the Test Plaintiffs' cases. The Stayed Plaintiffs have not been permitted to file their own pleadings or to participate in discovery related to their cases.

Following remand, the Stayed Plaintiffs attempted to participate in developing a plan that would allow all the Plaintiffs, including the Stayed Plaintiffs, to present their

---

[3] *See* Plaintiffs' Response to Order to Show Cause (June 22, 2020), *Downstream* ECF No. 228.

claims for review.[4] However, that request was rejected.[5] The Stayed Plaintiffs have been excluded from participating in this litigation, including this summary judgment briefing, and now face having final judgment entered in a small subset of the pending cases which have been handled by lawyers not of their own choosing, based on pleadings and discovery to which Stayed Plaintiffs have had no participation. Continuing to deprive the Stayed Plaintiffs of an opportunity to participate substantively in this litigation will further result in a deprivation of the Stayed Plaintiffs' constitutional due process rights.[6]

Here, in direct violation of the requirements of due process, the Court adopted a case management plan that contains none of the constitutionally required procedures for resolving multiple claims arising from a single incident (such as an aircraft crash or a factory explosion).[7] Chief among the available procedures is the Rule 23 class action, where the Court could have designated class representatives whose claims were typical of these plaintiffs' claims and appointed counsel to represent them in prosecuting those claims. The case might have been divided into sub-classes to ensure that factual and legal distinctions among the parties were adequately presented. Plaintiffs who opted into that

---

[4] *See* Response to United States and Milton Plaintiffs' Joint Motion for Status Conference and Proposal for New Proceedings on Remand (Sept. 13, 2022), *Milton* (17-1235*)* ECF No. 37.
[5] Second Amended Management Order No. 3 (Order Re-Opening Sub-Master Docket For Downstream Claims) (Sept. 28, 2022), *Downstream* ECF No. 253.
[6] *Taylor v. Sturgel*, 553 U.S. 880, 897 (2008) (Explaining that where a court does not take care to protect the interests of absent parties or fails to ensure that the parties to that litigation understand that their suit to be on behalf of absent parties, application of claim preclusion is inconsistent with "the due process of law guaranteed by the Fourteenth Amendment.").
[7] Second Amended Management Order No. 3 (Order Re-Opening Sub-Master Docket For Downstream Claims) (Sept. 28, 2022), *Downstream* ECF No. 253..

class action would have been bound by the result.

Or the Court might have managed these related cases under consented-to pretrial orders, as it did with more than 100 *Winstar*-related cases.[8] This would have allowed all plaintiffs to participate, under reasonable discovery, motion and trial procedures agreed to by the parties and approved by the Court. But that is not the procedure this Court adopted in its several case management orders.

What the Court did instead was order all cases arising from this event be consolidated for pretrial, divided into two sub-dockets (upstream and downstream), and a set of test cases prepared through pretrial by counsel appointed by the Court. The claims of all other Plaintiffs, including these Stayed Plaintiffs, remain stayed until further notice, and counsel for the Stayed Plaintiffs remain unable to participate in any of the proceedings.[9]

1. **At the outset, the Parties and the Court always understood that a decision in the test cases would not bind other Parties**

Allowing the Stayed Plaintiffs' cases to move forward to resolution is consistent with what the Parties originally understood would happen. In Case Management Order No. 3, issued December 5, 2017, Judge Braden consolidated the pending claims for pretrial only, and established separate sub-dockets for the upstream and the downstream cases. Her order of consolidation was for pretrial management only, did not consolidate the cases for trial, and made no one a party to an action to which they had not been joined

---

[8] *Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed. Cl. 174 (1997).
[9] Case Management Order No. 3 (Order establishing Sub-Master Docket for Downstream Claims) (Dec. 5, 2017), *Downstream* ECF No. 2.

under the Rules of the Court of Federal Claims:

> [The] downstream cases, are hereby consolidated for pretrial management. Management Order No. 3 does not address whether these actions are or will be consolidated for trial, nor does it have the effect of making any entity a party to an action in which it has not been joined and served in accordance with the RCFC.[10]

