1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3   IN RE: DOWNSTREAM ADDICKS AND      ) Case No.

4   BARKER (TEXAS) FLOOD-CONTROL       ) 17-9002L

5   RESERVOIRS.                        )

6   _____)

7

8

9                    Courtroom 8B

10          BOB CASEY UNITED STATES COURTHOUSE

11                   515 Rusk Street

12                Houston, Texas 77002

13               Friday, October 25, 2024

14                     10:00 a.m.

15

16

17                   Trial Volume 1

18

19

20       BEFORE:  THE HONORABLE LOREN A. SMITH

21

22

23

24   GARY SCHNEIDER, RMR, CRR, Court Reporter

25

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFFS:

 3          RAND P. NOLEN, ESQ.

 4          Fleming, Nolen & Jez, L.L.P.

 5          2800 Post Oak Boulevard

 6          Suite 6000

 7          Houston, TX 77056

 8          (713) 621-7944

 9          rand_nolen@fleming-law.com

10             and

11          RICHARD WARREN MITHOFF, JR., ESQ.

12          Mithoff Law Firm

13          500 Dallas Street, 3450

14          Houston, TX 77002

15          (713) 654-1122

16          rmithoff@mithofflaw.com

17             and

18          JACK EDWARD MCGEHEE, ESQ.

19          H.C. CHANG, ESQ.

20          McGehee, Chang, Landgraf, Feiler

21          10370 Richmond Avenue

22          Suite 1300

23          Houston, TX 77042

24          (713) 864-4000

25          jmcgehee@lawtx.com
```

```
 1          hcchang@lawtx.com

 2             and

 3          RUSSELL S. POST, ESQ.

 4          Beck Redden, LLP

 5          1221 McKinney Street, Suite 4500

 6          Houston, TX 77010

 7          (713) 951-6292

 8          rpost@beckredden.com

 9

10   ON BEHALF OF THE DEFENDANT:

11          KRISTINE SEARS TARDIFF, ESQ.

12          LAURA DUNCAN, ESQ.

13          FRANCES MORRIS, ESQ.

14          AMBER DUTTON-BYNUM, ESQ.

15          U.S. Department of Justice

16          Environmental and Natural Resources Division

17          53 Pleasant Street, 4th Floor

18          Concord, New Hampshire 03301

19          (603) 230-2583

20          kristine.tardiff@usdoj.gov

21          laura.duncan@usdoj.gov

22          frances.morris@usdoj.gov

23          amber.dutton-bynum@usdoj.gov

24

25
```

```
 1                    I N D E X

 2                                          PAGE

 3   WITNESS:  MATTHEW BARDOL

 4   Direct Examination By Mr. McGehee ..........57

 5   Direct Examination (Cont.) By Mr. McGehee .176

 6

 7   WITNESS:  CORAGGIO MAGLIO

 8   Direct Examination By Mr. Nolen ..........133

 9   Cross-Examination By Ms. Dutton-Bynum .....156

10   Redirect Examination By Mr. Nolen ........173

11

12                    EXHIBITS

13    EXHIBIT              FOR ID         IN EVID

14    PLAINTIFF:

15    PX 004                                  206

16    PX 014                                  206

17    PX 015               198

18    PX 333                                  206

19    PX 354                                  206

20    PX 405                                   67

21    PX 406                                   87

22    PX 407                                  198

23

24

25
```

```
 1          (EXHIBITS ADMITTED INTO EVIDENCE Continued)

 2     EXHIBIT                 FOR ID          IN EVID

 3     JOINT:

 4     JX 002                                     206

 5     JX 003                                     206

 6     JX 042                                     206

 7     JX 053                                     206

 8     JX 089                                     174

 9     JX 106                                 172/174

10     JX 109                                     174

11     JX 110                                     174

12

13

14

15

16

17

18

19                      REPORTER'S NOTES:

20     QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT

21           NECESSARILY REFLECT A DIRECT QUOTE

22

23       PROPER NAMES ARE PHONETICALLY SPELLED UNLESS

24                  STATED ON THE RECORD

25
```

```
 1              P R O C E E D I N G S

 2                -   -   -   -   -

 3         (Proceeding called to order, 11:16 a.m.)

 4         THE COURT:  I'm in a new facility, so I

 5    haven't -- I'm getting used to it.  I apologize so much

 6    for our big delay which we hadn't anticipated, but a

 7    few GPS failures.  Being lost, I think we parked

 8    somewhere near Dallas, so it took a little while

 9    getting from the garage.  So, again, I apologize, but

10    that's the first day, I guess.

11         Let me welcome you and also thank the

12    Houston -- United States District Court for Houston

13    District.  They've been very, very helpful to us.

14         So let me find out who's here.  And I'll ask

15    the plaintiff first to identify themselves for the

16    record.

17         MR. NOLEN:  Yes, Your Honor.  Rand Nolen,

18    Jack McGehee, Richard Mithoff, Larry Dunbar, and we

19    also have Russell Post for the plaintiff.