In response, the Government moved to vacate the pretrial schedule set by the Court and proposed a new schedule to set dates for a motion to certify a class under Rule 23 followed by selection of test cases. Had the Court followed the Government's proposed procedure, everyone who opted into the class would have been bound by the result.[11]

## 2. Stayed Plaintiffs' claims are legally distinguishable from the claims of the Test Plaintiffs

Stayed Plaintiffs will prove that the Government took a flowage easement over their lands by designing, constructing, and operating the Addicks and Barker facilities according to the Corps' written manual—directly and foreseeably causing and exacerbating the flooding of Plaintiffs' property, homes and businesses that would not have occurred absent the Corps' actions. And at trial, Stayed Plaintiffs will prove that the Addicks-Barker facilities were not constructed and operated to provide flood control for them, but rather primarily to provide flood control for downtown Houston and the Houston Ship Channel.[12] As the Corps boasted, in 2017 its actions avoided $7 billion in

---

[10] *Id*. at 2.
[11] Def.'s Mot. to Modify the Operative Downstream Scheduling Order (Dec. 19, 2017), *Downstream* ECF No. 9.
[12] *Buffalo Bayou, Texas Definite Project Report*, U.S. Army Corps of Engineers (1940) ("To provide for complete control of floods on the Buffalo Bayou watershed and the

property damage to downtown Houston buildings and infrastructure by its operation of Addicks-Barker—causing instead millions of dollars of damages to the Stayed Plaintiffs' properties.[13]

Stayed Plaintiffs will prove that the Corps anticipated a storm that would drop over 40 inches of rain in three days—more than Harvey did—and designed and constructed the Addicks and Barker facilities to store and safely release that quantity without flooding Stayed Plaintiffs' properties. They will prove that, instead of using that storage capacity, the Corps followed an operating plan that opened the facilities' floodgates when they were barely half full, intentionally releasing a torrent that the Corps knew would inundate Stayed Plaintiffs' homes and businesses, all according to the plan detailed in their 2012 Operations Manual. And they will prove that the Addicks and Barker facilities were neither authorized nor constructed to provide flood protection to Stayed Plaintiffs' properties, but rather to protect downtown Houston and its vital, commercial ship channel.

Stayed Plaintiffs will introduce into evidence the expert opinion of Dr. Philip B. Bedient, outlined in his accompanying declaration, stating:

> It is my professional opinion, based on reasonable engineering judgment, that the Army Corps of Engineers' (Corps') design and construction of the Addicks and Barker dam facilities, combined with the Corps' decision to release induced surcharges far in excess of the carrying capacity of the connecting Buffalo Bayou tributaries and outlets as required by the Corps' 2012 operations manual, was a significant and producing cause of property damage to the 192 properties represented in this Response to Order to Show

---

protection of the city of Houston, Texas, and the Houston Ship Channel against the estimated probable maximum storm."), attached as Ex. 3.
[13] *See* Tr. 164:24 to 165:8 (Thomas).

Cause. Had the Corps followed its pre-2012 operating procedures, which required the Corps to retain storm water until it could be released at rates that were within the carrying capacity of Buffalo Bayou and its outlets, or had the Corps completed improvements to Buffalo Bayou channels to increase their carrying capacity up to 15,000 cubic feet per second (cfs) as the project was originally designed and authorized, these Stayed Plaintiffs would have suffered far less flooding, if any.[14]

In short, it is my opinion that the 2017 flood damage to the Stayed Plaintiffs' properties was the direct, proximate and intended result of the Corps' decisions regarding the design, construction and operation of the Addicks and Barker dams, resulting in the Corps' release of about 15,000 cfs during late August and early September, 2017, instead of continuing to store the rainfall runoff from Harvey within the available storage capacity of the dams for later release at a time that would not have caused damaging flooding to Stayed Plaintiffs' properties.[15]

Stayed Plaintiffs' evidentiary case fits squarely within the Federal Circuit's *Ridge Line* rule that "a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity. . . .'"[16] Stayed Plaintiffs will argue that the act of God defense has not been recognized by the Federal Circuit and, given the facts of this case, could not apply anyway because of the Corps' actions in constructing and operating the facilities even under Texas state law (which does not apply here) because:

> To be insulated from liability, it must be shown that 1) the loss was due directly and exclusively to an act of nature and without human intervention, and 2) no amount of foresight or care which could have been reasonably required of the defendant could have prevented the injury.[17]

---

[14] Decl. of Dr. Philip B. Bedient at ¶ 4, attached as Ex. 2.
[15] *See id.* at ¶ 5.
[16] *Ridge Line, Inc.,* 346 F.3d at 1355.
[17] *McWilliams v. Masterson*, 112 S.W.3d 314 (Tex. Ct. App. 2003).