20         THE COURT:  Great.  Good to be here with you.

21         And likewise with the Department of Justice.

22         MS. DUNCAN:  Yes, Your Honor.  Good morning.

23    Laura Duncan for the United States.  With me today I

24    have Ms. Frances Morris, Ms. Amber Dutton-Bynum,

25    Ms. Kris Tardiff --
```

1          MS. TARDIFF:  Good morning.

2          MS. DUNCAN:  -- and our --

3          THE COURT:  Yes, Ms. Tardiff.  Good to see

4    you again.  She was here the first one of these that I

5    did.

6          MS. DUNCAN:  Yes.  And our agency counsel,

7    Ms. Erin Zetterstrom.

8          MS. ZETTERSTROM:  Good morning, Your Honor.

9          THE COURT:  Good to see you all and good to

10   have you here as well.

11         All right.  The first thing we're going to

12   do, there's some motions in limine that were filed

13   before the trial over the -- I think it was a couple

14   days ago, so I want to deal with those.  Then we can

15   get on to plaintiffs' opening statement.

16         And let me also ask counsel at this point

17   what's a realistic anticipation of next week.

18         Yes?

19         MR. NOLEN:  Your Honor, we suspect and

20   believe that the schedule the court has already entered

21   is realistic, and we actually believe we can finish our

22   case and give a little bit of time back.  In fact, one

23   of the things that I had mentioned to the lawyers for

24   the government was, is did the court want to have time

25   limits to try to get in in this four days the witnesses

1     that we have said we would bring.  And I had suggested

2     that maybe the court would impose some time limits.  We

3     had come out with about ten-and-a-half hours per side,

4     and so we would, you know, respectfully suggest that.

5              It was pointed out to me by opposing counsel

6     that this had been brought up before and that the court

7     had rejected time limits, so I don't want to say that

8     we've never considered this before, but I thought I

9     would raise it again since we're all here.

10              THE COURT:  Okay.  Thank you, Mr. Nolen.

11              I tend to think time limits are not useful

12     with good counsel, and this case has a lot of good

13     counsel.  Can usually -- you're not going to waste

14     time.  If they think something needs to be put on the

15     stand for the judge to hear the facts, that's

16     important.  I mean, I think we've gotten to a stage

17     where courts of appeals now are talking in five-minute

18     segments often for smaller cases and rarely more than

19     half an hour, and even that's rare.

20              So I think it's important for people to be

21     able to have time to put on their case.  And the trial

22     is the most appropriate because it's fact based, and

23     facts are not known until they become part of the

24     record.  And so limiting that is just I think not doing

25     the job that we need to do to figure out what the truth

 1   is.

 2           And also, as I said, I have a great respect

 3   for the counsel particularly in this case who I think

 4   are not going to waste their time.  And so as long as

 5   it isn't wasting their time, my time is designed to

 6   come to the right answer, and so I'm perfectly happy

 7   with the fact that you're looking at maybe

 8   ten-and-a-half hours each side.

 9           If we finish early, the last day was going to

10   be the site view.  Is that flexible enough that we

11   could move that back, for example, if we finished

12   Wednesday?  Can we have it Thursday rather than Friday?

13           MR. NOLEN:  I believe it's scheduled for

14   Thursday, Your Honor.

15           THE COURT:  Oh, it's scheduled.  Okay.

16           MR. NOLEN:  Yes, sir.

17           THE COURT:  So if we finished earlier than

18   that for some reason, maybe we could move it possibly

19   to Wednesday?

20           MR. NOLEN:  I don't know.  You'll have to ask

21   the government because it's their facilities.

22           THE COURT:  Okay.  Good.

23           Yes, Ms. Duncan?

24           MS. DUNCAN:  Your Honor, may I speak to those

25   issues briefly?

1           THE COURT:  Sure, sure.

2           MS. DUNCAN:  We agree with the court that at

3    this point it is not helpful to set time limits.  We

4    will certainly try to be efficient and do our best to

5    wrap up our case in the four days.  But at this point,

6    we've prepared our case as if there are not strict time

7    limits, and so we prefer to proceed as Your Honor has

8    outlined.

9           I will note that the last witness on our list

10   is Dr. Nairn, one of our expert witnesses.  We're

11   unable to present him on the 31st, which is why we put

12   the site visit on that day.

13          THE COURT:  Yeah, okay.

14          MS. DUNCAN:  So if we are not finished by

15   that Tuesday, we'll need to proceed, as I believe we

16   may have discussed in prior status conferences, which

17   is to find another set of days where we can get

18   together perhaps in D.C. or if we can make other

19   arrangements to be in Houston.

20          And on the site visit, Your Honor, if we get

21   to a point where we think we may want to look into

22   moving the site visit to Wednesday, we can look into

23   that.  I know that the corps has made various

24   arrangements for us, like reserving a van, and it may

25   be difficult to change those arrangements around.

1        THE COURT:  Okay.  I understand that.  So I
2   was just putting that as a suggestion.
3        MS. DUNCAN:  Yes, Your Honor.
4        In addition to the pending motions, and I'm
5   tracking three pending motions, Your Honor --
6        THE COURT:  Yes.
7        MS. DUNCAN:  -- we do have a few other
8   housekeeping matters.  Would you like to raise those
9   now?
10        THE COURT:  Yeah, why don't we raise the
11   housekeeping matters now.
12        MS. DUNCAN:  Okay.  Your Honor, you and your
13   clerk should have paper copies of all of the exhibits
14   in binders near your seats.  We also have an electronic
15   jump drive of exhibits for you.  Maybe the next break
16   we can bring that over.
17        THE COURT:  Okay.
18        MS. DUNCAN:  What we've found in prior trials
19   like this one is that there are so many large binders
20   that it is difficult for the witness to step down to
21   get a binder and an exhibit.  And what we've found
22   works well is to have a paralegal sit near the witness
23   stand and aid bringing the binder up and flipping to
24   the exhibit for the witnesses.  I believe that
25   plaintiffs are fine with this approach.  And we found

1    it saves a lot of time.  So we would propose to have a

2    paralegal sit over here during the exam of witnesses.

3              THE COURT:  Okay.  And the court has no

4    problem with that.

5              MS. DUNCAN:  Thank you.

6              We do have one witness who we believe is

7    slated for today, Mr. Coraggio Maglio.  He is a former

8    employee of the Corps of Engineers.  And he is

9    unavailable to testify next week.

10             THE COURT:  Okay.

11             MS. DUNCAN:  So we would like to -- even if

12   we're not to his spot in the witness call, we would

13   like to ask Your Honor to take a short break in the

14   testimony of whoever is on the stand later this

15   afternoon, perhaps 4:00 or whatever suits Your Honor,

16   to put Mr. Maglio on the stand and get his testimony in

17   before he has to leave town tomorrow.

18             THE COURT:  What's your expected time for his

19   testimony?

20             MS. DUNCAN:  The United States has

21   anticipated approximately a half hour for its

22   testimony, and I don't know what plaintiffs have in

23   mind.

24             MR. NOLEN:  Your Honor, we thought Mr. Maglio

25   would be about an hour.  He's a fairly short witness.

1          THE COURT:  Okay.  Why don't we then break
2    when he's available.  Thank you.
3          MS. DUNCAN:  And, Your Honor, with that, I
4    think the only thing left would be the three pending
5    motions.  I'd like to invite -- do you have an order
6    that you'd like to proceed in hearing those?
7          THE COURT:  No.
8          MS. DUNCAN:  Okay.  Why don't we start with
9    the video clips --
10         THE COURT:  Okay.
11         MS. DUNCAN:  -- motions.  And for that, I'm
12   going to ask Ms. Tardiff to argue.
13         THE COURT:  Okay.
14         Ms. Tardiff.
15         MS. TARDIFF:  Very good.  Thank you, Your
16   Honor.
17         So we've got two motions in limine before the
18   court this morning directed at plaintiffs' request to
19   play selected video deposition testimony, first in
20   their opening statement and then again as part of the
21   direct examination of their expert witness.  So let me
22   turn first to the opening statements since that's where
23   we will begin today.
24         The court did, of course, hear from the
25   parties on this issue at the pretrial hearing last

1   week, but that was before the plaintiffs had disclosed
2   what the video clips were that they intended to play.
3   So those have been disclosed to us on Tuesday.  Your
4   Honor, we've had a chance to review those, and that is
5   the reason why we filed the separate motion in limine.
6           So at the pretrial conference, the court
7   raised three evidentiary considerations regarding the
8   playing of unadmitted video deposition testimony during
9   the opening, so that was that the testimony needed to
10  be otherwise admissible, the testimony needed to be
11  relevant, or at least would be relevant at some point.
12  And then the court also flagged that the testimony is
13  not inflammatory or have other negative qualities.
14          So let me start with admissibility, Your
15  Honor.  To begin with, the court is conducting a trial
16  on the limited issues identified in the court's
17  pretrial order, and that's because it determined that
18  these issues could not be resolved on the paper record
19  that the parties presented on cross-motions for summary
20  judgment which, of course, included excerpts of
21  deposition transcripts.  So we are here to present
22  evidence to the court through live testimony.
23          Second, the admissibility of testimony should
24  be determined when each of these three witnesses whose
25  excerpts are at issue in the opening take the stand.

1    They are all going to take -- they are all here.  They

2    are all available.  They are all on the parties' --

3    both parties' witness list, and so we expect them to

4    take the stand, provide their testimony under oath

5    today or perhaps Monday.

6          The court should not assume that the excerpts

7    selected by plaintiffs are admissible as plaintiffs

8    intend to present them.  In fact, we did lodge

9    objections to many of the questions that were posed at

10   the depositions and that plaintiffs seek to play video

11   clips of.  And plaintiffs should not be allowed to skip

12   over the process of resolving those evidentiary

13   objections by playing the clips in their opening

14   statement.

15         And, of course, there's no prejudice to

16   plaintiffs in not being able to play the video clips in

17   their opening.  We have a courtroom full of trial

18   attorneys here.  Everybody knows how to ask good

19   questions when live witnesses are on the stand and deal

20   with objections as they come up.  So if the testimony

21   is indeed admissible, it will come in through the

22   normal process before the court here over the next

23   week.

24         And third, Your Honor, in the context of a

25   trial, of course, deposition testimony is only

1    admissible under specific and limited circumstances

2    under the rules, and that includes Rule 32 which

3    plaintiffs have not addressed, but the playing of

4    unadmitted video testimony in an opening is not one of

5    those permissible uses of deposition testimony, Your

6    Honor.  And that kind of brings us back to the

7    underlying problem with plaintiffs' proposal here for

8    their opening, and this also applies to the use of

9    deposition video clips with the expert, and that's that

10   plaintiffs have cherrypicked selected excerpts of the

11   deponents' testimony to show in their video clips.  And

12   in so doing, Your Honor, they are mischaracterizing the

13   witnesses' testimony by taking it out of context.

14        Now, this court's rules and the Federal Rules

15   of Evidence of course have provisions to protect

16   against this tactic which is prejudicial.  Certainly

17   when a party seeks to admit limited deposition

18   testimony under Rule 32, Rule 32(a)(6) expressly states

19   that the other side, the other party may require the

20   offer to introduce other parts.  That is the rule.

21   Plaintiffs are looking for a way to avoid the rule by

22   playing these excerpts and only those excerpts, and

23   that is prejudicial to the United States.

24        So that is the issue for the most part on the

25   openings.  And I can pause there if you want to take

1    these one by one or I can address the second motion.

2          THE COURT:  Yeah, let me just respond on

3    that.  I've always seen the opening statement as the

4    painting a picture of the views of the plaintiffs'

5    case.  And in that sense, it's not evidence and it goes

6    to the judge's understanding of the case.  If this was

7    a jury trial and we had a jury who might be influenced

8    by this, that would be a different story entirely.

9          But it seems to me in a bench trial, whatever

10   the plaintiff wants to put on in the opening seems to

11   me permissible because it's their portrait of the case

12   and it's their vision.  Obviously it isn't only vision.

13   Obviously the government has its own vision of the

14   case.  And the court has to piece together what the

15   ultimate truth is.

16          And the court is capable of listening to

17   almost any opening that's devoid of, say, obscene

18   material or material that's totally irrational and has

19   no basis in any fact that would be purely emotional.

20   That is not involved here.

21          So I'll deny the motion in limine and let the

22   plaintiffs put on -- obviously the government can

23   respond to this a number of ways by putting on its own

24   alternative or in the oral arguments or post-trial

25   briefs, you know, point out that the prejudice nature

1    that it's unrealistic or taken out of context.  But

2    everything in a trial is taken out of context.  The

3    contract is what, you know, really happened.  In --

4    during the tropical storm that poured so much water and

5    damage on Houston, there are thousands of things that

6    happened in that, terrible things to many of the people

7    in the courtroom.  But trials are about distilling

8    context to obviously what can fit in the courtroom and

9    can fit in the record.

10            So I think I'll deny that for those reasons.

11            MS. TARDIFF:  Very good, Your Honor.  And we

12    certainly understand that opening statements are not

13    evidence.  And the court made that clear in the

14    pretrial order, so we understand that applies here.

15            So let me turn, then, to our second motion in

16    limine which speaks to plaintiffs' second request in

17    terms of using the same video clips and some additional

18    ones through the introduction of testimony through

19    their expert witness who is intended to be their first

20    witness at trial because here we are now at a stage

21    where the court is hearing evidence.  And so some of

22    these same issues are at play, but now we're talking

23    about whether the video clips are actually admissible

24    into evidence --

25            THE COURT:  Yes.

1          MS. TARDIFF:  -- through the expert witness,
2     so it is a different question at this point.
3          Plaintiffs have filed a response to our
4     motion, so let me tackle this by going through some of
5     that.  Plaintiffs first say that the court should
6     sustain its prior ruling and the ruling now given here
7     today and overrule the government's motion.  Of course
8     there is no ruling on the issue of whether the video,
9     unadmitted video deposition clips can be used with
10    their expert witness, so this is the first time this
11    issue is before the court.
12          THE COURT:  Right.
13          MS. TARDIFF:  Plaintiffs next state that
14    despite the court previously stating it would permit
15    the use of video clip excerpts, the United States is
16    again -- again objects to what plaintiffs describe as
17    the common practice of asking an expert to comment on
18    defendant's anticipated defenses by showing short video
19    clips of defense witness sworn deposition testimony.
20    That's page 1 of the plaintiffs' response, Your Honor.
21          Again, no prior ruling on this issue, but
22    I've got two additional points I'd like to make there.
23    First, at least for me, I've been practicing before the
24    Court of Federal Claims for over 25 years, I have to
25    admit, and there is no common practice that I'm aware

1  of in this court or in any other federal court that
2  I've appeared in that allows asking an expert to
3  comment on a defendant's anticipated defenses by
4  showing short video clips of unadmitted deposition
5  testimony.  So that is unusual.
6          Now, experts can and often do sit in the
7  courtroom, listen to the testimony that actually comes
8  into the record and is admitted as evidence and then
9  respond to that as part of plaintiffs' rebuttal case if
10 they put one on.  But it is not appropriate to do a
11 pre-rebuttal case with the very first witness that
12 they're calling in the case.  So the evidence needs to
13 come in, and it should come in under the federal rules.
14 And then at that point if they want their expert to
15 provide rebuttal testimony, they may do so.
16         Now plaintiffs acknowledge that this is in
17 part what they're trying to do and suggest that
18 allowing these video clips in the record as evidence
19 through their expert would be judicially expedient
20 since it could eliminate the need to recall the expert
21 in rebuttal.  But, again, if there's a rebuttal case
22 here, it needs to come at the end after the United
23 States has rested and not through the very first
24 witness the plaintiffs call.
25         THE COURT:  I mean, that seems to me

1    something that in principle I would allow, but it's

2    much better challenged at the time and in the specific

3    circumstances, so I'll deny the motion for now but

4    leave to raise it later on.

5            MS. TARDIFF:  And we'll certainly be prepared

6    to raise it as those issues come up.

7            THE COURT:  Okay.

8            MS. TARDIFF:  Thank you, Your Honor.

9            MS. DUNCAN:  Your Honor?

10           THE COURT:  Yes.

11           MS. DUNCAN:  The third pending motion is the

12   motion for judicial notice.  Would you like to hear

13   argument on that at this point?

14           THE COURT:  I assume the judicial notice

15   deals with the declaration of a disaster by the

16   president and by the governor?

17           MS. DUNCAN:  Yes, Your Honor.

18           THE COURT:  What is -- has the plaintiff

19   objected to this?

20           MR. NOLEN:  We did, Your Honor, on the

21   grounds of relevancy.  Would you like to hear my

22   argument on this?

23           THE COURT:  Sure.

24           MR. NOLEN:  Okay.  So the reason is because

25   we're conflating two things here.  And there is no

1  doubt and we do not dispute, nobody has disputed, that

2  the Harvey event was just a humongous rain event.  I

3  mean, you couldn't have been in Houston, Texas and not

4  known that.  And so we fully acknowledge that there was

5  a very large rain event.  11 percent of the homes in

6  Houston, Texas were flooded as a result of this rain

7  event.  That 11 percent includes the folks who were

8  flooded as a result of the reservoir management.  But

9  the point of it is, is that we're conflating two

10 things.

11        When we talk about a declaration of disaster,

12 that's different from an emergency declaration.  And

13 the court had indicated that it was interested in two

14 questions, and none of those questions went to a

15 declaration of disaster.

16        We fully acknowledge that there was a

17 declaration of disaster issued by the governor of Texas

18 before Harvey ever made landfall, and there was a

19 declaration of disaster issued by the president that

20 was issued essentially the same day that Harvey made

21 landfall but before Houston had been fully inundated.

22        And, of course, as the court is undoubtedly

23 aware, those declarations are made for purposes of

24 funding and putting the resources and personnel in the

25 right places in order to deal with what it is that --

1    whatever the disaster is that is occurring.  But, you

2    know, it's a disaster when your house burns down; it is

3    an emergency when your house is on fire.

4           And what we understood that the court wanted

5    to consider in this limited evidentiary hearing was the

6    issue regarding emergency and whether or not an

7    emergency was declared.  We do not believe the court

8    will ever hear any evidence that the Army Corps of

9    Engineers ever declared an emergency.  They never

10   notified the city of an emergency.  They never notified

11   the county of an emergency.  The city didn't declare an

12   emergency.  The county didn't declare an emergency.  So

13   we don't see how a declaration of disaster -- we

14   acknowledge that these things happen, but we don't see

15   that it's relevant to the considerations of the issues

16   before the court.

17          THE COURT:  Okay.  Thank you.

18          I mean, it seems to me that the purpose of

19   judicial notice is to avoid having to spend court time

20   on things that no one disputes.  What the meaning of

21   those things is really not part of taking judicial

22   notice, just getting rid of the rules that would

23   otherwise require someone to verify it, hearsay and

24   other things.

25          So I'll allow the motion with the

1  understanding that what that does is allow those two

2  declarations not to require proof of a live witness to

3  waste time with something that no one disputes, and

4  that was the whole function of taking judicial notice

5  of things.

6          So what the significance of it obviously is

7  is to be debated at trial or to be presented at trial

8  by different positions.  So okay.  I'll allow that.

9          Ms. Duncan?

10          MS. DUNCAN:  We have nothing further at this

11  time.

12          THE COURT:  Okay.

13          Mr. Nolen, do you have anything before we get

14  into your opening statement?

15          MR. NOLEN:  The only thing is is that we have

16  agreed with the government to invoke Rule 615 on

17  exclusion of witnesses who are fact witnesses.

18          THE COURT:  Okay.

19          MR. NOLEN:  The government does have a

20  corporate representative or a government representative

21  who will be attending the entire trial.  But otherwise,

22  witnesses who are nonexperts would be excluded during

23  each other's testimony, if that's acceptable to the

24  court.

25          THE COURT:  That's definitely acceptable.

1    Obviously the mandatory rule.  I remember one witness

2    saying "Can I be excluded too?"  They were the

3    representative of the party.  No, can't do that.

4         All right.  You can begin with the opening

5    statement.

6         MR. NOLEN:  All right.  Thank you very much.

7    May it please the court, Your Honor, opposing counsel,

8    the government, nice to see you in our fair city, and

9    the homeowners who are present today for these

10   proceedings.  And we thank the court for also coming to

11   our fair city.  And actually waiting until October was

12   probably the best thing the court could have possibly

13   done.

14        So I'm going to start right at the beginning.

15   The Addicks and Barker reservoirs and why they're

16   there, what's the purpose.  And so the existing project

17   as authorized provides for flood risk management, the

18   protection of the City of Houston from flood damages,

19   and the prevention of excessive velocities and silt

20   deposits in the Houston Ship Channel Turning Basin.

21   That mission comes directly out of the Water Control

22   Manual.  And so we took that directly out of the Water

23   Control Manual.  So that's the purpose of these

24   reservoirs.

25        And, of course, my technology doesn't work.

1    There we go.

2         This is the Addicks Reservoir aerial view,

3    and you can see it's a large, very large dry reservoir

4    that is outlined in red.  A little hard to see on this

5    screen, but it's very large.  It's got basically an

6    earthen dam, and then it's got outlet gates.  And you

7    can see the outlet gates here, right here, Your Honor.

8    That's the outlet gates for Addicks Reservoir.  And in

9    the background, you see the downstream area.  In the

10   foreground, you're seeing the actual dry reservoir.

11   And if we go to the next one, that's the Barker

12   Reservoir aerial view, another very, very large

13   structure, and another dry reservoir.  People actually

14   utilize these reservoirs as parks, and the public goes

15   and visits them and people do the things that you would

16   do at any sort of public park inside the reservoirs.

17        The next picture is the outlet works for

18   Barker.  You can see in this picture that Barker at

19   that point had water in it and was outletting water

20   through the gates.  You can see in the background there

21   the highway and some of the structures downstream of

22   the reservoir.  And in the foreground, you're seeing

23   water inside the reservoir.  And so there's a very

24   large berm that you can drive across on the top that

25   goes above the outlet gates and goes all the way down,

1    all the way across the earthen berm that is there.  And

2    when the court makes its visit, you'll see these are

3    quite massive.  These are very, very large structures.

4            Going to the next slide, we see the size, the

5    relative size of Addicks Reservoir and Barker Reservoir

6    on the west side of Houston.  And then you see the

7    channel that comes out of those reservoirs.  We call

8    that Buffalo Bayou.  And what Buffalo Bayou is, that

9    juncture in that area is a channel to allow water to be

10   carried from those reservoirs to the Gulf of Mexico.

11           THE COURT:  Is that the white line, wavy

12   line?

13           MR. NOLEN:  So it's right here, Your Honor.

14   These --

15           THE COURT:  Okay.

16           MR. NOLEN:  -- two, and it goes -- it

17   follows.

18           THE COURT:  Yeah.

19           MR. NOLEN:  So that's Buffalo Bayou.  And

20   then --

21           THE COURT:  I thought for a while that was a

22   stock portfolio picture.

23           MR. NOLEN:  And so these numbers here are the

24   test property homeowners' properties.

25           THE COURT:  Okay.

1          MR. NOLEN:  And so we divided that up into

2     seven zones.  So you've got your closest zones up here

3     closest to Addicks Reservoir and Barker Reservoir, and

4     then you get farther away to the seventh zone which is

5     way down here where you see number 13.

6          THE COURT:  And that's going west from there?

7          MR. NOLEN:  It's actually -- so you're going

8     east from Addicks and Barker, Addicks and Barker on the

9     west side of Houston.

10          THE COURT:  Okay.  So those are farther out

11     from this line which is going towards the town -- or

12     the residential areas.

13          MR. NOLEN:  Yes.

14          THE COURT:  Okay.

15          MR. NOLEN:  Okay.  So on August 25th, 2017,

16     Hurricane Harvey made landfall along the Texas coast

17     near Rockport, Texas as a Category 4 hurricane.  Harvey

18     weakened into a tropical storm within 12 hours of

19     making landfall but stalled over the Houston area for

20     four days before moving into Louisiana on August 30th,

21     2017.  Those are stipulated facts.

22          And so the court has asked was there an

23     emergency that necessitated the United States Army

24     Corps of Engineers opening the Addicks and Barker

25     Reservoir gates or were the gates opened as a matter of

1    ordinary operating procedure.  We believe we know the

2    answer to this question and have known it for a while.

3    We know it because we did a lot of discovery in these

4    cases.  We talked to Colonel Lars Zetterstrom who was

5    the commander of the Galveston District.  He was the

6    man who was in charge during Harvey.  He was the man

7    who was in charge of releasing the water at Addicks and

8    Barker in the regulation called "induced surcharge."

9            We talked to Richard Long who was the

10   spokesman for the Army Corps of Engineers.  And we

11   talked to Rob Thomas.  In fact, Mr. Thomas I believe

12   was deposed five or six different times.  And although

13   there is some amount of competing testimony, we did

14   settle on a few things, and those things all indicate

15   no emergency.

16           The Army Corps of Engineers never declared a

17   Level 1, 2, or 3 emergency as defined by their

18   Emergency Action Plan during Tropical Storm Harvey.  We

19   know that because Mr. Thomas and Mr. Long told us.

20           Apart from Stage 2 extended watch, the Army

21   Corps of Engineers did not employ its Emergency Action

22   Plan or its Emergency Level 1, 2, or 3 operating

23   procedures for gate openings during Tropical Storm

24   Harvey.

25           In 2012, the corps revised its Water Control

1    Manual to incorporate a flood control operating

2    regulation, which I've already referenced called

3    "induced surcharges," but did not disclose the change

4    permitting downstream inundation to the downstream

5    property owners.  They had no knowledge.

6         And that regulation is pretty simple.  When a

7    set of conditions specified in the 2012 Water Control

8    Manual for releases of flood water from the reservoirs

9    under the induced surcharge provision, which is a

10   combination of pool elevation and rate of rise behind

11   the reservoirs, were reached, the corps initiated

12   induced surcharge operations and started releasing

13   water from both reservoirs shortly after midnight on

14   August 28, 2017.  Again, that's a stipulated fact.

15        The induced surcharge flood control

16   regulation is not an emergency measure that requires an

17   exercise of judgment in extreme conditions where

18   imminent danger of dam failure is present.  It is

19   instead a bright-line rule that is contained in the

20   Water Control Manual that dictates discharges when the

21   specific conditions are satisfied.

22        The triggers for induced surcharges occur

23   well before the reservoirs reach maximum storage

24   capacity at their design levels and well before there

25   is any imminent risk of dam failure by overtopping of

1    the reservoir embankments.

2              At the time the reservoirs were placed into

3    induced surcharge operations, the reservoirs were

4    performing exactly as expected with no significant

5    problems.  The reservoirs were not in any imminent

6    danger of failing.

7              During Harvey, the U.S. Army Corps of

8    Engineers operated Addicks and Barker by opening and

9    closing their floodgates consistent with its 2012 Water

10   Control Manual.  Another stipulated fact.

11             The Army Corps of Engineers followed the 2012

12   Water Control Manual throughout Tropical Storm Harvey,

13   and they followed it all the way up the chain of

14   command.

15             The reservoirs were placed into induced

16   surcharge during Harvey to follow the induced surcharge

17   flood control regulation, that's a mouthful, contained

18   in the Water Control Manual.  So they're following

19   along exactly with the induced surcharge flood control

20   regulation that was added in 2012.

21             By 2014, the Army Corps of Engineers had

22   created maps modeling downstream inundation at various

23   flow rates from the Addicks and Barker reservoirs.

24             When the reservoirs were placed into induced

25   surcharge operations, the corps knew the downstream

1    properties would be inundated with the release of that

2    water.

3            When the reservoirs were placed into induced

4    surcharge, they knew with precision which properties

5    would be inundated with water.  They knew the street,

6    they knew the address, and in some cases they knew

7    exactly how much water would be in people's living

8    rooms, kitchens, and bedrooms.

9            The decision to open the floodgates and to

10   release 125 billion gallons of impounded water on the

11   downstream property owners was entirely dictated by the

12   induced surcharge regulation in the manual.  As of

13   August 30th, 2017, the corps estimated that Addicks was

14   releasing 7,500 cubic feet per second and Barker was

15   releasing approximately 6300 cubic feet per second for

16   a combined discharge of 13,800 cfs downstream from the

17   opening of the gates.

18           Okay.  Roll the film, please.

19           (Video played.)

20           "You know what the Emergency Action Plan is?

21           "Yes.

22           "You know it's -- you've got to follow the

23   Emergency Action Plan to the T, correct?

24           "You need to follow the Emergency Action

25   Plan, yes.

1          "At no time during Hurricane Harvey was

2    Hurricane Harvey declared an emergency by the Corps of

3    Engineers, true?

4          "Could you restate that question, please?

5          "At no time did you designate this as an

6    emergency?

7          "Objection.  Form.  Calls for speculation.

8          "At no time to my knowledge did conditions

9    exist that would have required us to exercise the

10   emergency operation plan.

11         "And since the conditions didn't exist, you

12   didn't declare an emergency, did you?

13         "Objection.  Form.  Calls for speculation.

14         "Not to my knowledge.

15         "Okay.  And there's a -- and I'm going to

16   hand you that.  That's the corps' Emergency Action

17   Plan, isn't it?

18         "Yes, sir.

19         "And that's what you're referring to as never

20   being invoked in Harvey?

21         "Yes, sir.

22         "Okay.  Now, with respect to Addicks and

23   Barker, they were not under emergency operations; is

24   that correct?

25         "I'll object to the form of the question as

1    vague.

2              "As of August 22nd, 2017, Addicks and Barker

3    were not under any sort of Emergency Action Plan or

4    emergency operations, right?

5              "I -- no, they were not.

6              "And so if Addicks Barker were ever operating

7    under the EAP, that would have been something that

8    Mr. Thomas would have decided or determined?

9              "We would have determined that together, sir.

10             "Okay.  And to your knowledge, did that ever

11   occur?

12             "No, sir.

13             "Has there ever been a formal declaration of

14   a level two emergency in the history of the Addicks and

15   Barker Dams and Reservoirs?

16             "Not that I know of, sir.

17             "Has there ever been a formal declaration of

18   level one emergency?

19             "Not that I know of, sir.

20             "Has there ever been a formal declaration of

21   level three emergency?

22             "Not that I know of, sir.

23             "In this case, there was no issue involving

24   integrity of the dam.  True?

25             "Objection.  Form.  Calls for speculation.

1          "Not to my knowledge.

2          "Dam performed as expected?

3          "Objection.  Form.  Vague.

4          "To my knowledge, yes, sir.

5          "You were proud of how the dam performed?

6          "Yes.

7          "Was there ever a determination made that

8    either Addicks or Barker would fail?

9          "Not to my recollection.

10          "And this point here, controlled releases

11   from the dams are required to mitigate risk to the

12   structure, there was no structure failure, correct?

13          "That is correct.

14          "To either Addicks or Barker?

15          "No, sir."

16          (Video stopped.)

17          MR. NOLEN:  And so, Your Honor, what we

18   believe is, is that there was no emergency.  There was

19   no emergency.  No emergency was ever declared by the

20   corps, and this is what happened.  When they released

21   the water on August 30th, 2017, this is what the

22   downstream properties looked like.  So this -- we're

23   utilizing here Dr. Nairn, who is the corps' expert, we

24   utilized his modeling.  And what you're seeing here,

25   all of this red is water that is flowing out of the

1  channel, the channel runs right down the middle, but
2  it's flowing out all over those properties that I
3  identified previously for the court.  And it looks like
4  that.
5          THE COURT:  So all of that area --
6          MR. NOLEN:  Let me go back, Your Honor.  I'm
7  sorry.  There we are.  Yes, sir.
8          THE COURT:  I guess from here it looks brown,
9  the brown area.  But that is all water flooding where
10  it shouldn't have been.
11          MR. NOLEN:  Yes, Your Honor.  So they're
12  releasing it from those outlet gates up here and here,
13  and it's flowing into this channel, and it flows
14  outside of the banks of the channel because the channel
15  doesn't have the capacity to hold 13,600 cubic feet per
16  second of water.  It just can't do it.  And so the
17  whole thing becomes a channel.  It all becomes a
18  channel now.  All of the water is going into Buffalo
19  Bayou into the entire watershed and flooding all of the
20  residences that are downstream.  And so it looks like
21  that.  It looks like this.  It looks like this.  And it
22  looks like that.
23          And so an emergency was finally declared by
24  the city and the county when they started having to
25  remove and evacuate people out of their homes where

1    they were trapped after the releases, after the

2    releases had started.

3              The surcharge releases from the reservoirs

4    continued until September 16th, 2017, when normal

5    operations resumed.  So for 19 days, Your Honor, water

6    was flowing out of those reservoirs at 13,000 cubic

7    feet per second for 19 days, and so all of those folks

8    had to be removed.  Nobody could live in those houses.

9    They were completely inundated with water.

10             And so the court also asked what would have

11   happened if the gates had remained closed.  And we

12   know.  This is what August 30th, 2017, looks like.

13   These reservoirs are full of water.  There's the

14   Buffalo Bayou Channel, and there's not water in any

15   houses up here.  There may be a little water down here,

16   but there's no water at all up here.

17             And so that's Dr. Nairn again.  Dr. Nairn is

18   the government's expert.  And this is what he says it

19   would look like had those gates stayed closed.