### A. The Addicks-Barker facilities were designed and constructed to provide flood control for downtown Houston and the Houston Ship Channel—not to protect Stayed Plaintiffs' lands

In 1938, long before there were homes and businesses on Stayed Plaintiffs' lands to protect, Congress authorized the construction of the Addicks and Barker facilities to protect downtown Houston and its vital commercial ship channel following the devastating floods of 1929 and 1935. As the Government has stipulated: "Two particular storms and the flood devastation they created, one in May 1929 and the other in December 1935, prompted congressional action that led to the construction of the Addicks and Barker Dams."[18]

> Local historians report:
>
> Estimated property damage in 1929 was $1.4 million, an astounding sum at the time. Losses more than doubled in 1935, when seven people were killed and the Port of Houston was crippled for months with docks submerged, the channel clogged with mud and wreckage, and railroad tracks uprooted. Twenty-five blocks of the downtown business district and over one hundred residential blocks were inundated with water. Many businesses rebuilt after the 1929 flood, only to be ruined again in 1935.[19]

In response, Congress passed the Rivers and Harbors Act of 1938,[20] which included authorization for the Corps of Engineers to construct the Addicks and Barker Reservoirs as part of the Buffalo Bayou and Tributaries Project (BBTP), Texas.[21] The

---

[18] Joint Stip. ¶ 81 (Apr. 23, 2019), *Upstream* ECF No. 211.
[19] *Houston Underwater: A Look at the Floods of 1929 and* 1935, The Heritage Society, https://www.heritagesociety.org/houston-floods (last visited May 21, 2020).
[20] Pub. L. No. 75-685, 52 Stat. 802 (1938).
[21] Joint Stip. ¶ 86 (Apr. 23, 2019), *Upstream* ECF No. 211; *Addicks and Barker Reservoirs, Buffalo Bayou and Tributaries, Fort Bend and Harris Counties, Texas, 2009 Master Plan*, USACE, at 2 (Aug. 2009).

stated Congressional purpose of the project was "to provide for complete control of floods on the Buffalo Bayou watershed and the protection of the city of Houston, Texas, and the Houston Ship Channel against the estimated probable maximum storm."[22]

As designed and constructed, the Addicks and Barker reservoirs collect runoff from a nearly four-hundred-square-mile watershed, store it behind two earthen dams, and then release the stored water slowly enough to avoid flooding the targeted downtown Houston area. The Project's sole purpose has always been to provide flood risk reduction to the City of Houston by temporarily detaining stormwater runoff from the massive Addicks and Barker watersheds (as well as a portion of the Cypress Creek basin which overflows into Addicks during heavy rains) and then releasing it into Buffalo Bayou at a rate that does not endanger downtown Houston or the Houston Ship Channel.[23] As the Corps stated: "The existing project, as authorized, provides for flood risk management, the protection of the City of Houston from flood damages, and the prevention of excessive velocities and silt deposits in the Houston Ship Channel Turning Basin."[24]

The Corps originally designed the facilities to include "[a] system of canals [that] was to convey releases from White Oak Reservoir, north of Houston, to the San Jacinto

---

[22] Ex. 3 at 3.
[23] Joint Stip. ¶ 86 (Apr. 23, 2019), *Upstream* ECF No. 211; *Addicks and Barker Reservoirs, Buffalo Bayou and Tributaries, Fort Bend and Harris Counties, Texas, 2009 Master Plan*, USACE, at 1 (Aug. 2009), attached as Ex. 5.
[24] Ex. 3 at 3 ("It is a plan . . . to provide for complete control of floods on the Buffalo Bayou watershed and the protection of the city of Houston, Texas, and the Houston Ship Channel against the estimated probable maximum flood."); *Addicks and Barker Reservoirs, Buffalo Bayou and Tributaries, San Jacinto River Basin, TX*, *Water Control Manual*, USACE, at 3-1 (Nov. 2012).