20             Now, understand, Your Honor, that they

21   impounded the water for four days and then allowed it

22   to build up to where you had millions and billions of

23   gallons, 125 billion gallons, and then they open up the

24   reservoirs.  And when they do, it's like opening your

25   hose or a fire hose, you know, downstream on all of the

1  folks who live along the channel.  So somebody up here,

2  they're okay.  Somebody right there, they're all right.

3  Somebody right here, they're probably okay.  Right

4  there, probably all right because they're right up

5  there against the reservoir.  But anybody who lived

6  along the channel where they released the water, well,

7  they're flooded.  But they're not flooded here when

8  those gates are staying closed.

9          And so according to Dr. Nairn, eight of the

10  test properties would have sustained no flooding at

11  all, eight.  So that's in the first four zones.  Eight

12  of those would have never sustained any flooding at all

13  except for the induced surcharges.

14          And I mentioned this earlier to the court.

15  There were -- and so I've got some numbers.  There are

16  over 998,195 housing units in the City of Houston as of

17  2020.  Harvey flooded 96,410 homes in the City of

18  Houston.  So about 11 percent of the homes, the

19  residential properties were flooded in the City of

20  Houston as a result of Harvey.

21          We know with some high degree of certainty

22  from Dr. Nairn and from our own expert, Mr. Bardol,

23  that these homes that were flooded as a result of the

24  reservoirs wouldn't have never been flooded.  They just

25  simply wouldn't have.  And as to the four homes that

1    were test properties that were -- would have had some

2    amount of flooding, we know that Houston is sort of

3    flat, and it does flood from time to time, but Houston

4    drains really well.  We've just had to live with that

5    and deal with that for many, many years.

6              These homes, instead of being flooded for a

7    day or a day or two and having a couple of inches

8    inside the house, they instead had six and seven feet

9    of water inside the house for 19 days.  So this is what

10   these two things look like.  Gates open, gates closed.

11   Open and closed.  And so the folks who were in harm's

12   way would have not been in harm's way had they just

13   kept those gates closed.

14             And so how did the reservoir perform?  Was

15   there an emergency?  Back to that question.  And this

16   is the after-action report, Memorandum for Commander,

17   Southwest Division.  It's from Mr. Thomas, who is here

18   and who still works for the corps and who is the

19   corporate representative for the corps, and he said

20   overall conclusion is that the project was performing

21   as expected with no significant problems during this

22   pool of record event.  Significantly, he says at the

23   top, "The embankment outlet structures and emergency

24   spillways functioned as intended.  Piezometers,

25   settlement pins, and alignment surveys for the outlet

1    structures do not shown any alarming trends from this

2    pool of record.  There were no observations of seepage,

3    or critical distress areas located on the dams.  Wet

4    areas located on the downstream embankment toe were

5    monitored, but showed no signs of flow.  Erosion of the

6    dam and cofferdam crest became an issue for inspection

7    teams trying to transverse them."  But, again, that

8    conclusion, "Overall conclusion is that the project was

9    performing as expected with no significant problems

10   during this pool of record event."

11           So we know there was no emergency.  There was

12   no emergency.  They followed the manual.  It has

13   automatic triggers.  They followed the automatic

14   triggers.  And as a result, all of the people

15   downstream that were along Buffalo Bayou were inundated

16   with thousands of gallons of water that lasted for 19

17   days, keeping them out of their homes.  That's what we

18   believe the evidence will show, that's what we intend

19   to prove in this proceeding, and we look forward to

20   presenting our evidence, Your Honor.

21           THE COURT:  Okay.  Thank you.

22           MR. NOLEN:  Thank you.

23           THE COURT:  Let me move on, then, to the

24   government.  Do you want to do your opening statement

25   now or at the beginning of your case?

1          MS. DUNCAN:  We'll do it now, Your Honor.

2     And Ms. Frances Morris will present for the United

3     States.

4          THE COURT:  Okay.

5          You may proceed.

6          MS. MORRIS:  All right.  Good morning, Your

7     Honor.  My name is Frances Morris.  And together with

8     my team, we represent the United States in this matter.

9          We are here today to determine whether the

10    largest rainfall event in United States history which

11    threatened to inundate the fourth largest city in the

12    country constituted an emergency.  And Your Honor asked

13    the parties to answer several questions at this trial.

14    First, was there an emergency that necessitated the

15    U.S. Army Corps of Engineers opening the Addicks and

16    Barker gates or were they opened as a matter of

17    ordinary operating procedure, and, second, what would

18    have happened if the gates remained closed.

19          Now, in answering these questions, the court

20    is allowing the parties to present fact witnesses to

21    address the actions actually undertaken by the corps

22    during Harvey and then expert witnesses to address what

23    may have occurred had the corps taken alternative

24    action.

25          The United States will present fact

1  witnesses, both current and former corps employees, who
2  will explain that although the term "ordinary operating
3  procedure" isn't a term defined or typically used by
4  the corps, the Harvey event was not normal flood
5  control operations, it was an emergency, and they took
6  extraordinary actions to ensure the integrity of the
7  dams and ultimately the safety of the public.
8       The United States will also present testimony
9  of an expert flood modeler who will explain that
10 flooding was unavoidable.  Alternative action would
11 have either shifted the flooding to other
12 neighborhoods, increased dam safety risks, or made
13 plaintiffs worse off or both.  Plaintiffs, on the other
14 hand, will attempt to revise the history of what was by
15 any definition an emergency.  The facts will show
16 otherwise.
17      To date, Hurricane Harvey was the most
18 significant tropical cyclone rainfall event in United
19 States history both in scope and peak rainfall.  The
20 storm stalled for four days dropping more than
21 60 inches of rain over Southeastern Texas, and
22 approximately 33 inches of rain fell over Addicks and
23 Barker alone.  Harvey produced so much rain that the
24 National Weather Service had to add two new colors to
25 their precipitation forecasts.  To compare, Hurricane

1    Helene, which recently devastated the Asheville,

2    North Carolina area, dropped 14 inches of rain over

3    Asheville.  Harvey more than doubled that amount over

4    Addicks and Barker alone.

5            Now, this tremendous amount of rainfall

6    resulted in record flood pools in Addicks and Barker

7    Reservoirs.  In fact, the Harvey flood pools more than

8    doubled the previous record flood pools which had just

9    been set the previous year during the Tax Day Storm of

10   2016.

11           Your Honor just heard that plaintiffs claim

12   that Harvey was not an emergency.  But the

13   unprecedented magnitude of Harvey was reported not just

14   in Houston, not just in Texas, but nationwide.  News

15   outlets around the country were reporting on Harvey's

16   catastrophic flooding beyond anything experienced in

17   Houston.  Harvey's epic destruction caused by the

18   heaviest rain in history, an unprecedented and landmark

19   disaster.

20           Now, the evidence will show that since 1962

21   when all five of the outlets on each dam were gated,

22   the corps has operated the dams according to a Water

23   Control Manual.  The Water Control Manual, which was

24   updated in 2012 and in effect at the time of Harvey,

25   contains provisions for two distinct operating

1  circumstances: one, normal flood control regulation;

2  two, induced surcharge flood control regulation.

3          The United States will present testimony of

4  Mr. Robert Thomas, a highly trained dam safety engineer

5  and the Addicks and Barker dam safety officer appointed

6  by the corps who was present during the entire Harvey

7  event, who will explain that these operating categories

8  are mutually exclusive.  Operations fall into either

9  normal flood control or induced surcharge flood control

10  operations.

11          Mr. Thomas will testify that prior to Harvey,

12  the corps had always operated the dams under normal

13  flood control operations.  It was not until Harvey that

14  the corps operated the dams pursuant to the induced

15  surcharge flood control regulation for the first time

16  in the history of the project.

17          Mr. Thomas will explain that the Water

18  Control Manual governs the corps' operation of the

19  dams.  But as with any entity responsible for the

20  safety of the public, the corps has a plan for

21  emergencies.  It's called the Emergency Action Plan.

22  Mr. Thomas will testify that the Emergency Action Plan

23  exists to identify emergency situations that could

24  threaten the integrity of the dams.  And it helps plan

25  for expedited and coordinated responses to ultimately

1    protect lives and reduce property damage from dam

2    failure or uncontrolled releases of water.

3           And Mr. Thomas will testify that this plan

4    becomes automatically effective upon one of two

5    scenarios: one, upon actual or predicted water surface

6    elevations reaching designated limits or, two, when the

7    dam safety officer declares an emergency.

8           Now, plaintiffs insist that the Emergency

9    Action Plan can only take effect upon the second

10   scenario, declaration by the dam safety officer.  But

11   this ignores the plain language of the Emergency Action

12   Plan which clearly sets forth two distinct triggering

13   events.  Mr. Thomas will explain that upon either

14   event, the Emergency Action Plan automatically takes

15   effect.  And Mr. Thomas will also testify as to all of

16   the other reasons, in addition to implementation of the

17   emergency action plan, why Harvey was an emergency

18   situation even before the surcharge releases began,

19   including the record rapidly raising flood pools,

20   upstream flooding beyond government-owned land, and

21   uncontrolled releases flowing around the north end of

22   the Addicks Dam.

23          Now, plaintiffs misconstrue the Emergency

24   Action Plan and claim Harvey wasn't an emergency.

25   According to plaintiffs, the extraordinary flooding and

1    the corps' herculean response were just ordinary

2    operating procedure, not an emergency.  And instead of

3    telling the court about the facts plaintiffs will show

4    at trial, they told the court the arguments they'll

5    make, and that's because plaintiffs don't have the

6    facts to support their case.  Rather, plaintiffs will

7    invite the court to ignore what was actually happening

8    during Harvey and instead focus on several

9    cherry-picked deposition statements that lack

10   foundation and context.

11           And now because, Your Honor, we did discuss

12   the use of deposition testimony in opening and Your

13   Honor ruled that that would be allowable, we were going

14   to cite some deposition testimony just to provide some

15   further context for the court.

16           Now, plaintiffs played a clip from one of

17   Mr. Thomas' deposition where he stated that he was not

18   aware of any formal declaration of a Level 1, 2, or 3

19   emergency.  The plaintiffs omit Mr. Thomas' testimony

20   which immediately preceded the statement plaintiffs

21   chose to play where Mr. Thomas stated that during

22   Harvey, Emergency Level 2 under the Emergency Action

23   Plan was reached.  And now at trial, Mr. Thomas will

24   explain that there's no formal declaration of emergency

25   because the EAP doesn't require a formal declaration.

1    Rather, Emergency Level 2 is reached based on

2    observation and the implementation of the rules and

3    guidance in the Emergency Action Plan.

4            Plaintiffs also played a video clip from

5    retired Colonel Lars Zetterstrom, the district

6    commander of the Galveston District at the time of

7    Harvey.  Now, Colonel Zetterstrom will testify that on

8    August 22nd, 2017, before Harvey made landfall, Colonel

9    Zetterstrom declared an emergency for the entire

10   district, the entire Galveston District.  That covered

11   Addicks and Barker Dams when the concern over the

12   storm's worst effects shifted from the coastline where

13   the Hurricane first made landfall to inland areas and

14   specifically to the dams.  Colonel Zetterstrom will

15   explain the decision-making throughout the Harvey

16   event, why it was an emergency, and why waiting until

17   dam failure is imminent is too late to prevent disaster

18   of catastrophic proportions.  And the full testimony at

19   trial will show that the Harvey event was an emergency

20   and the corps' actions to manage it were anything but

21   ordinary; they were extraordinary.

22           Now, witnesses from the corps will tell the

23   court what actually happened from the standpoint that

24   matters, the decision-makers.

25           Let's look at the reservoirs just to orient a

1   brief timeline of events.  Both of the reservoirs,

2   Addicks and Barker, are ordinarily dry.  They have two

3   emergency spillways, both north and south, and gated

4   outlet structures.  Water enters the reservoirs through

5   direct rainfall or runoff from upstream watersheds.

6           The evidence at trial will show the following

7   timeline of events: On August 22nd, before Harvey made

8   landfall, Colonel Zetterstrom issued a declaration of

9   emergency for the entire district for Harvey.  On

10  August 23rd, the corps activated the Addicks-Barker

11  Multi-Agency Emergency Coordination Team, or ABECT.

12  And as early as August 23rd, the corps' forecast were

13  projecting that pools at both Addicks and Barker would

14  exceed the limits of government-owned land.  Thus, as

15  of August 23rd, when the reservoir flood pools were

16  projected to exceed the limits of government-owned

17  land, the emergency action plan became automatically

18  effective at Emergency Level 2.

19          When Harvey made landfall as a Category 4

20  hurricane on August 25th, both reservoirs were empty

21  and the gates were set to allow the inflows to pass

22  through and flow downstream.  But in accordance with

23  the Water Control Manual, the corps closed the gates on

24  both dams to protect against downstream flooding.

25          By August 26th, the corps' forecast projected

1   that existing record flood pools would be exceeded.

2   And by late on the 26th and early on the 27th, the

3   corps' forecast noted that the flood pools would rise

4   even higher and faster than previously expected and

5   that water would begin to flow around the ends of the

6   dams.

7           The corps held back an incredible amount of

8   water as long as they could safely do so.  But at this

9   time, the corps projected that releases would be

10  necessary under the induced surcharge provision of the

11  Water Control Manual.  And just as the corps followed

12  the Water Control Manual in closing the gates at the

13  beginning of the storm, they determined that the Water

14  Control Manual called for induced surcharge releases

15  because of both the flood pool elevation and the rate

16  in which the flood pools were rapidly rising.

17          So shortly after midnight on August 28th, the

18  corps began making reservoir releases under the induced

19  surcharge provision for the first time in the more than

20  80-year history of the Addicks and Barker project.

21          But even after these releases began, the

22  flood pools and the attendant risks with those large

23  flood pools kept rising.  On August 29th, water began

24  to flow uncontrolled around the north end of Addicks.

25  And so that would be the north emergency spillway you

1    see at the top right-hand corner of the screen.

2            THE COURT:  My view of -- okay.  I can see

3    it.  It was partly blocked by the eagle.

4            MS. MORRIS:  And then as the rain finally

5    subsided on August 30th, the flood pools peaked,

6    two days after mandatory releases began.  And that the

7    peak of the flood pools on August 30th, it was

8    difficult to tell what's upstream and what's downstream

9    of the dams.  Water was simply everywhere.

10           Induced surcharge releases continued until

11   September 16th when the flood pool levels finally

12   sufficiently lowered to return to normal flood control

13   operations.  But even then, normal flood control

14   releases continued.  The reservoirs were not fully

15   emptied of floodwaters until mid-October.

16           Far from ordinary.  The corps' actions taken

17   to manage the emergency imposed by Harvey were not only

18   extraordinary, they were brave.  Your Honor is going to

19   hear from several corps employees who attended to the

20   dams 24/7 through torrential rain with little to no

21   sleep at a time so they could monitor the dams for

22   safety issues.  You'll hear that corps employees were

23   rescued from their own vehicles which were submerged

24   while trying to monitor dam conditions.

25           You'll hear that for the first time in the

1   history of the project the gauges that typically

2   measure the flood pool elevations, they were at risk of

3   being inundated and had to be relocated to a higher

4   location.  And during this time, the corps was required

5   to take manual measurements by plumb bob every hour

6   while the gauges were inoperable.

7           You'll hear that the flood pools rose so high

8   that the dam operation platforms flooded, and so the

9   corps had to cut power to avoid electrocution which

10  then required manual operation of the massive gates.

11          You will hear that the corps had to evacuate

12  the Addicks and Barker Project Office, which is located

13  just downstream of the Barker outlets and which Your

14  Honor will see on the site visit next week, due to

15  flooding, and that was before any releases were made,

16  and they had to relocate to the National Guard nearby.

17          You will hear from employees who were away

18  from their own families trying to plan for their

19  family's safety while they experienced flooding while

20  constantly monitoring the safety of the dams.

21          You'll hear that as this unprecedented

22  situation unfolded, the corps operated knowing that the

23  Addicks and Barker Dams were classified as the highest

24  risk rating in the country.  This was due to known

25  issues with the dams' outlet structures which were in

1  the process of being replaced at the time Harvey hit,

2  but also due to the significant risks to life and

3  property associated with dam failure.

4          The dams had never before held back this

5  volume of water.  The closest flood pool was less than

6  half the volume of Harvey.  This was an untested volume

7  of water, and it was with an unknown outcome.  The

8  gates had never been tested at this level of risk.  And

9  there's no easy away to put it.  If the dams failed,

10  you'll hear that hundreds of thousands of lives if not

11  more would be at risk.

12          Now, the court has also asked the parties to

13  present evidence on what would have happened if the

14  gates on both dams had remained closed and related what

15  would have happened if the corps had taken alternative

16  action.

17          Now, as the United States has previously

18  explained, to the extent these questions relate to the

19  United States' defense of necessity, evidence should be

20  limited to the actual information known to the corps

21  while it was operating the project prior to and during

22  Harvey.  Hindsight or after-the-fact analysis including

23  opinions of whether the dams would have failed if the

24  gates had remained closed is irrelevant.  What matters

25  are the facts that were before the decision-makers at

1    the time they made the decisions.

2            But to the extent the court finds expert

3    opinions helpful in assessing the reasonableness of the

4    corps' actions compared to alternatives, the parties

5    will present expert testimony and several hypothetical

6    scenarios.

7            You will hear testimony from plaintiffs'

8    expert flood modeler, Mr. Matthew Bardol, who we expect

9    will make the conclusory claim that the releases were

10   not necessary.  But Mr. Bardol was not present during

11   Harvey, he's not a geotechnical expert, and he did not

12   analyze what would have happened to the dams themselves

13   had the corps not made releases.

14           Mr. Bardol did analyze what would have

15   happened to the properties had the corps kept the gates

16   closed, and he'll admit that upstream properties would

17   have experienced deeper and longer flooding, up to one

18   to two feet deeper, and approximately 3,000 additional

19   acres of land flooded.

20           And Mr. Bardol will also admit that both he

21   and the United States' expert, Dr. Robert Nairn, agree

22   that had the corps kept the gates closed, additional

23   uncontrolled water would have flowed around the end of

24   Addicks, flooding other downstream properties while

25   simultaneously increasing the risks.

1          The court will also hear from the United

2     States' expert, Dr. Nairn, who completed modeling in

3     both upstream and downstream cases and assessed what

4     would have happened if the corps had taken alternative

5     actions, including had the corps kept the gates closed.

6     And he'll explain that had the corps not followed the

7     Water Control Manual and kept the gates closed,

8     flooding would not have been eliminated but transferred

9     to other upstream and downstream properties.

10          Dr. Nairn will also testify as to what would

11    have happened if the corps had not followed the Water

12    Control Manual and never closed the gates in the first

13    place and also if the corps had never built the Addicks

14    and Barker Project.  Had the corps taken these

15    alternative actions, the consequences for downstream

16    plaintiffs would have been drastically worse.

17          At the end of this trial, Your Honor will be

18    asked to determine whether the worst rainfall event in

19    United States history, an act of God which threatened

20    to inundate the fourth largest city in the country,

21    home to over two million people, was an emergency.  You

22    just heard plaintiffs say that Harvey was not an

23    emergency because the dams did not reach a point of

24    imminent failure.

25          To suggest that the corps must wait to act

1   until the dams are in the process of failing is nothing
2   short of astonishing.  The corps cannot roll the dice
3   with people's lives.  The evidence will show that once
4   dam failure is imminent, it's too late for releases to
5   make a difference.  There's no going back.  Given the
6   consequences to life and property, waiting to act until
7   dam failure is imminent would not only be unreasonable,
8   it would be unconscionable.
9           Now, earlier this morning, plaintiffs'
10  counsel said that it's a disaster if your house burns
11  down; it's an emergency if your house is on fire.  Your
12  Honor, during Harvey, the house was on fire, and the
13  corps took action to prevent it from burning down.  At
14  the end of the trial, the United States will ask Your
15  Honor to find that Harvey was an emergency for which
16  the corps took extraordinary actions to ensure the
17  safety of the dams and ultimately the safety of the
18  public.  Thank you.
19          THE COURT:  Thank you.
20          Well, you've both presented I think good,
21  clear pictures of where your cases are going,
22  contradictory pictures.
23          So we now have -- it's, I guess, about 12:30.
24  Do we want to take a lunch break or is there something
25  we can do?  What makes sense in terms of the various

1    two legal teams we have?

2              MR. McGEHEE:  Your Honor, our first witness

3    is an expert.  I could qualify him and give an overview

4    of what he's going to speak to in 30 or 40 minutes, if

5    you would like to try that.

6              THE COURT:  Yeah, why don't we try that since

7    we got a late start.  I hope I'm not putting anyone

8    under stress by missing a lunch break.  Maybe we can

9    after this witness then take a brief lunch break.

10             MR. McGEHEE:  Your Honor, the plaintiffs call

11   Matt Bardol.

12             THE COURT:  Okay.

13             Mr. Bardol, if you'll come forward.

14   Mr. Bardol, if you'll raise your right hand.  And I

15   would say put your left hand on the Bible, but we don't

16   have a Bible here in the courtroom.  And somehow using

17   the Federal Rules of Evidence wouldn't be as good.

18   Thereupon--

19                       MATTHEW BARDOL

20   was called as a witness and, after having been first

21   duly sworn, testified as follows:

22             THE COURT:  Thank you very much.

23             MR. McGEHEE:  Your Honor, would you prefer me

24   to speak from the podium?

25             THE COURT:  Whichever you prefer.  That makes

1    better for the record since it's being recorded, so...

2              MR. McGEHEE:  I understand.

3              THE COURT:  If you need to approach the

4    witness, you may.

5              MR. McGEHEE:  Thank you, sir.

6                    DIRECT EXAMINATION

7    BY MR. McGEHEE:

8        Q.    Mr. Bardol, before I ask you to address the

9    questions that were posed by the judge, I'd like you to

10   explain to him why you're qualified to do so.  First of

11   all, introduce yourself, tell him where you're from and

12   what's your job.

13       A.    All right.  Yes.

14             Hello, sir.  My name's Matt Bardol.  I'm

15   senior principal at Geosyntec Engineering.  Been there

16   for 15 years.  My primary job and role as an expert,

17   I'm a professional engineer.  I graduated from

18   University of Notre Dame for undergrad in civil

19   engineering.  I went to ROTC, was in the Air Force for

20   seven years.  I was stationed at Dyess Air Force Base

21   in Abilene, Texas.  There I went back, I got my

22   master's degree from Hardin-Simmons University,

23   environmental management.  From there I moved to

24   Southern California, Los Angeles, also with the Air

25   Force.  I -- with that, I did civil engineering

1    focusing in water resources from the University of

2    Southern California.  With that, I'm licensed in the

3    State of California, Texas, and seven other states to

4    be a professional engineer.

5         Q.    What certifications do you hold?

6         A.    Certifications, in addition to being a

7    professional engineer, I'm also a certified floodplain

8    manager, a CFM.  That's through the State of Illinois,

9    but that's also recognized nationally.  Certified

10   Professional in Erosion and Sediment Control, CPESC.

11   I've held that for multiple years.  And then also

12   through the American Academy of Water Resource

13   Engineers I'm a diplomat, water resources engineer.

14   Those are only for individuals with over ten years of

15   experience that have continuous doing civil engineering

16   within water resources.

17        Q.    And let's start at the beginning of your

18   career in the United States Air Force.  What did you do

19   that relates to the questions that I'm going to be

20   asking you today?

21        A.    Yes.  Yeah, so I was a civil engineer.  But

22   also part of that, one of my first jobs, I was in Dyess

23   Air Force Base, I was called a disaster preparedness

24   engineer, a readiness officer.  So with that was for

25   command and control responding to natural disasters or

1    other disasters, so I ran a crew there for doing

2    emergency action plans for responses to base both

3    natural disasters, terrorist threats, and wartime

4    threats as well.

5         Q.   Now, you just hit a buzz word, emergency

6    action plans.  Tell us --

7         A.   Yes.

8         Q.   -- your experience writing, editing,

9    reviewing, enforcing them.

10        A.   Yes.  So while I was in the Air Force, I

11   prepared emergency action plans for natural disasters.

12   I ran the crews, the command and control.  So through

13   part of that was reviewing that to make sure they were

14   up to date.  So that was while I was in the Air Force.

15   But prior, after that, being a civil engineer in my

16   current role at Geosyntec and prior firms is doing dams

17   inspections, doing the hydrology hydraulics for the

18   design of spillways, looking at the PMF, the probable

19   maximum flood, tying that all back into the dam

20   structure itself.  And part of that is writing or

21   updating emergency action plans such as the one that

22   was written here for the Addicks and Barker.

23        Q.   Jumping over to the other buzz word, water

24   control manuals.  What experience do you have in

25   writing, editing, reviewing, enforcing water control

1   manuals?

2      A.   Yes.  So water control manuals, as far as how

3   the gates would operate.  So there's several dams that

4   I've worked on in the past that were gated.  Some do

5   not.  But usually even if it's not a gated structure,

6   it's looking at the outfall structure through the

7   emergency -- through emergency act- -- or looking at

8   flood control regulations if the outlets are blocked

9   and looking at flanking flows around auxillary

10  spillways.

11     Q.   This isn't your first storm water analysis in

12  your history, is it?  Tell us your experience working

13  with stormwaters, working with things that pertain to

14  our case.

15     A.   Yes, sir.  You know, so I've been a civil

16  engineer for almost 30 years now, but a little over 28.

17  I've been at my current firm for 15, but also been a

18  consulting engineer for about seven years prior to

19  that.  So, you know, about 25 years being a consulting

20  engineer -- or 22.  Part of that is looking at urban

21  flood controls such as in Houston, but also looking at

22  large dam spillways, flood control facilities, and

23  urban environment.  So it's looking at the hydrology,

24  the rainfall, looking at the hydraulics of the spillway

25  in and around urban environments within the channels

1    such as the Buffalo Bayou, but then also releases from

2    large flood control facilities such as the Addicks and

3    Barker Reservoirs.

4         Q.   You did a model for this case.  This wasn't

5    your first model, was it?

6         A.   No, I did -- I did one for this.  It was

7    definitely not my first model that I worked on, yes.

8         Q.   Tell us briefly your experience in making

9    models such as this case.

10        A.   Okay.  The approach that we used on this was

11   following similar to what the Harris County Flood

12   Control District would have done with the -- to the

13   models, HEC-HMS and HEC-RAS, for the hydraulics.  So

14   it's a standard in the United States as far as the --

15   for the hydrology, hydraulics.  Have used those for

16   just urban flood control, but also doing those same

17   type of models both 1D, one-dimensional, but then also

18   the two-dimensional.  Two-dimensional that we used for

19   upstream, I used those for probably about 30 different

20   dams-related projects as far as designing spillways,

21   updating emergency action plans, and then looking at

22   dam breach scenarios.

23        Q.   Do any government agencies use the models

24   that you used?

25        A.   They're standard practice throughout the US,

1    yes.  Pretty much all government agencies will accept

2    them, and it's the preferred model through the Army

3    Corps of Engineers and Harris County Flood Control

4    District.

5        Q.   So your model today is generally accepted in

6    the engineering community?

7        A.   Yes, it is, correct.

8        Q.   Okay.  You have here specific training in

9    emergency responses.  We're going to talk a lot about

10   that.

11       A.   Yes.

12       Q.   Tell us your background in reviewing,

13   identifying, writing emergency responses.

14       A.   Yes.  So it started off while I was in the

15   Air Force, a readiness officer, so I went through

16   several different trainings while I was in the Air

17   Force for doing disaster response.  Part of that was

18   with Fort McClellan which was for, on one hand, was a

19   chemical warfare defense, but it was also just command

20   and control during emergency response in the US.  It's

21   how to respond, how to follow a manual for the

22   emergency response, and then do the command and

23   control, passing it over to another authorized

24   individual for the command and control.  So that was in

25   the Air Force.

1        Since the Air Force, on the consulting side,

2   a lot of conferences as far as looking at emergency

3   action plans and how to respond or look at and analyze

4   dams both in the operational side, designing it, but

5   then also looking at dam breach or other emergency

6   action plans, how they would be implemented for looking

7   at the control of the facility itself.

8        Q.   And the questions the judge asked are not

9   about the danger and the emergencies involved with

10  Hurricane Harvey; they involve the dangers and

11  emergencies involved in opening the gates at

12  Addicks-Barker.  Do you understand that distinction?

13       A.   Yes, I do.

14       MR. McGEHEE:  At this point, Your Honor, I

15  would offer Mr. Bardol as an expert to testify today

16  and offer his Exhibit PX 290 into evidence.

17       And let me just ask the qualification

18  questions.

19  BY MR. McGEHEE:

20       Q.   Have you reviewed your CV?

21       A.   Yes, I have.

22       Q.   Does this fairly and accurately describe your

23  professional career up and to the present?

24       A.   It does, yes.

25       Q.   Thank you.

1          THE COURT:  Okay.

2          Does the government have any objection?

3          MS. DUNCAN:  Yes, Your Honor, we do have an

4    objection.

5          THE COURT:  Okay.

6          MS. DUNCAN:  We don't object to Mr. Bardol

7    testifying as to his opinions on the hydraulic modeling

8    as set forth in his report or his role as a hydrologist

9    regarding inundation on properties downstream.

10   However, we do object to him offering any opinions

11   regarding the integrity of the dam as outlined in

12   Section 8 of his report, he's not a geotechnical

13   engineer, opinions about whether or not there was an

14   emergency and opinions in comparison with the United

15   States expert.  May I elaborate?

16          THE COURT:  Okay.

17          MS. DUNCAN:  Okay.  As we've noted,

18   Mr. Bardol is not a geotechnical engineer, so any

19   opinions about the necessity of releases in regard to

20   dam safety are beyond his scope of expertise.  I just

21   want to draw a line in the sand there early.

22          As to emergency, Mr. Bardol can't offer

23   opinions about whether there was an emergency that

24   necessitated releases or not.  Unlike the corps

25   witnesses who were working at the project during the

1   event, Mr. Bardol has no firsthand knowledge of the
2   Harvey event and dam operations, and any opinion,
3   therefore, would need to fall within the strictures of
4   the expert rules, including 702.
5          And so whether there was an emergency was
6   also not a properly disclosed or supported opinion in
7   his expert report.  The only mention of emergency
8   conditions is in just over one page in the factual
9   background portion of his report.  It's not in the
10  methodology section of his report which is dedicated to
11  flood modeling, what he's actually qualified to do
12  here.
13         And he also doesn't include any conclusions
14  about emergency in the opinions portion of his report.
15  There's not even a clear method for this purported I
16  think claim of an emergency or the necessity related to
17  it.  There's not a clear standard.  You will hear there
18  is about one part of the report that relates potential
19  emergency to dam failure.  He's, of course, not
20  qualified to speak to that.
21         At bottom, Your Honor, plaintiffs attempt to
22  turn their flood modeler into an expert on dam safety
23  emergencies, fails to meet the strictures of Rule 702
24  and Rule 26, and it's not even consistent with sort of
25  the standards outlined in EAP or in -- for the legal

1    standard.

2            And, finally, we also object to plaintiffs --

3    to the extent he intends to offer comparison to

4    Dr. Nairn's results in detail, we do object to that as

5    an improperly disclosed opinion.

6            THE COURT:  All right.  It seems to me that

7    those objections go to substantively parts of the

8    testimony whether they're appropriate for an expert.

9    So it seems to me he's qualified clearly to be an

10   expert.  The specific areas need to be carved out by

11   specific questions and I can rule on those.  A general

12   ruling denying him expert status is not justified based

13   on what I've heard so far.  So I'll allow his

14   qualification as an expert and then permit the

15   government if you object to a specific question that he

16   goes beyond his expertise, raise it at that point.

17           MS. DUNCAN:  Yes, Your Honor.

18           THE COURT:  All right.

19           MR. McGEHEE:  Yes, sir.  I'd like to now --

20   it's hard to not publish something in a bench trial, so

21   I'm going to ask Your Honor to be prepared to forget

22   about this if it's not admitted.

23   BY MR. McGEHEE:

24       Q.  But I'd like to ask the witness if you've

25   seen this before and if this blowup in your opinion

1    fairly and accurately depicts the inundation area, the

2    location of all of the test properties, the Addicks and

3    Barker Reservoirs, the end of the dams, and the

4    outlets.

5              THE WITNESS:  It does, yes.  I've seen it and

6    it does accurately represent.

7              THE COURT:  Can you hold that up,

8    Mr. McGehee?

9              MR. McGEHEE:  Yes, sir.

10             THE COURT:  Okay.  That's what we saw on the

11   screen earlier?

12             MR. McGEHEE:  Exactly, sir.

13             THE COURT:  Okay.

14             MR. McGEHEE:  And, sir, at this point, we

15   would offer I think we're going to call it Plaintiffs'

16   Exhibit 465 for demonstrative purposes.

17             THE COURT:  Okay.

18             MR. McGEHEE:  I said it wrong, Judge.  405

19   for demonstrative purposes.

20             THE COURT:  Okay.  That will be corrected in