9

River, and from Addicks and Barker Reservoirs, south of Houston, to Galveston Bay."[25]

The designed south channel would carry a total of over 15,000 cubic feet per second "without overflowing its banks."[26] But the Corps never built the south channel from the dams to Galveston Bay and, by the time tropical storm Harvey arrived, Buffalo Bayou could carry (and the reservoirs could safely release) only about 3,000 cubic feet per second without overflowing and flooding Stayed Plaintiffs' homes and businesses.[27]

**B. The Corps designed the facilities to handle rainfall from storms with greater intensity than Harvey, which had occurred in the past and are likely to occur in the future**

Harvey deposited between 30 and 35 inches of rain over the Addicks and Barker watersheds from August 25 to August 29, 2017.[28] This quantity was well within the design capacity of the Addicks and Barker reservoirs, which had been retrofitted in the 1980s to manage up to 45 inches of rain in three days.[29] "Thus, the Harvey rainfall over the Addicks and Barker watersheds was clearly foreseeable and predictable, as a much larger amount of rain had been foreseen and designed for by the Corps."[30]

As early as 1938 the Corps determined that "estimated rainfall of 35.1 inches in

---

[25] *Draft Operational Assessment of the Addicks and Barker Reservoirs, Fort Bend and Harris Counties, TX*, USACE, at 2 (Oct. 2009).
[26] *Buffalo Bayou, Texas, Flood Control Project, Houston Texas: Addicks Dam, Analysis of Design*, USACE, at 7-8 (Sept. 1945).
[27] Upstream Trial Tr. 192:18-25 (Thomas: south canal with sufficient capacity to carry all surcharge releases to Galveston Bay from Addicks and Barker dams never built), attached as Ex. 4.
[28] Ex. 2 at ¶ 6 (Bedient Decl.).
[29] *Id*. at ¶ 8.
[30] *Id*. at ¶ 8.

104 hours . . . is considered as likely to occur with a frequency of once every 50 years."[31] The Corps selected as its design storm for the Addicks-Barker facilities the 1899 Hearn storm, which dumped 32-35 inches in 3-4 days about ninety miles from Houston. Harvey's rainfall matched almost exactly the profile of this design storm.

But in 1979 tropical storm Claudette dumped more than 43 inches of rain in 24 hours, within 40 miles of the Addicks and Barker facilities.[32] The occurrence of Claudette, combined with new dam safety criteria, led the Corps to re-evaluate the design and operation of the Addicks and Barker dams.[33]

So, by 1984 the Corps had concluded that the new Probable Maximum Storm (estimated to be 43 inches in 3 days) "is considered a probable occurrence when compared with the 1979 Claudette rainfall event which occurred some 40 miles to the south of the reservoirs."[34]

Based on its new maximum rainfall calculation of 45 inches in three days, together with new safety standards, the Corps dramatically increased the storage capacity of Addicks-Barker by raising the middle portion of the dam embankments and armoring the ends to now serve as emergency spillways. The construction of these dam modifications was completed by the late 1980s.[35] The average rainfall for the spillway design flood was

---

[31] *Report on Review of Plans for Buffalo Bayou Flood Control by the War Department United States Engineer Office, Galveston, Texas*, at USACE2019_000014 (Apr. 6, 1938) (Upstream ECF No 245-1).
[32] Ex. 2 at ¶ 12 (Bedient Decl.).
[33] *Id*. at ¶ 12.
[34] *Id*. at ¶ 12.
[35] *Id*. at ¶ 13.

11

computed as 44.6 inches in 72 hours, with a peak intensity of 11.3 inches.