21   the record.

22             (Admitted Exhibit No. PX 405.)

23   BY MR. McGEHEE:

24       Q.   I want to just get an overview of what we're

25   talking about today, Mr. Bardol.  First of all,

1    Hurricane Harvey, there were thousands of bad things
2    that happened about Hurricane Harvey.  It set all kinds
3    of records.  What I'd like to do is concentrate on how
4    each reservoir responded to Hurricane Harvey.
5        A.    Okay.
6        Q.    And I want to talk about whether -- how close
7    to 100 percent capacity each reservoir came during
8    Hurricane Harvey.
9            First of all, if they go to 100 percent
10   capacity, does that in and of itself constitute an
11   emergency?
12       A.    In and of itself, no.
13       Q.    Why not?
14       A.    They're designed to have the auxillary
15   spillways, you know, so they've been analyzed for much
16   larger storms than Hurricane Harvey to be able to
17   operate safely.
18       Q.    Okay.  Let's talk about capacity.  And I'm
19   not a hydrologist, nor am I an artist.  So let me do my
20   best to draw Addicks Reservoir.
21            MR. McGEHEE:  And just as a gesture of
22   courtesy, from time to time I'm going to allow you to
23   see that.
24            And, Your Honor, I'd like to publish it to
25   the homeowners as well.

1              THE COURT:  Okay.

2              MR. McGEHEE:  A picture of the land and of

3    Addicks Reservoir.

4    BY MR. McGEHEE:

5        Q.   And then I want to -- just assume with me --

6              THE COURT:  Is that like a cross-section of

7    the land?

8              MR. McGEHEE:  Yes, sir.  Yeah, this is

9    looking at it from ground level.

10             THE COURT:  Okay.

11             MR. McGEHEE:  This is upstream property and

12   this is downstream, and our test properties are down

13   here.

14             THE COURT:  Okay.

15   BY MR. McGEHEE:

16       Q.   With that, I'm going to draw a water level,

17   and I just want you to assume that that's a hundred

18   percent capacity.  Do we know about how many acre-feet

19   it takes to fill Addicks Reservoir up to 100 percent

20   capacity?  And I would invite you to use the Emergency

21   Action Plan at page E2 as a reference.

22       A.   If you could just slide it up slightly so I

23   could see it a little bit lower.  Yeah, there we go.

24   Yeah, thank you.

25             Yeah, so as far as on the -- on the capacity,

1   looking at this from the design perspective from the

2   spillway design flood, assuming that being the hundred

3   percent of the design capacity for the spillway design

4   flood looking at the spillway which would be on --

5   having flows through the auxillary spillways, that acre

6   foot of storage would be the 329,676-acre feet, and

7   that would be up to elevation of 115.

8       Q.    And I've written on here what you just said,

9   acre-feet up to an elevation on Addicks Reservoir of

10  115 feet.  Is that just what you said?

11      A.    Yes, it is.

12      Q.    And that represents 100 percent capacity,

13  correct?

14      A.    Compared to the spillway design flood, yes.

15      Q.    Yeah.

16          THE COURT:  And 115 is the altitude above sea

17  level?

18          THE WITNESS:  Yes, it would be using the --

19  using the local datum, yes.  It would be the elevation.

20  BY MR. McGEHEE:

21      Q.    And let's look at another -- there's water

22  coming into Addicks Reservoir and there's a hundred

23  percent capacity of water that can be permitted to run

24  into Addicks Reservoir, and I'm going to signify that

25  with arrows to the right.

1          What is the hundred percent capacity

2     permitted for water to flow into Addicks Reservoir

3     measured in cubic feet per second?

4          A.   Can I pull up -- it was --

5          Q.   Sure.

6          A.   There's a different graph within the Water

7     Control Manual.  If I can pull it up --

8          Q.   You can.

9          A.   -- and I'll just reference so they can --

10         MS. DUNCAN:  Objection, Your Honor.  It's not

11    clear how this relates to Mr. Bardol's opinion that is

12    actually disclosed within his report.  This doesn't

13    relate to flood modeling and the inundation downstream,

14    which is not objectionable.  And it's not clear what

15    other sort of opinion he is offering that's within his

16    report that this sort of information would go to.  This

17    is factual information.

18         MR. McGEHEE:  And, Judge, we're going to show

19    that Addicks was nowhere near full capacity.

20         THE COURT:  Okay.  I'll allow it for that

21    purpose.

22    BY MR. McGEHEE:

23         Q.   Was the cfs 294,000?

24         A.   It was 294,507 cfs, and that's on the back of

25    the Water Control Manual.  I can give you the plate

1    number.  Plate 8-01.

2        Q.   And I'm going to indicate that that's

3    100 percent capacity for Addicks Reservoir; is that

4    fair?

5        A.   Correct.  That's at the -- the spillway

6    design flood, that's the peak flow that it was designed

7    for, and that's the capacity or the full volume that

8    was within Addicks.

9        Q.   Right.

10            And had we reached that, which we didn't, but

11   had we reached that, would that in your opinion

12   constitute an emergency that would necessitate opening

13   the gates?

14            MS. DUNCAN:  Objection, Your Honor.  This

15   calls for an opinion that was not properly disclosed

16   within the report and he's not qualified to provide it

17   here.

18            THE COURT:  Mr. McGehee?

19            MR. McGEHEE:  Judge, it's throughout his

20   report.  It's at Section 2.2, 2.3, and 2.4.  And his --

21   the entire purpose for qualifying him and being here

22   and writing the report is to discuss emergencies and

23   gates closing.

24            MS. DUNCAN:  I disagree.  May I do a brief

25   voir dire?

1          THE COURT:  Do we have the report page that
2   he uses, these figures?  Do we have that here?
3          MR. McGEHEE:  Yes.  Can you --
4          THE WITNESS:  Yeah.
5          MS. DUNCAN:  And, Your Honor, it's more than
6   just the figures.  To be clear, it's this question of
7   whether the spillway design flood constitutes an
8   emergency.  That's not an opinion that was disclosed.
9          THE COURT:  If you'll ask your question as to
10  how that relates to an emergency or how that relates to
11  his opinions.
12  BY MR. McGEHEE:
13      Q.   Mr. Bardol, I'm referring to the two
14  questions that the judge asked.
15      A.   Yes.
16      Q.   In your opinion, is 100 percent capacity for
17  acre-feet and 100 percent capacity for cubic feet per
18  second, does that constitute an emergency that would
19  necessitate opening the gates?
20          MS. DUNCAN:  Objection.  This calls for an
21  undisclosed expert opinion.
22          THE COURT:  Yeah, I think I agree, so I'll
23  sustain the objection.
24  BY MR. McGEHEE:
25      Q.   What was the capacity -- what was the actual

1    capacity in acre-feet for Addicks Reservoir during

2    Hurricane Harvey?

3         A.    Yeah, it filled up to an elevation of 109.1.

4    And on this table, it indicates 199,000-acre-feet at

5    108.  Prorating that up to the 109.1, it's about

6    230-acre-feet, approximately, that it was -- was stored

7    behind.

8         Q.    230,000?

9         A.    Correct, yes.

10             And then just to give context to that volume

11   right there, Hurricane Harvey, it was over several

12   days, about a four-day storm, it was about -- it was --

13   the spillway design flood that creates the 329, there's

14   also water that they assume is in the reservoir at that

15   time, but then there's 44 inches of rain that happens

16   over just I believe it's a 72-hour period.  So it's a

17   very high intensity storm, 44 inches that came.  So

18   it's much higher than what Hurricane Harvey was.  So

19   that's where -- the relevancy between these different

20   numbers.  The 230-acre-feet was for massive storm

21   Hurricane Harvey, but that was still significantly

22   lower than what the design capacity of the reservoir

23   would be with the auxillary spillways being able to

24   function.

25        Q.    Just dividing one by the other, what was the

1   capacity in acre-feet of --

2       A.    About 66 percent.  230-acre-feet is about

3   66 percent of the total capacity that could have been

4   in -- within the Addicks Reservoir.

5           THE COURT:  So what is the basis of that

6   figure that it's within 80 percent of --

7           THE WITNESS:  I -- sorry, Judge?

8           THE COURT:  -- the reservoir?

9           I think you just said 80 percent, the 329.

10          THE WITNESS:  Oh, it was 66 percent.  So the

11  230-acre-feet is about 66 percent of that total volume

12  that would have been stored behind the reservoir for

13  the spillway design flood scenario with the two

14  different auxillary spillways being operated.  So the

15  reservoir was designed to operate up to that level.

16          THE COURT:  Up to the -- okay.  What is the

17  total level then that could go -- that's beyond 329?

18          THE WITNESS:  Beyond that, the -- the corps

19  in their manual have designed and analyzed it up until

20  the elevation of 115, the elevation that has a storge

21  of 329,000-acre-feet.  So that's the top analyzed and

22  performed analysis for the dam itself along with the

23  spillways.

24          THE COURT:  Okay.  So there's nothing beyond

25  that.

1          Now, did it go beyond that in this flood?

2          THE WITNESS:  Oh, no, it never got close to

3    that.  This is 115.  Hurricane Harvey only went up to

4    109.  I say "only."  It was a big storm.  It went up to

5    109.1.  So it still had another, you know, six feet

6    before it got up to the 115.  The top -- the high point

7    of the dam is 121.  Yeah, 121.  So the top of the dam

8    is another six feet.  But that was not analyzed part of

9    the Emergency Action Plan or part of the Water Control

10   Manual.

11         THE COURT:  Okay.  So 329 was the top figure

12   for the plan?

13         THE WITNESS:  329,000-acre feet was the total

14   volume that was calculated part of the analysis for

15   the -- within part of the Water Control Manual, yes.

16         THE COURT:  Okay.  Thank you.

17   BY MR. McGEHEE:

18      Q.   Now, the same questions for the inflow.  You

19   said the 100 percent capacity for 294,000 cubic feet

20   per second represents a hundred percent.  What was the

21   actual inflow during Hurricane Harvey?

22      A.   It was about 74,000 cubic feet per second was

23   the approximate inflow during Hurricane Harvey.  And

24   the 294,000 approximately there, that was when the

25   corps analyzed this for the spillway design flood, the

1    peak inflow for that specific storm.

2         THE COURT:  Okay.

3    BY MR. McGEHEE:

4    Q.    And if -- so based on that, do the arithmetic

5    and tell us what capacity was flowing into Hurricane

6    Harvey, what was flowing into Addicks Reservoir during

7    Hurricane Harvey?

8    A.    Yeah, that's --

9         MS. DUNCAN:  Objection, Your Honor.  We're

10   now into more undisclosed opinions.  I don't believe

11   these calculations and the discussion of them is

12   anywhere in his report.

13        THE COURT:  Which calculations are you

14   referring to?

15        MS. DUNCAN:  These comparisons of Harvey to a

16   spillway design flood.

17        THE COURT:  Well, I'm not sure of having --

18   I'm obviously not that familiar with the report.

19        Are these figures in your report?

20        THE WITNESS:  This figure, the numbers as far

21   as the spillway design flood, I do talk about it in

22   Section 2 as far as what the design capacity that the

23   44 inches was being the spillway design flood for that

24   specific probable maximum flood, and then the peak

25   elevation or the -- the volume that was in there.  I do

1  reference those as far as part of the Emergency Action
2  Plan and the Water Control Manual, those -- those
3  numbers.
4          THE COURT:  Okay.  I'll allow the question.
5          MS. DUNCAN:  Well, and, Your Honor, then we
6  have a follow-on objection that there is high-level
7  discussion of these general concepts in the background
8  section but not as they relate to his opinions in this
9  report, and so we'll just lodge an additional
10  objection.
11          THE COURT:  I'm not sure which opinions we're
12  talking about at this point.
13          MS. DUNCAN:  I think that's part of the
14  problem, this isn't tethered to any sort of opinion.
15          THE COURT:  What?
16          MS. DUNCAN:  This testimony that we're
17  hearing isn't tethered to any of the opinions that he
18  has properly disclosed in his report.
19          THE COURT:  Okay.  I'll allow it to let him
20  see if that's -- as it goes on whether there's the same
21  problem in your view or not.
22  BY MR. McGEHEE:
23      Q.  What's the percent of capacity for the cubic
24  feet per second flowing into Addicks Reservoir during
25  Hurricane Harvey?

1      A.    Yeah, looking at the numbers right now, it's

2  probably, you know, 20-some percent.

3      Q.    So according to the Emergency Action Plan,

4  are the gates open at any time when 329,000-acre-feet

5  of water are in Addicks or if 294,000 cubic feet per

6  second are flowing into Addicks?  According to the

7  Emergency Action Plan which you studied and discussed

8  in your report, do these numbers trigger any

9  emergencies according to the Emergency Action Plan?

10     A.    Well, the --

11          MS. DUNCAN:  Objection, Your Honor.  We do

12  have a further objection on this.  He's not been

13  disclosed as an expert to provide opinions on whether

14  there was an emergency.  And he's talking about an

15  Emergency Action Plan and whether there are gates that

16  are -- were being operated.  That's also not in his

17  opinion.

18          THE COURT:  Well, I think the questions

19  relate to the Emergency Action Plan which is he an

20  expert on, so I'll allow the questions.

21          MS. DUNCAN:  Your Honor, may I just clarify?

22  Can we clarify what exactly he's been qualified as an

23  expert in?  I was not tracking if he was qualified as

24  an expert in Emergency Action Plan.  I don't think we

25  ever had a representation --

 1              THE COURT:  I thought that was the area that

 2     he was qualified in, so I rule that now at least to

 3     clarify if it wasn't clear before.

 4              MR. McGEHEE:  For the record, he was

 5     cross-examined in detail by opposing counsel during his

 6     deposition.

 7              THE COURT:  Okay.

 8     BY MR. McGEHEE:

 9         Q.   Does the Emergency Action Plan trigger any of

10     these hundred percent capacity events to constitute an

11     emergency?

12         A.   Not that I know of.  The Water Control Manual

13     has the rate of rise of when they'd be opened, so that

14     triggers that underneath the ordinary operating

15     procedures for what would be the standing rules for the

16     dam tender when they operate and when they close and

17     open the gates.

18         Q.   So based on your answer, a hundred percent

19     capacity is not one of the triggering points under the

20     Water Control Manual?

21         A.   Just that number itself.

22         Q.   And how about if we go down, down to

23     66 percent capacity, same question.

24         A.   The -- I just want to make sure I'm following

25     you.  The Emergency Action Plan is really the Water

1   Control Manual that's triggering when the gates are
2   opened underneath the standing rules or engagement for
3   the dam tender underneath ordinary operating procedure.
4   So that's when it's triggered.  And the --
5           MS. DUNCAN:  Objection.
6           THE COURT:  Well, don't -- let's not
7   interrupt the question at this -- or the answer,
8   rather.
9           You may go ahead.
10          THE WITNESS:  Okay.  Yeah, so it's in the
11  Water Control Manual that constitutes when the gates
12  are opened.
13  BY MR. McGEHEE:
14      Q.   And the Water Control Manual is silent --
15          MS. DUNCAN:  Objection.
16          THE COURT:  What is the objection to the
17  question?
18          MS. DUNCAN:  Well, the objection goes to
19  Mr. Bardol's testimony now getting into what is an
20  ordinary operating procedure.  That is a term of art
21  Your Honor used in its order.  It is found nowhere in
22  Mr. Bardol's expert report.  And it's found -- it
23  was -- and it's not used in the Water Control Manual or
24  the Emergency Action Plan either.  So this is a new
25  opinion he's forming for the purposes of this case

1    after the Rule 26 deadlines have passed.

2         THE COURT:  Well, what he seems to be

3    answering, and it seems that he's talking about facts

4    related to what presumably have been the -- partly in

5    the report is to what -- is there any operating

6    procedure that requires you to open the gates if it

7    gets to 20 percent or -- which is -- or 66 percent

8    capacity.  Am I phrasing the question correctly?

9         MR. McGEHEE:  Sir, that's exactly right.  And

10   I'll ask the witness to respond to that.

11        THE COURT:  Yeah.  And I think that seems to

12   me to come out of the -- his report and the -- what's

13   going to happen as a result of these things.  So I'll

14   overrule the objections.

15   BY MR. McGEHEE:

16        Q.   Did you understand the judge's question?

17        A.   I...

18        Q.   Could you apply it to is there any

19   operational trigger when 66 percent capacity is reached

20   in Addicks to trigger an emergency under the Emergency

21   Action Plan?

22        A.   I'm just trying to...

23             The Emergency Action Plan has the different

24   levels, and there's action that's constituted based on

25   observations of the dam itself.

1      Q.   And they're based on rate of rise and
2   elevation?

3      A.   That's in the -- the Water Control Manual has
4   the rate of rise and the elevation.  So it starts at a
5   certain elevation, 101, which is below the
6   government-owned land.  As you hit a certain elevation,
7   you have a certain rate of rise within the Water
8   Control Manual that falls underneath the induced
9   surcharge regulations.

10     Q.   Okay.  And now back to the judge's question.
11  Is there any operational trigger in the Water Control
12  Manual that is triggered when Addicks Reservoir reaches
13  230,000-acre-feet?

14     A.   Well, for that volume, no, it doesn't specify
15  a volume.

16     Q.   And how about 74,000 cfs?  Is there any
17  operational trigger in the Water Control Manual?

18     A.   If it goes back to the rate of rise, so
19  that's where it would go back to the -- the induced
20  surcharge, if there's a rate of rise above a certain
21  elevation, then it would trigger underneath that which
22  would be the standing order to the dam tender in
23  appendix B I believe it is for the following induced
24  surcharge.

25     Q.   Thank you.

1             MR. McGEHEE:  Your Honor, that concludes my

2    discussion on capacity.  I said I would do my best to

3    get to the overview.  And if you wanted to a break, now

4    would be good.

5             THE COURT:  Okay.

6             What kind of -- I'm not familiar with the

7    restaurants or eating places or -- what is a reasonable

8    time for a break to get people in, out, and back in?

9             MR. McGEHEE:  Judge, is 45 minutes okay?

10            THE COURT:  Yeah.

11            MS. DUNCAN:  How long does Your Honor like to

12   take?

13            THE COURT:  Well, it depends on what we have

14   to do.  Forty-five minutes is as much -- more than, you

15   know, I need to eat.  On the other hand, you have to

16   also get to where you're --

17            MR. McGEHEE:  Judge, an hour would be fine

18   too.

19            THE COURT:  Okay.  Well, let's take an

20   hour --

21            MR. McGEHEE:  Okay.

22            THE COURT:  -- to make sure that we have

23   enough time.  We'll resume then at 1:05.

24            (Off the record from 1:03 until 2:16.)

25            THE COURT:  All right.  Almost made it back,

1    not quite.  We'll have to add another ten minutes.  The

2    food court over in the next block was -- seemed to be

3    the closest we were able to find for food here.

4            MR. McGEHEE:  Good job.

5            THE COURT:  Oh, I guess there is something in

6    there.  We'll try Monday to see the cafeteria here.

7            Anyway, by the way, I saw that, Ms. Duncan,

8    you were Judge Miller's law clerk.

9            MS. DUNCAN:  Yes, sir.

10           THE COURT:  I'm very privileged using his

11   office.

12           MS. DUNCAN:  Yes.  I understand he is on a

13   cruise right now.

14           THE COURT:  Ah.  That's a good place to be.

15   This is almost like a cruise.  But there's no one

16   giving you a cocktail and you don't have a lot of time

17   to eat.  So other than that.  It's probably better for

18   me not to be on a cruise.

19           So anyway, let's resume, Mr. McGehee.

20           MS. DUNCAN:  And, your Honor, before we get

21   started, can we do one housekeeping matter?  Does Your

22   Honor have a sense of when you plan to end the day?

23   And I ask so that we can try to fit in Mr. Maglio with

24   an appropriate amount of time for his exam.

25           THE COURT:  Well, if we can do that.  I don't

1    have a magical time where I turn into a pumpkin or

2    anything.  I would prefer to stay as long as we need to

3    to get a witness done and complete so they don't have

4    to come back again.  So I'm willing to stay for

5    Mr. Maglio to get him finished today.

6              MS. DUNCAN:  Okay.

7              THE COURT:  And then we can each day look at

8    the schedule when we start and see if, you know, we

9    need to do that again or we need to cut the day shorter

10   than we normally would because we've got all the full

11   witnesses we can get.  So let's do it very

12   pragmatically to make sure we can put as little stress

13   on witnesses as possible.

14             MS. DUNCAN:  Yes, Your Honor.  So perhaps at

15   the next break in the proceedings we can discuss if

16   that's a good time to then bring in Mr. Maglio.

17             THE COURT:  Okay.  Sounds good.

18             MR. McGEHEE:  Your Honor?

19             THE COURT:  Yes?

20             MR. McGEHEE:  May it please the court?  I've

21   marked Exhibit 405, which I already read into the

22   record.  And I would now offer 406, Plaintiffs' 406 for

23   demonstrative purposes.  It's the chart that we wrote

24   that is entitled "Capacity."

25             THE COURT:  Okay.  That chart --

1           MR. McGEHEE:  Yes, sir.

2           THE COURT:  -- that you're pointing to.

3           MR. McGEHEE:  Yes.

4           THE COURT:  Will you mark it for

5    identification?

6           MR. McGEHEE:  For identification.

7           THE COURT:  What number?

8           MR. McGEHEE:  We would offer it as a

9    demonstrative.

10          THE COURT:  What number is that?

11          MR. NOLEN:  Plaintiffs' 406.

12          THE COURT:  406 as a demonstrative.

13          Any objection?

14          MS. DUNCAN:  Not as a demonstrative.

15          THE COURT:  Okay.  It's admitted.

16          (Admitted Exhibit No. PX 406.)

17   BY MR. McGEHEE:

18      Q.   Mr. Bardol, we've been talking about

19   capacity, and we've talked about the maximum capacity,

20   and we talked about how Hurricane Harvey filled up

21   Addicks Reservoir to 66 percent of that capacity.  And

22   the word that I'd like you to define that encompasses

23   all this capacity is spillway design flood.

24          First of all, is spillway design flood where

25   you got this top number for 100 percent capacity?

1      A.    Yes, I can explain that.  So the spillway

2    design flood is on that table that is still being shown

3    up here on the E2 I believe it is from the Emergency

4    Action Plan.  So that specifies, you know, the 329 as

5    being, you know, the volume that's held behind the dam

6    at that time.

7           The spillway design flood is used for

8    designing the auxillary spillways that are on each side

9    that we talked about before that's on the north and on

10   the west.  There's the natural grade at one zero eight,

11   108.  But then the spillway design flood is used for

12   pushing water.  As the dam fills up, behind the dam

13   within the reservoir, the water begins to flank.  For

14   the design purposes, they run that storm to be able to

15   look at the spillways on either side, the northern one

16   that was actually activated partially during Hurricane

17   Harvey, and to make sure that it's safe, can safely

18   pass the spillway design flood, which is much larger

19   than Harvey, it was about 44 inches over about a

20   three-day period, 72 hours.  And that's where the

21   294 cubic feet per second is coming in.  You know, they

22   go through a couple calculations I won't go through

23   here.  That's the results in that 329-acre-feet being

24   stored with water going around the spillways up to an

25   elevation of 115.  Hurricane Harvey was at 109.

1          THE COURT:  Okay.  But let me maybe reduce it

2     in my simple example.  I had -- my sink in the bathroom

3     was clogged and it wasn't -- I was filling it up and it

4     reached the top.  Now, at the top it spills over onto

5     the floor, so you like it to reach the top.  That's

6     where you call the plumber.  But is that when the

7     spillway would take effect, once the reservoir reached

8     that level, or is it going to work before then?

9          THE WITNESS:  I -- I heard the -- the

10    Addicks, we'll just talk about Addicks.  Addicks and

11    Barker have similar components.  So there's the main

12    spillway which are the conduits.  Probably think -- use

13    the sink example.  You have the sink itself as far as,

14    you know, you have the plunger, you open and close it.

15         THE COURT:  Yes.

16         THE WITNESS:  As that fills up, you close the

17    plug.  Then there's usually that overflow that's in

18    there before it spills over on the ground.  And then

19    sizing that hole, so it goes back into the pipe so it

20    doesn't go on the round.

21         So the auxillary spillways, they use this

22    design to make sure that they can take that -- the big

23    storm, full faucet going.  For here, it's that 44

24    inches, the real big storm, to make sure it can flow

25    through that spillway before it damages and the dam

1    would fail due to hydraulic scouring along --

2              MS. DUNCAN:  Objection.

3              THE WITNESS:  -- the spillways.

4              THE COURT:  Yes, what's the objection?

5              MS. DUNCAN:  I apologize for interrupting the

6    witness.

7              The objection is that now this witness has

8    started testifying as to dam failure matters, and that

9    is beyond his expertise and it's beyond what he's been

10   qualified for.

11             THE COURT:  I think he was qualified for how

12   the emergency plan works.  I was asking the question in

13   part just to give me a conceptual view, not necessarily

14   the numbers.  But at some point -- going back to using

15   my sink, my sink goes up to the top and there's a

16   little hole on one side of it that goes down into the

17   drain through a different way.

18             THE WITNESS:  Yes.

19             THE COURT:  Once it reaches full, the hole

20   doesn't quite take all the water out.  So it still

21   continues to get near overflowing, though the hole is

22   probably mitigating that.  The spillways, this is

23   conceptually --

24             THE WITNESS:  Yeah.

25             THE COURT:  -- do that before the reservoir

1    was to overflow.

2              THE WITNESS:  Yes, correct.  A good analogy

3    is the top -- the high point of the dam is at 121, so

4    that would be like the lip of your sink.

5              THE COURT:  Yeah.

6              THE WITNESS:  The spillway starts off at 108,

7    then it continues on up to 115.  So that spillway is

8    designed to handle that flow.

9              And as far as on the failure side, on the dam

10   there is going to be two components: geotechnical and

11   the hydraulic component.  I'll look at the hydraulic

12   component to make sure those components can safely

13   pass, you know, the spillway design flood or whatever

14   design flood that's there.  So hydraulically they can

15   function to pass that.  And that's what was done here

16   with the spillway design flood, to make sure the

17   auxillary spillways on the north and on the west were

18   designed appropriately to be able to pass those storm

19   events.

20             THE COURT:  And are the spillways opened or

21   closed manually or is it -- they just --

22             THE WITNESS:  Oh, good --

23             THE COURT:  -- gravity does --

24             THE WITNESS:  -- question.

25             THE COURT:  -- the work?

1          THE WITNESS:  Yeah, these are just open, so

2     it's -- there's the main gate structure at the dam that

3     is the five conduits with gates.  The spillways, the

4     auxillary spillways, they're roller-compacted concrete.

5     So they're concreted in.  That was done in the '80s up

6     into the '90s where they were -- so it's just overland

7     flow path.  So when you hear flanking flows where water

8     went around the north, that's actually through the

9     designed spillway to be able to handle that flow.  So

10    they're open structure.  There's no gates.  It's just

11    roller-compacted concrete over the earth for that part

12    of the dam.

13          THE COURT:  So just when it gets to a certain

14    level, the 108 level --

15          THE WITNESS: Yes.

16          THE COURT:  -- the water starts pouring into

17    the spillways.

18          THE WITNESS:  It -- correct, it flanks

19    around, it goes over the spillway, and then that's

20    concreted all the way up to, you know, 111.5, and goes

21    up even higher up to the 115 for the auxillary

22    spillways.  And there are a few -- they're several

23    thousand feet long, so they're very large.

24          THE COURT:  Okay.  Thank you very much.

25          THE WITNESS:  Yes.

1    BY MR. McGEHEE:

2        Q.   And following up on that, if the judge's sink

3    fills up to spillway design flood, does his sink spill

4    out onto the floor?

5        A.   If we're taking the top of the sink as being

6    the 121, the top of the dam, no.  It would be going

7    through that -- the spillway, what I'm kind of equating

8    to that hole that you designed for that to --

9        Q.   The second question, will his sink break at

10   spillway design flood?

11       A.   It would not.

12       Q.   Okay.  And this is Addicks.  Addicks has

13   66 percent capacity for acre-feet and 20 percent

14   capacity for inflow.  Compare those to Barker.

15       A.   Yeah, if I can pull up the...

16       Q.   And we don't need specific numbers.

17       A.   Okay.

18       Q.   But just is Barker higher or lower?

19       A.   Yeah.  So, you know, Barker -- I'm just going

20   to pull up the elevation here.

21            Spillway design flood was up to 108.  I just

22   want to make sure I get the right elevation to what it

23   filled up to for Harvey.  And this is in my report.

24   I'll reference the table when I get to it.

25            So I'm looking at page 6-39 of my report,

1    table 6-1.  I'm just going to reference what was the

2    top for Barker.  So during the -- the gate's open, so

3    this was during the Harvey event, it filled up to

4    101.5, 101.6, just above 101.  And when we look at this

5    chart right here, going up to 101, that's below the

6    natural ground at the end, so it never activated the

7    spillway.  So Barker Reservoir filled up, and it never

8    flanked around the side.  The auxillary spillways were

9    never activated.  It only went through the primary gate

10    structure at the end, the conduit pipes.

11         Q.    Okay.  Thank you.

12               And the acre-feet at Hurricane Harvey for

13    Barker was 173,000, approximately?

14               MS. DUNCAN:  Objection.  Mr. McGehee is

15    leading the witness.

16               THE COURT:  Well, I don't think there's --

17    that's where answer is not being suggested.  I'll allow

18    it.  Maybe he's speeding it up a little bit.

19               THE WITNESS:  I mean, I can look at my report

20    and pull up the number from here.  When I look on here,

21    it's, you know, between 133 to 209, so it's the number

22    you said there, about the 170.  I can pull up the

23    number here if you want me to reference the exact

24    number.

25               Do you want me to pull up the number out of

1    my report for the --

2    BY MR. McGEHEE:

3        Q.    We just want to get a relative capacity

4    comparison.

5        A.    It...

6        Q.    For Barker.

7        A.    Yeah, it was -- let's see.  I mean, it was

8    below the -- when you compare it to the spillway design

9    flood, which is the ultimate, it's -- you know, it's

10   around 50 percent, you know, just over 50 percent of

11   the spillway design flood elevation.

12       Q.    So the capacity from Hurricane Harvey in

13   Barker was less than the capacity for Hurricane Harvey

14   in Addicks?

15       A.    Actually, I'd probably flip it around.  There

16   was more capacity that was even --

17       Q.    I said --

18       A.    -- available --

19       Q.    -- it backwards.

20       A.    -- yeah.  Yeah, so less capacity was used.

21   There was more capacity that was actually available.

22       Q.    Thank you.

23       A.    Yes.

24       Q.    Thank you.

25             Just before we get into this next subject, to

1    avoid an objection, there was an objection that your

2    report didn't talk about emergencies.  Tell the court

3    the title of paragraph 2.6 in your report.

4        A.   Yes, sir.

5        Q.   Just the title.

6        A.   2.6, the title is "There was no emergency.

7    The reservoirs performed as expected by the U.S. Army

8    Corps of Engineers."

9        Q.   Okay.  Now I'd like to talk about the reason

10   for opening the gates.  I'd like to talk --

11       A.   Yes.

12       Q.   I'd like to talk about the reason for opening

13   the gates.  And then next we're going to talk about

14   whether that reason had anything to do with emergency.

15   But let's first talk about the reason for opening the

16   gates.

17       A.   Yes.

18       Q.   The sole reason for opening the gates was --

19   and before you answer, I'd like to present to you what

20   the defense is on those reasons and show you

21   three minutes' worth of clips what the defense says the

22   reason is and then have you comment on those clips.

23       A.   Yes.

24            MS. DUNCAN:  Objection.  Your Honor, he is

25   putting forth information and then asking the court to

1    comment -- I mean the witness to comment on it.  That's

2    improper on multiple bases.  First we have a 702

3    problem.  This is not an undisclosed -- sorry, this is

4    an undisclosed expert opinion, and it has to be based

5    on scientific, technical or specialized knowledge, not

6    simply commenting on fact information.  There's no

7    methodology to this.

8          We also have a 703 problem.  Sure an expert

9    can rely on hearsay, but that doesn't mean that that

10   hearsay is then admissible.  Plaintiffs are trying to

11   get around that by formulating deposition testimony as

12   a question?  That's improper as well.  He can ask a

13   question directly.  But otherwise, what he's proposing

14   today here is improper under 702 and 703.

15         MR. McGEHEE:  Your Honor, regarding hearsay,

16   it's not hearsay.  It's a statement by a party

17   opponent.  They're not surprised.  We sent them over

18   our clips on Tuesday.

19         THE COURT:  Yes.

20         MR. McGEHEE:  They were present during the

21   depositions.  They had firsthand -- and we're asking

22   the expert to comment on their defenses.  This is the

23   most expedient way to do it.  If we wait and let the

24   expert listen to all of the defenses and call him in as

25   a rebuttal witness, that's going to waste lots of court

1    time.

2              THE COURT:  I'll overrule the objection.

3              MS. DUNCAN:  Your Honor, may I lodge one more

4    objection for the record?  This is a rebuttal set of

5    questions.  Mr. Bardol did not prepare a rebuttal

6    report, and this sort of information is nowhere in his

7    expert report, except for Mr. Thomas.  He is the only

8    one in here.  All these other witnesses they put in

9    these clips are simply not in the report.  They've not

10   been disclosed.  We haven't been able to depose

11   Mr. Bardol about his reliance on them.

12             THE COURT:  These were for -- most of the

13   quotes were deposition quotes, so they were being

14   deposed when the depositions were made, presumably.

15   And he's being asked about that now, so it seems to me

16   an appropriate question.

17             MR. McGEHEE:  Play clip 4.

18             (Video played.)

19             "There was an intentional -- there was an

20   induced surcharge which included intentionally

21   delivering extra water to this area on the Buffalo

22   Bayou.

23             "Objection.  Form.  Vague.  Is that a

24   question, counsel?

25             "There was an intentional release of water

1   down Buffalo Bayou, yes.

2            "By the book?

3            "By the book.

4            "Object to form.  Vague.

5            "And that book is the same book that closed

6   the gates?

7            "Objection.  Form.  Vague.

8            "Yes.

9            "Tell the judge what the Water Control Manual

10  is.

11           "The Water Control Manual is the document

12  that is used to govern water control decisions.

13           "If we fed -- go with me on this.  If we had

14  a computer that y'all created and we fed the Water

15  Control Manual into that computer and so that the only

16  decisions that were made during Hurricane Harvey came

17  out of that computer and the computer was following the

18  Water Control Manual.  Are you with me in my

19  hypothetical?

20           "I think so.

21           "Would the computer have made any different

22  decisions than you made?

23           "Well, it's a very subjective and obviously a

24  hypothetical question, so difficult for me to answer

25  what a computer would do versus what the humans did or

1    would do given the models and the Water Control Manual.

2             "And I'm saying if you fed the Water Control

3    Manual and all your models into the computer, would the

4    computer have made a different decision than you made?

5             "Object to the form of the question.

6             "Based off of this hypothetical, I do not

7    believe that a computer receiving the input that you

8    described would have made a different decision.

9             "I agree with that.  Thanks for your answer.

10            "But for today, it's your testimony that the

11   decision to open the gates was done by the book

12   according to the Water Control Manual?