### C. In its 2012 operations manual, the Corps adopted a plan to release floodwaters on Stayed Plaintiffs rather than use the full storage capacity of Addicks and Barker[36]

But completion of increased storage capacity in the reservoirs highlighted a new problem: even though the dams were redesigned and reconstructed during the 1980s to store far more water to handle a much larger storm event for the new Maximum Design Storm, the Corps did not acquire any additional land to accommodate the increased storage of water. As the Corps stated, storing additional water meant that "pool levels in excess of Government-owned land will damage residential developments adjacent to Government-owned lands."[37] In addition, the Corps never completed the improvements of Buffalo Bayou and tributaries, as originally designed, to carry up to 15,000 cfs. By 1992—and still in 2017 when Harvey arrived—the Corps could release no more than 3,000 cfs before Buffalo Bayou overflowed, flooding Stayed Plaintiffs.[38]

Until 2012, the Corps' official operations manual for Addicks and Barker required that rainfall volumes be stored using the additional capacity, even though this would inundate upstream properties that the Corps had no right to flood during a flood event, the gates are closed and reservoir levels are allowed to rise until they overflow the spillways."[39] Had the Corps followed this pre-2012 operations plan, Stayed Plaintiffs

---

[36] *Addicks and Barker Reservoirs, Buffalo Bayou and Tributaries, San Jacinto River Basin, Texas, Water Control Manual,* USACE, at 8-2 (Nov. 2012), available at http://cdm16021.contentdm.oclc.org/utils/getfile/collection/p16021coll11/id/1867.
[37] Ex. 2 at ¶ 16 (Bedient Decl.).
[38] *Id.* at ¶ 18.
[39] *Id.* at ¶ 18.

would not have received flood waters from the facilities.[40]

But by the time Harvey arrived the Corps had reversed its position and adopted a requirement in its 2012 operations manual providing for the release of induced surcharges when the reservoir pools reached about 45% of the facilities' storage capacities. If the inflows and pool elevation conditions dictated use of these induced surcharge regulations, the Dam Operator was to release water from the dams regardless of the limits of downstream channel capacity.[41] That is, once the reservoirs were about half full, the Corps was to release flows that it knew would overtop Buffalo Bayou and flood Stayed Plaintiffs' properties.[42]

In managing Harvey's rainfall, the Corps followed the requirements it had set forth in its 2012 manual:

> Once the pool levels rose above 45 percent capacity, rising above the Federal Government-Owned Lands and beginning to flood upstream private properties, the Corps began to open its floodgates at both Addicks and Barker dams early in the morning of August 28, 2017, eventually reaching a discharge of up to 15,000 cfs into a channel whose capacity was no more than 3,000 cfs. The result was significant flood damage to Plaintiffs' properties that would not have occurred if the Corps had just left the floodgates closed until the water could safely be released.[43]

In short, Harvey was neither unique nor unprecedented—Harvey was exactly what the Corps designed the facilities to handle to protect downtown Houston and the ship channel. And the Corps intentionally released the facilities' water just as it had planned to

---

[40] *Id.* at ¶ 4.
[41] *Id.* at ¶ 21.
[42] *Id.* at ¶ 21.
[43] *Id.* at ¶ 23.

in its operations manual prepared years earlier. Stayed Plaintiffs will prove through fact and expert evidence that the act of God defense—requiring unforeseeable rainfall amounts and no contributory Corps action—has no application to their claims. As Dr. Bedient concludes: "This flooding of the downstream properties was a man-made situation directly resulting from the Corps' design, construction, and 2012 operation requirements for Addicks and Barker dams. Never before had these dams released flood damaging flows downstream during a flood event."[44]

**Conclusion**

The Stayed Plaintiffs' taking claims are legally distinguishable from the Test Plaintiffs' taking claims and, consistent with the requirement of due process, they should be allowed to prepare and present their claims for review.

Respectfully submitted,

s/ Nancie G. Marzulla
Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Ave., NW,
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)
roger@marzulla.com
nancie@marzulla.com

January 10, 2023                                    Counsel for Stayed Plaintiffs

Of Counsel

---

[44] *Id*. at ¶ 23.

William Fred Hagans
Hagans Montgomery Hagans
3200 Travis
4th Floor
Houston, TX 77006
713−222−2700
Fax: 713-547-4950
fhagans@hagans.law

Stephanie M. Taylor
Hagans Montgomery Hagans
3200 Travis
4th Floor
Houston, TX 77006
713−222−2700
Fax: 713-547-4950
staylor@hagans.law