13            "Objection.  Form.  Mischaracterizes prior

14   testimony.

15            "That was done by the book following the dam

16   safety protocols as well as the Water Control Manual.

17            "And I think you may have already answered

18   it, but are you saying -- and it's not a trick question

19   because Mr. Thomas and many others have answered this

20   already.  But is it your understanding during Harvey

21   that the corps operated Addicks and Barker consistent

22   with the Water Control Manual's directives and that

23   deviation you just referenced?

24            "Objection.  Form.  Compound question.  Calls

25   for speculation.

1          "In my opinion, we followed the Water Control

2    Manual to the letter.

3          "And the reason the gates were opened was

4    because of these induced surcharge regulations as

5    prescribed and set forth in the Water Control Manual,

6    right?

7          "That's right.

8          "Was there any other reason?

9          "No, sir.

10          (Video stopped.)

11   BY MR. McGEHEE:

12      Q.   Based on what you just heard, was emergency a

13   reason for opening the gates?

14      A.   No.  They were following the Water Control

15   Manual.

16      Q.   Based on what you just heard, was imminent

17   danger a reason for opening the gates?

18      A.   No, it was not.

19      Q.   I'm going to use the judge's term.  Describe

20   the single document that lists the ordinary operating

21   procedure for when the gates are to be opened absent an

22   emergency.

23      A.   Yes.  The Water Control Manual outlines the

24   ordinary operating procedures for the dam tender for

25   opening and closing the gates.  That's included in the

1    Water Control Manual.

2        Q.   And could you point -- we're going to pull it

3    up here in a second.

4        A.   Yes.

5        Q.   But my question will be, can you point to the

6    Water Control Manual, what triggered the corps to open

7    the gates based on the Water Control Manual?

8        A.   Yeah.  So this -- what we're looking at is

9    one of the plates at the back.  If you slide it up

10   slightly, I can just reference the plate number.  Yeah,

11   it's plate 703, induced surcharge.  This is for

12   Addicks.  And how this would be read is on the very

13   left-hand side, the vertical axis, what the dam tender

14   would be who is operating it would look at what

15   elevation.  So there's two elements that would go into

16   it.  It would be first elevation and then the rate of

17   rise, how fast the water is filling up within the

18   reservoir upstream, just upstream of the dam.

19           So on the left-hand side, if you went to like

20   a 104, if the water filled up to that, that doesn't

21   automatically cause the gates to be opened or operated

22   differently.  You have to look at rate of rise, and

23   those are those curved lines going across.  So if

24   underneath here you're at a 104 and the rate of rise

25   is, you know, .36, you would slide over to that.  And

1   then once you hit that line, you'd follow that black

2   line up to the top.  It's kind of hard to see here.  I

3   think that's a 2.5 foot.  So then the dam tender would

4   open up the gates 2.5 feet.  So this is the induced

5   surcharge with a manual that would be followed based on

6   the elevation that's in the reservoir upstream of the

7   dam and then sliding over to the rate of rise, how fast

8   it is filling up.

9       Q.   When the corps employee said "by the book,"

10  is that the book he was referring to?

11      A.   This is the book, the Water Control Manual,

12  yes, sir.

13      Q.   And I can't -- I can't see very well at all.

14           MR. McGEHEE:  If I could approach?

15           THE COURT:  Sure.

16  BY MR. McGEHEE:

17      Q.   Right here, it says "induce surcharge

18  operating schedule."  Anywhere in there does it say

19  "emergency"?

20      A.   For this and within the manual where these

21  fall under, no, it does not use the word "emergency."

22      Q.   Based on what the corps employee said and

23  what's in the ordinary operating procedure, was there

24  any other reason that has been testified to or you

25  reviewed in your documents?  So is there any other

1    reason to open the gates?

2        A.    Other than following the water control manual

3    to -- by the book, as he said, no, there's no other

4    reason that I've seen.

5        Q.    Before I ask whether or not there was, in

6    fact, an emergency -- and we're going back now to the

7    judge's question, whether an emergency necessitated.

8    Before I ask whether or not there was, in fact, an

9    emergency, whether it was declared or assumed or

10   informal, I'd like to see -- I'd like you to listen to

11   what the corps officials said about that subject, and

12   then I'm going to ask your opinion.

13           MR. McGEHEE:  Please play clip number 1.

14           MS. DUNCAN:  Your Honor, we'd like to renew

15   our objection.  We believe this is improper testimony

16   that the plaintiffs are trying to backdoor in.  He is

17   not qualified to speak on this Emergency Action Plan as

18   to whether there was an actual emergency.  That's a

19   fact question.  He hasn't described any methodology

20   other than simply looking at testimony.  Well, you're

21   the one who looks at testimony, Your Honor.  You're the

22   one who decides questions of fact.  And so plaintiffs

23   are trying to backdoor in this inadmissible, unadmitted

24   deposition testimony through their expert on what is

25   simply a fact question.

1          THE COURT:  Okay.  I'll overrule the

2     objection but allow you to have a sustaining continuing

3     objection to that issue.

4          (Video played.)

5          "You know what the Emergency Action Plan is?

6          "Yes.

7          "You know it's -- you've got to follow the

8     Emergency Action Plan to the T, correct?

9          "You need to follow the Emergency Action

10    Plan, yes.

11          "At no time during Hurricane Harvey was

12    Hurricane Harvey declared an emergency by the Corps of

13    Engineers, true?

14          "Could you restate that question, please?

15          "At no time did you designate this as an

16    emergency?

17          "Objection.  Form.  Calls for speculation.

18          "At no time to my knowledge did conditions

19    exist that would have required us to exercise the

20    emergency operation plan.

21          "And since the conditions didn't exist, you

22    didn't declare an emergency, did you?

23          "Objection.  Form.  Calls for speculation.

24          "Not to my knowledge.

25          "Okay.  And there's a -- and I'm going to

1  hand you that.  That's the corps' Emergency Action

2  Plan, isn't it?

3           "Yes, sir.

4           "And that's what you're referring to as never

5  being invoked in Harvey?

6           "Yes, sir.

7           "Okay.  Now with respect to Addicks and

8  Barker, they were not under emergency operations; is

9  that correct?

10          "I'll object to the form of the question as

11 vague.

12          "As of August 22nd, 2017, Addicks and Barker

13 were not under any sort of Emergency Action Plan or

14 emergency operations, right?

15          "I -- no, they were not.

16          "And so if Addicks Barker were ever operating

17 under the EAP, that would have been something that

18 Mr. Thomas would have decided or determined?

19          "We would have determined that together, sir.

20          "Okay.  And to your knowledge, did that ever

21 occur?

22          "No, sir.

23          "Has there ever been a formal declaration of

24 a level two emergency in the history of the Addicks and

25 Barker Dams and Reservoirs?

1          "Not that I know of, sir.

2          "Has there ever been a formal declaration of

3    level one emergency?

4          "Not that I know of, sir.

5          "Has there ever been a formal declaration of

6    level three emergency?

7          "Not that I know of, sir."

8          (Video stopped.)

9    BY MR. McGEHEE:

10        Q.   Based on those responses, your training,

11   skill, and experience, and what you've reviewed in this

12   case, I'd ask you the judge's question.  Did emergency

13   necessitate opening the gates?

14        A.   From what I've seen, no.  They were following

15   the Water Control Manual based on the elevation and

16   rate of rise.  It was not based on emergency

17   observations out in the field.

18        Q.   And how does that fit with the ordinary

19   operating procedure?

20        A.   They were following the ordinary operating

21   procedures based on an elevation rate of rise to open

22   the gates underneath the induced surcharge.

23        Q.   Did you review the memo for the commander and

24   the report of performance?

25        A.   I did, yes.

1      Q.   So I have a hard time, I can read my version.

2  Can you read your version?

3      A.   With my glasses off, then I can, yes.

4      Q.   You can't do it either?

5      A.   No, I can.  Yes.

6      Q.   Okay.  Could you please read from the

7  memorandum for the commander written by Robert Thomas

8  the highlighted portions of number 2?

9      A.   Yes, sir.

10          "The embankment, outlet structures, and

11  emergency spillways functioned as intended.

12  Piezometers, settlement pins, and alignment surveys for

13  the outlet structures do not show any alarming trends

14  from this pool of record.  No observations of seepage,

15  critical distress areas located on the dams -- or

16  critical distress areas located on the dams.  Overall

17  conclusion is that the project was performing as

18  expected with no significant problems during this pool

19  of record."

20      Q.   Could you read the report of performance, the

21  highlighted portion on the page that H.C. is going to

22  put up here?  There you go.

23      A.   Okay.  Great.

24          "In general, both dams functioned as expected

25  throughout the flooding event and no critical issues

1   were observed that would impact the future performance

2   of the dams.  Release from the reservoir were made

3   following the Water Control Manual, WCM, November --

4   dated November 2012, induced surcharge regulated

5   releases."

6       Q.   And read - I think this is one of the last

7   ones - the next page, just the highlighted portion.

8       A.   Yes.

9            "In general, the observation teams did not

10  find any critical issues that could impact the proper

11  performance of the dams.  There were no critical

12  findings observed during this Stage 2 extended watch

13  for both Addicks and Barker dams."

14      Q.   And then we have a section that refers to our

15  capacity chart here in that same document.  Would you

16  read the highlighted portion that's called "Emergency

17  Spillway Performance," the highlighted portion.

18      A.   Yes.

19           "The full capacity of the emergency spillways

20  was not reached.  No issues were observed with

21  emergency spillways.  The emergency spillways of the

22  south end of the Addicks Dam and both the Barker Dam

23  did not see any flows."

24      Q.   One last paragraph.  Just the highlighted is

25  fine.

1       A.    The top is "Piezometer measurements, no
2  critical issues were observed."
3       Q.    Mr. Bardol, based on the training you had in
4  emergencies, based on your writing and editing and
5  reviewing emergency action plans, after-action reports,
6  and all your training, skill, and experience, should a
7  memorandum for the commander and a report of
8  performance that's written a month or so after the
9  event, should it be truthful?
10      A.    Yes, it should be.
11      Q.    Should it be completed?
12      A.    Yes, it should be.
13      Q.    Should it be helpful for future events?
14      A.    Yes.
15      Q.    Could future -- could future lives depend on
16  the accuracy?
17      A.    Yes, it would.
18      Q.    Describe where in these documents that we
19  just read, describe where they discussed that emergency
20  necessitated opening the gates.
21      A.    These documents do not show that.
22      Q.    Describe in these documents written shortly
23  after the event that they discuss imminent danger
24  necessitated opening the gates.
25      A.    They do not.

1      Q.   Describe where it says the Water Control
2   Manual was not followed.
3      A.   It does not say that.
4      Q.   Describe where it says the ordinary operating
5   procedure was not followed.
6      A.   It does not say that.
7      Q.   Describe whether a declaration of emergency
8   ever appears in these documents.
9      A.   I do not see that.
10      Q.   Describe whether a declaration of emergency
11   was ever communicated to Houston, Fort Bend County,
12   Harris County Flood Control, or the 7.5 million
13   residents of the Houston area.
14      A.   I did not see that.
15           MS. DUNCAN:  Objection.  Your Honor, we're
16   well beyond the foundation of Mr. Bardol's expert
17   report.  He doesn't describe doing such an analysis and
18   it certainly isn't in his report.
19           THE COURT:  Well, I guess it's within the
20   context of this report, the question.
21           Is that right, Mr. McGehee?
22           MR. McGEHEE:  Yes, sir.
23           THE COURT:  I assume.  Within the context of
24   this document then, I'll overrule the objection.
25

1    BY MR. McGEHEE:

2        Q.   I'm going to talk about the Emergency Action

3    Plan, times when an emergency exists.

4        A.   Yes.

5        Q.   And even though I think it's obvious our

6    position an emergency did not exist, let's go to the

7    Emergency Action Plan and see whether the conditions

8    were met that satisfy an emergency under the Emergency

9    Action Plan.

10           First of all, do you recall Mr. Long saying

11   that those conditions did not exist?

12       A.   Yes, I do recall that.

13       Q.   Okay.  Let's look at the Emergency Action

14   Plan.  Page 15 of the Emergency Action Plan, it lists

15   the Level 1 emergency, Level 2 emergency, and Level 3

16   emergency.

17           Do you see that?

18       A.   I do, yes.

19       Q.   Were those conditions for Level 1 emergency

20   ever met?

21       A.   From what I saw, no.

22       Q.   Were the conditions for a Level 2 emergency

23   ever met?

24       A.   No.

25       Q.   Were the conditions for a Level 3 emergency,

1    which -- it says "Level 3 Emergency - Evacuation."

2    Were those conditions ever met?

3        A.    Following from this page, no, they were not

4    met.

5        Q.    There's a section where there's a procedure

6    for opening the gates and doing other things under the

7    Emergency Action Plan.  When you look at the procedure

8    on page C-13, it says "Emergency Level 1 or 2,

9    Condition 1" and "Condition 2."

10            Do you see those?

11       A.    I do.

12       Q.    And you've reviewed those?

13       A.    I have, yes.

14       Q.    Were those conditions met?

15       A.    These conditions were not met, no.

16       Q.    Do you see how the gates are supposed to be

17   opened during an emergency?

18       A.    Yes, on this page.  And I think the following

19   page, there's another table.

20       Q.    Is that how they opened the gates, according

21   to this emergency, during Hurricane Harvey or did they

22   follow the procedure in the Water Control Manual?

23       A.    They followed the procedures in the Water

24   Control Manual.

25       Q.    And did a dam safety officer ever declare

1    when the termination of the emergency occurred?

2         A.    I did not see one, no.

3         Q.    Would you agree that every, every emergency,

4    a hundred percent every single emergency should be

5    declared?

6         A.    That's correct, yes.

7         Q.    Would you agree that no emergency ever under

8    the sun should be informal or secret?

9              MS. DUNCAN:  Objection.  Leading.

10   Argumentative.

11             THE COURT:  It is leading.

12             MR. McGEHEE:  It is, Your Honor.

13   BY MR. McGEHEE:

14        Q.    How appropriate would it be for --

15             THE COURT:  Sustained.

16             MR. McGEHEE:  -- the corps to say they

17   invoked an informal emergency?

18             THE WITNESS:  Within the Emergency Action

19   Plan and standard procedures, emergency is declared.

20   So there's a defining point when someone in control and

21   in command would declare an emergency, then enact the

22   actions.

23   BY MR. McGEHEE:

24        Q.    I'd like to talk about informal emergency,

25   and I'd like to ask you the propriety of even having an

1  informal emergency.  And I'd like you to listen to what
2  the corps officials said about that, and then I'm going
3  to ask your opinion about it.
4        MR. McGEHEE:  Please play clip 2.
5        MS. DUNCAN:  Objection.  We renew our prior
6  objection about playing deposition testimony, and then
7  we also object to the relevance of propriety.  It's
8  really not relevant whether this witness thinks it's
9  proper.  Again, all this goes back to a fact question
10 as to whether the EAP was invoked.  It doesn't require
11 an expert looking at deposition testimony and reaching
12 a purported opinion on it.
13       THE COURT:  Well, the propriety I agree with.
14 The rest of the question is okay.  So I'll allow the
15 question minus the propriety.
16       MR. McGEHEE:  And I'll withdraw the propriety
17 question.
18       Play clip 2.
19       (Video played.)
20       "So looking back at Exhibit 25, which is the
21 report of performance for Addicks and Barker Dams for
22 this new pool of record, I don't find any discussion of
23 Emergency Level 2 being activated in this document.  Is
24 that because it was only an informal declaration?
25       "No, sir.  It's because there was no threat

1    of immediate dam failure.

2                "Does the Emergency Action Plan prescribe

3    having an informal level two emergency designation?

4                "I don't believe so, sir.

5                "You don't believe so?

6                "I don't believe, sir.

7                "I heard the word 'informal emergency,' and I

8    almost laughed because it sounds to me like an

9    oxymoron.  Do you know an oxymoron is when two words

10   seem to contradict each other?

11               "Objection to form.  Compound question.

12               "You know that's the definition of oxymoron?

13               "Yes, sir.

14               "Nowhere in the Emergency Action Plan are the

15   words 'informal emergency' used, correct?

16               "Objection.  Form.  Lack of foundation.

17               "I do not know the document word for word, so

18   I couldn't say if it's in there or not.

19               "You know that it's not protocol to have

20   informal emergency action plans, correct?

21               "Objection.  Form.  Lack of foundation.

22               "Yes, sir.

23               "And I'll be straight with you, Mr. Long.  I

24   think the word 'informal emergency' came up in

25   preparation for this lawsuit.  So my question is this:

1   Have you ever seen those words written in any document
2   ever in the history of the world ever published by the
3   Corps of Engineers?  Have you ever seen the words
4   'informal emergency'?
5           "Objection.  Form.  Compound question.
6           "Not that I recall."
7           (Video stopped.)
8           THE COURT:  I've seen the word "informal
9   emergency" used with my three-year-old grandson.  It
10  happens all the time.  He wants to do something and
11  grandpa, good nature to say, "Oh, yeah."  And then
12  realizes, no, his mother and dad aren't going to like
13  that.
14          MR. McGEHEE:  So I'm going to modify my
15  script.
16  BY MR. McGEHEE:
17      Q.   Mr. Bardol, I'm not going to ask you
18  propriety.
19          What documents indicate, if any, of all of
20  the things that you've reviewed that an informal
21  emergency was ever communicated in writing to the
22  Harris County Flood Control District, to Fort Bend, to
23  the City of Houston, or to the 7.5 million residents of
24  the Houston area?
25      A.   I have --

1          MS. DUNCAN:  Objection, Your Honor.  This is

2     not a matter that was analyzed in his report or

3     disclosed as an opinion.  It's beyond the scope and

4     improper under Rule 26.

5          THE COURT:  Yeah, I think I'd agree with

6     that.  I'll sustain the objection.

7     BY MR. McGEHEE:

8          Q.   What corps documents have you reviewed that

9     ever used the word "informal emergency"?

10         A.   Corps documents or even just other documents

11    for dam safety, Emergency Action Plans, including the

12    Corps of Engineers for the Federal Emergency Regulatory

13    Commission or the energy commission that -- for

14    hydroelectric facilities, it's always declared

15    emergency when it goes into Emergency Action Plan.  It

16    would not be informal.  Once it goes into Emergency

17    Action Plan, there's a formal notification process.

18    Notification tree, I did that in the Air Force.  But

19    also through Emergency Action Plans, you end up having

20    declare an emergency.  That enacts, you know, usually a

21    flow chat of who is notified when.  There's usually

22    written communication that goes out as far as specific

23    sound bites of what the emergency is, what the action

24    would be.  So it's usually a very formal process.

25         Q.   Let's talk about paragraph 8.5 of your

1    report.

2            MR. McGEHEE:  And, Your Honor, I said I would

3    notify you where I get to convenient stopping points.

4    Here is one.  There's another one in 15, 20 minutes.

5    And I am just alerting the court.

6            THE COURT:  Okay.  Well, how much time are

7    you going to need for Mr. Maglio?

8            MS. DUNCAN:  I think between the parties,

9    we've estimated approximately an hour and a half.

10           THE COURT:  So why don't we go for 20 minutes

11   here, and then we can stop and then bring on

12   Mr. Maglio.

13           MR. McGEHEE:  Thank you, sir.

14   BY MR. McGEHEE:

15       Q.   Page 8.5 of your report.  And I want to talk

16   about dam failure and dam safety.  And before I do, I'd

17   like you to listen to what the corps officials said

18   about dam failure and safety as a reason for the

19   induced surcharges.

20           Please play clip number 3.

21           MS. DUNCAN:  Objection.  Before we go there,

22   Your Honor, this witness is not a geotechnical expert.

23   He can't speak to the stability of the dam for the

24   likelihood of failure.  He never analyzed that in this

25   report and it's, again, beyond the scope of his

1    expertise.  Part of this report was authored by a

2    geotechnical expert that the plaintiffs have chose to

3    not put on the stand.  So Mr. Bardol can't sit here and

4    cover geotechnical or dam integrity related topics.

5              MR. McGEHEE:  Judge, it's his report.  He can

6    rely on other people in Geosyntec.  It even occupies

7    its own chapter, Chapter 8.56, for dam failure and dam

8    safety.

9              THE COURT:  Okay.  I'll allow it with the

10   understanding that if he goes beyond the report, he's

11   not a geotechnical expert, but he does have the ability

12   to use that as an expert witness.  Okay.

13             MR. McGEHEE:  Clip 3.

14             (Video played.)

15             "In this case there was no issue involving

16   integrity of the dam, true?

17             "Objection.  Form.  Calls for speculation.

18             "Not to my knowledge.

19             "Dam performed as expected?

20             "Objection.  Form.  Vague.

21             "To my knowledge, yes, sir.

22             "You were proud of how the dam performed?

23             "Yes.

24             "And I think we established in your first two

25   days of deposition that there was never a point where

1    the Army Corps believed that the reservoirs were about

2    to fail.  True, sir?

3            "True.

4            "So your observers and your piezometers

5    weren't giving you data saying we're about to have

6    imminent failure, right?

7            "That's right, sir.

8            "And, in fact, you made comments and people

9    with the corps made comments that erroneous reports

10   that there had been failures where inaccurate, right?

11           "That's right, sir.

12           "And this point here, controlled releases

13   from the dams are required to mitigate risk to the

14   structure, there was no structure failure, correct?

15           "That is correct.

16           "To either Addicks or Barker?

17           "No, sir.

18           "Was there ever a determination made that

19   either Addicks or Barker would fail?

20           "Not to my recollection.

21           (Video stopped.)

22   BY MR. McGEHEE:

23     Q.   Let's talk about dam safety as a reason for

24   the induced surcharge.  And describe in your opinion

25   whether or not dam safety a long, long time ago during

1    the reign of the 1962 Water Control Manual, which had a
2    different name, do you think dam safety in the 1962
3    Water Control Manual wasn't a reason why induced
4    surcharges were used?
5         A.    Yes, I'll talk to that.  So as far as on the
6    1962, the -- it's kind of hard to see there, but the
7    Reservoir Regulation Manual, when this was enacted or
8    was in place, the auxillary spillways I talked about
9    before, Judge, you know, they were not reinforced, they
10   were not roller-compacted concrete.  They were just
11   bare earth.  So if there was flanking flows, there
12   would be a risk at that time for the hydraulic scouring
13   and failure of the dam through the hydraulic forces.
14            And just as on the component here of -- you
15   know, I do work with a lot of geotech engineers.  I am
16   not.  But usually with the dam itself, I always joke
17   with them, you know, a dam but for the water is really
18   not a dam.  You really need water up there.  So it's
19   always the geotech and the water sources engineer that
20   are working together.
21            So underneath this, you know, underneath
22   1962, there was a concern of dam failure based by
23   flanking, use the auxillary spillways.  Actually back
24   then I think they were called "emergency spillways."
25   That was changed after they were, you know, reinforced

1    because by them being enacted, it's just ordinary

2    operating underneath that that they can flank and they

3    wouldn't fail.  So back then, there was a risk due to

4    failure due to scouring up there.  But after they

5    were --

6               THE COURT:  What did the risk cause, you

7    said?

8               THE WITNESS:  When the 1962 manual was in

9    place, prior to the 1980s when they were -- the

10   auxillary spillways were paved, if the water would flow

11   around and flank up there, it could cause a dam failure

12   because you would have scouring and it would scour the

13   earth, and that's a hydraulic, not a geotechnical

14   element, but it would scour where the spillway would

15   be.

16              THE COURT:  Okay.

17   BY MR. McGEHEE:

18       Q.   And if you can --

19              MR. McGEHEE:  I'm sorry, Judge.  Are you...

20              THE COURT:  Yeah, that answers my...

21   BY MR. McGEHEE:

22       Q.   In the old manual, in the 1962 manual, where

23   dam safety may have been a reason for -- they didn't

24   call them induced surcharges, but opening the gates,

25   what's the topic title that describes when the gates

1   should be open?  Read the topic title for number 30.

2       A.   30 was Emergency Regulation.

3       Q.   Emergency Regulation.

4            And that topic title is different from

5   today's Water Control Manual, correct?

6       A.   It is, correct, yes.  They removed the word

7   "emergency."

8       Q.   And let's look at the chart on the next page

9   that describes the criteria that you described before,

10  the elevation and the rate of rise for when the gates

11  are supposed to be open.  First of all, tell us what's

12  highlighted.  What is this table called?

13      A.   This is emergency operating schedule, plate

14  22.

15      Q.   And as we pointed out before in the current

16  Water Control Manual, those words don't appear.  It

17  doesn't say "emergency," does it?

18      A.   It does not.

19      Q.   And what does this panel say compared to the

20  2012 manual?  What does this panel say when to open the

21  gates?  About the same?

22      A.   It's similar here.  They have the elevation

23  on the left, so the reservoir elevation.  Then they

24  have the rate of rise in decimal feet for the inflow.

25  And just as similar, you go from the elevation, follow

1    that graph to the right where you get the rate of rise.

2    And then from that, you can figure out how much to open

3    up the five conduits in order -- in measurement of

4    feet.

5         Q.   And we talked about what might have happened

6    between 1962 and 2012 to remove dam safety as a reason

7    for the induced surcharge.  And I want to turn your

8    attention to the dam safety modification report.  Are

9    you familiar with that, sir?

10        A.   I am, yes.

11        Q.   And you've read that?

12        A.   I have, yes.

13        Q.   I'd like to put up JX 042 on the board.  And

14   I think you generally described the improvements that

15   might be a reason why dam safety is no longer an issue.

16   Just briefly read the highlighted portions of the dam

17   safety modification report that's highlighted on

18   page -- on paragraph 2.6.10.

19        A.   Yes.  The title is "Armoring Ends of Dams,

20   Addicks and Barker Dams."  Roller-compacted concrete,

21   which is RCC -- just the highlighted, correct?

22             MS. DUNCAN:  And, Your Honor, may I get a

23   page number?

24             MR. McGEHEE:  Yes.  USACE066071.

25             MS. DUNCAN:  Got it.  Thank you.

1         MR. McGEHEE:  Okay.

2    BY MR. McGEHEE:

3         Q.   Go ahead, sir.

4         A.   Just read the highlighted portions or --

5         Q.   Yes, sir.

6         A.   Okay.

7         Q.   Yes, sir.

8         A.   So it starts off with the armoring ends of

9    the dams, Addicks and Barker Dams.  It talks about the

10   roller-compacted concrete, the RCC I mentioned before,

11   was placed in lengths of 10,550, and then the

12   8,489 feet along the dams, and then also lengths of

13   11,631 and 2,990 feet were the lengths that it was

14   placed.  The armoring consist of eight-inch plate --

15   eight-inch in-place thickness of roller-compacted

16   concrete.  The RCC was placed over the crown and

17   downstream slope of the outflow embankment and extends

18   ten feet longitudinally.  An apron varying in width

19   from 10 to 15 feet, protection in the tailwater area.

20   Additionally, the apron at the toe of the embankment

21   was extended for lengths of 30 feet.  To assure that

22   the erosion will not occur past the transition between

23   the overflow and the main embankment sections of the

24   dam, the roller -- oh, I'm sorry, that's not

25   highlighted.  A steel pile cutoff wall was driven

1    across the dam embankment.

2        Q.   How does that support your opinion that the

3    dam safety reason in the 1962 manual no longer exists

4    in the 2012 manual?

5            MS. DUNCAN:  Objection, Your Honor.  We're

6    now well beyond his report again.  He doesn't analyze

7    the '62 manual anywhere in his report, nor does the

8    geotechnical portion analyze this level of detail.  And

9    they certainly -- the report certainly doesn't

10   characterize the '62 manual and this armoring for dam

11   safety.

12           MR. McGEHEE:  And if I could just ask a

13   predicate question.

14   BY MR. McGEHEE:

15       Q.   Does your report discuss dam safety?

16       A.   It talks about the improvements that are

17   outlined in here, and it was taken for given that, you

18   know, these were enacted.  I mentioned the '62, but

19   just that the 2012 Water Control Manual was what was in

20   place.  That's what the focus was.

21           MS. DUNCAN:  Your Honor, may I respond?

22   There's a big difference between describing the history

23   of the project and how it might have changed over time

24   and then trying to draw conclusions about how it might

25   have impacted the Water Control Manual and operations

1    over time.  He hasn't done that in his report.

2           THE COURT:  It seems like a fairly direct

3    logical leap if you say here's what they had said in

4    '52 that made is safer.  Basically that's -- that seems

5    to me that's a common conclusion that you could draw.

6    So I'll allow the question.

7    BY MR. McGEHEE:

8        Q.    You can answer the question.

9        A.    Okay.  Just as far as -- do you mind

10   re-asking the question?  I want to make sure I stay on

11   point with --

12       Q.    Yeah, we can read back the question.

13       A.    I'll go though -- I think I have the gist of

14   it.  As far as from the 1962, these improvements were

15   not in place in the '80s and '90s.  Significant amount

16   of improvements were put in place at the end of the --

17   at the end of the dams at the auxillary spillways.  So

18   then moving into the new Water Control Manual, it would

19   not be and I would not have the same concern with scour

20   that would happen at these auxillary spillways because

21   they are reinforced with roller-compacted concrete, the

22   steel plates, et cetera, to be able to look at that.

23           Also in this time period, the spillway design

24   flood was updated, and that would have been also looked

25   at that we already went through those tables of having

1    that much higher storm event for designing the

2    spillways.

3            THE COURT:  So that's why dam safety has

4    become a nonissue in the later reports.

5            THE WITNESS:  Correct, when it comes to the

6    induced surcharge in allowing flanking flows.

7            THE COURT:  Usually when I want to do

8    something, I say, "dam, safety."

9    BY MR. McGEHEE:

10       Q.   Sir, did you review the draft operational

11   assessment of October of 2009?

12       A.   I did, yes, sir.

13       Q.   I'd like to read two passages, one to

14   identify whether or not the corps knew it could happen

15   and, two, whether or not there's support in there of

16   your opinion for an alternative reason for opening the

17   gates using the induced surcharge ordinary operating

18   procedure.

19            First of all, let's look at the operating

20   constraints under the draft operational assessment

21   manual.  And can you read the highlights?  Because I

22   can't.

23       A.   Yes.

24            "The increase in downstream development and

25   possibly downstream tributary inflow has contributed to

1    reductions in allowable outflows.  The dams are

2    operated strictly to prevent downstream flooding;

3    therefore, the gates remain shut even if pool levels

4    increase and flood upstream properties.  The flood

5    pools have never exceeded the limit of government-owned

6    land and the homes upstream of the dams have not

7    flooded due to the pool.  However, available hydrologic

8    models indicate that the limit of government-owned land

9    would be exceeded in extreme events; for example, it is

10    believed that if Tropical Storms Allison or Claudette

11    had been centered on the basin, flooding of the

12    upstream development would have occurred."

13        Q.   And now I'd like to turn to page 464103 and

14    ask whether this suggests another reason for opening

15    the gates during the induced surcharge procedure

16    besides dam failure?

17        A.   Do you want me to read this first?

18        Q.   Yes, please.

19        A.   Okay.

20            "With such high valuation of upstream

21    properties, it might be desirable to increase the

22    allowable release rates from the reservoir once the

23    downstream peak flows have occurred and accept some

24    increased duration of downstream flooding."

25        Q.   Now I'd like to just ask the bottom-line

1    questions that the court asks.  In your opinion, did

2    emergency necessitate opening the gates?

3        A.    No.

4        Q.    Was -- were the gates opened based on

5    ordinary operating procedure?

6        A.    Yes, following the Water Control Manual

7    induced surcharge.

8        Q.    Thank you.

9            MR. McGEHEE:  Your Honor, now we're going

10   into the gates closed and we're going to go into test

11   properties.  If Your Honor would like a break at -- or

12   like to permit the defense to call a witness out of

13   order, that's okay.

14           THE COURT:  Okay.  Do you want to do that now

15   or do you want to break for five minutes or...

16           MS. DUNCAN:  I think we should take just a

17   very short break to make sure the witness is here and

18   get resituated.

19           THE COURT:  Okay.  We'll make it ten because

20   it will take us that long to find our way in the maze

21   here.

22           We will stand in recess for ten minutes.

23           (Off the record from 3:13 until 3:26.)

24           MR. NOLEN:  May I proceed, Your Honor?

25           THE COURT:  Yes.

 1          MR. NOLEN:  All right.  At this time the

 2    plaintiffs will call Coraggio Maglio.

 3          THE COURT:  Mr. Maglio, if you'll go up to

 4    the witness stand and raise your right hand and sort of

 5    imagine your left hand is on the Bible which we don't

 6    have there.  It's an invisible Bible.

 7    Thereupon--

 8                    CORAGGIO MAGLIO

 9    was called as a witness and, after having been first

10    duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12    BY MR. NOLEN:

13       Q.   Mr. Maglio, would you please state your full

14    name for the record.

15       A.   It's Coraggio Kenneth Maglio.

16       Q.   All right.  Mr. Maglio, you no longer work

17    for the Army Corps of Engineers; is that true?

18       A.   Yes.

19       Q.   When did you leave?

20       A.   A couple years ago.

21       Q.   Did you work for the Army Corps for about

22    14 years?

23       A.   Yes, sir.

24       Q.   Were you working for the Army Corps of

25    Engineers during Hurricane Harvey?

    1        A.    Yes, I was.

    2        Q.    Did you move to Texas in 2016?

    3        A.    Yes, sir.

    4        Q.    Did you start with the corps as a design

    5   civil engineer in the waterways section?

    6        A.    Yes.

    7        Q.    And when you came to Texas, were you assigned

    8   to H&H?

    9        A.    Yes.

   10        Q.    And what is H&H?

   11        A.    Hydraulics and hydrology.

   12        Q.    And was that in the Galveston District?

   13        A.    Yes, sir.

   14        Q.    What was your title?

   15        A.    I was the branch chief.

   16        Q.    The branch chief of engineering or hydraulic

   17   engineering?

   18        A.    Hydraulics and hydrology.

   19        Q.    All right.  Are you a registered engineer?

   20        A.    Yes, sir.

   21        Q.    Were you ever registered in the state of

   22   Texas?

   23        A.    Yes.

   24        Q.    And when did you become registered in the

   25   state of Texas?

```
 1       A.    Right about the time I left the corps, so it
 2   would have been '21, '22, somewhere in there.
 3       Q.    Prior to -- and I'm not sure that people are
 4   picking you up.  Can you kind of direct that microphone
 5   a little bit to your face?
 6       A.    Sure.
 7       Q.    Yeah, I'm just not sure everybody is able to
 8   hear.
 9             Okay.  So during the period of time that you
10   were supervising the engineering, hydraulic engineering
11   for the Galveston District, were you not registered in
12   Texas?
13       A.    No, I was not.
14       Q.    Where were you registered?
15       A.    In the state of Florida.
16       Q.    Any other states?
17       A.    No.
18       Q.    Were you responsible for staffing the Harvey
19   event for water control purposes?
20       A.    Yes.
21       Q.    Did you physically go to the Barker Reservoir
22   Field Office on Highway 6 just before Harvey landed in
23   Houston?
24       A.    Around that point in time, yes.
25       Q.    A little before?
```

1      A.   It was -- yeah.  It blended together, but,

2  yes, right around that time.

3      Q.   And were you there to be closer to the dams

4  and to make hydraulic observations?

5      A.   Yes, sir.

6      Q.   Who else was there with you?

7      A.   I brought four folks from my team, and then

8  we had the dam safety team, all the folks from the

9  field office at the reservoirs.

10          Do you want specific names?

11     Q.   Maybe I can help.

12          Was Chuck Ciliske there?

13     A.   Yes, he was.

14     Q.   Rob Thomas?

15     A.   Yes, sir.

16     Q.   Was Richard Long there?

17     A.   Yes, sir.

18     Q.   And was the dam tender there?

19     A.   Well, there's numerous dam tenders, but, yes.

20     Q.   Okay.  Do you know who the dam tender was

21  when you were at the field office?

22     A.   Several people filled that role at various

23  times, so...

24     Q.   And I --

25     A.   So, yes, they were --

1      Q.   Oh, I'm sorry.

2      A.   They were present.  There were folks that

3   were dam tenders there all the time.

4      Q.   Thank you.

5           Is the dam tender the person within the corps

6   who actually opens the flood gate?

7      A.   Yes.

8      Q.   So is it correct that to open the gates, you

9   have to unlock a control box and push a button?

10      A.   As far as I recall, yes.

11      Q.   And do you know if during Harvey the corps

12   operated the reservoir gates in accordance with the

13   2012 Water Control Manual?

14      A.   Yes, sir.

15      Q.   Is it your belief that the corps followed the

16   Water Control Manual to the letter?

17      A.   Yes, sir.

18      Q.   You were involved in the teleconferences when

19   putting the reservoirs into induced surcharge; is that

20   correct?

21      A.   I was involved in some of them, I'm sure.

22      Q.   You're not the -- you were not the

23   decision-maker, right?

24      A.   Well, no, not the ultimate decision-maker.

25      Q.   And when I'm talking about the ultimate

1    decision-maker, I mean the person who would have been

2    responsible for determining that the reservoir should

3    be placed in induced surcharge.

4         A.   No, it did not fall under me --

5         Q.   Okay.

6         A.   -- directly.

7         Q.   And do you recall that the reservoirs were

8    opened on August 28th, 2017?

9         A.   Yeah, on or about then.

10        Q.   After the induced surcharges began, you were

11   acting as a rover checking out points of concern

12   related to the reservoirs for the corps?

13        A.   Yes.

14        Q.   And when I said "rover," do you understand

15   what that means, that you were just sort of driving

16   around checking out points of interest?

17        A.   Yes, sir.

18        Q.   And that's what you were doing?

19        A.   Some of the time, yes.

20        Q.   And you were reporting back what you were

21   finding; is that true?

22        A.   Yes.

23        Q.   At that point, was the corps short staffed?

24        A.   We were doing the best that we could with the

25   staff we had.  We always want more, but, yes, we were

1  working with the staff we had.

2      Q.  I'm going to show you an email and ask you if

3  you recognize it.

4          MR. NOLEN:  May I approach the witness, Your

5  Honor?

6          THE COURT:  Yes, you may.

7  BY MR. NOLEN:

8      Q.  I'm going to leave it with you for a second.

9          MS. DUTTON-BYNUM:  Your Honor, can we get an

10  exhibit number for that?

11          MR. NOLEN:  Yeah, I was about to call it.  So

12  the number is JX 110.  JX 110.

13  BY MR. NOLEN:

14      Q.  Do you recognize that as an email that you

15  sent?

16      A.  Yes.

17      Q.  And can you read the email for us?

18      A.  "It is barely moving."

19      Q.  All right.  I'm going to ask that we display

20  the email that you've identified.

21          And so that's the email that you've got right

22  in front of you; is that correct?

23      A.  Yes, sir.

24      Q.  And was that your description of the north

25  end of Addicks?

1      A.   Yes, based on the image in the email.

2      Q.   Okay.  And so there is an image attached to

3  the email; is that right?

4      A.   Yes.

5      Q.   Is that a photograph that you took?

6      A.   Yes, sir.

7      Q.   Is this the image itself?

8      A.   Yes.

9      Q.   Is that the amount of water that you were

10  seeing at that time that was on the north end of

11  Addicks?

12      A.   Yes, sir.

13      Q.   And what's the date?

14      A.   The 29th.

15           THE COURT:  Let me ask a question.  By "the

16  north end of Addicks," do you mean the reservoir?

17           MR. NOLEN:  The north end of Addicks, the

18  spillway on the north end of Addicks, Your Honor.

19           THE COURT:  So this is the -- the spillway is

20  the take up.  And it gets to a certain height, the

21  water comes down the spillways?

22           MR. NOLEN:  The water cascades down onto the

23  spillway, that's correct, and passes over it.

24           THE COURT:  Okay.  It looks like the spillway

25  goes into a building.  Is that correct?

1   BY MR. NOLEN:

2       Q.   Well, actually, that building is off

3   government-owned land, right?

4       A.   Yes, sir.

5       Q.   It's about five feet off government-owned

6   land; is that correct?

7       A.   I'm not exactly certain how far it is, but

8   it's very close to the end of the spillway.

9            MR. NOLEN:  Do you have any other questions,

10  Your Honor?

11           THE COURT:  Well, I guess the building -- the

12  spillway isn't used very much, is it?  So I guess the

13  building can function still?

14           THE WITNESS:  Water has never gotten to that

15  point before or since.

16           THE COURT:  Okay.  So then did it flood the

17  building?

18           THE WITNESS:  I'm not certain.  I would

19  assume it did.  It went up a little higher than this,

20  so...

21           THE COURT:  Okay.  Thank you.

22  BY MR. NOLEN:

23       Q.   And you just said you would assume it did,

24  but you actually don't even know if it actually did

25  flood that building, do you?

1       A.    No.

2       Q.    And you took the photograph; is that right?

3       A.    Yes, sir.

4       Q.    And so you were physically there on the 29th,

5    and the rain was, what, just drizzling at that point?

6       A.    Well, during the storm, you had bands come

7    through.  So in between the bands, I would get out the

8    truck and take pictures when I could.

9       Q.    And when you took this picture, it wasn't

10   actually raining, was it?

11      A.    Yes.  It was drizzling.  It pretty much

12   consistently drizzled for days.

13      Q.    And when you said the water was barely moving

14   around the northern end or barely moving, tell us what

15   you were articulating there.

16      A.    So what I was trying to make sure everybody

17   understood, the water was going around the end of the

18   dams where the dam ties into natural grade.  And that's

19   something we've never seen before, and that meant the

20   water was leaving government-owned land around the

21   spillway.

22      Q.    But you said "barely moving."  So there's a

23   flowage rate involved in your assessment, correct?

24      A.    Yes.

25      Q.    And when you said "it's barely moving," can

1    you calculate what the flowage rate was?

2        A.   I don't know if this is from the same image

3    that I took, but I remember sending a text or an email

4    or something that said we're seeing about two to

5    four feet per second moving around the end.  I'm not

6    sure if it's the same time, but it was a very small

7    quantity of water.

8        Q.   Is it true the corps was never actually able

9    to quantify the total amount of water that migrated

10   around the north end of Addicks?

11       A.   Not to my knowledge.

12       Q.   Right.

13            Y'all gave some guestimates, but basically

14   you couldn't actually even quantify it; is that true?

15       A.   Personally, no.

16       Q.   Well, did you ever see any educated

17   guesses -- anything other than educated guesses

18   quantifying the amount of water that was moving around

19   the north end?

20       A.   No.

21       Q.   Is August 29th when the water first started

22   flowing around the north end of Addicks?

23       A.   I would assume, yes.

24       Q.   Okay.  That's the day you were taking the

25   picture?

```
1        A.    That's the day that I first observed it, yes.

2        Q.    And no water went over the auxillary

3  spillways of either reservoir or dam, correct?

4        A.    No.

5        Q.    And I'm going to show you another email.

6              MR. NOLEN:  May I approach, Your Honor?

7              THE COURT:  Yes.

8              MR. NOLEN:  I'm handing the witness JX 109.

9  BY MR. NOLEN:

10       Q.    Is that an email that you wrote?

11       A.    Yes, sir.

12       Q.    And I'm going to go ahead and ask we publish

13  it, which we just did.

14             And so the email says -- JX 109 says

15  "Subject: Addicks flow around northern."  It's got

16  another photograph attached.  And you wrote,

17  "Greetings, Flow around the northern end of dam is

18  minimal currently at 2035.  It is about 4" deep and

19  flowing at 2-4 cfs."

20             Is that right?

21       A.    Yes, sir.

22       Q.    And I'm going to ask that we take a look at

23  the photograph itself.  And so this is a nighttime

24  photo of the same location that you were at earlier,

25  correct?
```

```
 1          A.    Yes, sir.

 2          Q.    And you took that photograph?

 3          A.    Yes, sir.

 4          Q.    And you did not do a formal calculation?

 5    That again is a guesstimate on your part?

 6          A.    Yes.

 7                THE COURT:  Is that the spillway again we're

 8    looking at?

 9                THE WITNESS:  That's the end of the spillway

10    where it ties into natural ground.

11                THE COURT:  Okay.  So is the reservoir down

12    at the end or are we at the reservoir?

13                THE WITNESS:  I'm standing on the spillway

14    looking at the end of it where it terminates into

15    natural ground.

16                THE COURT:  Okay.  Where it terminates into

17    what?

18                THE WITNESS:  I'm standing on the spillway --

19                THE COURT:  Right.

20                THE WITNESS:  -- looking towards where it

21    terminates into natural ground.

22                THE COURT:  Into the...

23                THE WITNESS:  Into the existing grade.

24                THE COURT:  Into existing spillway -- into

25    the existing --
```

1              THE WITNESS:  Land.

2              THE COURT:  -- land or reservoir.

3              THE WITNESS:  Yes.

4              THE COURT:  So you're where the spillway

5    would come out?  You're standing now at the outside of

6    the spillway, at the mouth of the spillway or the

7    entrance into the spillway?

8              THE WITNESS:  So I'm standing on -- the

9    spillway is about four feet higher than where this is.

10             THE COURT:  Yes.

11             THE WITNESS:  And so it drops down over the

12   course of many feet and then drops into native ground.

13             THE COURT:  Okay.

14             THE WITNESS:  Into the natural ground.  So

15   it's going around the end of that tieback.

16             THE COURT:  Okay.  And that's regular ground.

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.

19   BY MR. NOLEN:

20       Q.   Mr. Maglio, at the time you were taking that

21   photograph, did you actually have your back to the

22   reservoir?

23       A.   I was standing on the spillway looking along

24   the length.

25       Q.   Right.

1          And so the structure of the reservoir itself

2     where it runs into the ground, you're actually --

3     you've got your back to it, right?

4          A.   Yes.

5          Q.   Okay.  To your knowledge, did the corps do

6     any kind of estimate or analysis of whether any

7     structures were actually flooded because of migration

8     of water around the north end of Addicks?

9          A.   I believe we did look at that structure.  I

10    don't remember if it was determined that it got

11    flooded.  My job was to stay on the reservoir itself,

12    and so I didn't leave at this point to go look anywhere

13    else, so...

14         Q.   So let me ask you this: You said earlier that

15    the corps followed the 2012 Water Control Manual.  And

16    is it correct that there was really no discussion about

17    whether or not to follow it?

18         A.   As far as I was concerned, our job was to

19    follow the Water Control Manual to the letter of the

20    law, and that's what we attempted to do in every way

21    possible.

22              MR. NOLEN:  Okay.  And I'm going to approach

23    the witness again, Your Honor, if that's okay and hand

24    him another email.

25              THE COURT:  Sure.

1          MR. NOLEN:  I'm going to hand JX 089 to the

2    witness.

3          THE COURT:  Okay.

4    BY MR. NOLEN:

5        Q.   Is that email an email that you wrote, sir?

6        A.   Yes, it was.

7        Q.   Okay.  I'm going to ask that we go ahead and

8    put that up so we can see it.

9              And I have -- there's a highlight on here

10   that I've put up for the purposes of our viewing here.

11   You can see that this is from you.  It is August 27th,

12   2017, and it looks like it's at 6:18; is that right?

13       A.   That seems correct, yes.

14       Q.   Okay.  And it says "Subject: Following the

15   water control manual."

16              Do you see that, sir?

17       A.   Yes, sir.

18       Q.   And although there's some markings on this...

19              Well, we can read the document anyway.  The

20   copy you have doesn't have any markings on it, does it?

21       A.   No, it does not.

22       Q.   Okay.  It says, "If anyone tells you to not

23   follow the water control manual, we will need to speak

24   with Rob."

25              Do you see that?

1        A.    Yes, sir.

2        Q.    And you're referring to Rob Thomas; is that

3   correct?

4        A.    Yes, sir.

5        Q.    And so the reason that I asked earlier about

6   discussion about following the Water Control Manual is

7   because this email seems to imply that there may have

8   been some discussion about not following it.  Does that

9   refresh your recollection at all about whether there

10  was any discussion about not following the Water

11  Control Manual?

12       A.    There was lots of ideas that people had that

13  were not necessarily within the government or in our

14  chain of command that had lots of opinions, and we were

15  seeing lots of things on social media.  And we were

16  hearing all of that, especially when we were on phone

17  calls with them.

18             Our job is to follow the Water Control

19  Manual, and this was just to remind my team, as most of

20  their leadership was going to bed, finally, after hours

21  and hours and days and days, just stay on task, don't

22  get distracted, don't let anybody sway you.  And that's

23  what this was for, was to remind everybody just do your

24  job.

25       Q.    All right.  So I have to follow up just a

1    little bit about who these communications were that you

2    were having -- or that you were seeing on social media.

3             Were these people with the Harris County

4    Flood Control District?

5        A.    It's with everybody.  So we had multiple

6    meetings, you know, all hours of the day and night.  We

7    had ABECT meetings where we would reach out to Fort

8    Bend County, Harris County Flood Control, various

9    cities and other groups, and there was lot of opinions.

10   Plus we had lots of social media.  We had people

11   calling in on the helpline at the water control center

12   in Galveston and their office and emergency management.

13   So they were hearing all these things.

14            I did not want my guys -- since I was

15   separated from them, the guys in Galveston, I wanted

16   them just to stay on task, do your job exactly like,

17   you know, we've done it before, how we've been trained,

18   just do what you need to do without any of the noise

19   clouding your judgment.

20       Q.    Is it true that the purpose of induced

21   surcharge is to avoid uncontrolled releases around the

22   end of the spillways and over the spillways to try to

23   control the water?

24       A.    More or less that's the intention of it.

25       Q.    Is it true that you don't know that the

1    reservoir regulation manual that preceded the 2012

2    Water Control Manual even existed?

3        A.    No, I knew there was prior documents.  I do

4    not, you know, specifically remember what they were

5    called.  But, yes, we've always had methodologies for

6    maintaining and operating our structures.

7        Q.    So do you know that under the prior version

8    of the water control document for the reservoirs that

9    the gates would have stayed closed during the event,

10   Harvey?

11       A.    No.

12       Q.    And did you ever go back and review that?

13   You were asked about it in your deposition.  Did you

14   ever go back and take a look at it?

15       A.    No, I did not.

16       Q.    Okay.  And you had not reviewed it prior to

17   your deposition, right?

18       A.    No, not that I recall.

19       Q.    And you didn't know at the time that the

20   reservoir regulation manual did not have an induced

21   surcharge regulation in it, correct?

22       A.    No.

23       Q.    And you still don't have an understanding in

24   that regard?

25       A.    No, I've not gone back and investigated that.

1      Q.   Have you ever gone back and read or reviewed

2  any of the depositions of any of your colleagues that

3  were taken in these cases?

4      A.   No, I have not.

5           MR. NOLEN:  I'm going to approach again, Your

6  Honor, and hand the witness one last email.  I'm going

7  to hand JX 106.

8  BY MR. NOLEN:

9      Q.   Do you recognize that email, sir?

10     A.   Yes, sir.

11     Q.   Okay.  I'm going to ask that JX 106 be put

12 up.

13          All right, sir.  They've already actually got

14 it up here, so I'm observing it.  I think this is the

15 second page of the document, so if you'll flip over.

16 And emails start in the back, so I have to -- they move

17 forward, and so we have to start at the back.  I'm only

18 going to ask but this part of this email.  It's from

19 Rob Thomas or Robert Thomas.  You're cc'd on it.  And

20 the question that is to Michael Sterling says, "How do

21 you feel about a 6000 CFS deviation.  Just thinking

22 about it."

23          And then the next response is "Very uneasy."

24          Do you see that?

25     A.   Yes, sir.

1      Q.   Is the reason for that is because at 6,000
2  cfs, a deviation of 6,000 cfs, meaning you're releasing
3  6,000 cfs, that you're going to be putting water into
4  people's houses?
5      A.   I'm not certain at 6,000 cfs you would be
6  putting water into homes, but it would be like
7  outbuildings, sheds, tennis courts.  But I don't -- I
8  don't know if 6,000 cfs we would actually put water in
9  homes.
10      Q.   Did you believe that 6,000 cfs was going to
11  inundate at least some people's properties?
12      A.   They're living space?  I don't believe so.
13           MS. DUTTON-BYNUM:  Objection, Your Honor.  I
14  think he's mischaracterizing his testimony.  He never
15  said that he was -- that he felt a certain way about
16  the cfs deviation.
17           THE COURT:  I think it was clarified he
18  indicated now he didn't say that, so I'll overrule the
19  objection since it's been asked and answered.
20           MR. NOLEN:  May I approach the witness again,
21  Your Honor?
22           THE COURT:  Yes.
23           MR. NOLEN:  All right.  I've handed the
24  witness his prior testimony, and I've asked him to
25  review page 205, lines 2 through 22, which I've

1    highlighted for him.

2    BY MR. NOLEN:

3        Q.    Tell me when you're finished, sir.

4            MS. DUTTON-BYNUM:  Objection, Your Honor, to

5    improper impeachment.

6            THE COURT:  What?

7            MS. DUTTON-BYNUM:  Improper impeachment.

8            THE COURT:  Well, you're asking him to read

9    his -- we haven't had a question yet, but he's asking

10   to read his prior testimony.

11           MS. DUTTON-BYNUM:  But there's been no

12   contradicted statement.

13           THE COURT:  Well, it hasn't been raised yet.

14   You've interrupted before he's gotten to the thing that

15   might be improper.  He hasn't gotten there yet.  So

16   I'll allow him to read, and then he can -- counsel will

17   ask the question, and then you can object if you want

18   to.

19   BY MR. NOLEN:

20       Q.    Have you read it, sir?

21       A.    Yeah.  Do you want me to read it out loud?

22   Or what do you mean?

23       Q.    No.  I'm just going to ask you a question.

24           So I'm going to ask you, then, you knew at

25   6,000 cubic feet per second the corps was going to

1    inundate people's homes, including the living areas of
2    those homes, correct?
3         A.   According to this, it sounds like I did
4    believe at the time, yes.
5         Q.   All right.  And when you say "according to
6    this," looking at your prior testimony, it appears that
7    that's what you testified to, correct?
8         A.   Yes.
9         Q.   All right.  I want to focus on the period of
10   time before Harvey.  Let me have that deposition back,
11   if you don't mind.
12        A.   Apparently I'm the one who is doodling on the
13   screen whenever the thing touches.  I don't know how
14   you clear that, but...
15             THE COURT:  Is that from the past or is
16   current?
17             THE WITNESS:  It's whenever I pull the paper
18   and it touches the screen, it adds stuff.
19   BY MR. NOLEN:
20        Q.   Well, I'm not going to show you any more
21   exhibits, I don't think.  But opposing counsel may, so
22   we may need to figure that out before they start asking
23   questions.
24             So I want to focus on the period of time
25   before Harvey.  You actually never attended any type of

1    meeting with members of the public developers or

2    elected officials where there was any discussion of

3    induced surcharge; is that right?

4        A.   No, I never attended any of those.

5        Q.   Okay.  And if you went out and talked with

6    anybody about induced surcharge or what that was or

7    whether that was in the 2012 Water Control Manual, any

8    of those discussions came after Harvey; is that true?

9        A.   No, that's not true.

10        Q.   Okay.  So prior to 2012 -- I mean prior to

11    Harvey, you had gone out and discussed with members of

12    the public or developers or city officials or county

13    officials about induced surcharge?

14        A.   So we had had meetings with our ABECT

15    committee, and we had talked about that post Tax Day.

16        Q.   Okay.  The ABECT committee is a meeting

17    that's a coordinated committee with the county and the

18    city; is that true?

19        A.   A couple counties, a bunch of various

20    municipalities, the City of Houston, yes.

21        Q.   But presentations to the public you did not

22    do, correct?

23        A.   No.

24        Q.   And you were not present for any

25    presentations to the public regarding induced surcharge

1    prior to Hurricane Harvey; is that correct?

2         A.   No, I was not.

3         Q.   All right.

4              MR. NOLEN:  I'll pass the witness.  Thank you

5    very much.

6              THE COURT:  Okay.  Counsel for the

7    government.

8              MS. DUTTON-BYNUM:  Yes, Your Honor.

9                   CROSS-EXAMINATION

10   BY MS. DUTTON-BYNUM:

11        Q.   Good evening, Mr. Maglio.

12             We heard you talk a little bit about your

13   role during Harvey.  I want to kind of hear about your

14   experience during the Harvey event.

15             When were you called to be at the project

16   office?

17        A.   We were watching Harvey all that preceding

18   week, and we made the decision the day before, the

19   Thursday of that event, that we needed to go the

20   following day and deploy people up there so that we had

21   boots on the ground ready to make observations or any

22   other activities necessary.

23        Q.   And when you say you were trying to figure

24   out things, where were you physically during this call

25   of assessing where the staff would go?

1    A.    So we were in Galveston.  We were game

2  planning how we were going to staff for the event, who

3  was going to be in the district office in Galveston

4  versus who was going to go up to the reservoirs and man

5  the posts up there.

6    Q.    And you said you went down that Thursday

7  before?

8    A.    Friday.

9    Q.    The Friday.  Okay.

10        And when you went down to the project or to

11  the dam, where were you on that Friday?

12    A.    We drove up to a hotel adjacent to basically

13  610 so that we could easily get to the offices of the

14  corps and the dams.

15    Q.    And when you say "we," who is we?

16    A.    I initially brought four staff and myself.

17  We had to send one back to the district office to run

18  models, so I ended up with three staff, H&H staff and

19  myself at the project offices.

20    Q.    Okay.  And so you're at the hotel.  You get

21  to the hotel.  What do you do next?

22    A.    We set up shop, get ready to do all the

23  calls, all the emails, all the things we were doing

24  continuously.  We stayed in the hotels for a day or

25  two, and then we started meeting at the project offices

1    and working from that location.

2        Q.   Okay.  And when did you go to the dam?

3        A.   I think it was Saturday, I believe.  So

4    Saturday or Sunday.  So we transitioned from the hotel

5    to the dams themselves.

6        Q.   And when you say your team transitioned, how

7    did you transition?  Where did you go?  Where did they

8    go?  Were you all together?

9        A.   We went to the project office.

10       Q.   Okay.

11       A.   Some of them I believe stayed at the hotel

12   longer than I did.  And we started just having meetings

13   in person at the project office when we could.

14       Q.   And so you mentioned that you supervised the

15   hydraulic observation team.  What was your role?  What

16   were you-all observing?

17       A.   So that role evolved throughout the entirety

18   of the event.  So initially there's not much flooding

19   happening, it's just rain falling and it hasn't pooled

20   and caused damage yet, so there's not a whole lot to

21   see.  So we were just getting all our ducks in a row to

22   make sure that we have a game plan.  We start thinking

23   about staffing, who is going to be up at what hours.

24   And so that's the main focus at the front end of an

25   event until the rain falls and you have significant

1    issues to address.  And then just try to get sleep and
2    be ready when you're going to need to work extremely
3    long hours to go do observations, make sure there's no
4    damaging flows happening, you're not seeing any
5    scouring or slumping.  We were primarily focused on
6    initially the discharges, just making sure that, you
7    know, there weren't any issues that we could see and
8    potentially address.
9         Q.   And how did you divvy up the team?
10         A.   Since I was down a person, I had to deploy
11    myself to be one of the observers, so I was down to
12    three staff and myself.  And then two or three days in,
13    one of my staff didn't feel well, so I ended up having
14    to be out on the Addicks Reservoir myself.  And I put
15    my other two staff on Barker because they had access
16    directly to the National Guard Armory, so they had a
17    safe place to get to every day.  And I knew I was going
18    to lose access to leave Addicks, so I just put myself
19    there.
20         Q.   And you mentioned the dam safety team before.
21    What's the difference between your team and the dam
22    safety team?
23         A.   So we have different roles and
24    responsibilities.  Typically the dam safety team stays
25    on the reservoirs themselves.  They're looking for

1    slumping or boils or any sort of failure mechanism
2    going on.  Sometimes they're checking piezometers which
3    are measuring water levels in the interior of the dam.
4    So their focus is on the dam itself.  We're looking for
5    any water issues.  Typically we're rovers, so we can
6    leave the site.  We can go look at sites downstream or
7    upstream of the reservoirs.  But during the main
8    rainfall event, we couldn't go anywhere.  We were on an
9    island, basically.  So we were just like the dam safety
10   guy, we were trapped there.  But then we had to collect
11   information, different types of information.  We lost
12   some of our gauges.  We were measuring the water levels
13   upstream and downstream, and then reporting that back
14   to the dam safety team that was feeding that back to my
15   team in Galveston.
16       Q.   You mentioned you were on an island.  What do
17   you mean by that?
18       A.   So the dams themselves, there was water
19   everywhere.  You couldn't leave for a couple days.  You
20   could not exit the dams from Addicks, so it was an
21   island.  It was the only high ground around.  Upstream
22   and downstream were under water.
23       Q.   And so let's talk about when you get to the
24   dam on -- which dam were you --
25       A.   I was on Addicks.

1      Q.   Addicks.  Okay.

2           What do you do when you get to the dam on

3    that Friday or Saturday that you mentioned?

4      A.   I believe it was Sunday when I --

5      Q.   Sunday.

6      A.   -- headed over to Addicks.

7      Q.   Okay.

8      A.   It was Sunday or Monday.  I just started

9    making observations.  If I saw anything strange, out of

10   place, we would call the back, take pictures, let

11   people that are -- our geotech experts look at things.

12   If I'm taking measurements, I'm relaying that back to

13   the people that need to input that data into the models

14   to run simulations.

15     Q.   And you mentioned gauges.  What's a gauge?

16     A.   So around the reservoirs and many of the

17   incoming tributaries and downstream streams, we have

18   water level censors that measure the height of the

19   water so that we can feed that into our numerical

20   models and make decisions that are dictated by the

21   Water Control Manual.

22     Q.   And how do you measure the water by the

23   gauges, if you could just explain for the court?

24     A.   So the gauges have a pressure sensor in a

25   tube that's down in the water, and it measures the

1   weight of the water above it, so it tells how high the

2   water is.

3        Q.   And how did the gauges hold up during

4   Hurricane Harvey?

5        A.   We lost a lot of gauges.  Most of them at

6   Addicks at one point were down, and so we had to do

7   manual readings.

8        Q.   And when you say you lost the gauges, what do

9   you mean by that?

10        A.   They went under water.

11        Q.   And so the gauges are under water.  How are

12   you measuring the water at this time?

13        A.   We had a thing called a plumb bob, which is

14   like a tape measure with a weight on the end, and we

15   would lower it down, and we'd measure the water

16   surface.

17        Q.   Have the gauges --

18             THE COURT:  I was going to ask, the gauges

19   are not waterproof?

20             THE WITNESS:  Not the brainbox of them.  They

21   were not supposed to go under water.  They were

22   designed well above the hundred-year water level and

23   they still were submerged.

24             THE COURT:  Thank you.

25

1   BY MS. DUTTON-BYNUM:

2       Q.   And have the gauges ever been under water

3   before, to your knowledge?

4       A.   Not that number, for sure.  But some of them

5   I'm sure have gone under during other short, small

6   events.  We lost a lot of gauges, so...

7       Q.   And how long did you have to do these manual

8   readings?

9       A.   If I remember correctly, it was something

10  like three days at Addicks.

11      Q.   And how often were you required to do these

12  manual readings?

13      A.   If I remember correctly, we were trying to do

14  them hourly.

15      Q.   And were you the one doing these manual

16  readings?

17      A.   Yes, at Addicks.

18      Q.   For all three days?

19      A.   Yeah, for as long as I could.  I stayed up

20  for apparently around 36 days before -- or 36 hours

21  before I couldn't wake up anymore.  And then I slept

22  for a few hours, and then I was back at it.  But I had

23  to get woken up by National Guardsman to make sure I

24  was alive, so...

25      Q.   You were woken up by -- what do you mean my

1    that?

2        A.    I mean I fell asleep in my truck on the top

3    of the reservoir and no one could get ahold of me

4    because I was unconscious.  After, you know, several

5    days in the field and a few days or a day and a half

6    being awake, I couldn't wake up anymore.

7        Q.    And --

8        A.    So they sent somebody to make sure I was

9    alive.

10       Q.    Okay.

11       A.    And he woke me up.

12       Q.    And during these manual readings as well, if

13   you could just paint of picture of what that looked

14   like for 36 hours every hour.  How were you using these

15   plumb bobs and how were you getting those measurements

16   to your team?

17       A.    So we have a box on the side of the handrail

18   of the control structure, and we would take this reel,

19   kind of like a fishing reel, and we'd lower it down

20   with this tape all the way down to the water surface.

21   The last couple of feet we would let it free fall.  It

22   would hit the water surface, move the debris out.  And

23   then we were able to pull it up real fast, get to the

24   water surface before the debris came back in and would

25   mess up the measurement.  So that's what we would do

1   every hour.  And then I would get back to the truck

2   after taking the reading, and I would text it back to

3   the office, and then they would relay it back to the

4   water control center.

5        Q.   And those measurements, what were -- how were

6   your team using those measurements at the time?

7        A.   So they were using it as inputs into our

8   spreadsheets or our numerical models, and that would

9   tell us how to regulate the reservoir, when do we need

10  to open gates, when do we do something different other

11  than keep everything closed.

12       Q.   I know you mentioned you were the one

13  responsible for 36 hours.  Was it difficult to measure

14  with a plumb bob in the middle of a storm?

15       A.   It was a little bit of a learning curve.

16  But, yeah, it's not that hard after you get the hang of

17  it.

18       Q.   Are there things in the water while you're

19  measuring?

20       A.   There was tons of debris blown in from the

21  wind and the flood itself.  There were fire ants that

22  you would be hitting periodically, you know, whatever

23  was down there.  So you just had to deal with what we

24  had.

25       Q.   Okay.  Let's pull up JX 110.  You were shown

1    a few pictures.

2            Before we pull it up, can you explain what

3    fire ants are so Judge Smith can --

4        A.    So fire ants are ants.  But when you have a

5    big flood, the entire mound, all the ants come out

6    together and make a raft, and they hold together and

7    they float as large blobs.  And we had a tremendous

8    amount of fire ants at Addicks at the control

9    structure.  At one point, acres I would say.  It was

10   pretty insane.

11       Q.    So we can pull up JX 110, just the photo that

12   you took on the 29th.

13       A.    Okay.

14       Q.    Why did you take this picture?

15       A.    Because it was potentially the first time

16   water had reached the end of the dams, the spillways,

17   in recorded history.

18       Q.    And you say "potentially."  What do you mean

19   by that?

20       A.    We've never had anything like this before

21   and, you know, I wanted to document when we finally got

22   to the point where the water was at this elevation.

23            THE COURT:  It wasn't the beauty of the

24   picture?  Just captured this beautiful scene?

25            THE WITNESS:  Yeah, something like that.

1     Modern art.

2     BY MS. DUTTON-BYNUM:

3          Q.   And why was that significant to you about

4     water being on this end of the spillway?

5          A.   It meant the water was going around the

6     reservoir and then flowing down along the exterior toe.

7     And if that continued, you would have a wet exterior

8     toe.  It would get wetter and wetter, which is a bad

9     thing for dam safety.

10         Q.   And can you explain what the wet toe -- what

11    that means?

12         A.   So the way these dam structures work is they

13    use the sheer strength and other properties of the dry

14    material itself to hold back the water that's inside of

15    them.  And the more water you have on the outside, it

16    starts losing strength, and you can have slumping on

17    the exterior and ultimate dam failure which would have

18    been extremely catastrophic.

19         Q.   Let's move -- let's show I believe it's

20    JX 89, one of the email chains that you were shown

21    before.

22              MS. DUTTON-BYNUM:  And can you do JX 116?

23              We'll move on from this and we'll come back

24    to it.

25

1  BY MS. DUTTON-BYNUM:

2      Q.   You spoke briefly about -- you were shown an

3  email about testing the gate operability.  Why did

4  y'all test the gate operability?

5           MR. NOLEN:  Objection, Your Honor.  He's

6  never seen any email about gate operability.  I didn't

7  show him any.

8           THE COURT:  This doesn't seem relevant to

9  direct.

10          MS. DUTTON-BYNUM:  And, Your Honor, as a

11  reminder, we are also presenting our direct examination

12  at the same time --

13          THE COURT:  Okay.

14          MS. DUTTON-BYNUM:  -- as defendant.  I can

15  pull it up, JX 106.

16          THE COURT:  Okay.  We'll put that -- show the

17  record it reflects that this is more direct testimony.

18  So I'll overrule the objection.

19  BY MS. DUTTON-BYNUM:

20      Q.   Do you see the email in front of you,

21  Mr. Maglio?

22      A.   Yes, I do.

23      Q.   I'll direct your attention to the top of the

24  email.  What did you send to your colleague, would you

25  say?

1      A.   So it was basically just letting the folks in
2   the field office know, the dam tender, the guy that was
3   leading much of that team, that we have authorization
4   to test the gates.

5      Q.   And why did you need to test the gates?

6      A.   Well, we had -- I believe at this point in
7   time we had never had as much water within the
8   reservoirs before, and so one of the critical items
9   that we wanted to make sure is when we do have even
10  more water behind these gates, we knew -- we know
11  that -- we believe they're all still going to function
12  as intended, and that if they're going to fail, they
13  will fail in the down position.  So we wanted to just
14  test them all to see if there's any issues.  And in
15  structures this large and this old, you always have,
16  you know, things happening that you don't expect.  You
17  have strange sounds.  And they were very, very old at
18  the point in time, so we just wanted to make sure
19  everything was behaving properly.

20     Q.   And did they -- did everything behave
21  properly when you tested them?

22     A.   If my memory serves me right, one did not
23  work properly at all and we had --

24          THE COURT:  What didn't work properly?

25          THE WITNESS:  One of the gates had an issue.

1          THE COURT:  One of the what?

2          THE WITNESS:  One of the gates, the gates --

3          THE COURT:  Oh, gates.

4          THE WITNESS:  -- that would open and close

5     and release the water.

6     BY MS. DUTTON-BYNUM:

7     Q.   And we'll just go to the bottom of this email

8     really quick as well that you were asked a question

9     about.

10          So the bottom email that Rob sent, Rob Thomas

11    sent to the group asking about the deviations, did you

12    respond to the email in this email chain?

13    A.   It doesn't look like I responded to Rob's

14    initial thoughts, no.

15    Q.   And so who said that?  Or so you weren't the

16    one who said "very uneasy" to the response?

17    A.   No.  That was Michael Sterling from division.

18    Q.   Okay.  Let's move just briefly talking about

19    the Water Control Manual that you were asked by

20    opposing counsel.  So what -- sorry.  One second.

21          From your understanding, what is the Water

22    Control Manual?

23    A.   It's a guide that tells us how to -- the

24    purpose of the dams, how to operate the dams, how to

25    maintain the dams, and so it's our go-to book.  It

1    gives you a lot of history.  It walks you through the

2    entire purpose and function of the reservoirs.

3         Q.   And so you've seen the Water Control Manual

4    before?

5         A.   Many times.

6         Q.   Okay.  Let's pull up JX 2.  We can go to the

7    table of contents.  And so you're familiar with the

8    operations of the dams?

9         A.   Yes.

10        Q.   Is that found in the Water Control Manual?

11        A.   There's larger concepts.  We have more

12   detailed operational procedures that we follow, but the

13   regulation rules are in here.

14        Q.   Let's go to the Water Control Plan page next.

15   So 7-05, what does that lay out?

16        A.   So normal flood control regulations versus

17   induced surcharge, and then constraints regarding flood

18   control operations.  So more or less, some things you

19   need to consider.

20        Q.   And are induced surcharges normal flood

21   control, covered under the normal flood control?

22        A.   No, they're anything but normal.  They are

23   when you're well out of the range of a normal flood.

24   Like in Hurricane Harvey, we had had way more water

25   than we had ever had before.  When Tax Day occurred, we

1  double the pools of record.  And then when Harvey
2  occurred, we doubled those pools of record and it put
3  us into induced surcharge at the first time at both
4  reservoirs.  So it was well off the reservation of
5  normal.
6          MS. DUTTON-BYNUM:  Your Honor, if I can get
7  just one moment to confer with my table?
8          THE COURT:  Yes.
9          MS. DUTTON-BYNUM:  Your Honor, We'd to move
10 JX 106 into evidence.
11         THE COURT:  Okay.
12         Any objection?
13         MR. NOLEN:  No, Your Honor.
14         THE COURT:  Okay.  That's admitted.
15         (Admitted Exhibit No. JX 106.)
16         MS. DUTTON-BYNUM:  All right.  At this time,
17 I pass the witness, Your Honor.
18         THE COURT:  Okay.
19         MS. DUTTON-BYNUM:  Or conclude this
20 examination, rather.
21         THE COURT:  Any -- Mr. Nolen, any final
22 redirect?
23         MR. NOLEN:  Just a little bit, Your Honor.
24         THE COURT:  Okay.
25

1                      REDIRECT EXAMINATION

2    BY MR. NOLEN:

3        Q.   So, Mr. Maglio, it's true that the corps lost

4    monitors on Memorial Day 2015, right?

5        A.   I'm not certain.  I wasn't at the -- at the

6    time.  But, yes, it was a significant flood.  I don't

7    know if we lost -- gauges?  Is that what you meant?

8        Q.   Yes.

9        A.   I would assume so.  It was pretty

10   significant.

11       Q.   And also on Tax Day 2016, right?

12       A.   I believe we did lose a few.

13       Q.   Right.

14            And you weren't there for Tropical Storm

15   Allison in 2001, were you?

16       A.   No, I was not.

17       Q.   All right.  That was a pretty significant

18   flooding event, correct?

19       A.   Yeah.

20       Q.   Do you believe or know whether gauges were

21   lost during that event?

22       A.   I am not certain.

23       Q.   Okay.  And you called this water flow around

24   the north end of Addicks negligible, right?

25       A.   Yes, at this time.  Yeah.

1      Q.   Yeah.  Well, no.  It never changed, though,

2   did it?  In other words, it never got deeper than your

3   picture at 9:42 on the 29th, did it?

4      A.   I don't believe it did.

5      Q.   Right.

6           And so you called that negligible, correct?

7      A.   Well, it's not a lot of water.

8           MR. NOLEN:  All right.  Thank you, Your

9   Honor.  We would move -- plaintiffs would move to admit

10  Exhibits JX 110, JX 109, JX 089, JX 106.  Those were

11  the exhibits that I covered with the witness earlier.

12          THE COURT:  Any objection?

13          MS. DUTTON-BYNUM:  No objection, Your Honor.

14          THE COURT:  Okay.  Those will be admitted.

15          (Admitted Exhibit No. JX 110.)

16          (Admitted Exhibit No. JX 109.)

17          (Admitted Exhibit No. JX 089.)

18          (Admitted Exhibit No. JX 106.)

19          THE COURT:  Any final question?  Any final

20  recross?

21          MS. DUTTON-BYNUM:  No, Your Honor.

22          THE COURT:  Okay.

23          Mr. Maglio, the court thanks you very much

24  for your testimony and you are now excused.

25          THE WITNESS:  Okay.

1          (Witness excused.)

2          MR. NOLEN:  I'm going to retrieve the

3     exhibits, if you don't mind, Your Honor.

4          THE COURT:  Oh, no.

5          Why don't we take a break before we resume

6     with the witness we had prior to inserting Mr. Maglio

7     into the schedule.  And it's 4:20.  Let's take, the

8     court needs to do some things, a 15-minute break.  But

9     after that, how long will the witness take that we

10    have?  Mr. McGehee I should be asking.

11         MR. McGEHEE:  Yes, sir.  And I was going to

12    give you the option of quitting for the day or I think

13    I can finish my direct in 30 or 40 minutes.

14         THE COURT:  Well, that sounds like a

15    reasonable way, and then the government can begin cross

16    on Monday.

17         Okay.  Why don't we take a 15-minute break.

18    We'll come back and do that witness, and then hopefully

19    be out of here by 5:00 to 5:30 range.

20         Okay.  We'll stand in recess.

21         (Off the record from 4:21 until 4:38.)

22         THE COURT:  The witness was sworn in earlier

23    today, so still under oath.  Welcome back.

24         THE WITNESS:  Thank you, sir.

25         MR. McGEHEE:  Your Honor, I sensed that you

1    were a little unsure of the positioning and where we

2    were when we saw what I called the puddle picture, so

3    I'd like to start out by asking Mr. Bardol to situate

4    us starting with that picture that we used with

5    Mr. Maglio.

6            THE COURT:  Yeah, that's probably a good

7    idea.  I was a little unsure when you were dealing with

8    two-dimensional pictures in a three-dimensional scene.

9            MR. McGEHEE:  I understand.

10            DIRECT EXAMINATION (Continued)

11    BY MR. McGEHEE:

12        Q.    So, Mr. Bardol, you recall that picture that

13    Mr. Maglio --

14        A.    I do, yes.

15        Q.    And here I have a blowup of that very same

16    picture.

17        A.    Yes.

18        Q.    And now I want to migrate from deposition --

19    or from blowup to blowup.

20        A.    Yeah.

21        Q.    On this blowup, where we're looking at that

22    puddle, I'm calling it a puddle, is right here,

23    correct?

24        A.    If that could just be moved back.  This other

25    one is blocking.  I can't see the full...

1           Yeah, there we go.

2      Q.   Does that help?

3      A.   Yes.

4      Q.   Okay.  And we're standing right here,

5  correct?

6      A.   Correct, on the very northern end of that

7  blue tip.

8      Q.   And we're looking that way?

9      A.   Correct.  We're looking in a northerly

10  direction, yes.

11      Q.   Okay.  And then on this masterpiece of a

12  document right here --

13      A.   Yes.

14      Q.   -- we're at the very top of the dam, correct?

15      A.   On the top of the dam, but we're the very

16  northern end.  So the dam -- the dam structure wraps

17  around from the blue line, goes down to the green to

18  the south, and then it goes the west still on that --

19      Q.   Right.

20           And that private building that doesn't even

21  look wet yet, that private building --

22           THE COURT:  That was a government building, I

23  think.

24           MR. McGEHEE:  The nongovernment --

25           THE COURT:  I thought it was a government

1     building.  Or nongovernment?  Somehow I thought --
2          MS. DUNCAN:  I mean, I can tell you, but you
3     could also ask the witness.
4          THE WITNESS:  Yeah, my understanding, this is
5     off government-owned property, so it's a private
6     building, as I understand.  This picture, we're
7     standing -- or the individual, Mr. Maglio, is standing
8     on the dam structure on the spillway looking north, so
9     that building is off government-owned property.
10    BY MR. McGEHEE:
11         Q.   Okay.  So that building, the nongovernment
12    building, we've got a little white spot here right
13    here.  Is that where the building is situated?
14         A.   That is my understanding, yes.
15         THE COURT:  Okay.  So it's on government
16    property?
17         THE WITNESS:  No, it's just off.  It's just
18    off.
19         THE COURT:  Just off.  Okay.
20         THE WITNESS:  Yes.
21    BY MR. McGEHEE:
22         Q.   And if you're looking at that, if you're
23    looking at that picture, behind me, if I just do an
24    about face, what I'm doing is I'm looking down this way
25    at miles and miles of the top of the dam?

1     A.   Of the -- yes, of the earthen embankment,
2  that's the dam.  So then the water here is flowing from
3  left from behind the reservoir behind the dam to the
4  right.  So the spillway is not the classic spillway
5  that -- you see that looks like a slide.  This is a
6  spillway that's concrete here where the water is
7  flowing from left to right, so it's protecting the top,
8  the crest they would call of it the dam structure.
9     Q.   And now for the timing -- and I don't mean to
10 understate or overstate it, but that -- I call it a
11 puddle, that amount --
12          MS. DUNCAN:  Objection, Your Honor.
13          THE COURT:  Well...
14          MS. DUNCAN:  He continues to call this a
15 puddle.  It's argumentative.  That's now how the
16 witness described it.
17          THE COURT:  Okay.  Well, it's not evidence
18 that it's a puddle.  The court will ignore that it --
19 it looks like a puddle, though.
20          MR. McGEHEE:  I'm not going to go there.
21          THE COURT:  It's some water, some water,
22 whatever you want to call it.  It looks like a puddle.
23 BY MR. McGEHEE:
24    Q.   We'll call that that amount of water.  There
25 you go.  That amount of water is what's on the

1    auxillary spillway at the same time that the outlets

2    are open and the downstream properties are flooding; is

3    that correct?

4            MS. DUNCAN:  Objection.  Leading.

5            THE COURT:  What?

6            THE WITNESS:  When this picture was taken,

7    the...

8            THE COURT:  What is the objection?

9            MS. DUNCAN:  The objection is leading.

10           THE COURT:  Well, yeah, it is leading.  But

11   it seems to me, again, this is getting us advancing, so

12   I'll allow the question.

13           Yes, go ahead.

14           THE WITNESS:  This picture was taken, as I

15   understand, from the -- I'm just hearing this, when

16   the -- it was under induced surcharge, the gates would

17   have been opened, so the -- there would have been the

18   flow through the outlet structures, both of them,

19   Addicks and Barker.  And then this is part of the

20   flanking flows that was discussed in my report and the

21   previous --

22           THE COURT:  But this would have been during

23   the flooding, the flooding time that the plaintiffs'

24   property was flooded?

25           THE WITNESS:  At some of the times, yes.

1          THE COURT:  Even though at this point it's
2     clearly not raining or it may be drizzling.
3          THE WITNESS:  Correct, yeah.  There was
4     the -- because the gates were opened during induced
5     surcharge.  That was allowing the water through -- out
6     of the primary outlets into the headwaters of Buffalo
7     Bayou.
8          THE COURT:  Okay.  So the spillway then, you
9     know, I want to make sure I'm not confused, ran around
10    where that blue line is.  It wasn't just a straight
11    slide.  It was ran around the property on the top of
12    the dam?
13         THE WITNESS:  Correct.  It was -- the
14    roller-compacted concrete was placed on top of the very
15    northern end of the dam.  So each of the ends of the
16    dams, those were the auxillary spillway where water was
17    allowed to flank around it.
18         THE COURT:  Okay.
19         THE WITNESS:  So they placed it further, I'll
20    say, upstream closer to the center of the dam.  So
21    you're going from the blue down to the green, it's
22    going to be a higher elevation.  So the
23    roller-compacted concrete would be at the top, and then
24    it runs down the back side if it overtops there.
25         Then when you keep going to the north, that

1    dam, that maybe is, you know, 10 feet, 15 feet at that

2    point, it starts getting narrower and narrower and it

3    meets with you heard the "natural grade."  So at this

4    point is elevation one zero eight, 108, that's where

5    the dam, you know, kind of kisses -- touches down onto

6    the natural grade, and it still has this concrete pad

7    there so that way it won't scour when water flows

8    across it.

9              THE COURT:  Okay.

10             THE WITNESS:  And that continues on as the

11   dam gets higher.

12             THE COURT:  Hopefully I'll get to see some of

13   this whenever we go to the dam.

14             THE WITNESS:  Yes.

15             THE COURT:  We damn well will go to the dam.

16             MR. McGEHEE:  And so you're going to drive

17   right up to that spot on the site visit.

18             THE COURT:  Okay.  Mr. Puddle won't be there,

19   or whatever it is.

20             MR. McGEHEE:  And the puddle will be gone.

21   The nonpuddle will be gone.

22             THE COURT:  The nonpuddle.

23   BY MR. McGEHEE:

24        Q.   Mr. Bardol --

25        A.   Yes, sir?

1     Q.   -- the opposing expert, Mr. Nairn, wrote a

2   report -- did a model, and we're going to compare your

3   model with his model.  Before we do that, I'd like you

4   to hear what Mr. Nairn said about your model so that

5   you can respond and we can fill out a chart that I've

6   shown you and we've seen before.  Are you with me?

7     A.   Yes, sir.

8     Q.   I'd like to read from Mr. Nairn --

9          MS. DUNCAN:  Objection.

10         THE COURT:  What is your objection?

11         MS. DUNCAN:  My objection is that this is

12   improper rebuttal testimony.  Dr. Nairn hasn't

13   testified.  And, moreover, it's an improperly disclosed

14   opinion because none of this information is in

15   Mr. Bardol's opinion.  So we have multiple issues here.

16         MR. McGEHEE:  Your Honor, we disclosed this

17   line and verse to opposing counsel on Tuesday, and I'd

18   like him to know what the opposing expert is going to

19   say and hear his response to it.  And I'd like to read

20   a sworn deposition testimony where counsel attended two

21   questions from his sworn testimony.

22         THE COURT:  Okay.

23         MS. DUNCAN:  Your Honor, may we re-urge the

24   objection?  In addition, it's irrelevant what Dr. Nairn

25   said about Mr. Bardol's testimony.  If they want to ask

1   Dr. Nairn about his testimony when he provides it, they

2   can certainly do that.  But they're trying to pre-admit

3   Dr. Nairn's sort of opinions in this context.  It's

4   inappropriate to read another expert's sort of

5   testimony to an expert and say "What do you think?"

6           THE COURT:  Well, I don't think that's

7   inappropriate in itself.  It may be unusual, the

8   procedure we're using here, but I don't think it

9   violates any rule.  I'll allow the testimony.

10          MS. DUNCAN:  Your Honor, may I note that -- I

11  mean, this is hearsay.  It's an out-of-court statement

12  used for the truth of the matter that it asserts, so it

13  does violate that.

14          THE COURT:  Well, and that -- you -- this is

15  kind of cross-examination in reverse, using the

16  deposition before effectively the testimony has been

17  given live, so I'll allow it.

18  BY MR. McGEHEE:

19      Q.   Reading from page 37, line 13 through line 16

20  from Mr. Nairn, "They are" -- and we're talking about

21  the two models, your model and his model.  "They are in

22  the model results.  And we did review and compare the

23  results for the closed gate between Geosyntec's model

24  and our model and they're very similar."

25          Reading from page 48, line 10 through 13, "I

1  have looked at the model results for downstream with

2  gates closed and compared those to the model results

3  for downstream gates closed from Geosyntec and the

4  models generally are similar."

5          Do you agree with Dr. Nairn's statements?

6      A.   Yes, in many situations they are similar.

7  Very similar.

8      Q.   Explain your --

9          THE COURT:  A little louder.

10          THE WITNESS:  Oh.  Yes, the models are very

11  similar.

12  BY MR. McGEHEE:

13      Q.   Explain your methodology for the way you

14  developed your model.

15      A.   Yes.  As far as the methodology, this is laid

16  out in my report, but I'll try to give a summary.  Do

17  you want me have you go to the section or...

18      Q.   If your report is useful, that's fine.  If

19  not, you can just tell us --

20      A.   Okay.

21      Q.   -- your methodology.

22      A.   Yeah, I'll just go through it.  And then if

23  we have to cite part of the report, I can go there.

24          Our -- our approach, the big picture of it,

25  was to use the same models as the Army Corps of

1   Engineers would have had access to at the time, also

2   the Harris County Flood Control District.  So

3   there's -- one of the models is a hydrology model.

4   It's called HEC-HMS.  So that looks at the

5   precipitation of the watershed, and it looks at the

6   runoff of how much water is going to be flooding in

7   some -- in an area.  We use that read -- that model is

8   also used by Harris County Flood Control District and

9   by FEMA that does -- the Federal Emergency Management

10  Agency that also does all the flood maps in the area.

11  So both of those U.S. Government agencies, both at the

12  federal level and the local flood control district,

13  uses that model.  There's also Dr. Bedient who had used

14  that model and updated that.  So we used that as our

15  foundation for doing the hydrology of how much water is

16  running off during Hurricane Harvey.  And then I will

17  have all the flows going into the reservoirs and then

18  also into Buffalo Bayou directly.

19          The other model would be the hydraulic model

20  that's called HEC-HMS developed by the Army Corps of

21  Engineers.  That's the model that, my understanding,

22  the Corps of Engineers was using, but also it was used

23  by the Harris County Flood Control District, and then

24  also is what's used by FEMA, the Federal Emergency

25  Management Agency, at the federal level for this.

1        So we took -- built that model for the
2    hydraulic model for the downstream of the -- the two
3    reservoirs for Buffalo Bayou, and then we looked at two
4    different scenarios.  One, we used the hydrology and
5    the hydraulic to look at what actually happened during
6    Hurricane Harvey.  We simulated the gates opening just
7    per the Water Control Manual of how they were.  We used
8    gauge data that looked at the elevation within the
9    creek to try to match it, and then we simulated
10   Hurricane Harvey and what was flooded.
11       Then on the flip side, the main thing we did
12   is we just assumed all the gates out of the two
13   reservoirs, both Addicks and Barker, were closed.  So
14   they never were open according to the induced
15   surcharge, and said, "Okay.  What would happen?"  We
16   closed that, and then we built a model to look at how
17   much water would be going around.  Would it go around
18   all these auxillary spillways, both Barker or Addicks.
19   Barker, it would never flank.  It would fill up.  The
20   water would not go around the emergency spillway.  For
21   Addicks that's up on the north, it would continue to
22   spill at that same location that we saw the picture,
23   but it would go up a little bit higher, about like a
24   foot or foot and a half of more water that would go
25   around it, but it was still significantly less than the

1   spillway design flow that we talked about.  So that was

2   the model itself.  So then we could quantify how much

3   water would go around the dam on the auxillary spillway

4   to the north, and then we can look at, you know, how

5   that water would re-enter into Buffalo Bayou.  So

6   that's the overview of the two models.

7       Q.   And the two models, yours and Nairn's?

8       A.   Yes, correct.

9       Q.   Are both of those -- and I want to spot the

10  government's model.  Are both of those generally

11  accepted models in the engineering committee?

12      A.   The one that Geosyntec used were the ones

13  that were used -- typically used by Harris County, the

14  Army Corps, and FEMA, and the US.  Dr. Nairn used

15  another model that's typically used in other

16  situations.  It's actually a French-based company that

17  used it.  It's a 2D model that he used and developed.

18  But at the outset, methodology is similar.  The models

19  are different.  Ours are federally accepted in the US.

20  But then the output of the results of it are generally

21  similar, as Dr. Nairn mentioned.

22      Q.   Did your model include observed data?

23      A.   Yes, it did.

24      Q.   Tell the court why observed data is so

25  important.

1      A.   Yes.  So as we looked at the downstream along
2  Buffalo Bayou, the hydraulics of how the water was
3  going, we wanted to not just look at, you know, what
4  was peak water level that was achieved, we also looked
5  at observed data, both the elevation of where it
6  achieved from gauged data, but also the homeowners, and
7  we looked at temporally or when it started flooding.
8  Did it start on the 27th, 28th, 29th, really just
9  seeing did that water get to that high elevation before
10 or after induced surcharges were instituted.  So then
11 we could figure out, okay, not only is our model
12 hitting the proper elevation, temporally did it hit it
13 on the right day because that's just important did it
14 flood on the 27th at the beginning of the storm or did
15 it start flooding on the 29th or 30th later in the
16 storm event.
17     Q.   Do you know if Mr. Nairn used observed data?
18     A.   I'm not aware if he did.
19     Q.   You're aware that he did not, correct?
20     A.   Correct.  I --
21          MS. DUNCAN:  Objection.  Leading.  And, Your
22 Honor --
23          THE COURT:  Well, let's clarify the question.
24 Repeat the question.
25

1    BY MR. McGEHEE:

2        Q.    Did Nairn use observed data?

3        A.    He used observed data just for the gauge

4    data.  But as far as residents of when it happened, I

5    did not see anywhere in his report for the upstream or

6    the downstream report of where he used observed data at

7    the homes of what the flooding elevation was or when it

8    happened.

9        Q.    Okay.  At this time I'd like to show you a

10   chart that you've seen before that lists the 12 test

11   properties.

12            MS. DUNCAN:  Yes.  And, Your Honor, while

13   he's doing that, I'd like to re-urge our objection.

14   Now that we've heard Mr. Bardol go into significant

15   detail about Dr. Nairn's model that has not been put

16   into evidence yet and has never disclosed in his

17   report, we'd like to re-urge that this is well beyond

18   the scope of his report.  It's not disclosed under

19   Rule 26, and it shouldn't be included.  If plaintiffs

20   want to do a comparison, they can do so in cross, they

21   can do so in argument or on rebuttal within the scope

22   of his report.  This is improper.

23            THE COURT:  Okay.  Well, at this point, the

24   court has ruled.  We will allow this.  Presumably if

25   Dr. Nairn doesn't testify, I'll let you renew the

1    objection.

2    BY MR. McGEHEE:

3        Q.    I'm going to write the word "I" here, and "I"

4    means you.   "I" means Matt Bardol.

5        A.    Yes, sir.

6        Q.    "I agree with Dr. Nairn."  And the inverse is

7    true, too, "Dr. Nairn agrees with me."  Are you with

8    me?

9        A.    Yes, sir.

10        Q.    1 through 12, what are you in agreement?

11        A.    Yeah.  And just -- and part of this is a -- I

12    think there was an affidavit that I submitted soon

13    after I did the report where I had just a visual of

14    Dr. Nairn's table of where he had the depth of

15    elevation, so there was --

16        Q.    Oh, I forgot about that.

17              So you did address Dr. Nairn's report in your

18    report -- in your affidavit?

19        A.    In the affidavit where I looked at the output

20    of the depth of flooding from his gates closed

21    scenario.

22        Q.    Thank you for that clarification.

23              MS. DUNCAN:  Your Honor, may I jump in here

24    and raise another objection?  He has just now admitted

25    that this information he's citing is not in his report.

1   It was in an affidavit filed later.  That doesn't make

2   it part of the Rule 26 disclosures.  If anything, it is

3   a rebuttal report.  It should be saved for a rebuttal

4   case.

5           THE COURT:  Maybe.  The rebuttal, using a

6   reference there was an affidavit does not seem to be

7   needed to be a rebuttal.  That's direct testimony in

8   the direct case.  It's a thing that has happened.  So

9   there's no hearsay involved in that especially when

10  you're putting on the rebuttal not for the truth of it

11  but to say he did put an affidavit in.  So I'll allow

12  the testimony.

13  BY MR. McGEHEE:

14      Q.   So let's go down 1 through 12.  Number one,

15  Milton, you're both in agreement with each other?

16      A.   Correct, both agree that there's no flooding.

17      Q.   Shipos?

18      A.   Both agree.

19      Q.   Memorial Southwest.

20      A.   We largely agree.  We're -- actually,

21  Dr. Nairn's report shows zero flooding for Memorial

22  SMC.  Our model shows minor flooding that's consistent

23  with the testimony, about six or eight inches.  But

24  there was significant flooding after the induced

25  surcharge that there was several feet more of flooding

1    after the gates were opened.

2         Q.   Okay.  So I jumped -- I agree, I put Nairn

3    has zero flooding.  And gates closed, I wrote minor

4    flooding for yours.

5         A.   Correct, yes, sir.

6         Q.   Okay.  Let's finish up.

7              Good Resources, agree?

8         A.   Both agree there was no flooding.

9         Q.   Aldred?

10        A.   We have a minor disagreement.  I show zero

11   flooding.  Dr. Nairn's report shows .4 feet, which is a

12   few inches of flooding.

13        Q.   Whose do you think it correct?

14        A.   When we look at the observed observation from

15   Aldred, the observed flooding was well after the

16   induced surcharge.  So our models are very close or

17   relatively close in this area where we show no and he

18   shows a few inches.  The flooding starts to occur after

19   the induced surcharge.

20        Q.   So when I wrote "no" on your column, based on

21   observed data; is that correct?

22        A.   Correct, yes.

23        Q.   Okay.  Hollis, agree?

24        A.   Oh, we both agree there's no flooding.

25        Q.   Silverman, agree?

1        A.    Correct, we agree there's no flooding.

2        Q.    Godejord, agree?

3        A.    We agree there's no funding.

4        Q.    Cutts, agree?

5        A.    We agree there's no flooding.

6        Q.    Beyoglu?

7        A.    Both of these -- the last three here,

8   Beyoglu, Azar, and Welling, we disagree in the sense

9   that, you know, both of our models show some amount of

10  flooding prior to induced surcharge.  In his expert

11  report that I relied upon in mine, he makes a statement

12  in his conclusions that potentially downstream of

13  Beltway 8 there could be longer induced -- or there

14  could be longer periods of flooding, you know, with

15  induced surcharges, so that's -- we agree on that

16  portion of it.

17        Our model shows both, you know, we could go

18  back to Beyoglu, that there was minor flooding for that

19  prior to induced surcharge, but then there was

20  significantly more flooding and longer flooding.

21        Q.    So I have here a column "Gates Closed - Less

22  flooding, shorter duration."  Is this Nairn's opinion,

23  10, 11, and 12?

24        A.    He doesn't provide a narrative of each of

25  these properties.  He just has a table of elevations.

1          Q.    Based on his table of elevations?

2          A.    Correct.

3          Q.    Okay.  And gates closed, according to you,

4     gates closed, there was no flooding for Milton?

5          A.    Correct.

6          Q.    For Shipos?

7          A.    There's no flooding.

8          Q.    Minor flooding for Memorial Southwest.  Even

9     though the government said there was no flooding, you

10    admitted there's minor flooding?

11         A.    Correct, yes.

12         Q.    Okay.  Good Resources?

13         A.    There was no flooding.

14         Q.    Hollis?

15         A.    There was no flooding.

16         Q.    Silverman?

17         A.    There was no flooding.

18         Q.    Godejord?

19         A.    No flooding.

20         Q.    Cutts?

21         A.    There was no flooding.

22         Q.    And then we have here the others.

23               So based on all these, if the gates were

24    closed, would the infected -- would the property

25    owners, the test property owners have been better off?

1      A.   Yes.  As far as when we look at depth of

2   flooding and duration, yes.

3      Q.   If the gates had been closed, would dam

4   safety have been an issue?

5           MS. DUNCAN:  Objection.  Now we're beyond the

6   scope of his opinion on inundation mapping.  He is not

7   a geotechnical engineer.  He cannot offer opinions on

8   dam stability or dam integrity.  May I have a brief

9   voir dire on this?

10          THE COURT:  At this point, voir dire doesn't

11  seem to be appropriate.  It's -- well, actually, I'll

12  probably let the court ask a voir dire question.

13          Did you take this from testimony by a

14  geoscientist?

15          THE WITNESS:  If I could maybe expand on

16  this.  Just as far as dam safety, and I said it

17  slightly before, I don't know if it was heard, dam

18  safety has two components.  There's the hydrology,

19  hydraulics, the water, and then there's the

20  geotechnical.  We work hand in hand.  I do a lot of dam

21  safety reports, and there's a geotechnical and a water

22  resources component looking at those two components.

23          THE COURT:  And in this specific case, was

24  this from -- which part was this from?

25          THE WITNESS:  This part, as far as the

1    question that was right here --

2              THE COURT:  Yeah.

3              THE WITNESS:  -- there's no concern for dam

4    safety from the hydrology, hydraulics.  For the water

5    going around the spillways, going around the auxillary

6    spillways, I'm relying on the previous testimony and

7    the government report on the geotech.  I'm not offering

8    any geotechnical opinion on the piezometers or anything

9    else.  It was already submitted by the after-action

10   reports.  We're relying on that geotechnical.  But when

11   it comes who the hydrology, hydraulics, and the

12   scouring of the spillways, that's why they were

13   reinforced with roller-compacted concrete.  I'm

14   qualified to speak to the sheer forces, sheer

15   velocities, and the scouring component for the

16   functionality of the spillways being designed for that

17   flow rate.

18             THE COURT:  Okay.  Well, I'll allow the

19   question.  I think there's foundation that's been laid.

20   BY MR. McGEHEE:

21        Q.    And, Matt, I -- I'm done with this chart,

22   unless there's anything else you want to include.

23        A.    No, that's all, sir.

24             MR. McGEHEE:  Let's call that 407.  And we

25   would offer 407, Plaintiffs' 407 into evidence as

1    demonstrative at this time.

2              THE COURT:  Any objection?

3              MS. DUNCAN:  No objection.

4              (Admitted Exhibit No. PX 407.)

5              MR. McGEHEE:  Your Honor, we would offer

6    Mr. Bardol's affidavit as well, Plaintiffs' Exhibit

7    PX 015, into evidence.

8              MS. DUNCAN:  We do object to that because

9    it's an undisclosed expert opinion and an affidavit

10   itself.  Outside of construct of Rule 26, it is

11   hearsay.

12             THE COURT:  What is the purpose for which

13   you're offering the affidavit?

14             MR. McGEHEE:  Judge, to complete his report.

15   And she says "undisclosed" so many times.  We've given

16   this to her.  She's had this for five years or --

17   several years, and she's referred to it.  And it was

18   just a complete -- to complete his expert report.

19             MS. DUNCAN:  Right.  What I mean by that,

20   Your Honor, when I say "undisclosed," I mean

21   undisclosed pursuant to Rule 26.  What he's -- this

22   affidavit is a rebuttal report that came long after the

23   rebuttal -- excuse me, the expert report deadlines, and

24   so it's an improperly disclosed expert report.  It was

25   attached to the summary judgment filings, we believe.

1        MR. McGEHEE:  And I think that helps us.

2   But, anyway, it's the 12th of June 2019, it was

3   provided to the government shortly thereafter.

4        THE COURT:  And what is it?  Tell me the

5   background.  Who is Mr. Bardol, I guess?  And what is

6   his affidavit for?

7        MR. CHANG:  Your Honor, if I may?  H.C.

8   Chang.  This is the affidavit that the witness was just

9   referencing a comparison that could be actually

10  summarized in that chart, a comparison of his opinion

11  and Dr. Nairn's opinion.

12       THE COURT:  How is that relevant to those two

13  opinions?  Who is Mr. Bardol and what is -- why is

14  he drafting --

15       MR. McGEHEE:  Yeah, it was the witness'

16  affidavit.

17       THE COURT:  Oh, it's the witness.

18       THE WITNESS:  Yeah, it was my affidavit.

19       THE COURT:  Oh, okay.

20       MR. McGEHEE:  And I should have done a better

21  job.  This is -- if I could approach the witness?

22       THE WITNESS:  Yes, sir.

23  BY MR. McGEHEE:

24       Q.   Is that your affidavit?

25       A.   Yes, it is.

1        Q.    Okay.

2              THE COURT:  What would the affidavit be

3        introduced for?

4              MR. McGEHEE:  To complete his report and to

5        support his testimony.  And, quite frankly, he was

6        cross-examined on this for several hours during his

7        deposition.

8              MS. DUNCAN:  Not on that he was not.  I

9        didn't even introduce it as a deposition exhibit.  And,

10       Your Honor, his testimony came in about it.  I mean,

11       the affidavit doesn't come in.  The affidavit itself is

12       hearsay.  It's not a properly disclosed expert report,

13       affirmative or rebuttal.

14             THE COURT:  I agree.  I'll exclude it.  I'll

15       sustain the objection.

16             MR. McGEHEE:  Thank you, Your Honor.

17       BY MR. McGEHEE:

18       Q.    Mr. Bardol, as you know, we don't think an

19       emergency existed.  You testified as much.  But let's

20       assume -- let's assume there was an emergency.  What's

21       the danger in having an actual bona fide emergency and

22       not declaring it in writing to the City of Houston, to

23       Harris County, to Fort Bend, and to the Houston

24       residence?  What's the danger in not formally

25       disclosing it?

1          MS. DUNCAN:  Objection, Your Honor.  This is
2    well beyond the scope of his report.  He never talks
3    about this sort of thing and reporting declarations.
4          THE COURT:  Well, I've heard some discussion
5    that has dealt with this whole question of emergency
6    which is central to the case, so I'll allow the
7    question.
8          THE WITNESS:  Yes, as far as not formally
9    declaring it, the Emergency Action Plan, ones I've
10   written, ones I've followed and go through, it is
11   there's a formal declaration and there's a formal
12   action for notifications.  There's usually typical, you
13   know, emails or notifications that go out to certain
14   officials explaining what the emergency is and what the
15   resulting actions are.  So if there's not that formal
16   declaration or implementing that that I didn't see, the
17   danger would be that the right people are not being
18   notified of the impending danger, what action needs to
19   be done, and then those, you know, other formal chains
20   of command can actually be implemented.
21   BY MR. McGEHEE:
22        Q.   How troubling was it to you when you heard
23   the word "informal emergency"?
24        A.   I mean, when I heard "informal," it's --
25   it's -- you either declare an emergency or not.  So I

1    just -- it doesn't make sense as far as an oxymoron, I

2    think that was the term that was used before, of not

3    having a formal declaration emergency.  An informal

4    emergency, is not quite there.

5           My wife's a nurse.  They have certain codes.

6    If there's an emergency, it's usually declared.  They

7    go through it.  Same thing in engineering, Emergency

8    Action Plan.  So it's usually a formal declaration, so

9    there's procedures that you follow afterwards.

10     Q.    Thank you, sir.

11           MR. McGEHEE:  Pass the witness.

12           THE COURT:  Okay.  Well, we're going to

13    have --

14           MR. McGEHEE:  I'm being told here, can we do

15    some housekeeping admissions here?  I talked about a

16    bunch of exhibits and I didn't admit them.

17           THE COURT:  Sure, let's get through those

18    quickly.

19           MR. CHANG:  Your Honor, there were a number

20    of exhibits referenced by Mr. McGehee today.  I would

21    just briefly go over them.

22           First of all, there is the CV of Mr. Bardol.

23    I think we incorrectly identified it.  It should be PX

24    354.

25           THE COURT:  Okay.

1            MR. CHANG:  That Mr. Bardol's CV.

2            And there's a copy of Mr. Bardol's report.

3    That should be PX 014.  And then there are number of

4    exhibits, joint exhibits that should be preadmitted.

5    There's Water Control Manual, that's JX 002.  There's

6    Emergency Action Plan, that's JX 003.  And then there's

7    a memorandum for commander, JX 053.  I'll make a note

8    that it's really two pieces of documents.  It's a

9    memorandum for commander report of performance, JX 053.

10   And then there's the Addicks and Barker Dam Safety

11   Modification Report, that's JX 042.  And then there's

12   the 2009 draft operational assessment, that's

13   Plaintiffs' Exhibit PX 333.  And, finally, the 1962

14   Addicks and Barker Reservoir regulation manual, that's

15   PX 004.  The plaintiffs would move to admit these

16   exhibits into the evidence.

17           THE COURT:  Any objection?

18           MS. DUNCAN:  We only have one objection, and

19   that relates to PX 014, and we'd like to simply make a

20   record that we object to the portions of Section 8

21   being admitted that relate to dam integrity, and

22   there's three specific sentences, if I can read them

23   into the record, because he's not a geotechnical

24   engineer, and he's not qualified to make those

25   opinions.  And we further object to two conclusory --

1    or a conclusory sort of statement in the factual

2    background relating to an emergency.  May I read those?

3            THE COURT:  Yes.

4            MS. DUNCAN:  So we object to the sentence on

5    2-20 of PX 14, "Per USACE's own post-Harvey report,

6    there is no creditable evidence that any emergency

7    implicating possible dam failure existed at the time of

8    Hurricane Harvey."  We, of course, object because we

9    don't believe Mr. Bardol is qualified for that.

10           We also object to portions of Section 8, the

11   very last sentence on page 8-55, "These protective

12   levees could have sustained significantly higher

13   floodwaters than imposed during Hurricane Harvey."

14   That is the portion we object to.  We believe that's a

15   geotechnical opinion, not for Mr. Bardol who is a flood

16   modeler.

17           We also object to the entirety of the

18   portions on 8-56.

19           THE COURT:  Which are?

20           MS. DUNCAN:  I can read those.  The first

21   bullet on 8-56 states, "In response to dam safety

22   concerns identified by USACE, rehabilitation efforts

23   were completed by USACE after publication of the

24   1962 RRM to improve performance of the outlet works, in

25   other words, mitigate potential for excessive seepage

1  and piping."  It goes on, "The previous, in other words

2  pre-Hurricane Harvey, maximum pool of record, in other

3  words, 102.65 foot at Addicks and 95.2 foot at Barker

4  were reached in 2016 and provided a full scale

5  demonstration of the effectiveness of rehabilitation

6  activities at the outlet works completed since

7  imposition of 2012 Water Control Manual.  Therefore, it

8  was not necessary from a dam safety perspective to open

9  the gates."  That is a problem, Your Honor because he

10  cannot speak to and did not analyze in this report the

11  effectiveness of the rehabilitation activities, and

12  that would be geotechnical engineer's purview.

13      And, finally, we object to the second half of

14  the sentence, the last bullet on 8-56 where it states

15  "and there would have been no significant decrease in

16  dam safety due to levee instability and/or seepage and

17  piping."  That also is a geotechnical opinion.

18      THE COURT:  Mr. McGehee?

19      MR. McGEHEE:  Your Honor, it just sounds like

20  she's objecting to the parts of the report that the

21  government doesn't like.  He's proved himself up as an

22  expert in those areas.  He's talked about them.  He's

23  testified to it.  And I think the entire report should

24  come in and not redacted based on the government's

25  wishes.

 1          MR. CHANG:  Your Honor, one additional thing.
 2     That segment of the report was performed by Mr. Bardol
 3     in connection with a geotechnical engineer.  That was
 4     entirely disclosed.
 5          THE COURT:  Okay.  I'll allow the material.
 6          (Admitted Exhibit No. PX 354.)
 7          (Admitted Exhibit No. JX 042.)
 8          (Admitted Exhibit No. JX 002.)
 9          (Admitted Exhibit No. PX 014.)
10          (Admitted Exhibit No. JX 003.)
11          (Admitted Exhibit No. JX 053.)
12          (Admitted Exhibit No. PX 333.)
13          (Admitted Exhibit No. PX 004.)
14          MR. CHANG:  Thank you, Your Honor.
15          THE COURT:  One of the things particularly
16     with reports is the court doesn't want to sort of
17     redact and go over a report.  They're going to --
18     generally unless a report is somehow way off.  This one
19     seems to not be way off, and there was a geo engineer
20     working with Mr. Bardol, so I'll allow the documents
21     in.
22          Okay.  Do we have anything else on a -- yes?
23          MR. McGEHEE:  No, sir.  We pass the witness.
24          THE COURT:  Okay.
25          So the witness will be back with us on

1    Monday.

2              THE WITNESS:  I guess so, yes.

3              THE COURT:  And --

4              MS. DUNCAN:  Your Honor, will the witness

5    remain under oath over the weekend?

6              THE COURT:  Yes, yes.  He can't be

7    interrogated over the weekend.

8              So no one can cross-examine you or examine

9    you --

10             THE WITNESS:  All right.

11             THE COURT:  -- or put you on any stand

12   anywhere except maybe a bandstand if you play an

13   instrument.  So you're excused at the moment and we'll

14   look forward to seeing you Monday.

15             I think now that we know how to get to the

16   place and we know that our GPS is at least working now,

17   I think we can make it here without any trouble.  So

18   let's resume at 10:00 o'clock on Monday.  And then

19   we'll have who on Monday after Mr. Bardol --

20             MR. McGEHEE:  Judge, as soon as --

21             THE COURT:  Cross.

22             MR. McGEHEE:  -- Mr. Bardol is finished, we

23   will call Robert Thomas.

24             MR. NOLEN:  Rob Thomas, correct, Your Honor.

25             THE COURT:  And what is the likely -- his

1    likely length?

2          MR. McGEHEE:  Ours is two hours.  An hour for

3    direct.

4          THE COURT:  So we're talking about finishing

5    him -- well, after cross early afternoon?

6          MR. McGEHEE:  I would hope so, Your Honor,

7    but --

8          MS. DUNCAN:  Recall, Your Honor, that we're

9    also conducting our direct exams at the same time for

10   efficiency so that we can get the witnesses up and down

11   and they can leave.  And so we have a lengthy direct

12   exam prepared with Mr. Thomas, given his significant

13   role he played in this event, so we anticipate

14   approximately five hours, maybe.

15         THE COURT:  So that will presumably end the

16   day on Monday.  Will we be able finish that then

17   Monday, do you think?

18         MS. DUNCAN:  I'm not sure because, I mean,

19   we'll have to do the cross-exam of Mr. Bardol.

20         THE COURT:  Okay.  Right.

21         What does then Tuesday look like?

22         MR. McGEHEE:  Sir, Tuesday we're going to

23   call Colonel Zetterstrom, and that's it.  And then

24   Nairn.  And Kauffman.

25         MR. NOLEN:  Michael Kauffman.

1          MR. McGEHEE:  Michael Kauffman.  So we have

2     two witnesses and then their expert.

3          THE COURT:  Okay.  So now we're looking at

4     then --

5          MR. NOLEN:  Oh, and Richard Long.  I'm sorry.

6     Richard Long.  We have three experts.

7          THE COURT:  So Wednesday, do we have then

8     Wednesday potentially lined up?

9          MS. DUNCAN:  Well, Your Honor, if the

10     plaintiffs actually call each of those witnesses, then

11     that will take care of, I believe, most of the fact

12     witnesses on our list unless we decide somebody else

13     needs to be called from our may call list.  And the

14     last person that we would call would be Dr. Nairn.

15          THE COURT:  Okay.  So that would mean we

16     could finish up probably by the end of Wednesday and

17     Thursday do the site visit?

18          MR. NOLEN:  Yes, sir.

19          THE COURT:  And then would there be anything

20     else then we'd want to do back in court on Friday?

21          MS. DUNCAN:  Well, Your Honor, I don't think

22     that we made arrangements to have our witnesses or

23     anything around.  I mean, if -- or even the teams.  I

24     think all of teams who are coming down from DC are

25     largely going back.  I am local, but I think most

1   everyone else is not.  So, you know, I think we'll have
2   to see if there is any testimony to finish up and when
3   we can schedule that for.
4           THE COURT:  Okay.
5           MS. DUNCAN:  And for closing arguments or
6   briefing would be helpful, when to schedule that for.
7           THE COURT:  Okay.  Let's think about that
8   later.  But we'll likely then have Monday, Tuesday, and
9   Wednesday, pretty much full days, maybe finishing
10  Wednesday.  And then Thursday the site view.  And then
11  if there's anything more, we can do it Friday, I guess.
12          MS. DUNCAN:  Well, Your Honor, I'm not sure
13  that we can.  Dr. Nairn and our attorney handling him
14  is not available after Wednesday, which is why we
15  proposed the site visit for Thursday --
16          THE COURT:  Okay.
17          MS. DUNCAN:  -- instead of trial.  So we
18  would not be able to finish that part.  But if, for
19  example, we did finish Dr. Nairn and plaintiffs had a
20  rebuttal case or something, perhaps if we could make
21  those arrangements.  We'd have to look into it.
22          THE COURT:  Well, what the court would prefer
23  rather than coming back down from the court as well as
24  probably other people here, we could always do the --
25  if we had an extra day's worth, we could do a Zoom

1    hearing.  I think I found that particularly with the

2    hearing where you know the people and you've seen them

3    live and you know the credibility, all those things,

4    doing it by Zoom afterwards is much easier than would

5    imagine and very effective.  I mean, I don't know that

6    I would start a trial on Zoom having never seen the

7    people in person.  But after having had not only

8    other -- plus or other hearings and this trial, I think

9    it would be fairly easy to do a day of Zoom to finish

10   up.

11             MR. McGEHEE:  That would be fine with us,

12   Judge.

13             MS. DUNCAN:  We'd just need to find a day,

14   Your Honor.

15             THE COURT:  Yeah.

16             MS. DUNCAN:  And, you know, also if it's just

17   experts and we're not burdening fact witnesses, another

18   option might be to meet in D.C. at your courthouse.

19             THE COURT:  Well, we're happy always to have

20   you, though I don't want to put any stresses on anyone

21   from Texas coming up, but certainly everyone will be

22   welcome.  But talk among yourselves and come up with

23   something that you think works for all -- everyone.

24   And the court is happy to do it if we want to do it in

25   D.C. or want to do by Zoom.  So in terms of making

1  arrangements to leave, I may make arrangements to leave

2  Friday rather than -- currently I think our flights

3  leave Saturday since we're --

4          MS. DUNCAN:  Friday is good.

5          THE COURT:  Yeah, it seems to be we're not

6  going to be able doing anything on Friday, so we'll do

7  the site visit and then leave Friday.  And then we'll

8  have a -- why don't we schedule then the following week

9  we'll have status conference on Monday and see what

10 you've collected and recommended.

11         MS. DUNCAN:  Your Honor, the parties did file

12 a joint sort of proposed itinerary for the site visit.

13 We have sort of practiced the route since we filed that

14 and noted a few small changes for efficiency.  I think

15 we've got agreement with plaintiffs on those.  So we'll

16 try to get that on file in the coming days.  It's

17 negligible impact.  It won't change the start and end

18 time.  And we expect that to wrap up by early

19 afternoon.  So if you're changing flights another

20 option might even be late Thursday, if you'd prefer.

21         THE COURT:  Okay.  Well, how long is -- we're

22 going to meet I think it was 10:00 o'clock for the site

23 visit.  Where -- logistically where are we going to

24 meet?

25         MS. DUNCAN:  Yes, Your Honor.  I'll give you

1    the overview, and then it's all in writing on the

2    docket if you need to refer back to it.  So we'll meet

3    out at the corps' project office which --

4              Rand, if I can borrow this, and, Jack, if I

5    could borrow this map?

6              We're going to meet right out here, Judge.

7    You might even see some pictures of where we're going

8    to meet in coming days.  So we're going to jump, all of

9    us, into a van that the corps has arranged for us, and

10   there will be room for yourself and the clerk and a

11   corps representative who can sort of tell us what we're

12   seeing.

13             THE COURT:  Okay.  Where will we meet the

14   van?

15             MS. DUNCAN:  We'll meet the van at the corps'

16   project office.  There's a big parking lot.  It would

17   require driving out there and then all jumping into the

18   van.

19             THE COURT:  Okay.  So the van is out there.

20   Yeah, if we have good instructions then so we can get

21   there without getting lost again.

22             MS. DUNCAN:  Yes.

23             And if I could just briefly walk you through.

24   What we'll do is we'll start out at the outlets here on

25   Barker reservoir.  We'll drive through briefly some of

1    the downstream property neighborhoods before we go up

2    to the Addicks Reservoir.  We'll drive on the dam

3    around and up and out to that end of the dam where the

4    uncontrolled releases were flowing around during the

5    event.

6              MR. McGEHEE:  The puddle.

7              MS. DUNCAN:  And then we'll come back down to

8    Clay Road, we'll come over, then we'll see some of the

9    upstream neighborhoods that also flooded during the

10   storm.  And then we'll come on back and hop out of van.

11   And then we have a route proposed by plaintiffs to sort

12   of follow along near the bayou to make your way back to

13   downtown as a sort of self-guided tour back.

14             THE COURT:  Okay.

15             MS. DUNCAN:  Does that sound right?

16             MR. NOLEN:  Yeah, that's right.

17             MR. McGEHEE:  And, Judge, can we ask, are you

18   in a rental car or are you Uber or are you driving --

19             THE COURT:  Yeah, we're in a rental car.

20             MR. McGEHEE:  Okay.  So we need to end up

21   where we started then, it sounds like.

22             THE COURT:  Yeah, that's what I was just

23   thinking.  If we were going to start downtown with the

24   van, it would be more convenient because we would leave

25   our car down here at the court and then come back to

1    the court and then go back to the hotel.

2              MR. McGEHEE:  Can't we just do it in reverse?

3              MS. DUNCAN:  We can look into it.

4              MR. McGEHEE:  Judge, we've been pretty

5    cooperative on this.  I would propose that we start by

6    the courthouse and you get in and get out the same

7    place, but we would have to reverse engineer the trip.

8    But if you give us time, maybe we can figure it out.

9              THE COURT:  Okay.  That will be great if you

10   could.

11             So we will see you-all at 10:00 o'clock

12   tomorrow.  Have a good night.

13             MR. McGEHEE:  Monday.

14             THE COURT:  Monday.  I'm sorry.  Have a good

15   weekend.

16             (Proceedings recessed at 5:23 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2

 3

 4

 5       I, Gary Schneider, a shorthand reporter, do hereby

 6   certify that the foregoing proceedings were taken down

 7   and transcribed under my direction to the best of my

 8   ability.

 9

10   DATED: November 12, 2024        s/Gary Schneider

11                                   Gary Schneider, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    ADMITTED EXHIBITS
 2
 3    JX           PAGE     DESCRIPTION
 4    002          206      11/1/2012-Water Control Manual
 5                          (2012)
 6    003          206      5/22/2014-Addicks and Barker
 7                          Emergency Action Plan (2014)
 8    042          206      5/1/2013-DSMR ? U.S. Army Corps
 9                          of Engineers, Addicks and Barker
10                          Dam Modification Report (May 2013)
11    053          206      10/27/2017-Report of Performance,
12                          New Pool of Record After Harvey
13                          (2017)
14    089          174      8/27/2017-Email String Ending
15                          in 8-27-17 Email from Charles
16                          Scheffler to Robert Thoma
17                          regarding plan to follow water
18                          control manual
19    106          172      8/27/2017-Email from Maglio to
20                          Michael Sterling, Michael Zalesak,
21                          and Rob Thomas with subject
22                          "RE:Deviation"
23    109          174      8/29/2017-Email from Maglio to
24                          DLL-CESWG-FLOOD with subject
25                          "Addicks flow around northern"
```

```
 1   110          174    8/29/2017-Email from Maglio to

 2                        DLL-CESWG-FLOOD with subject "Image

 3                        of the Addicks emergency spillway"

 4

 5   PX           PAGE   DESCRIPTION

 6   004          206    Apr-62-U.S. Army Corps of Engineers,

 7                        Galveston District, Buffalo Bayou,

 8                        Texas Reservoir Regulation Manual for

 9                        Addicks and Barker Reservoirs,

10                        Buffalo Bayou Watershed ("1962

11                        Reservoir Regulation Manual")

12   014          206    11/13/2018-Initial Expert Opinion

13                        Report of M. Bardol, P.E., C.F.M.,

14                        D.WRE and R. Bachus, Ph.D., P.E., D.GE

15                        ("Bardol Expert Rep.")

16   333          206    Oct-09-USACE (2009): Draft Operational

17                        Assessment of the Addicks and Barker

18                        Reservoirs, Fort Bend and Harris

19                        Counties, TX, Galveston District,

20                        sponsored by Harris County Flood Control

21                        District, October 2009.

22   354          206    8/29/2024-Matthew Bardol's revised CV

23   405          67     Demonstrative

24   406          87     Demonstrative-chart entitled "Capacity"

25   407          198    Demonstrative-chart
```