IN THE UNITED STATES COURT OF FEDERAL CLAIMS

IN RE: DOWNSTREAM ADDICKS AND    ) Case No.

BARKER (TEXAS) FLOOD-CONTROL    ) 17-9002L

RESERVOIRS.    )

_____)

Courtroom 8B

BOB CASEY UNITED STATES COURTHOUSE

515 Rusk Street

Houston, Texas 77002

Tuesday, October 29, 2024

10:00 a.m.

Trial Volume 3

BEFORE: THE HONORABLE LOREN A. SMITH

GARY SCHNEIDER, RMR, CRR, Court Reporter

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

RAND P. NOLEN, ESQ.

Fleming, Nolen & Jez, L.L.P.

2800 Post Oak Boulevard

Suite 6000

Houston, TX 77056

(713) 621-7944

rand_nolen@fleming-law.com

and

JACK EDWARD MCGEHEE, ESQ.

H.C. CHANG, ESQ.

McGehee, Chang, Landgraf, Feiler

10370 Richmond Avenue

Suite 1300

Houston, TX 77042

(713) 864-4000

jmcgehee@lawtx.com

hcchang@lawtx.com

and

RICHARD WARREN MITHOFF, JR., ESQ.

Mithoff Law Firm

500 Dallas Street, Suite 3450

Houston, TX 77002

(713) 654-1122

rmithoff@mithofflaw.com

and

RUSSELL S. POST, ESQ.

Beck Redden, LLP

1221 McKinney Street, Suite 4500

Houston, TX 77010

(713) 951-6292

rpost@beckredden.com


ON BEHALF OF THE DEFENDANT:

KRISTINE SEARS TARDIFF, ESQ.

LAURA DUNCAN, ESQ.

FRANCES MORRIS, ESQ.

AMBER DUTTON-BYNUM, ESQ.

U.S. Department of Justice

Environmental and Natural Resources Division

53 Pleasant Street, 4th Floor

Concord, New Hampshire 03301

(603) 230-2583

kristine.tardiff@usdoj.gov

laura.duncan@usdoj.gov

frances.morris@usdoj.gov

amber.dutton-bynum@usdoj.gov

439

                                I N D E X

                                                    Page

WITNESS:  ROBERT CHARLES THOMAS, III

Direct Examination (Cont.) By Mr. Mithoff .444

Cross-Examination By Ms. Duncan ..........489

Redirect Examination By Mr. Nolen ........630


                                EXHIBITS

 EXHIBIT                    FOR ID          IN EVID
 PLAINTIFF:

| EXHIBIT | FOR ID | IN EVID |
|---|---|---|
| PLAINTIFF: | | |
| PX 004 | | 487 |
| PX 009 | | 487 |
| PX 360 | | 487 |
| PX 361 | | 487 |
| PX 362 | | 489 |
| PX 363 | | 487 |
| PX 404 | | 487 |
| | | |
| DEFENDANT: | | |
| DX 212 | | 610 |
| DX 290 | | 522 |

440

(EXHIBITS ADMITTED INTO EVIDENCE Continued)

EXHIBIT                    FOR ID           IN EVID

JOINT:

JX 002                                       487

JX 038                                       487

JDX 042                                      487

JDX 110                                      487

REPORTER'S NOTES:

QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT

NECESSARILY REFLECT A DIRECT QUOTE

PROPER NAMES ARE PHONETICALLY SPELLED UNLESS

STATED ON THE RECORD

P R O C E E D I N G S

-   -   -   -   -

(Proceeding called to order, 10:04 a.m.)

THE COURT:  We are already ready to begin unless anyone has any preliminary housekeeping-type issues.

Plaintiff?

MR. NOLEN:  Your Honor, we addressed the -- I addressed with opposing counsel the site visit, and I think we've got all of the details worked out on that, and I believe they're going to actually file an amended site visit for the court so that you have the itinerary for that.  It hasn't really changed.  We just made a few modifications, and hopefully those are agreeable and acceptable.

We've also been discussing scheduling and potential scheduling.  It may be that -- there's concern at least that Dr. Nairn, who is the corps' witness, will not be -- will not get on.  And if that's the case, we have advised opposing counsel that instead of the court having to travel, we would be willing to come to Washington, D.C. to complete Dr. Nairn at the court's convenience when the court wants to schedule that if that's the case.  But we're going to do everything we can to try to get to the end so that

we're -- that we do wrap this up.  It's just that that's the unknown.

THE COURT:  Okay.  Well, either way, the court is certainly happy to have you all come to Washington.  We cannot promise the weather you have in Houston.

MR. NOLEN:  Well, you might not want to promise that.

THE COURT:  No.  That's through some times in the year.  At this time I noticed it was 45 in Washington last night and 75 here, so about a 30-degree gap.  So you might want to bring warm clothes if you do come to Washington.  We usually don't get real bad weather in November and December, but this has been a strange year with weather, so we may.

Okay.  Well, that's good to know, then. We'll plan on the details for Thursday and we'll see how far we can get today and tomorrow.

Now, today we have -- I want to stop at 11:50 because we have a noon status conference in one of our bid protest cases on our equitable emergency docket, so I'm not sure -- I don't think these people are seeking preliminary injunction which usually is the thing that speeds up the process.  I think that's resolved, so it should be a very short conference at noon, and then we

can resume at 1:00 o'clock or 1:10, whatever would be a reasonable time tomorrow -- or today, rather, for lunch.

MR. NOLEN:  Okay.

THE COURT:  Okay.  Anything else?

MS. DUNCAN:  I just want to note that we will do our very best to get Mr. Thomas on and off the stand today, but as noted, we have a lengthy direct exam planned for him.

THE COURT:  Yeah.

MS. DUNCAN:  And so whether we can make that happen may depend on how long plaintiffs take here.

THE COURT:  Okay.

MS. DUNCAN:  Just alerting the court that we can continue to reassess throughout the day.  It may be he extends briefly into tomorrow.

THE COURT:  Okay.  We'll do whatever we can do.

MS. DUNCAN:  Thank you.

THE COURT:  All right.  We left off the witness yesterday, he's still under oath today.  And with that --

Yes.  Has plaintiff finished the examination yet?  I didn't remember.  Oh, yes, you had indicated that, Mr. Mithoff, that it would be another 45 minutes.

MR. MITHOFF:  Approximately.

THE COURT:  Yeah, approximately.

MR. MITHOFF:  Approximately, Your Honor.
Thank you.

THE COURT:  Then you may proceed.

MR. MITHOFF:  Thank you, Judge.

Thereupon--

ROBERT CHARLES THOMAS, III

was called as a witness and, after having been first previously duly sworn, testified as follows:

DIRECT EXAMINATION (Continued)

BY MR. MITHOFF:

Q.   Good morning, sir.

A.   Good morning, sir.

Q.   Mr. Thomas, you were previously designated by the United States in this case in Joint Exhibit 102 in what lawyers call a 30(b)(6) notice, and you were designated to testify on certain areas in this case, and you're acquainted with those areas, are you not?

A.   Generally, sir.

Q.   Your lawyers explained to you that there would be several areas you would be designated to testify in, did they not?

A.   They did.  But I wouldn't admit to remembering every single one.

Trial

Q.   And I'm not going to ask you to remember every single one.

Specifically, with respect to item 4 in Joint Exhibit 102, you were designated in response to a request for a witness to testify regarding the general history of the Barker and Addicks Reservoirs and Dams including their initial construction, the installation of gates, raising of the embankment, addition of concrete spillways, upgrades to the gate structure, and revisions to operations procedures including Water Control Manuals by the USACE since inception.

Do you understand that?

A.   So I haven't found it all on the page, but I do understand that.

Q.   I'm sorry?

A.   I didn't see it all on the page you were showing, but I understand that, yes, sir.

Q.   I'm happy to approach and --

A.   I think he's got it highlighted now, if that's the one you mean.

Q.   Yes, sir.

MS. DUNCAN:  Your Honor?

THE WITNESS:  Yes.

MS. DUNCAN:  Your Honor, I'd like to raise an objection for the record to note that Mr. Thomas is

here testifying in his personal capacity.  He certainly has knowledge of these topics given he was previously the 30(b)(6) designee, but that designation was simply for the deposition.  And plaintiff did not identify any portions of that deposition for admission at trial as they would have needed to do as part of their pretrial filings.  So I just wanted to make that very clear for the record.

THE COURT:  Well, I mean, every witness is testifying on their own whether they're an officer of a corporation or an administrator.  So I think that distinction may have some relevance in contract law where, you know, only people with certain authority can enter into context.  But I don't know that that has any relevance in this context, so I'll note the objection.

Mr. Mithoff?

MR. MITHOFF:  And as we set at the outset, this witness had been designated pursuant to the adverse party rule.

THE COURT:  Yes.

BY MR. MITHOFF:

Q.    What I want to do, Mr. Thomas, is move through the history of some of the manuals, some of the documents in order to help put into context how we got to where we are today and how we got to where we were

back at the time of these events.

Do you understand that?

A.   Yes, sir.

Q.   And I want to begin with a board that we did not get to talk about yesterday.  We've talked about the maps showing both reservoirs as well as the channel, and we have outlined in green and blue the portions of the earthen embankment as well as the Smith embankment, correct?

A.   Correct.

Q.   What I wanted to do was actually point out for the court's benefit and for mine as well, if you could help us here, the various components as they actually appear in real life.  This is Joint Exhibit 42, Figure 2-11, Barker Dam at Outlet Works during reservoir impoundment.

You've seen this photograph or at least ones similar to it before, have you not?

A.   Yes, sir.

Q.   And I want to identify the components that we are looking at.

The blue water here at the bottom of the exhibit is impounded water; is that correct?

A.   So you have some labels.  Am I allowed to walk down there so I can read them?

Q.    I'll read them to you.

A.    Okay.

Q.    These were for me to help remember what to ask you, but you're welcome to come read my labels.

A.    Yeah?  Okay.  That's --

Q.    This says "Impounded Water."  Why don't I just read to them to you?  Is that better?

A.    Okay.  Yes, sir.

Q.    Is this impounded water?

A.    Yes, sir.

Q.    Okay.  And this structure here is labeled "Embankment."

Is that the embankment?

A.    That would be the crest of the embankment, right.

Q.    And a portion of this is what we've called earthen embankment, correct?

A.    So everything that you see there with grass on it, that's the earthen embankment.

Q.    And there has been testimony about the surface.  What is the surface covered with, the surface you can drive on?

A.    It's gravelish.  Caliche, maybe.

Q.    And this structure here I've labeled "Gates."

Are those the gates?

A.    That's the control tower.  The gates are underneath it.

Q.    And the vertical lines which appear to be steel structures, is that part of what holds the gates?

A.    Yes, sir.  That's the stem.  So the stem is there, and that's what's connected to the gate at the bottom.

Q.    And is there a conduit between the water and this portion here which I believe is part of the spillway?

A.    Five of them, yes, sir.

Q.    Five conduits?

A.    Yes, sir.

Q.    One for each gate?

A.    So the middle conduit has two gates on it, but effectively, yes, sir.

THE COURT:  Now, let me ask a question there.

Is this the spillway, this area here?

THE WITNESS:  So the spillway is about from where the dam ends to about where you see that rock kind of end.  So right there, sir.  Yeah.  That general area.

THE COURT:  That's the -- this is the spillway?

THE WITNESS:  That's the parabolic spillway

that's part of the primary outlet structure, yes, sir.

THE COURT:  Okay.  Is this part of the spillway too?

THE WITNESS:  No, sir.  That's just the crest of the dam.  The other spillways are further away from this.  Those emergency spillways are at the ends of the dam.  Not here.  This is what we call the primary outlet works with the primary parabolic spillway.

THE COURT:  Okay.  And what is this?  Is that Buffalo Bayou or one of the bayous?

THE WITNESS:  Yes, sir, that's the channel connecting to Buffalo Bayou.

THE COURT:  Okay.  So this is a natural river that you -- there's been work done to make this, correct?

THE WITNESS:  There has been some work, sir.  So this was a natural channel before, but there has been some rectification of the channel from here a little ways downstream.  Most of the bayou remains in its more natural state, but this part has been improved.  And you can kind of see that with the way the slopes look and you'll get a chance to see it in person on the site visit.

THE COURT:  Okay.

Trial

BY MR. MITHOFF:

Q.   And is there a portion here that is made of concrete?

A.   Yes, sir.

Q.   And what is -- what is that called, this darker blue area?

A.   That's the parabolic spillway.

Q.   Parabolic spillway?

A.   Correct, sir.

Q.   And what kind of concrete, do you know?

A.   I don't know what kind of concrete they used.

Q.   Do you know anything about the thickness of the concrete?

A.   I want to say -- I'd have to go look at the thing.  It's pretty thick at that section.  I'd have to look.

Q.   And do these portions of the embankment that we labeled earlier or discussed on there the white line here that you said was covered in some kind of crushed gravel or some similar material, does that ultimately end up with cement portions that connect to the earthen embankment?

A.   Yes, sir.  So over on your other map, the green line on this other map, maybe it's hard for everyone else to see, you can see where the earthen

part of the embankment is, and the blue lines there I think show the approximate locations of those emergency spillways which are covered in concrete.

Q.   And that's what I wanted to ask you next because we've only see it in that map.  We want to look at what I think may be a picture of that cement part of the spillway; is that correct?

A.   Yes, sir.

Q.   For the record, this is Joint Exhibit 42, Figure 2-19, RCC, northeast end, Addicks Dam.  This is on the Addicks side.  The other photograph is Barker.

But both sides, wherever we see the blue lines on this map, would be the cement, what I think is called rolled concrete?

A.   Right.  The RCC stands for roller-compacted concrete, and both ends of both dams have that for a section of the embankment to form emergency spillways.

Q.   And do you know the approximate thickness of that concrete, that rolled concrete?

A.   So I think it's 6 to 8 inches.  I'd have to go look.  It's relatively thin.  Much thinner than we would build today.

Q.   And does that change in thickness as it progresses or do you know?

A.   I don't remember that detail, sir.  I don't

think so.  I don't remember for sure.

Q.   And finally we've seen this picture before, I believe.  Joint Exhibit 110.

THE COURT:  The puddle.

MR. MITHOFF:  The puddle.

BY MR. MITHOFF:

Q.   Where does the puddle fit in to what we have described so far as this cement spillway?

A.   So that's the very end of the north end of the Addicks spillway.

Q.   So that would be where on this diagram?

A.   Right at the very top blue.

Q.   Right up here?

A.   Correct.

Q.   The very top of the document.  And we've been referring to this document as the drawing, and it's Exhibit -- Plaintiffs' Exhibit 405.

And I think this question was asked maybe yesterday.  Do you recall whether this building is on federal land or nonfederal land?

A.   As far as I know, the federal government does not own that building.

Q.   Does not?

A.   Correct.

Q.   And where does the boundary end?  Somewhere

near the end of this spillway?

A.    That's right.  Very close to the building.

Q.    We've heard reference to armor plates at the ends of the dam.  What is that?

A.    I don't know that one, sir.  I'm not sure what you're talking about.

Q.    Okay.  We'll come back to that.

What I want to do is walk through now some of the historical developments in the manuals and other documents.  And I think we have these on cue to pull up.  I'm happy to approach you as I did yesterday because you told me your vision was not the best, nor is mine.  But I think we can pull it up.  It's Plaintiffs' Exhibit 4.  It's not a very readable copy. Let me hand you a copy.

A.    Thank you.

Q.    This is -- I can barely read it myself.  This is entitled "Reservoir Regulation Manual for Addicks and Barker Reservoirs Buffalo Bayou Watershed April 1962," correct?

A.    Correct.

Q.    This obviously predated the 2012 Water Control Manual and the 2014 Emergency Action Plan of April 1962 -- excuse me, this April 1962 document preceded both the 2012 Water Control Manual and the

2014 Emergency Action Plan, correct?

A.   Yes, sir.

Q.   Are you familiar generally with this document?  You've seen it before?

A.   Yes, sir.

Q.   If you'll turn to page 31, there's a heading entitled "Instructions to Dam Tender."  We'll see if we can pull it up and see if the picture is any better.  You're going to be able to see it I think better on your copy than you will from the screen.

THE COURT:  Is the dam tender a person?  A specific person?  I mean -- the witness, you are the dam tender?

THE WITNESS:  No, sir.  So the dam tender is not just one person.  It's the person that we assign to actually go move the gates.  So it's a person that works at the project office.  You'll see how that works on the site visit, I think.  So it can be a different person each day, but it's a person that the water control team in the district headquarters calls and says, "Please change this gate to this many feet."

THE COURT:  Okay.  So there's no one permanently at the dam itself, it looks like?

THE WITNESS:  That's right.  For these structures, we drive to them and operate them at the

structure.  And the exception to that, sir, is during Hurricane Harvey, we went ahead and assigned people at those structures during the worst part of the storm. Ordinarily they're not there, sir.

THE COURT:  Is there a place for them to be if there is a storm or not?

THE WITNESS:  So during Hurricane Harvey, there was not a place for them to be.  They would sit in their trucks or after the rain stopped we put up some little canopies.  But now there is a little building.  With the new structures, you'll be able to see it, now it's much more comfortable if we have to have someone there.

THE COURT:  But you're still not -- you don't put --

THE WITNESS:  No, sir.

THE COURT:  This isn't like a big hydro project where you have 20 people always at the dam?

THE WITNESS:  Exactly, sir.

THE COURT:  Okay.

BY MR. MITHOFF:

Q.   Did those dam tenders ultimately report to you through a chain of command?

A.   During Hurricane Harvey.

Q.   I have just a couple questions about this

457

Trial

10/29/2024

document.  As you see, I want to simply identify some points in time.

Looking at paragraph 29, it's entitled "Emergency Regulation," and paragraph 30, "Emergency Regulation by Dam Tender."  And I don't intend to read through all of those, but if you'll look at the lower part of paragraph 29, about five or six sentences from the bottom of 29.  If we can get to the bottom of 29.

MR. MITHOFF:  May I just approach the witness, Your Honor?

THE COURT:  Yes.

MR. MITHOFF:  This is kind of hard to read and it's just two sentences.

BY MR. MITHOFF:

Q.   Looking at the bottom of the page of paragraph 29, it simply says "The conduit rating curves will be used to set gate openings for the required discharges at each dam.  If plates 14 and 15 have dictated releases, they will be made regardless of channel capacity downstream."

Do both of these paragraphs, both 29 and 30, discuss emergency procedures?

A.   They do.

Q.   And do they make reference specifically to plates at it looks likes Bates 8252, page 14 and 15?

A.    Correct.

Q.    What is a plate?

A.    It's a figure.

Q.    So if we look at both plates 14 and 15, does this tell us -- well, first of all, does it describe in a graph pool elevations, inflow curves, and outflows, and the cfs increments?

A.    It does.

Q.    Has the standard project flood for these dams changed from 1962 up through the date of Harvey in 2017?

A.    Yes, sir.

Q.    How has it changed generally?

A.    Well, I don't -- let me look and see if it's in here.

Do you have the 2012 Water Control Manual I can look at real quick to see if it has the same numbers?

Q.    I think we do have a copy here.  Joint Exhibit 2.

A.    I don't remember if we list this in this manual or not.  Let me look.

So I'm just reading off of this page, XIV.

Q.    Right.

A.    It would be pertinent data.  So it lists the

standard project flood, as does table 1 from the 1962 manual, and so those are different numbers.  There's also a change in the datum, so you can't compare the numbers directly.  So all that is to say that it's different now and the manuals show a difference in it.

Q.  Can you tell us just generally what the differences are?  I'm not asking for specific numbers.

A.  The biggest change in hydrology happened in 1977, sir, and that's when we recalculated the probable maximum precipitation in the spillway design flood. And the flood pools got much bigger for Addicks and Barker.  And that's when the corps realized that the dams at that time would not survive the probable maximum flood.  So that would be reflected in these documents if we dug in and took all the numbers apart.

THE COURT:  Was that when the concrete was put on the top of the spillways?

THE WITNESS:  Correct, sir.  So in the '80s, we raised the main embankments so that they would not overtop and we put concrete on those spillways so that they would not fail from that spillway design flood at the time.  However, as you saw in the dam safety modification report, our analysis is now that we don't have a lot of confidence that the spillways will survive the spillway design flood amount.

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/29/2024

BY MR. MITHOFF:

Q.    All right.  I want to move through the next set of documents and you can tell us what changes, if any, have been made.

Let's look next at Plaintiffs' Exhibit 361, which is entitled "Emergency Operation Plan Addicks and Barker Reservoirs."  And I simply want to identify this document again for the chronology so that if we want to go back and move through to see all of the changes from year to year, we can do so.

Does that appear to be a document that includes 1977 emergency operation plans for Addicks and Barker Reservoirs?

A.    It does, sir.  I don't specifically remember reading this one before, but that's what it appears to be.

Q.    Okay.  And look at, if you will, Appendix A, and I'm happy to show you again my copy of -- if it's not readily findable.

Do you have that?

A.    Yes, sir.

Q.    There's a section called "Operating Procedure."  And in the middle of that paragraph, it says "When the reservoir pool reaches elevation 95 msl operation will be in accordance with Table 1 or 2,

page A-3, without regard to downstream conditions."

Is that a correct reading of the operating procedure at that time?

A.   That's what it says.

Q.   What is msl?

A.   It means sea level.

Q.   Does this plan require that these procedures be used if the specified criteria are satisfied?

A.   Well, that's what that said, sir.  But like I said, I don't think I've read this one before, so I'll definitely read it after I get off the stand.

Q.   But that's what it appears to say?

A.   That's what it says, sir.

Q.   Do you know whether these procedures are identical to or different from the 1962 reservoir regulation manual's emergency regulation?

MS. DUNCAN:  Objection.  Lacks foundation. The witness has testified he hasn't read this document before.

THE COURT:  I think it's appropriate.  Lay a foundation for that.

MR. MITHOFF:  Okay.

BY MR. MITHOFF:

Q.   In fairness, you said you had not read it. Do you know one way or the other -- or do not remember

reading it, do you know one way or the other whether or not the procedures differ from the 1962 reservoir regulation manual?

A.   Let's just see.

MS. DUNCAN:  Objection, Your Honor.  I'll go ahead and reraise the question -- sorry, the objection about foundation.  He was asked do you know one way or the other as to how they compare.

THE COURT:  Yeah.

MS. DUNCAN:  He said he hasn't read it.

THE COURT:  I'm not sure the witness has been asked the appropriate foundation questions.

BY MR. MITHOFF:

Q.   If you've not read it or don't recall reading it, just set it aside.

Let me ask you next about a document from 2000...

I skipped one.  Warner has reminded me.  I want to read next from a document or call your attention to a document from 1993 called the "1993 Emergency Operation Plan:  Addicks and Barker Reservoirs."  It's marked as Plaintiffs' 360.

Does this appear to be what I have described it to be?

A.   So I haven't read this one before that I

remember.  And it's also got many different dates.
It's hard to tell if this is maybe a collection of
reports or if it's just this is how it was produced
since I don't remember reading it.  There is even some
1999 stuff in the back as labeled.  So I'm not entirely
sure, sir.

Q.   In preparation for your testimony in this
case, did you have a chance to read this or an
opportunity to read this document or not?

A.   I don't remember reading it, sir.

Q.   Let me ask you then next about the 2000
Emergency Operation Plan for Addicks and Barker
Reservoir marked as Plaintiffs' Exhibit 363.

Do you recall reviewing that document?

A.   I don't remember this one either, sir.

Q.   Look, if you will, at Appendix A, entitled
"Reservoir Regulation."

Have you found that page?

A.   Yes, sir.

Q.   In the middle of the page, there's a section
entitled "Operating Procedure" with a Phase I - Alert;
Phase II - Emergency with Conditions 1 and 2, and then
C. Phase III - Evacuation.

Do you recall at any time reviewing those
portions of the reservoir regulation?

MS. DUNCAN:  Objection, Your Honor.  Lacks foundation.  The witness has stated he hasn't reviewed this.

MR. MITHOFF:  I'm simply asking him whether he reviewed these particular pages for his testimony.

THE COURT:  Okay.  I mean, that's appropriate, an appropriate question.  I'll allow the question.

THE WITNESS:  Sorry, sir.  I don't remember reading this.

BY MR. MITHOFF:

Q.   Let me ask you about the 2006 document. Before I move away from that Appendix A on the 2002 document, can you at least tell us whether or not the title would appear to discuss operating procedures?

A.   So you're saying this one is 2002, sir?

Q.   Before we move to 2002, go back to 2000.

A.   Okay.  2000.

Q.   Appendix A.  I know you haven't read the document.  All I want to know is whether or not this particular section appears to relate to operating procedures?

MS. DUNCAN:  Objection, Your Honor.  It's not clear what the relevance is for a 2000 Emergency Action Plan when we know it's not the one in place at the time

of Harvey.

THE COURT:  Right.  I remember asking him a question that he doesn't know the answer to.  It's not really one that anyone would necessarily know the answer to other than you'll read the words and they say something.  But it's not probative of any issue in the case, so I'll sustain the objection.

MR. MITHOFF:  Okay.

BY MR. MITHOFF:

Q.  With regard to the 2006 document, the Emergency Operation Plan of August 2006 marked as Plaintiffs' Exhibit 362, do you recall ever reviewing or consulting in any way in that set of regulations?

A.  Sorry, sir.  I don't remember reading this one either.

Q.  Okay.

THE COURT:  Let me ask you a question.  Yesterday I was unclear of the answer to this.  Is the emergency plan a document that the corps publishes and that someone could buy from a government bookstore or is online?

THE WITNESS:  No, sir, we generally don't publish the Emergency Action Plans.  We're now allowed to release them, but only after we redact certain technical information and personal information, sir.

THE COURT:  Okay.  So that is generally not a public document --

THE WITNESS:  Correct, sir.

THE COURT:  -- or a document the public sees?

THE WITNESS:  Correct.

THE COURT:  Thank you.

BY MR. MITHOFF:

Q.  Okay.  And I take it from your last answer that you have not had an occasion, then, to consult the reservoir regulations in that 2006 manual?

A.  No, sir.

Q.  I'm asking you these questions simply to see whether or not you knew how it had developed over time, but we'll leave that aside.

I do want to ask you a final question about a document that I believe you have seen before, Joint Exhibit 38.  This is called the "Reconnaissance Report, Section 216 Study," for "Section 216 Study Addicks and Barker Reservoirs."

Are you acquainted with that document, sir?

A.  Yes, sir.

Q.  And how are you acquainted with that document?

A.  I reviewed it as part of the 30(b)(6) requirements.

Q.   Okay.  So in anticipation of this litigation, you reviewed it?

A.   Yes, sir.  Years ago, sir.

Q.   I'm sorry?

A.   Years ago.  I haven't gone back and read it recently.

Q.   I'm sorry?

A.   During the original depositions I reviewed this, but I haven't read it recently, sir.

Q.   Okay.

THE COURT:  It isn't compelling reading to -- or relaxing -- plan.

THE WITNESS:  Yes, sir.

BY MR. MITHOFF:

Q.   Let me ask you just about a couple of aspects about this document.

If you turn to page 3, there's a section entitled "Study Authority."

Do you see that?

A.   Which 3?  There's a couple of 3s.

Q.   Page 3.

A.   Like the very third page?  Okay.  Way in.  So this has got a lot of cover sheets on the paper you gave me, sir, so I think I got to get all the way into the report.

Q.   Yeah, the complete report.

A.   Found it.

Q.   You found it?

A.   Yeah.  It's many pages in, but it's the third page of the main report.

Q.   And it says "The authority to review the operations of completed projects is found in Section 216 of the 1970 Flood Control Act.  The law authorizes studies to review the operations of completed federal projects and to recommend project modifications or change operations, when advisable, because of significantly changed physical or economic conditions.  Any such modifications must be economically justified."

Are you acquainted generally with this process of reviewing from time to time the operations of these projects in order to make recommendations for changes?

A.   Under this authority, yes, sir.

Q.   And are you involved in that process from time to time?

A.   Yes, sir.

Q.   And do you recall having an opportunity then, and I think you told me earlier, to actually read this report?

A.    Yes, sir.

Q.    Was there a committee that would look at proposed modifications from time to time or was this an assignment that was yours alone or did you have others consult with you?

A.    To be clear, I didn't work on this particular report, if that was the question, sir.

Q.    You've reviewed it and you're familiar with it?

A.    Correct.

Q.    And my question, and perhaps I didn't word it very well, was whether or not when you reviewed it, did you do it as part of a committee assignment or just for this case?

A.    I just read it, sir.

Q.    Okay.  Let's look at page 5 entitled "Project Modifications."  And at the bottom of the page, it says "Additional modifications were made to the dams between 1986 and 1989 to comply with the Dam Safety Assurance Program."

Do you understand that to be generally correct?

A.    Yes, sir.

Q.    It goes on to say "The crest elevations of major portions of the dams were raised to achieve

needed freeboard requirements for wind-generated wave run-up.  Erosion protection was added to the ends of the dams to serve as overflow spillways during major storms greater than the standard project flood event, up to and including the probable maximum flood."

And you are definitely acquainted with that?

A.   Is the question that I'm acquainted with it? The answer to that is yes.

Q.   Okay.  And under "Current Reservoirs Operations and Procedures," this report goes on to say "Present operations regulate the reservoirs in a manner that prevents damaging stages on downstream Buffalo Bayou.  This is accomplished by utilizing, to the maximum extent possible, the available storage capacity within the reservoirs.  This is in keeping with the original primary objective of flood control for the Addicks and Barker Reservoirs."

Do you agree with that?

A.   That's what it says, sir.

Q.   And then the report continues on page 7 starting at the top of the page with the first full sentence, "The dams and reservoir lands required for upstream temporary reservoir storage are now surrounded by residential and commercial urban developments. Densely populated housing developments essentially fill

Trial

the fringe areas between the government-owned lands and the maximum pool elevation adjacent to Addicks Reservoir.  Much of the fringe areas of Barker Reservoir are bordered by similar developments and the rest are rapidly developing.  Urban development extending for miles upstream from the reservoirs has resulted in increased rainfall runoff into the detention facilities.  Recent flood events have clearly identified the need for modification or the reservoir -- of the reservoir or operational changes."

You were aware of that subject?

A.    Yes, sir.

Q.    Were you a part of any discussion involving issues raised by this paragraph?  In other words, did you in your capacity with the corps from time to time weigh in on issues raised here with respect to what to do about recent flooding events that have clearly identified the need for modification of the reservoir or operational changes?

A.    So this paragraph is talking about this reconnaissance study that was done in response to the 1992 pool of record.  And I wasn't a part of any of that, sir.

Q.    Okay.  And your views were not sought out on what might be done by way of modification or

operational changes?

A.   I didn't work for the Corps of Engineers in the '90s, sir.

Q.   Okay.  When did you first start with the corps?

A.   2002.

Q.   So this document would have been one you, as you told us earlier, went back to review specifically for testifying in this case?

A.   Correct, sir.

Q.   Have you sought out any discussion with anyone who was involved, a discussion back at that time for the need for modification?

A.   So I sought out I think it was Joe Trahan, and I was specifically talking to him about -- more about the work during the '80s, but he might have had some engagements.  But I don't remember talking to him specifically about this.  That's one of the few people I was able to find that knew about this back then.

Q.   Let me ask you about the next section on the same page, "Planned Scope of Work for Reconnaissance Study."  And then the last two sentences on that page, "This Special Report," referring to report above, "is also included in Appendix Number 1.  Both reports identify several potentially feasible alternatives that

would be evaluated in the reconnaissance study.  These alternatives are briefly described as follows."  Bullet point 1:  "Increase reservoir flood storage by evacuation on GOL" -- which is government-owned land, correct?

A.   I think both of your questions are correct on that topic.  You were asking is that what it says and I think you were saying is government-owned land GOL, so yes to both.

Q.   And the next bullet point is in terms of this planned scope of work, "Increase reservoir flood storage by purchase of flowage easement in the fringe areas adjacent to government-owned land over existing developed properties."

Next, "Increase reservoir storage capacity by means of buyout and relocation of developed properties."

Next, "Reduce reservoir inflows by increasing upstream storage on undeveloped lands located above existing urban developments."

Next, "Increase reservoir flood releases buyout of downstream damageable properties."

Next, "Increase reservoir flood releases by enlargement of the downstream Buffalo Bayou channel."

Next, "Increase reservoir flood releases by

installation of additional outlet works and diversion of flows to streams other than the Buffalo Bayou."

And next, "Increase reservoir flood releases and release prolonged storage by changing the current operating plan."

Next, "Adopt a flood warning and evacuation plan."

Next, "Accept existing conditions and risk through no action."

Did you have a chance in preparing for your testimony here as a 30(b)(6) witness on this subject have a chance to discuss any of these alternative solutions?

A.    Did I discuss with who, sir?

Q.    I'm sorry?

A.    What's the question again, sir?

Q.    Did you have a chance to discuss with anyone any of these series of proposed solutions?

A.    Probably.  I probably talked to people about the 1995 recon report, but I'm not remembering specific discussions.

Do you have a more detailed question, sir?

Q.    Yes.  Did you discuss, for example, in the third bullet point from the bottom increasing reservoir flood releases and reduce prolonged storage by changing

the current operating plan?

A.    I don't remember a specific discussion related to this report.

Q.    Do you remember generally discussing with anyone with the corps, sir, either in your role that you have now or in your role as a 30(b)(6) witness in preparation for testifying about this subject, do you recall specifically discussing this alternative of increasing reservoir flood releases and reduce the prolonged storage by changing the current operating plan?

A.    So since about 2018 -- you know, after Hurricane Harvey, the Congress authorized us to do a new feasibility study which we called the "Buffalo Bayou and Tributaries Resiliency Study."  So we've been looking into these same questions under that authority since 2018 and have not yet reached a conclusion.

Q.    Not reached yet what?

A.    A conclusion, sir.

Q.    And you've been studying that since when?

A.    Around 2018.

THE COURT:  I guess if you were going to do the buyout, you'd have to get money from Congress, so that was part of the reason for not reaching a conclusion?

THE WITNESS:  So, sir, the -- our process -- you may know this already, it requires us to complete this report and make a recommendation to Congress and then Congress has to authorize what we recommend to them.  And then they have to appropriate money for us to do what they recommended.  So in this case we haven't reached a step where we make a recommendation to Congress yet, sir.

THE COURT:  Of one of those alternatives?

THE WITNESS:  Yes.  Or some other.  We are also talking about tunnels for example.  We talked about as many alternatives as we can think of to help reduce flood risk for the people that live around Buffalo Bayou.

THE COURT:  All right.  Would digging the reservoirs deeper be another alternative?

THE WITNESS:  Yes, sir, that's one of the things we've been talking about as well.

THE COURT:  Okay.

BY MR. MITHOFF:

Q.    Continuing on page 11 on this same general subject, page 11 in the middle of the page, Appendix 5 presents the real estate impacts of one of the smaller plans evaluated to conclusion.

Do you recall reviewing this particular

paragraph in anticipation for testifying?

A.    I read the whole report, sir.

Q.    Okay.

A.    I don't remember the details of this particular paragraph.  I can read it for you, though.

Q.    Well, look at the middle of the paragraph, if you will.  And I want to ask you about an analysis that's referenced there.  If you'd begin in the middle of that page where it says "A district review of court cases."

Do you see that?

A.    Yes, sir.

Q.    "A district review of court cases indicates that although there might be litigation requiring legal expense, there is little likelihood that payment of damages would be required.  These legal recommendations are based on existing court cases which generally protect the government from liability for infrequent flooding of agricultural and grazing lands.  The analysis indicates that potential for liability if flooding is induced on valuable residential lands on a less frequent basis."

Do you recall discussing that part of the analysis with anyone with the corps, that is analyzing the potential for liability if flooding is induced on

Trial

valuable residential lands even on a less frequent basis?

A.   Am I allowed to say that I talked to my counsel about it?

Q.   I don't want to inquire about what your lawyer may have said to you or you may have said to your lawyer.  I want to know if you've talked with anyone else with the corps, not a lawyer.

A.   I don't remember a specific discussion about this, but I was aware of this and I remember reading this now that you read it to me.

Q.   Is it fair to say, then, and I'm not asking for content of the conversation, is it fair to say that the only conversations you've had about this have been with counsel?

A.   I don't know if that's true.  I just don't remember a specific discussion with someone outside of counsel about that.  But I'm sure I've talked to someone about that before.  I just don't remember offhand.

Q.   Did it ever come up in the course of meetings with those you worked with after Harvey and after everything we know, and we know that valuable residential lands were, in fact, severely damaged in flooding, do we not?

A.    We do.

Q.    Have you, again leaving aside discussion with counsel, had any discussion about what might be done to protect the valuable residential lands other than continuing to flood them?

A.    So like we just talked about, like, we've embarked on this very important feasibility study to help answer this question because, you know, we're all very concerned about it.

Q.    But you don't have any proposed solution?

A.    There are many different proposed solutions, but there is not a recommendation yet, sir.

Q.    Turn, if you will, to the section of this document in Appendix 5 which should be attached to your document.  This is page 7 of that document.

A.    This part, right?  This is what you're looking for?

Q.    Yes.  And I'm happy to show you my copy if it's easier.

A.    "Caveat"?

Q.    Page 7 entitled "Caveat."

Do you see that?

A.    Got it.

Q.    "The corps has knowingly reduced discharges in the Buffalo Bayou beginning in 1949 to 7,900 cfs

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/29/2024

and, again, 1963 when the remaining two uncontrolled gates were gated.  As a result, we have seen the development of expensive homes and improvements closer to the bayou below the reservoirs.  By keeping releases from the reservoirs to a maximum of 2,000 cfs, landowners have begun to rely on these restricted flows."

Do you recall discussing with others with the corps, sir, in your official capacity about the fact that landowners in this area, these areas we've been talking about, have begun to rely on restricted flows?

A.   Well, like I said, through the study process, we're evaluating that.  So we have a big study going on right now to address the concerns about flows in Buffalo Bayou.

Q.   And one of the biggest concerns is that landowners who are affected here had relied presumably on representation of restricted flows?

MS. DUNCAN:  Objection.  Calls for speculation.

MR. MITHOFF:  This man has been designated as a witness to testify about this very area.

MS. DUNCAN:  Your Honor, that's actually not true.  He is testifying here in his personal capacity.  He was designated back at the 30(b)(6) deposition to

testify about that and they didn't seek to put those portions of his testimony into evidence.  So if he has personal knowledge of it, then we don't object to the question, but I don't think he knows what these sort of "biggest concern" was.

THE COURT:  Well, I think if he can answer it, he can answer it.  It seems to me a legitimate question for someone in a position of authority in the agency, whatever their status as a witness.

THE WITNESS:  Could you ask it again, sir?

BY MR. MITHOFF:

Q.  Yes, sir.

Were you aware and did you discuss with others in your official capacity the fact that landowners in these areas had begun to rely on representations of restricted flow?

A.  So through the study process, you know, we've been looking at flooding, at all the flooding, and so I don't know that we've been using the words "rely on the restricted flow" or not, but we've definitely been looking at flooding downstream.

Q.  Whether you used those specific words or not, you knew that people were relying on certain representations that the corps had made, do you not?

MS. DUNCAN:  Objection.  Foundation.  And

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                10/29/2024

it's vague as to the time frame.

THE COURT:  Yeah.  Also it's -- the real difficulty with the question is it's raising what he knew about what people were thinking, so I'll sustain the objection.

BY MR. MITHOFF:

Q.  Did you have any discussion at all with regard to landowners' reliance?

A.  I think the way we've been talking about it is about who floods and when, right?  So we're looking at different flood stages and probabilities and we're looking at, you know, first flow elevation, saying, hey, these properties flood at those different events. That's how we're approaching it, sir.

Q.  That's not what?

A.  That is how we're approaching it, based on the statistical probability of flooding of different places.

Q.  But right now does the corps have any solution?

A.  So like I said, there are a number of proposed solutions.  There is no recommendation yet.

Q.  Do you have any knowledge in your capacity as a witness designated here as a 30(b)(6) witness as to whether or not there's any timetable on when such

resolution might occur?

MS. DUNCAN:  Objection.  This witness is not testifying today as a 30(b)(6) witness.  And I'll also note as we mentioned in the pretrial conference, this study is ongoing and the United States has asserted the deliberative process privilege over sort of any information that is not public and not final in the upstream litigation.  To the extent plaintiffs are seeking to get at that information here, we would ask to be allowed to assert that privilege here.

MR. MITHOFF:  And I'll rephrase the question.

BY MR. MITHOFF:

Q.  I was simply asking whether or not you had any knowledge of whether or not there is any timetable to reach a resolution of this issue relating to the fact that homeowners are relying on restricted flows?

MS. DUNCAN:  Objection.  Assumes facts not in evidence.  I don't think that the question has been asked about reliance or the witness certainly hasn't testified to that effect.

THE COURT:  Well, the question of whether they have a timetable doesn't seem to me to be relevant.  Whether they are saying a year, a hundred years or never, that's not relevant to this case.  That's all in the future.  So I'll sustain the

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                                    10/29/2024

objection.

BY MR. MITHOFF:

Q.   Let me ask you just one final question, sir, and that has to do with a document we discussed yesterday that had to do with the reporting of evidence of distress of civil works structures.  And I think you told me you were not sure whether or not this document, Plaintiffs' Exhibit 404, was the current version or whether it had been replaced?

A.   Correct.

Q.   Let me ask you --

MR. MITHOFF:  If I could approach the witness, Your Honor.

BY MR. MITHOFF:

Q.   -- regarding Plaintiffs' Exhibit 6 which is a document we discussed yesterday, the Emergency Action Plan for Addicks Reservoir and Barker Reservoir.  You can read on my copy.  I just had one.

A.   Okay.

Q.   This document we discussed at length, did we not?

A.   Yes, sir.

Q.   At page 5 there are references cited under paragraph D.  And in the references cited in the May 22, 2014, document, which is what we have.  The

references included ER 1110-2-101, "Reporting of Evidence of Distressed Civil Works Structures, USACE, March 1996."

Q.    Does that appear to be this document, sir?

A.    It is that document, sir.

Q.    Okay.

A.    And like I said, I just don't know when it was superseded.

Q.    But, in any event, the Emergency Action Plan that we've been discussing here today, the 2014, cites that as a reference?

A.    It does.

Q.    It cites that as the date of the reference?

A.    It does.

Q.    It cites the reference number ER 1110-2-101?

A.    Correct.

MR. MITHOFF:  I believe that's all I have at this time, sir.  Thank you.

We will be moving to admit exhibits, Your Honor, with the court's permission at the next recess.

THE COURT:  Okay.

MR. MITHOFF:  Actually, Ms. Demetriou has them here.  I can read them.

THE COURT:  Okay.  Why don't you read them.

MR. MITHOFF:  Maybe I can't read them.

PX 004, JX 038.

MS. DUNCAN:  Your Honor, can we -- wait.  Let me make sure that I'm getting these.

Can we start over, Mr. Mithoff?

MR. MITHOFF:  Sure.  Or you can come look over my shoulder if you want.

Are you ready?

MS. DUNCAN:  Sure.

MR. MITHOFF:  PX 004, JX 038, PX 009, demonstrative JX 42, demonstrative JX 110, JX 002, PX 361, PX 360, PX 363, JX 038, PX 404.

We move their admission, Your Honor.

MS. DUNCAN:  Your Honor, I'm going to need just a moment.

Your Honor, I understand that -- the first objection relates to PX 360, PX 361, and PX 363, those were the Emergency Action Plans that Mr. Thomas did not -- did not have foundation to testify about, and they are irrelevant.  That's from '77, approximately '93, I believe, and 2000.  So we object to the admission of those.

MR. MITHOFF:  Your Honor, we think and in the briefing that will follow that being able to show the chronology of how this evolved over time to get to where we are now, those documents are very relevant and

487

Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                10/29/2024

highly probative.  I didn't quiz this witness on it because it predated his time.

THE COURT:  Right.

MR. MITHOFF:  But they are documents that are official documents of the corps and we think show the progression historically of how we got to where we are.

THE COURT:  Okay.  They're not related to this witness, but they are official documents of the corps.  I'll admit them since they're public documents and if they're of some use in the case, that's all right.

(Admitted Exhibit No. PX 004.)

(Admitted Exhibit No. JX 038.)

(Admitted Exhibit No. PX 009.)

(Admitted Exhibit No. JX 42.)

(Admitted Exhibit No. JX 110.)

(Admitted Exhibit No. JX 002.)

(Admitted Exhibit No. PX 361.)

(Admitted Exhibit No. PX 360.)

(Admitted Exhibit No. PX 363.)

(Admitted Exhibit No. JX 038.)

(Admitted Exhibit No. PX 404.)

THE COURT:  Mr. Thomas has been on the stand for a long time, and the court -- why don't we let Mr. Thomas take a break before the examination.  It's

now 11:16, so we have about I guess 40 minutes or so before our bid protest status conference begins.  And the question, do we want -- when do we want to take a break?  We can come back after a short break, let Mr. Thomas get off the witness stand for the moment and we can do like half an hour or is does it make sense to take a longer break now?

MS. DUNCAN:  Whatever the court prefers.  However, if we want to try to get through Mr. Thomas' testimony, then I think we should try to get at least a half hour in before --

THE COURT:  Okay.

MS. DUNCAN:  -- lunch.

THE COURT:  Well, let's take a ten-minute break then and give everyone a chance to get a break rest and then we'll reconvene in about ten minutes and adjourn at 11:50.

(Off the record from 11:17 until 11:30.)

THE COURT:  All right.  Please be seated.

Do you have more?

MR. MITHOFF:  I do not.  I just wanted to introduce one exhibit that I failed to read off of Teresa's list, Plaintiffs' 362, the Emergency Operation Plan August 2006 in the same purpose that I did for the others to show the chronology over time and what

Trial

10/29/2024

changed and how it changed.

THE COURT:  Okay.  Any objection?

MS. DUNCAN:  Well, we raised the same objection we did for the others, it lacks foundation.

THE COURT:  Okay.  I'll allow it.  It's a government document, so it doesn't really need a foundation.  It needs just a statement why is it here in this case.  It can be somewhere in the government or in the trial, but it needs a place in the trial of relevancy, so I think there is some relevance to it, so I'll admit it.

(Admitted Exhibit No. PX 362.)

THE COURT:  Okay.  You may proceed with direct examination.

MS. DUNCAN:  Thank you, Your Honor.  We'll do our best to make as much headway as we can say in the next 20 minutes.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MS. DUNCAN:

Q.  Okay.  Mr. Thomas, we're going to cover a little bit of background and we're going to try to focus our time on information that you haven't already testified to or to provide additional context there.

So can you remind us where do you work?

A.    I work for the Galveston district of the Army Corps of Engineers.

MS. DUNCAN:  Okay.  And why don't we put up on the screen DDX 1.

BY MS. DUNCAN:

Q.    And I'm showing you what we marked as DDX 1. What is this?

A.    This is a map showing the overall operational areas of the Corps of Engineers.  It's got, you know, our headquarters located in Washington, D.C.  We work -- the Galveston district works within the Southwestern division which is the gray grouping of states there between Oklahoma, Arkansas, and Texas. And the Galveston district itself is on the coast of Texas, and it's where it's kind of got "Galveston district" written, and it's, you know, the whole coast of Texas, in a few counties.

Q.    Okay.  And how does -- what are the distinctions between a district division and headquarters?

A.    The districts are the operational elements where we actually execute the mission.  The division helps organize the districts and supports strategy and policy and the headquarters is our overall commanding element.

Q.   Okay.  And remind us of your title at the corps, Galveston district.

A.   Engineering and construction division chief. And I'm also the dam safety officer.

Q.   Okay.  And --

THE COURT:  Are you living in Galveston?

THE WITNESS:  I live up in League City, sir, about halfway between here and Galveston.

BY MS. DUNCAN:

Q.   And how long is your commute to work each day?

A.   It's about an hour.

THE COURT:  What city is it?

THE WITNESS:  It's called League City.

THE COURT:  League.

THE WITNESS:  Just one of the suburbs.  It's an hour north of Galveston.

THE COURT:  I think I remember we had a case near Galveston, a taking case on one of the barrier islands some years ago and we made the drive, the trial was in Houston, we made the drive for the site visit to Galveston and down to Padre Island.

THE WITNESS:  Oh, nice.

THE COURT:  It was raining heavily.  It wasn't Hurricane Harvey yet, but they were having

floods and you saw not that far out of Houston the little islands where there were two or three cattle on the island and they were air dropping food to them.

MS. DUNCAN:  Wow.

THE COURT:  Because otherwise they would have all starved.  But it was a rainy trip to Galveston.

BY MS. DUNCAN:

Q.  The court mentioned a trip he made where it was raining.

Are large rainstorms common in this region?

A.  We're known for having heavy flooding and rain.

Q.  So as the engineering and construction -- excuse me, engineering and construction chief for the Galveston district, what are your responsibilities?

A.  I'm the senior technical manager for the district, so I oversee all of the construction resident area offices.  I oversee all the technical design, geospatial work, the hydraulics and hydrology branch including water control, the dam safety section.

Q.  Approximately how many people do you manage?

A.  It's around 300 now.

Q.  Okay.  And how long have you served at the corps?

A.  I started in 2002, but I did have a break in

service.

Q. Okay. And approximately how many years total have you been with the corps?

A. It's 15 to 20.

Q. Okay. And who do you report to within the district?

A. My supervisor is the district commander who is currently Colonel Rhett Blackmon.

Q. And who was the commander at the time of the Harvey event?

A. Colonel Lars Zetterstrom.

Q. Can you tell us briefly about your educational background?

A. I have a bachelor's degree in maritime systems engineering from Texas A&M University in Galveston and a master's degree in ocean engineering from Texas A&M University.

Q. Okay. Do you have any professional licenses or certifications?

A. I'm a registered professional engineer in Texas and Louisiana, and I'm board-certified in coastal and navigation engineering.

Q. Okay. Can you tell us briefly about any professional work history outside of the corps?

A. So outside of the corps, I worked for a

consulting firm in Corpus Christi called HGR.

Q.   Okay.  Now, as the engineering and construction chief, what is your role with regard to Addicks and Barker Dams and Reservoirs?

A.   I'm the senior engineer for the district, but I'm also the dam safety officer, so I'm responsible for implementing the dam safety program.  I'm also, you know, overall responsible for the water control program which is in our H&H branch, or hydraulics and hydrology branch.

Q.   Okay.  And we'll talk a little more about how those components operate during a storm like Harvey in a moment.

But I'd like to ask a few foundational questions about the dams.  And to do that, I'd like to put up on the screen 637.

MS. DUNCAN:  Your Honor, may I invite Mr. Thomas to sort of point to a board and speak to it?

THE COURT:  Yes, you may.

MS. DUNCAN:  Okay.  I'll put up a blow up.

BY MS. DUNCAN:

Q.   Okay.  Mr. Thomas, we have heard a bit about how these reservoirs work.  Can you talk to us just at a very high level how do they work?

A.   Well, at a high level, the water flows in

from the upper watersheds so the Barker watershed here, the Addicks watershed here, and Cyprus Creek watershed up here.  It flows into the reservoirs uncontrolled and then is limited by the gates structure here to releases downstream of Buffalo Bayou.

Q.    Okay.

THE COURT:  Does it flow in because of surface runoff or does some it come through the ground?

THE WITNESS:  So it's primarily surface, so overland flow as well as there's a number of tributaries that come into the reservoirs.  You can see those in blue here, sir.  And so the biggest flows are coming in those tributaries, but it's also getting sheet flow, just overflow into the reservoir.  Not groundwater so much.

THE COURT:  Does this present any health hazards?  These dirty floodwaters, they always say how dangerous floodwaters are probably because they're dirty and full of garbage and disease-carrying.  Is that the case with this normal flow or not?

THE WITNESS:  During normal flow, they're basically following along these tributaries and they're just creeks flowing up to the outlet structures and then they're passing through the outlet structures at a few hundred cubic feet per second.  So pretty small

flows when it's not flooding.  And then most of the time the reservoirs are dry, so there's usually not pools in here.

BY MS. DUNCAN:

Q.   And just to talk about that a bit more, are there -- is the land put to other uses when it's not storing flood water?

A.   Yes, ma'am.  We allow outgrants, so communities can do things like soccer fields.  I think there's an RC airport, you know, where they launch remote control airplanes.  And there's a shooting range, I think.  There used to be a zoo.  Things like that.

Q.   Okay.  And then what happens to these uses when the reservoirs are during an event and they're detaining floodwaters?

A.   So those uses would be suspended while there's water on those properties with outgrants.

Q.   Okay.  And are there any roads that run through the reservoirs?

A.   There are.  There are some major roads that go through both reservoirs that are, you know, significant commuting highways.

Q.   Okay.  Can you just point on the map to a few of those?

A.    So there's one through here, there's one through here, there's one.  Right here is a big one.

Q.    Okay.  And are some of the names of those -- did Highway 6, for example, run through the reservoir?

A.    Right, Highway 6 comes right like along Barker and it goes straight across the Addicks Reservoir.

MS. DUNCAN:  And, Your Honor, I'll note that on the site visit, we'll have the opportunity to drive Highway 6 from this north part of the reservoir down back to the project office.

BY MS. DUNCAN:

Q.    And just to orient us for where we'll be at the site visit, approximately -- I mean, where is the Addicks and Barker project office right now?

A.    So it's right near the Barker outlet here on the Barker Dam kind of on the northeast side, and it's across the street from the actual project.  Our original project office is right next to the dam, but that's still flooded out and we haven't replaced it yet.  So we're in a rental property across the street.

Q.    You said "still flooded out."  What do you mean by that?

A.    Well, our project office flooded during

Hurricane Harvey, and we need to replace it, and so we're in the process of replacing it.

Q.   Was it flooded before or after the releases began from the reservoirs?

A.   After the releases, I think.

Q.   Okay.

A.   Or the actual structure, the parking lot had started flooding before we started making releases, but I think it actually went into the property after the releases, I think.

Q.   And when Harvey hit, what was the status of the dams in terms of how much water was in them?

A.   They were dry.

Q.   Okay.  So let me ask you -- well, before we move on from this, what is the authorized purpose of the dams?

A.   Flood risk management.

Q.   Okay.  And flood risk management to what areas?

A.   To the City of Houston and the Houston Ship Channel.

Q.   Okay.  And then what areas on this map then are being protected by the reservoirs?

A.   So that's everything here below the dams to the south and east, kind of the bottom right corner of

your picture.

Q.   Okay.   Now, can you just point out for us briefly the gated outlet structures and then the emergency spillways?

A.   So as labeled here, gated outlet structure for Barker is right here on the east side of Barker and the kind of south side of Addicks gate outlet structure.   And then the yellow highlight shows the emergency spillways on the ends of both dams.

Q.   Okay.   Let me just make a few points about the -- each of those.   And I'm going to put up on the -- page PX 637 at PDF 2.

Okay.   Mr. Thomas, what are we looking at in this -- these pictures?

A.   So the left side picture shows the Addicks primary outlet works.   And we talked about this earlier.   So here is what the gates actually look like down underneath the water when it's dry.   This is the control tower we looked at earlier, sir, and this is passing through the embankment.   So the green is the grass on top of the embankment, this is that road we talked about, and then this is that parabolic spillway and stilling basin here in the outlet channel.

Q.   Okay.   And then can you -- what is inside the reservoir and what area is outside the reservoir?

A.    Inside the reservoir is on the top on both, and then downstream on both is on the bottom.

Q.    Okay.  And before we move on, what's the difference between a gated outlet structure or gated spillway and an emergency spillway?

A.    Well, in this particular case, the gated primary outlets can be controlled so we can open and close the gates and let the water in and out.  And on these emergency spillways, they're just basically concreted-covered embankments where the water will just flow out over as the water rises.

Q.    Now, let's -- and are -- the gated outlet structures that you pointed out for Addicks Reservoir, at the time of Harvey were they the same design at Barker?

A.    So they're similar.  So these are the structures that were in place during Harvey, sir. You'll see new structures on the site visit.  The Addicks outlets are a little bit smaller than the Barker outlets.

Q.    And you mentioned that there are new outlet structures now.  What do you mean by that?

A.    So we've replaced the primary outlets on both projects.  That construction was underway during Hurricane Harvey.

Q.    And why did you replace them?

A.    Because of the serious dam safety concerns with those structures.

Q.    Okay.  We'll go into more detail on that later.  But at a high level, what do you mean by that?

A.    They had an unacceptable high probability of failure during certain pool levels, and so -- we had done a lot of work to help make them as safe as possible, but there was a lot of concern that they would fail under high pools --

Q.    Okay.

A.    -- or high releases.

Q.    Okay.  And if we move to the right-hand side of DX 637, PDF 2, I want to point your attention to the inset right here where it's got a picture of a gated outlet structure.

What are we looking at here?

A.    So the inset shows the walkway from the top of the embankment out to the control tower and then, we saw these earlier, these are the stems that, you know, hold the gates below them.

Q.    And you say "stems."  What does that mean?

A.    Basically a big threaded steel rod that's holding the gate below so that you can lower and raise the gate.

Q.   Okay.  And is there a pool -- is the reservoir in this inset picture of Barker Reservoir holding any pool?

A.   So it looks like in this picture you can just see water in the channel, so there's just water flowing through.  But there's not a pool, it looks like.

Q.   And then how about for the inset picture?

A.   Oh, sorry.  And in the inset, yes, you can see the pool is up here above the gates.

Q.   Okay.  Is it normally up above the gates?

A.   Well, they're typically dry unless we've had a rain event and we're releasing water or waiting to release water.

Q.   Okay.  And has -- and just for context for what we might see in a minute, has the water ever risen all the way up to the control structure platforms?

A.   During Harvey, it did at Addicks.

Q.   Okay.  And had it ever done that before?

A.   It did not.

Q.   Okay.  Let's just talk briefly about the spillways and then I'll let you sit down.

Okay.  I am showing you now DX 637 at PDF 3. What are we looking at here, Mr. Thomas?

A.   So this is a blowup of the Addicks Reservoir and Dam in the background with two insets, and the one

on the left shows the south emergency spillway, and the one on the right shows the north emergency spillway, and they're both highlighted in yellow.

Q.   Okay.  Now, we have -- are these spillways ever called something other than emergency spillway?

A.   Right.  You'll see them labeled as both "emergency" and "auxiliary" in our reports.

Q.   Why do you call them emergency spillways?

A.   We still have a pretty high probability of failure, and we have an ongoing dam safety modification study, so I continue to call them emergency spillways until we have some confidence that they will survive the spillway design flood.

Q.   Okay.  And can you tell me can the corps operate -- well, can they operate these spillways in any fashion during a storm event with a high pool?

A.   So the spillways operate automatically as a function of pool level.  When the water comes up over the spillway, the water just flows out over them.

Q.   So there's not a mechanical function to these spillways?

A.   Correct, there are no gates on the spillways.

Q.   Okay.  And just very briefly, let's turn to PDF 5 of DX 637.  Mr. Thomas, what are we looking at here?

A.   So this is just a picture of that concrete spillway we talked about.  It's, like we said, 6 or 8 inches thick, and it -- basically we just excavated the embankment and replaced that 6 to 8 inches with concrete.  This is a good picture because you can see some of the cracking that's occurred.  We've done a number of repair projects out here.  These joints here continue to separate.  You know, we have expansive clays, and so the clays, they grow and shrink and swell.  And so we've had a lot of problems with cracking here, and that's one of the reasons our dam safety professionals are concerned that they'll fail during very high flows.

Q.   Okay.  And what was the condition of these emergency spillways at the time of the Harvey event?

A.   The same that we just discussed.

Q.   Okay.  And it looks like, but correct me if I'm wrong, that in the top picture of this page, there is sort of an upward slope.  Is that the case?

A.   That's correct.  So this is the elevation of the main embankment.

Q.   And you're pointing to the top part of the concrete, the top picture?

A.   The very highest part of the concrete.  So the concrete extends on to the main embankment a little

ways.  We'll be able to see that in the site visit. And then it slopes down the same way that dams did back in the 1940s to that grade, and then it continues out. So you wouldn't expect -- the dams are currently designed for the current spillway design flood not to have water flow over the top of the embankment but, rather, to flow over the lower sections.

Q.   Okay.  And we'll talk more about that spillway design flood in a moment.

MS. DUNCAN:  Your Honor, this is a good stopping point.  I see that it's 11:49:48.  Should we go ahead and take our break?

THE COURT:  Yeah, why don't we do that. We'll reconvene how about 1:15 for a lunch break, and we will see you-all at 1:15.  We are adjourned.

(Off the record from 11:50 until 1:14.)

THE COURT:  Please be seated.  All right.  We have Mr. Nolen.

MR. NOLEN:  Your Honor, Mr. Mithoff had to leave, and so I'm going to be pinch-hitting for him. And I've already talked to Ms. Duncan about that, and there's no objection that I know of.

THE COURT:  No, I am -- Mr. Mithoff came over to me as I was exiting the courtroom and explained what the situation was, so I told him he's in our prayers

and hopefully will be all right.  I know it's a daunting kind of health threat, but hopefully he'll be all right.

MR. NOLEN:  Yeah, well, we all hope so.

THE COURT:  And please in the time after next week keep the court informed on how he's doing.

MR. NOLEN:  I will do that.

THE COURT:  Okay.

MR. NOLEN:  Yes, Your Honor.

THE COURT:  Thank you.

Okay.  We are all set to begin.

I remember somehow emergency spillways always reminds of me when my children were young.  There's always the emergency spillway.

MS. DUNCAN:  In my house it's usually the Cheerios bowl with the milk going everywhere.

THE COURT:  Yes, yes, with cereal it makes it even worse.  That's scouring, I guess we're here to learn.  I don't know if the Cheerios scour the floor, but they didn't seem to make it any better.

MS. DUNCAN:  Your Honor, before we get started, at the beginning of Mr. Thomas' presentation, I put on the screen a map of the corps district and division and headquarters quarters, and I called this DDX 1, and in actuality it's DDX 2.  So I wanted to

correct the record.

THE COURT:  Okay.

MS. DUNCAN:  Okay.  May I proceed?

THE COURT:  Yes, you may.

BY MS. DUNCAN:

Q.    Okay.  Mr. Thomas, let's talk a little bit about dam safety.  So you mentioned that were you the dam safety officer for the Galveston district?

A.    Yes, ma'am.

Q.    And are you the dam safety officer for the Addicks and Barker Dams and Reservoirs.

A.    Yes, ma'am.

Q.    And how long have you served in this role?

A.    Since 2016.

Q.    Okay.  And what are the responsibilities of the dam safety officer for the district?

A.    To be the senior person responsible for implementing the dam safety program, to ensure that it's appropriately resourced, and that we're, you know, following our regulations appropriately.

Q.    Okay.  And do you have -- do you undergo any training as a dam safety officer?

A.    Yes, ma'am.  There was training before my appointment as well as, you know, my past experience.  And then every year we have -- you know, there's

headquarters-led kind of dam safety conference, there's a division-led dam safety conference, and then we have district dam safety committee meetings as well.  So we have a couple of meetings a year --

THE COURT:  One dam safety conference after another.

THE WITNESS:  Exactly like that, sir.

So we do a lot of trainings throughout the year.

BY MS. DUNCAN:

Q.   Okay.  Now, you mentioned your appointment. What does that mean?

A.   Dam safety officers are appointed in writing by the district commanders with concurrence from the division dam safety officer.

Q.   Okay.  And what qualifications, if any, do you have to possess to be appointed as a dam safety officer?

A.   You have to have some experience in dam safety, you have to have -- be either a registered professional engineer or geologist, I believe, and then they review your experience to make sure that they agree that you meet the qualifications.

Q.   Okay.

MS. DUNCAN:  Let's put up on the screen

JX 13.

BY MS. DUNCAN:

Q.   Mr. Thomas, are you familiar with this document?

A.   Yes, ma'am.

Q.   Okay.  And what is this document?

A.   This is engineering regulation 1110-2-1156.

Q.   Okay.  And at a very high level, what is the purpose of this document?

A.   It lays out the policy and procedures for dam safety for the Corps of Engineers.

Q.   Okay.  And can you tell us what is the corps' dam safety program?

A.   It's all of the rules and regulations we have for implementing dam safety on our projects.

Q.   Okay.  How many dams does the corps manage?

A.   Around 700.

Q.   Okay.  And why does the corps have a dam safety program?

A.   So in the '70s there were a couple of really high-profile dam failures.  People lost their lives.  And so as a result, there was a series of executive orders and legislation that came out that promulgated federal guidance on having dam safety programs.

Q.   Okay.

THE COURT:  Now, you have all of the big dams that normally think of hydroelectric.  Hoover Dam would be...

THE WITNESS:  Corps of Engineers does have those kinds of dams, sir.  I only have three dams.  I have these two, and I have another called Wallisville Dam.

THE COURT:  You don't think of Texas, at least I didn't, as a place where there would be significant dams because of not having -- you don't think of it as a place that would have significant watercourses.

THE WITNESS:  So here on the coast, sir, that's exactly right.  As you get further inland, our Fort Worth forward district has as many dams on the Trinity River and along many other rivers.

BY MS. DUNCAN:

Q.   And can you describe for us what could happen if there is a dam failure?

A.   So dam failures can be catastrophic.  So like the one in the '70s I think was called Buffalo Creek, if I remember right, and hundreds of people died there.  So dam failure can make a flood much worse than would have happened without the dam in the first place.

Q.   Okay.  And I'd like you to turn briefly to

page 1-3 of this document.  This is in Chapter 1, page 1-3.  And I'd like to ask you about a couple of paragraphs under Section 1.11 titled "Principles for Dam Safety Program Management."

Can you walk us through the first three subparts of this section?

A.   Sure.  So you mean like 1.11.1, "Public Safety"?

Q.   Yes, let's start there.

A.   So a key mission of our program is to achieve an equitable and reasonably low level of risk to the public from its dams.  Effectively, life safety is paramount.  We put life safety above everything else at our dams.  It goes on to say "The dam safety officers are designated advisors and advocates for life-safety decisions."

Q.   Okay.  And walk us through the next two provisions, 1.11.2 and 1.11.2.1.

A.   The next one in is "Do no harm," and that's kind of the mantra of dam safety.  It underpins everything that we do.

Q.   And then walk us through the last provision highlighted up here, 1.11.2.1.

A.   And then it goes on to say that "Our dams are designed and operated in a way that during a flood the

Trial

Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/29/2024

spillway flow will not at any time during the event result in downstream flooding more severe than that which would have been the circumstances had the dam not existed."

Q.   Okay.  And why is that a principle of sort of corps' dam safety program?

A.   The purpose of the dams -- the dams have many purposes.  In this case, Addicks and Barker are floods risk management, right?  They're there to protect people.  We don't want to make the dams to make people's lives worse than they would have been without the dams in the first place.

Q.   Okay.  Now, how could that concept apply in a case like this where plaintiffs have brought complaints about releases from a dam during a storm event?

A.   Well, in this case, the inflow, I think we heard earlier the inflow was more than 70- or 80,000 cfs per dam, so you had over 140,000 cfs inflow.  And we were able to limit that inflow to, you know, less than 14,000 cfs.

Q.   Okay.  Does the --

MS. DUNCAN:  We can take that screen down.

THE WITNESS:  I said "inflow."  I should have said limit the outflow to less than 14,000 cfs.  Apologies.

BY MS. DUNCAN:

Q.   Okay.  And so then can you just then connect that to how these dams work?

A.   Right, that's exactly how they work.  So inflow comes in at very high rates and we reduce that inflow to the downstream channel.  And every time except Harvey we've been able to reduce it so that there were no additional flooding from the releases.  Harvey is the first time ever that we've had to make releases during a flood.

Q.   Okay.  And then even with those releases, how did those releases compare to the inflow coming in?

A.   Yeah, something like 10 percent.

Q.   Okay.

A.   So much, much smaller than it would have been without the dams.

Q.   Okay.  Now, does the corps' dam safety program define the concept of an emergency?

A.   It does.

Q.   Okay.  Can you walk us through or talk us about how it defines an emergency?

A.   Well, we can just find it in here.  Let's see if I can find it.

Q.   Sure.  If you find a page, let us know what page.  Or if you end up just telling us what you

recall, that works too.

A.    Let me see if I can find the right page.

MR. NOLEN:  What is he looking at?

MS. DUNCAN:  He's looking at JX 13.  That's the dam safety engineering regulation.

THE WITNESS:  I'm not seeing what I was looking for right off, but what I was thinking of is, you know, our USACE guidance and FEMA guidance both think about emergencies as both non-breach conditions and breach conditions.  So we're thinking about flooding emergencies that result from operations that are effectively planned for.  They're designed for. Things like the surcharge releases, things like spillway overflows, we know that these things can happen, and so we should plan for those emergencies.

There's also will breach emergencies where the dam is going to fail.  We see that there's some erosion around the outlet structures, for example, and we think something is going to fail and the flood is going to be much worse than we thought it could have been.  So there's kind of those two categories of emergencies.  And then the guidance kind of says to go in and plan for what you think the emergencies might be and lay that out in your Emergency Action Plans.

Q.    Okay.  And we'll talk a little more about

Trial

Downstream Addicks and Barker (Texas) Flood-Control Reservoirs          10/29/2024

that.  But why don't we put up on the screen and put before you just quickly DX 136.  Are you familiar with DX 136?

A.    Yes, ma'am.

Q.    And how, if at all, does this relate to how the corps' dam safety program defines emergencies?

A.    So I think this one has also been superseded, I think.  But this has some of that information that's also in the newer engineering regulation.

Q.    Okay.  And some of the information such as?

A.    The things that I just talked about in terms of what emergencies are.

Q.    Okay.  And --

A.    If I can find it.

Q.    -- what types of -- can you remind us, then, what those types of emergencies are?

A.    I'm hoping I can find it.

Q.    If I could turn your attention to page 12 and 13 of DX 136.

A.    That would be helpful.

      There we go.  Okay.

Q.    So how, if at all, does this relate to the types of emergencies you were just describing to us?

A.    So this is talking about emergency levels.

Q.    Okay.  The document on page 12 and 13.

A.    It talks about a high flow emergency, so it indicates that the flooding is occurring on the river system but there's no apparent threat to the integrity of the dam or levee system.  And that's, you know, where we try to convey to the outside agencies that the downstream flooding may occur.

Q.    And if we move to the next page, page 13, is there a definition for other sorts of emergencies?

A.    So then the next one is a non-breach emergency.  So the non-breach emergency level, you know, would be the dam itself is not going to breach, but we might need to do some increased monitoring mitigation and notification to internal and external people.

Q.    Okay.  And then how about the next kind of emergency that's defined?

A.    And then it talks about a potential breach emergency which is where a dam or levee could be, you know, either definitely going to fail or, you know, looking like it might fail.

Q.    Great.

And then, finally, let's talk briefly about the imminent breach emergency defined here.  How is it defined?

A.    It's defined as a dam has breached, is

breaching, or is about to breach.

Q. Okay. And how does that relate -- yesterday with Mr. Mithoff, you defined the word "imminent." How does this relate to, you know, your definition of imminent?

A. I think it's the same --

Q. Okay.

A. -- depending on how well I said it the first time.

Q. Okay. So where do the USACE definitions of like -- are there any -- where do the USACE definitions of dam safety sort of originate?

A. So I think originally FEMA was assigned as the lead federal agency for dam safety, and so they have -- you know, those kind of emergencies are also defined in FEMA's guidance for how to prepare an Emergency Action Plan. And then there's, you know, international and national committees on dam safety that work together. And, you know, USACE is a big part of the overall community on dam safety, so...

Q. Okay. Are there any corps or other federal guidelines regarding requirements for planning for emergencies?

A. There are.

Q. Okay. And what of those apply to the corps?

A.   So ER 1156.  And then I think the other one is ER 8156, I think, don't quote me on the number, which is the one I think that superseded the EC you're showing me here.

Q.   Okay.  Now, at a general level, what is an Emergency Action Plan?

A.   It is -- oh, my gosh.

Q.   What do you --

A.   It's a document that basically is about how we -- what emergencies we think could happen and then what we should do in response to those emergencies.

Q.   Okay.  And do corps projects across the country utilize EAPs?

A.   They do.

Q.   And why is that?

A.   It's a requirement.

Q.   Okay.  And are there corps sort of standards in terms of preparing and organizing EAPs?

A.   Yes, ma'am.

Q.   Okay.  Are -- you mentioned earlier that EAPs are not typically available to the public.  Why is that?

A.   So they contain some sensitive information that we generally wouldn't release.  So that could be people's personal phone numbers, for example, or their

work phone numbers.  It could also be some sensitive information about the dams and how, you know, terrorists might use that information to harm people.

Q.  Okay.  Are the Emergency Action Plans distributed to local governments?

A.  They are.

Q.  Can you give us a sense of like who within the local governments might have a copy of an EAP?

A.  So for Addicks and Barker, we have an Addicks and Barker emergency coordination team that includes many other government agencies like Harris County, the City of Houston emergency management, Fort Bend County. All of the local governments that have an interest in the area, so we distribute them to those folks.

Q.  Okay.  Now, was -- if we put up on the screen JX 3, and we'll hand you a copy.

Mr. Thomas, was JX 3 the Emergency Action Plan in effect during Harvey?

A.  Yes, ma'am.

Q.  Okay.  And what, if any, role did you have in approving JX 3?

A.  I was the hydraulics and hydrology branch chief when this was approved.

Q.  Okay.  And has this EAP in JX 3 been updated since 2014?

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                10/29/2024

A.   Yes, ma'am.

Q.   Have you had any role in those updates?

A.   Yes, ma'am.

Q.   Okay.  And what was your role?

A.   So I am the dam safety officer for those updated reports.  I'm the approver for those, for the annual updates, and then we have everyone review the bigger updates.

Q.   Okay.  And your voice trails off just a little, Mr. Thomas, I'll ask you --

A.   Sorry.

Q.   -- speak into the mic.

THE COURT:  Yeah, let me -- I just didn't hear.  You do it every year?  You have a -- you have to then approve the plan?

THE WITNESS:  Yes, sir.  We -- our goal is to do an update every year.

THE COURT:  Okay.

BY MS. DUNCAN:

Q.   And who defines the emergencies that are listed in an Emergency Action Plan?

A.   We do, the Corps of Engineers.

Q.   Okay.  And who defines the actions to be taken in those plans?

A.   We do, the Corps of Engineers.

Q.    Okay.  As part of your role as dam safety officer, do you ever give any presentations?

A.    Yes, ma'am.

MS. DUNCAN:  Okay.  I'd like to put up on the screen DX 290.

And we'll hand you a copy here.

BY MS. DUNCAN:

Q.    Mr. Thomas, what is DX 290?

A.    This is a presentation that I gave after Hurricane Harvey to the United States Society on Dams.

Q.    Okay.  And who prepared this presentation?

A.    I put it together, but I had some help from my team as well.

Q.    Okay.  And why did you prepare this presentation?

A.    After these big flooding emergencies, it's, you know, kind of industry practice to go and talk to each other about what happened so we can all learn from each other.

Q.    Okay.  And what was the timing of this presentation in relation to the Harvey event?

A.    It was after.  So this was May of 2018.

Q.    Okay.  And what kind of information is included in this document?

A.    There's some history of the projects.

There's some information about what's included in the dam safety modification report, kind of the current status of the projects at Harvey. And then there's some pictures, you know, from the actual event and flooding.

Q. Okay. And who did you present this to?

A. It's a conference of the United States Society on Dams.

Q. And how many people were present?

A. 5- to 600.

Q. Okay.

MS. DUNCAN: Your Honor, I'd like to offer DX 290 into evidence.

THE COURT: Okay. Any objection?

MR. NOLEN: No objection, Your Honor.

THE COURT: Okay. I'll admit it.

(Admitted Exhibit No. DX 290.)

BY MS. DUNCAN:

Q. So we'll come back to that in just a moment.

So, Mr. Thomas, can you tell us what was your role at the Addicks and Barker Dams and Reservoirs during the Harvey event?

A. I was the engineering and construction division chief and the dam safety officer.

Q. Okay.

MS. DUNCAN:  And if we put up on the screen DX 603.

BY MS. DUNCAN:

Q.  And what are we looking at here?

A.  This is an org chart showing how we were functionally organized during Hurricane Harvey.

Q.  Okay.  And what do you mean "functionally organized"?

A.  Basically the reporting chain through the commander.

Q.  Okay.  And when is this sort of organizational structure in effect?

A.  During emergencies.

Q.  Okay.  And where were you physically located during the event?

A.  I went to the dams.

Q.  Okay.  When?

A.  Around August 25th, I think.

Q.  Okay.  And when did you leave the dams?

A.  A few weeks later, two or three weeks later.

Q.  Okay.  So you were at the dams for two to three weeks?

A.  Yes, ma'am.

Q.  Where did you stay when you were out there?

A.  When I got to sleep, I stayed at a hotel.

524

Q.   Okay.

A.   Depending on what day it was.

Q.   Okay.  Now, you said you went early on the 25th or so.  Why did you go at that time?

A.   So talking with the commander, you know, there's a lot of concern about the ability to travel around Houston during floods.  It's very unsafe to drive around Houston during floods, and so we wanted to get me to the dams before it was impossible to get there.

Q.   Okay.  Is there a saying that we have in Texas about driving in a flood?

A.   I think you're referring to "turn around, don't drown."

Q.   Why is it dangerous to drive during a flood?

A.   Historically I think that's where the majority of the deaths have occurred, is in cars during floods here.

Q.   Okay.

THE COURT:  Cars I think in only 3 feet of water you -- the car begins to float and you no longer have any control.

THE WITNESS:  Yeah.

BY MS. DUNCAN:

Q.   So, Mr. Thomas, later we'll walk through sort

Trial

of a day-by-day event -- of events at the reservoirs while you were there.

But just to set the stage for why we're here, can you describe for us Hurricane Harvey and its impact on the Addicks and Barker Dams and Reservoirs during that event?

A.   I think we've kind of already seen it was, you know, this epic rainfall, more than we certainly ever had in those watersheds before, but along the coast more than we've ever had anywhere in the country before.  So a really large flood.

Q.   And so how did that impact the operation at the dams?

A.   Well, I mean, you know, we had to operate during that flooding emergency, so, you know, we had -- all of the people you see here were activated in accordance with our Emergency Action Plan.  You know, we had foundation observers on the dams at all times. We ended up having to deploy outlet observers during the emergency.  You know, we had people that couldn't get where they were going.  We had people that lost their own personal vehicles, people that had to be rescued from our own team, you know, our own responders.  So it was a very intense event for us, just like it was for the people that live around the

reservoirs, so...

Q. Okay. Now, to illustrate some of what you're saying, I'd like to look at a few pictures. So why don't we start by looking at DX 290 at PDF page 15.

Now, can you tell us what we're looking at in this picture in relation to sort of the dams and the flooding event?

THE COURT: I guess we've got two different pictures.

THE WITNESS: Not that one.

MS. DUNCAN: Not this one, Your Honor. Let me pull this down.

THE COURT: Okay.

MS. DUNCAN: It should be on your screen, Your Honor. Can you see it?

THE COURT: Oh, yeah, here it is. It's on.

THE WITNESS: Okay. So if you look at the picture, the very, very top of the picture is the reservoir. That's the inside. You can see the green is the embankment like we talked about before. And that kind of horseshoe-shaped object there, that's called the cofferdam. Inside that is where we're building the new outlet works. To the right of that cofferdam you can kind of see the whitewater on the downstream, the bottom side of the green embankment.

THE COURT:  Yeah.

THE WITNESS:  I don't know if we're going to have a pointer or not.  We talked about it, but...

So the water is coming in from the top of picture, and it's coming out through our spillway.  Our spillway at this point.

BY MS. DUNCAN:

Q.   Just one second.  Okay.

A.   Okay.  So our spillway is submerged.  It's not designed to run that way.

Q.   When you say "spillway," is that the -- what is that?

A.   That's the primary outlet structure, the parabolic spillway that we showed some pictures of earlier.  So that's where we have the gates at.

So we've got -- at this point the gates have been opened, we're releasing water.  I think this picture is around the 30th of August, so that means we're releasing the most water we're going to be releasing.  And you can see that our construction site is completely submerged.

What you can't see in the left side of the picture there, sir, is the new conduits are actually sitting there.  They're big steel tubes.  But they're under water because the water is to deep in there.

Okay.  We'll see if we can make this work.

MS. DUNCAN:  Your Honor, we have a pointer for the witness that should show up on the screen.

THE COURT:  Okay.

MS. DUNCAN:  And do you see the green mark, Your Honor?

THE COURT:  Yes.

MS. DUNCAN:  Okay.  It should show up on all of our screens.

THE COURT:  Okay.

BY MS. DUNCAN:

Q.  So I'll ask the witness, Mr. Thomas, can you please pick up with describing this portion of the picture.

A.  Okay.  So where the pointer is at now is that's the new outlets that you'll see on the site visit are today.  But during the flood, we were building them.  So that's our construction site submerged.

And then over here, this whitewater, that's the downstream side where the releases are being made.  So that's the water being released.  And you can see that it's very turbulent.  And what you can't see is you can't see the headwall.  You can just barely see the wingwalls kind of constraining the flow, so this

structure is submerged at this point.

Q.  Okay.

THE COURT:  What is that structure again? What does it do?

THE WITNESS:  This is the structure that lets the water out of the dams that we can control.  This is where following the Water Control Manual, we open the gates, this is where the water came out.

THE COURT:  So this is on the opposite side from the reservoirs?

THE WITNESS:  Correct.

THE COURT:  The other side of the dam?

THE WITNESS:  That's right.  This is outside the dam down here.  And up here is inside the dam, inside the reservoir.

THE COURT:  And this is during the flood period itself?

THE WITNESS:  Yes, sir.  I think this is -- this picture is very close to the very peak of the flood.

THE COURT:  The one that was under construction is being this -- is that white building under construction or is it...

THE WITNESS:  So what's under construction is where the pointer is, it's under water.  We're building

a brand-new outlet structure here.  These white -- oh, gosh.  This white, this is construction equipment and supplies over here.  And here is some of our construction equipment that they put up on the access ramp to the dam to protect it.

BY MS. DUNCAN:

Q.   And if we zoom back out, can you talk to us about the bottom right-hand side of the picture.  Can we zoom in on that?

A.   Okay.  So now this is I-10.

Q.   What's I-10?

A.   Sorry.  Interstate 10, a major highway that helps connect both sides of Houston as well as the country.  This black object here, this is called an aqua dam.  It's basically a big geo-textile filled bag that they pump full of water and it's forming a dam on the highway to keep the water off.  And you can kind of see this wet line.  This is where the water had gotten up to on the road before they were able to drain it.

Q.   And if we look on the bottom left-hand corner.

MS. DUNCAN:  Can you zoom over there, Mr. Jackson?  Thank you.

BY MS. DUNCAN:

Q.   And what are we looking at here?

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                10/29/2024

A.    So here you can see boats and boats being launched.  This is both emergency responders and volunteers helping to evacuate people or helping to get people back to their homes to maybe get a pet or whatever they had to -- whatever had to go on inside the flooded area.  But people are accessing the neighborhoods and communities by boat from roads.

Q.    Okay.

MS. DUNCAN:  Why don't we move to DX 298 at PDF 17.

BY MS. DUNCAN:

Q.    Generally what are we looking at in this set of pictures?

A.    So this is Addicks again, so now you're looking downstream on the left where the pointer is at.  And that's the primary outlet structures.  That's the water coming out of the dams where the gates are at.  You can see water flowing in over the wingwalls on both sides, and then it's flowing downstream.

And then on the right, that is the control structure for the gates.  And what you can see here is a lot of debris in the water.  And there's water over the walkway.  So the primary power to this structure runs underneath the walkway that you're looking at, so we had to turn the power off to this structure to

prevent our folks from getting electrocuted while they were operating it.  But you can see how much water got up onto the structure.  That became a serious, you know, concern for us as we were operating.

Q.   Okay.  So when did the water get too high such that you had to turn off the electricity?

A.   I think that was later in the day on the 29th, if I remember right.  We have a timeline, though.

Q.   Okay.  And you said the power core runs underneath this walkway?

A.   It does.

Q.   Okay.  Has this walkway or the platform ever been flooded before?

A.   It had not been flooded before.

Q.   Okay.  And what is that brown stuff that's just to the left of the platform?

A.   It's debris.  Like vegetation, trash, whatever was in the reservoirs that's floated up to the top.  And it's kind of being trapped by the cofferdam, and it's being held up against the structure.

Q.   Okay.  Did you notice -- did you drive around during the event?

A.   I did.

Q.   And where were you driving?

A.   I mean, at different times, everywhere.

Q.    Okay.   You mean around the dams?

MR. NOLEN:  Your Honor, I'm going to object. This is real interesting and all of this is great background, but it has nothing to do with the two questions the court has posed to the parties.  I mean, it literally has nothing to do with those two questions.

We know that the reservoirs fill up with water.  That's what they're designed to do.  We also know that they opened the gates and flooded the downstream because the Water Control Manual told them to.  He has testified, as will every witness, that it wasn't an emergency situation that required opening those reservoirs, it was just following the Water Control Manual and the induced surcharge regulation. So this is great and it's real interesting, but it's just not relevant to our case.

MS. DUNCAN:  Your Honor, I disagree.  And I am happy to pose the question right now if Your Honor would like.  This sort of information, this sort of detail about how high the water rose and how they had to turn off the gates and operate them manually, that's the sort of information that was going on at the time when the corps was making its decision to first open the gates and then to increase the releases.  And what

you'll hear, if allowed, is sort of how all these details come together and why they are a dam safety emergency.

THE COURT:  But the dam openings were because of what the plan said.  I mean, they weren't opening the --

MS. DUNCAN:  Well --

THE COURT:  -- them as a result of an emergency.  They're opening them as the book said.

MS. DUNCAN:  Well, Your Honor, I think there's more to it than that.  And if allowed, I would like to ask the witness those sorts of questions.

THE COURT:  Okay.  Well, ask the witness those sorts of questions that are relevant I think rather than just talking about -- it's interesting too. I'm a big fan of the Weather Channel and History Channel and like to see these things, but that's not the purpose of the trial.

MS. DUNCAN:  Well, to be clear, Your Honor, I'll certainly ask the witness, but there is context to all of this, and so this is one of the pieces of the puzzle.  So we do have some more interesting things like this that all form together to form the timeline of the dam safety emergency.  So just --

THE COURT:  There was already testimony that

we didn't have an emergency, we didn't have a dam emergency.  There was no testimony that there was any chance of the dam failing.  So there was a weather emergency which covered all of Hurricane Harvey, but there was no emergency for the dam, at least so far we haven't heard any evidence if there was.

MS. DUNCAN:  Well, you heard from Mr. Bardol.

THE COURT:  Right.

MS. DUNCAN:  And you heard cherry-picked pieces of depositions taken by plaintiffs.  So one of our jobs today is to help you understand the full picture and why there was a dam safety emergency.

THE COURT:  Okay.  But let me ask that first question.

Was the door -- were the gates opened because of the plan, the emergency plan?

THE WITNESS:  The gates were opened, sir, following the Water Control Manual.

THE COURT:  The Water Control Manual.  Okay.

THE WITNESS:  But if I could add?

THE COURT:  Yes.

THE WITNESS:  It absolutely was a dam safety emergency, and that's what was -- you know, we are always looking at the decisions that we're making, right?  And we're thinking is this the right decision?

And we knew that it was the right decision to follow the Water Control Manual because this is a dam safety emergency.  So we were -- and you're going to see all those emails and everything, the document that we -- we were talking about this.  The whole time we're talking about these are the highest-risk dams in the entire Corps of Engineers.  It is not safe to not follow the plan.  But we did absolutely open the gates following the plan, and that's why we opened the gates.

I don't understand really how that -- how those things go together for you, sir, but I just want to make it clear there was a dam safety emergency and that's an important part of what we were doing.

THE COURT:  But the dams -- here's where I'm having trouble understanding.  The dam weather emergency doesn't seem to have any connection with the opening of the gates.  You were going to open the gates per the operating procedure, you said.  It wasn't like, boy, things are getting bad, we got to open those gates, you know, to save the city.  It isn't that kind of emergency response, the response was laid out in your plan.  So how does the emergency relate to that?

THE WITNESS:  For me, it relates in that the emergency was telling us that our plan was the right thing to do.

THE COURT:  Right.

THE WITNESS:  That's how, you know, we're making -- we're looking because it's a big deal to open the gates for us.  Like, that wasn't something that anyone did without a lot of thought.  And as we approached it, you know, we spent a lot of time talking about it, we were looking at all the dam safety risks, all the risks of failure.  It's not fair to say there was no probability of failure during the storm.  It is fair to say the dams did great and didn't fail.  But during the storm, we didn't know that, right.  And so we were looking at that and we're saying, hey, it's right to follow this plan, like, we need to follow the plan as much as we can because that's the safe thing to do for the city.  That's how they're connected for me, sir.

THE COURT:  Isn't that the plan.  I mean, the plan isn't that you make a decision to follow the plan.  You've got the plan, you've got to follow the plan, and you did and it produced what came about.  But I don't see how any of that is -- I mean, the emergency obviously gets everyone up and ready and doing things, but it doesn't seem to be the reason you open gates.  Is that fair?

THE WITNESS:  It is fair to say that we

opened the gates following the plan, absolutely.

THE COURT: Right. Right. Okay. Thank you.

BY MS. DUNCAN:

Q. Let me ask a few follow-up questions there.

Were alternatives to following the plan discussed?

A. They were.

Q. And I'll ask you a few follow-ups there. But is the corps able to deviate from the plan?

A. It's allowed.

Q. Okay. Why didn't the corps deviate in this case?

A. So in this case, there were really two big failure modes we were very concerned about. We were afraid that the primary outlets might fail especially if we opened the gates, and then we were afraid that the emergency spillway might fail if they were run -- you know, if we got to the 112 plus kind of elevations. And so we were balancing that the whole time. And then we are were looking at all the interim risk measures. So we had done a lot of work to make the primary outlets more safe. And so even with that work, we were very, very careful about how we opened the gates, and we took a long time to do it so we could watch them and make sure that they were still safe as we were opening

them.  And so there's a lot of that that went on throughout the emergency.

But, ultimately, I don't want to dissuade you, sir, we did follow our water control plan.

THE COURT:  Let me just ask about what you just said.  When you opened the gates, is there a safety issue in opening them?  I mean --

THE WITNESS:  There was.

THE COURT:  -- someone has to know what they're doing, I guess, obviously, one.  But what could bad happen if you opened the gates and you didn't do it the right way?

THE WITNESS:  So it's not about -- there's part of that.  We don't want to open them unbalanced.  But the other part of this is we had some concerns about that spillway, the parabolic spillway failing, and so we had done a lot of work to that spillway, including adding some steel plates to it, we'll show you all this, to make it more safe to discharge over it.  We were concerned that at some point discharging some amount of water that the spillway itself at the primary outlet works could fail, and so we were doing math throughout the storm.  The tailwater that ended up happening, the downstream flood, ended up being what helped us calculate that it was, in fact, safe to open

the gates as much as we did.

THE COURT:  Is it like not all or nothing?  You pull up the gates and you pull them up all the way or do you pull them up part way?

THE WITNESS:  A little bit at a time, sir.  So we ended up doing 1- or 200 cfs per hour or every couple of hours, something like that.  We did very small openings gradually so that we could watch and see if the structures appeared to be safe to continue to operate.  And that's why we had people out on the structures with the gates the whole time because we were just concerned that -- you know, for these kind of issues, it's very hard to know how well the repairs have worked until you actually tested them.  And you can't test these until something like this happens.

THE COURT:  Sure.  But once you did that, you had opened them fully, I guess?

THE WITNESS:  We did.  Over time, we were able to open Addicks fully.  And we never did get Barker open all the way before the pool stopped rising.

THE COURT:  How long did it take to get Addicks open?

THE WITNESS:  We started on the morning of the 28th, and we finished in the afternoon of the 29th, so almost two days, day and a half.

THE COURT:  Okay.  Thank you.

MR. NOLEN:  Your Honor, I just have to object one more time because the -- so we've got stipulation that they followed the Water Control Manual.

THE COURT:  Yes.

MR. NOLEN:  What was just described by Mr. Thomas is that by opening the gates, they were actually risking failure of the gates.  In other words, they let it amass for four days until it was completely full or near full and then they opened the gates.  If they had kept the gates shut the entire time, you don't even risk that gate failure that he just described, that you don't -- you do not risk that failure because your gates stay closed.  And so he's telling you about that, but that was not the reason that they made the decision to open the gates.  There's no evidence of that at all.

THE COURT:  No.  No.  And he was pretty clear on that, Mr. Thomas was pretty clear on why they opened the gates.  It was part of the plan.

MR. NOLEN:  That's right, part of the Water Control Manual which is ordinary operations of the reservoirs, Your Honor.

THE COURT:  Okay.

MS. DUNCAN:  Okay.  So let's talk a little

bit more about that.

BY MS. DUNCAN:

Q.   Let's just jump right into some of these emails.  Mr. Thomas, let's go to DX 608.

Okay.  Mr. Thomas, what are we looking at?  And we'll get you a copy.  What are we looking at in DX 608?

A.   This is an email from Eric Halpin to the folks on here.  One is Major General Ed Jackson.  He was the deputy commanding general for the Corps of Engineers.  Another is James Dolton who was the headquarters dam safety officer.  And then Larry McCallister who was the ENC chief at the Corps of Engineers at the headquarters at that time.  And he's kind of summarizing the discussions that we've had amongst the dam safety chain following the requirements in the Emergency Action Plan and he's kind of saying this is what we've decided among -- all the way to the headquarters.

Q.   Okay.  And before we go further, let's just put up on the screen DX 603 which is -- and it might even be in your binder which is an org chart.  So you can just give us a sense of the chain of command here.

Let's go to 602, excuse me.  DX 602.  Mr. Thomas, what are we looking at in DX 602?

Trial

A.    So this shows the chains of command in the corps.  So the actual chain of command goes from Commander Zetterstrom to Colonel Owen at the Southwestern division to General Semonite at the headquarters.  It also shows what you might call a technical chain of command where it is the Galveston district dam safety officer, and I report to the Southwestern division dam safety officer, and he's talking to the headquarters dam safety officer, which is James Dolton.  But we also have a Mr. Eric Halpin who is at this point was the Corps of Engineers special assistant for dam and levee safety.  He's effectively the most senior dam safety officer in the Corps of Engineers.

Q.    Okay.  And so if we go back then to the email at DX 603 -- excuse me, DX 608.

A.    I need to make a correction.  I think I said most senior dam safety officer.  I meant most senior dam safety expert.

Q.    Okay.  So that's Mr. Halpin?

A.    Mr. Halpin, correct.

Q.    Okay.  So now if we go back to DX 608 with that context, can you walk us through this email?  And you received this email?

A.    Yes, ma'am.

Q.   Okay.  And was it -- was this email sent in the course of official business for the government?

A.   Yes, ma'am.

Q.   Okay.  And can you walk us through this email?

A.   Right.  So he's summarizing that we've had this discussion and that we've started --

Q.   And what discussion are you talking about?

A.   Dam safety discussion related to Addicks and Barker during Hurricane Harvey.

Q.   And what's the date and time of this?

A.   This is August 28th at 6:00 P.M.  And we'd been talking about this with the dam safety folks all day long and the previous days as well.

Q.   Okay.  When you say "talking about this," what are you referring to?

A.   I'm referring to basically the operations during Hurricane Harvey and how we characterize those in terms of dam safety and why we thought following the Water Control Manual was the right thing to do.

Q.   Okay.  And keep going.

Is there anything else that Mr. Halpin is describing in this email?

A.   So he's describing and -- although I don't think he says it here, he's talking about it here, we

had an interim risk reduction measure in place at the beginning of the storm.

Q.   What's an interim risk reduction measure?

A.   It's a thing we do temporarily to help reduce risk to a dam.  So we can do things like change operations, we can do things like install pieces like grout, conduit, things like that.  So we can make structural modifications.  Or in this case we made a modification to say, hey, don't release more than 4,000 cfs per structure without doing some calculations.  And that's what we ended up doing during the storm.

Q.   Okay.

A.   And so he's saying that we've started making those releases, and we're approaching the limit of that interim risk reduction measure at 4,000 cfs.  That's the context that his email is written in.  And then he attaches a white paper that summarizes the conclusions from all of those dam safety discussions.

Q.   And did you have input on this white paper?

A.   Yes, ma'am.

Q.   Okay.  Let's go to the white paper.

THE COURT:  Well, let me ask, why was there this limit for 4,000?

THE WITNESS:  So like we talk about, these structures had a lot of issues.  They were -- like with

the dam itself was -- I don't know if we said this already.  In the Corps of Engineers, we rate our dams based on their life safety consequences and probability of failure.

THE COURT:  Yeah.

THE WITNESS:  And so we rate them from I to V; I being the highest risk, V being the lowest risk, Addicks and Barker were rated as Classification I.  At this point, there were about 12 dams in the entire country that had a risk rating that high.  And so these were among the two highest-risk dams in the entire Corps of Engineers.  So when there's a big flood, we're all talking about this.

And so for these particular structures, these structures were driving, you know, our concern of failure for the entire dam, first, because they're the first thing that gets loaded.  But we also had concerns at those emergency spillways.  So that's what's driving this whole discussion, is there's failure concerns with the primary outlets and there's failure concerns with the emergency spillway.  And so that's why we're having this discussion.  It's like, "Hey, what's safe to do here?"

BY MS. DUNCAN:

Q.   And, Mr. Thomas, just to put that into

context, among those two risk drivers you talked about, where are those located on these maps?

A.   So there's a set of potential failure modes associated with the gated outlet structures that you see, and then there's a potential failure mode associated with the emergency spillways that you see.

Q.   Okay.  And this is DX 637, PDF 1.

And, Mr. Thomas, my next question was --

MR. NOLEN:  Just a second.  I have an objection.

Your Honor, this document that they just put up -- and I'm sorry to sit down, but I have to see what I'm doing here.  DX 608 is an email that is sent after the reservoir releases start, and so it is actually an email that is not prior to the reservoirs starting to be emptied through the controlled releases through the gates.

THE COURT:  Yeah.

MR. NOLEN:  And that memo that is attached that's being circulated that Mr. Thomas says that he just worked on is something that is after the induced surcharge started occurring.

MS. DUNCAN:  Your Honor, the witness testified that this email and the white paper are based on conversations that had been happening over the

course of several days and the releases were just ramping up, so they were just sort of -- they had not reached full capacity yet.

THE COURT:  Okay.  So this isn't creating the release, it's discussing it as it's going on?

MS. DUNCAN:  Well, I think Mr. Thomas will be able to explain more about that if we talk about the white paper.

THE COURT:  Okay.  Why is it relevant, though?  Before we let Mr. Thomas talk about it, what's the relevance of this?  They're discussing this, hey, interesting thing going on in the world, the dam is -- they're exploring all of this as professionals would be doing.

MS. DUNCAN:  No, Your Honor.  It's documenting the operational -- the rationale for the operational decisions including why they are following the Water Control Manual.  So if we can get to the white paper, I think the relevance will become clear, Your Honor.  It's talking about the key failure modes that they are trying to balance and why they determined that following the Water Control Manual was the best way to address the dam safety emergency.

THE COURT:  Okay.  I'll allow that.

BY MS. DUNCAN:

Q.   Okay.  Mr. Thomas, let's turn to the operational white paper.  And let's look at the first top half of this white paper.  Can you walk us through what we're looking at here?

A.   So the first bullet talks about at this point, you know, we're starting to get forecasts that are showing, you know, not only surcharge but also use of the emergency spillways.

Q.   And when you talk about surcharge, just to make sure we're extra clear, where on this map are we talking?

A.   Releases from the gated structures into Buffalo Bayou.

Q.   Okay.  And then when you talk about the emergency spillways, what are we talking about?

A.   The yellow outlined areas.

Q.   Great.  Keep going.

A.   And he's highlighting here that the management decisions are intertwined, right?  Because we have dam safety issues with both of those structures.  And so then he goes on to lay out what we talked about under the three potential failure modes that have become, you know, driving our risk at this point.

Q.   And just to put this in context, how soon after the releases began were you having -- or when were these -- excuse me, conversations and failure modes being discussed in the context of the timing of the releases?

A.   Well, we started discussing this probably on the 25th, so before the releases.

Q.   Okay.

A.   And we talked about it over the weekend, right?  And then, you know, we spent certainly all day Monday really focused on can we go past the 4,000 limit and should we go past the 4,000 limit.

Q.   Okay.  And walk us through these three potential failure modes.

A.   So the first one we're talking about is the primary outlet works, and there's a couple of problems with these.  We've tried to fix voids around the structure.  We've installed filters.  We've done things to try to prevent seepage around the structure.  So that's a failure mode that could happen whether we open the gates or not.  Right?

And then we looked at, okay, when you do open the gates, you've got this risk of the parabolic chute slab failing, and we've done a lot of work to address that as well.  We put in some steel slabs.  And one

thing we had not done is in that limitation, we put our -- we self-imposed a limitation of 4,000 cfs, and we did that based on a very low tailwater.  But that isn't the condition during Harvey.  So we were able to during the emergency redo those calculations with the actual tailwater and show that it would most likely be safe to open the gates.  But we wanted to very closely monitor the opening of those gates.

So as we saw strange noise or we saw some additional scour, we could -- you know, that's an option that lets us close the gates and reduce our risk, right?  So what he's pointing out here is that, you know, we mitigated some of that risk by all the things I just described.  But we do have pipe pressurization occurring meaning that, you know, the conduits are pressured in a way they weren't designed to be.  But so far, so far the outlet works appear to be running well.

At this point we're later in the day on the 28th, we now have some observed data on the outlets.  Okay.  We're starting to think it looks like those are going to be okay.

Q.   Can I ask you a follow-up question?  If they're running well, does that mean there is no risk?

A.   No.

Q.   Okay.  And you mentioned that for one of these items in 2(a) there is risk whether you open the gates or not?  Which was that?

A.   Right.  So there's a series of different failure modes associated with the primary outlet works. One of them is that spillway slab I talked about, but the others are just, you know, voids around the conduits, seepage that we've seen around the conduits. And we've tried to fix those things.  We've done things as interim measures to help reduce that risk.  But like I said, we didn't know at this point exactly how well it would work, but that gave us some confidence in the primary outlet works.

Q.   Okay.  Let's talk about the second potential failure mode.

A.   Right.  And then the emergency spillways, we've calculated for those that during a spillway design flood we think there's an unacceptable probability that they might fail.  I think you showed 14 percent earlier.  You know, that's really kind of a guess.  But when you're guessing at something so serious, that's a high guess.

Q.   Why is it a serious risk?

A.   Well, because when those spillways fail, then, you know, people get flooded.  People can die.

Q.    Okay.

A.    I mean...

So originally we saw the spillways as a lesser risk driver.  That's why the spillways were in the dam safety modification study.  The reason for that is because the likelihood of getting a pool high enough to activate the spillways is pretty infrequent.  Unfortunately, during Harvey now we've got a forecast that says they're going to be activated, and so that takes away the things that makes the emergency spillway lower risk, right, because now it's not the frequency of flooding, they're going to flood at this point as far as we're concerned, right?

Q.    Okay.

A.    So that's what made the emergency spillways become a risk driver because now it looked like the flood was going to actually happen.

Q.    Okay.  And then what about potential failure mode 3?

A.    Right.  So he's talking about overtopping and failure of the dam.  And so he's saying that if we restrict the releases too much, like we said earlier, we, you know, do this spillway design flood based on, you know, the induced surcharge curves happening.  So he's implying that it's possible that we could even

overtop the dam as another failure mode.

Q.   Okay.  Now let's move on to the next piece of this.  The primary operational objectives, can you walk us through those?

A.   Right.  So what we kind of agreed on was that, you know, our goal here, of course, is to prevent the failure of the dam considering both the failure modes at the primary outlets and at the emergency spillways.  And so what we said was, go ahead and release the water from the outlets until we either see distress or we're within the limits of the water control plan.  That helps take the performance pressure off of the spillways, right?  And then we also wanted to get some flood-fighting materials ready just in case we needed them.

But we want to highlight there that we're keeping the maximum releases within the Water Control Plan, right?  We don't want to induce any additional nonfailure flooding downstream.  And so that's what we were saying there.  So stay within the Water Control Plan but release as much as the Water Control Plan allowed us to help keep the risk off the emergency spillways.

THE COURT:  Is that the 4,000 feet?

THE WITNESS:  At this point the Water Control

Plan called for full discharge at both structures which is closer to 8,000 cfs each.  But I think the number we've agreed on is like 13,000 something total.

MS. DUNCAN:  Okay.  While we're talking about Mr. Halpin, let's go to DX 606.

BY MS. DUNCAN:

Q.   You may have a copy there.

A.   I do.

Q.   Okay.

MS. DUNCAN:  Can we go to DX 606?

BY MS. DUNCAN:

Q.   You've got a copy in front of you, Mr. Thomas.  Okay.  What are you looking at in DX 606?

A.   It's an email from Mr. Halpin to again the same folks as before except he's added Jose Sanchez who was a one of our -- I think he was leading emergency operations at the headquarters at that time, and Pete Perez who was a senior executive service member at Southwestern division at that time.

Q.   And what role did these individuals have in regard to dam safety?

A.   So they are the senior dam safety.  So like we said, James Dolton is the dam safety officer for the Corps of Engineers, Eric Halpin is our most senior expert and the special assistance for dam and levee

safety.

Q.   And did you receive this email?

A.   I did.

Q.   And was it sent in the course of operations?

A.   Yes, ma'am.

Q.   Okay.  And I'll ask you to slow down just a little bit.  Thank you.

A.   Sorry.

Q.   That's okay.

A.   I know.

Q.   Mr. Thomas, can you walk us -- what date and time is this email sent?

A.   So I got it at 9:00 P.M. on the 29th.  It looks like I got it right after it was sent, so 9:00 P.M. on the 29th.

Q.   And had you been having communications with this group of people?

A.   Yes, ma'am.

Q.   Okay.  And how frequently were you in communication with this group of people during the event?

A.   Continuously, depending on the person.  So it's not just me, right?  I'm reporting following that, you know, notification chart in EAP.  So Mike Zalesak was doing a lot of communication as well for me.

Trial

Q.   And where in the timeline of making releases does August 29th fall?

A.   I think this is after we've reached kind of peak releases and it's before we actually -- the pools peaked the next day.

Q.   Okay.  Now, can you walk us through the email that you received from Mr. Halpin.  It was forwarded to you by Mr. Halpin.

A.   Right.  Are you going to put it back up or no?

Q.   Oh, yeah.

MS. DUNCAN:  Mr. Jackson, can we...

BY MS. DUNCAN:

Q.   Okay.  Mr. Thomas, walk us through this email.

A.   So this is Mr. Halpin's perspective on the emergency at that point of the flood.  So the first bullet there is he's highlighting this is still the highest-risk dam in our portfolio, and he means both of them.

Q.   Okay.  And how many dams are there in the corps' portfolio?

A.   So he's saying at this point there's 714, and he would rather have any of those with more water behind them.

Q.   Okay.  And can we just start with even the first sentence of this email.  What does he mean by -- what do you understand - did he means by "false confidence"?

A.   Well, it's -- I think he was just trying to highlight that now that the pools are full, failure is still possible.  It doesn't mean that the risk is over, that we need to stay vigilant.  We need to make sure that we keep our observers in place.  We need to make sure that we continue our communication, right?  We're still having an emergency.

Q.   Okay.  And he notes "Good efforts and results up to that point."

What is that referring to?

A.   He's talking about I think all of the coordination that we've done.  So we've had some of the corps' most advanced dam safety experts working with our team day and night throughout this whole thing making sure that every decision that we were making was as safe as possible.

Q.   Okay.  And so let's move on to paragraph 2 and the sub-bullets.  Can you walk us through what he's describing there.

A.   So first he says, you know, we're still early in the emergency and it's too soon to declare a

victory.

Q.   Okay.  And walk us through the reasons why he says it is still an emergency.

A.   So he says --

MR. NOLEN:  Objection.  Calls for speculation.

MS. DUNCAN:  Okay.

THE COURT:  Yeah.

MS. DUNCAN:  Okay.

BY MS. DUNCAN:

Q.   Mr. Thomas --

THE COURT:  I'll sustain that.

BY MS. DUNCAN:

Q.   -- based on your conversations that you have had and your experience, can you walk us through what Mr. Halpin is describing at least the reasons he's stating for why he says there is an emergency?

MR. NOLEN:  Objection.  Calls for hearsay.

THE COURT:  Yeah, I think it is hearsay.

MS. DUNCAN:  Your Honor, we've established that this is a government record, a business record. He's stated that it was an email that was sent in the course of business of the managing of the emergency.

THE COURT:  It's not in the regular course of business.  It's a specific individual statement which

really requires the person who is making it to be subject to cross-examination.

MS. DUNCAN:  Your Honor, the other hearsay exception that we believe applies is Rule 8033 and it relates to then-existing mental condition.  And the rule -- the portion of the rule that applies I believe is a statement of the declarant's then-existing state of mind such as motive, intent, or plan.

THE COURT:  Well, that might be useful if that individual was on trial here for something relating to his state of mind, but I don't think he is.  And, therefore, that exception doesn't apply.  That exception is usually used in criminal law anyway, but...

MS. DUNCAN:  Well, Your Honor, he is -- Mr. Halpin is a senior official, and we're talking about sort of --

THE COURT:  His mental state?

MS. DUNCAN:  Well, his intent and plan and motive for agreeing to operate the dams in the way that they are being operated.

THE COURT:  I don't think you can push mental state there, no.

MS. DUNCAN:  Okay.

THE COURT:  Objection sustained.

MS. DUNCAN:  All right.  Now, we can take that down.

BY MS. DUNCAN:

Q.  Let me ask you just a few questions about the kinds of conversations that you were having with Mr. Halpin and the senior safety team at the time.

Were you able -- you showed us some pictures earlier about water being -- covering sort of the outlets.  How, if at all, does that relate to the ability to manage the reservoirs during a historic storm like Harvey?

A.  Well, it did a couple of things.  One is we weren't able to monitor the downstream toe of the dam, so we aren't really sure what was happening at the downstream toe of the dam.  It was under the water.

Q.  And what's the toe of the dam?

A.  It's where the end of the embankment meets the natural earth.

Q.  Okay.  And is that --

THE COURT:  That's where the hill comes down to the ground?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

BY MS. DUNCAN:

Q.  Okay.

A.   And it also -- these conduits weren't meant to run that way, and so they were making some strange noises and they were -- you would see pressure waves propagating in and out of them, and we weren't really sure if that was safe or not.  Over the course of the storm, it turned out that it was okay.  But we didn't really know that at that time.

Q.   Okay.  And can you talk to us about the balancing of the risk factors.  How, if at all, did that play into your decision to follow the Water Control Manual?

A.   Well, it helped us know that we were doing the right thing because we knew that -- you know, we didn't know how much rain would ultimately fall, and we didn't know if another storm was coming, although we know that it's possible.  But knowing that we have this, you know, potential risk for failure at the emergency spillways and that we have this potential risk for failure at the primary outlet works, especially as the water level gets higher, that was telling us that following the Water Control Plan is going to lower the water in the dams the fastest way. And so, you know, that told us that that was the right thing to do.

Q.   And why do you want to lower the water in the

dams in the fastest way?

A.    Well, like you saw in the dam safety modification report, the probability of failure goes up drastically as you get to higher pool levels based on our analyses at the time.

Q.    Okay.  And you mentioned additional storms that might come.  Talk to us about why was that a consideration.

A.    Well, as the pools are full, right?  They have less storage capacity for the next hurricane or rainfall event of any kind.

Q.    Okay.  Was there a storm in the Atlantic at the time of Harvey?

A.    I think Irma may have been in the Atlantic about the time Harvey was happening.

Q.    Okay.  And when -- based on your sort of meetings with these senior dam safety professionals, why was there a concern of false confidence?

MR. NOLEN:  Objection, Your Honor.  That's hearsay, a request for hearsay, eliciting hearsay from the witness.

THE COURT:  Yeah, I think that's clear.  I'll sustain the objection.

MS. DUNCAN:  Okay.

BY MS. DUNCAN:

Q.   Was there any -- did you expect any pressure to slow or halt releases during the event?

A.   So it was certainly possible that we might get some pressure to not make releases --

Q.   Okay.

A.   -- during the event.

Q.   Okay.  And in the context of the decision to make the releases, why do you call it the right decision?

A.   So I call it the right decision because it was within our Water Control Plan, it was what we were already planning to do, and it also was the least risk option available to us.  So it helped us maintain the lowest possible pool levels which helped us keep the dams as safe as possible.

Q.   So when you say "least risk option available to us," just can you describe that for us?

A.   So one option would have been to just not open the gates, right?  That would have resulted in higher pools.  And at the time we didn't know how much higher, you know?  But the higher pools equals more risk in a dam like this.  Another option could have been just open the gates from the very beginning, right?  But we didn't want to do that because we didn't

want to add additional flood risk, and we didn't want to violate our Water Control Plan.

Q.    Add additional flood risk for whom?

A.    The people that lived downstream of the dams.

Q.    Okay.  And so were there any other risk considerations?

A.    Let's see.  I'm sure there were.

Q.    Well, were there any other alternatives that were discussed to try to implement during the storm?

A.    There were many alternatives discussed.

Q.    And when you say "alternatives," alternatives to following the Water Control Manual?

A.    Well, both that and other things.  We --

Q.    Okay.

A.    -- tried to brainstorm every possible thing we thought could happen.  I remember at one point someone asked if we could, you know, sandbag around the end of the dams, and we -- that's not feasible.

Q.    Why is that not feasible?

A.    Well, there's no natural abutment.  You would have miles of sandbag bags and we didn't have enough sandbags.

Q.    Was the idea you put sandbags along the back side of the reservoir?

A.    That was an idea that was proposed and we

talked about it.  That's also not feasible.  There's no way to reasonably sandbag the entire back side of the reservoir, for example.

Q.  Okay.

A.  Certainly not to pump the water in, right? So we talked about even ideas as crazy as that we talked about to try to just brainstorm.  Is there anything we can do to help reduce risk for the community?

What else did we talk about?  We talked about different amounts of -- so of releases.  And we talked about how much flow we might get around the end of the spillways based on that.

Q.  So you mean varying the amount of controlled releases?

A.  Right.

Q.  And then what impact might that have on the level of uncontrolled releases?

A.  Well, and that was the risk.  Since we didn't really know how much rain was going to fall, any decision that we made early in the storm could have, you know, serious consequences later, and we just didn't know.  It just kept all driving us back to follow the Water Control Plan, that's what's authorized.  And we kept checking to make sure that was

the safest option available for us.

Q.   Okay.

THE COURT:  Are we getting to a point either taking a break or finishing because I think we're getting some fairly peripheral areas.  I mean, I would know that the -- a good administrator, as the witness, Mr. Thomas, is, but always thinking about things, but we're getting the periphery of where we're getting actual evidence.  Yes, we know he's thinking about things.  His testimony is credible.  But it really -- we're running out of good testimony --

MS. DUNCAN:  Okay.

THE COURT:  -- that's going to relate to the facts of this case.

MS. DUNCAN:  Well, your Honor, I would like to talk a little bit about the known -- the quantification of the risk that existed at the time. We could start that now or we could take a break if Your Honor prefers.

THE COURT:  Well, do you have specific figures and things we want to --

MS. DUNCAN:  Yes.

THE COURT:  -- part of the calculations made by Mr. Thomas at the time?

MS. DUNCAN:  Well, it was -- yes, it's a --

the dam safety modification report that you've seen.

So why don't we go to -- let's see.  Why don't we go to JX 13.

BY MS. DUNCAN:

Q.   And, Mr. Thomas, what is JX 13?

A.   I thought you said dam safety modification report.

Q.   I did.  Is that not JX 13?

A.   It doesn't look like it.

Q.   Excuse me.  Just one second.

MS. DUNCAN:  Okay.  Let's go to JX 42.

BY MS. DUNCAN:

Q.   Okay.  And what is this, JX 42?

A.   This is the 2013 Dam Safety Modification Report.

Q.   Okay.  And what is the purpose of this document?

A.   It's documenting a modifications study that was conducted for the phase 1 project for Addicks and Barker focused on the primary outlet works.

Q.   Okay.  And if we go to PDF page 15, the "Executive Summary."

THE COURT:  Now, this was a report that was done after the hurricane?

THE WITNESS:  Before the hurricane, sir.

THE COURT:  Okay.  This is before the hurricane.

BY MS. DUNCAN:

Q.   And can you talk us through the timing of this report in relation to Hurricane Harvey?

A.   So this report was done in 2013, and this is the authorizing report for building those new outlet structures that we talked about.  And that construction had started before Harvey, started off in 2015 or so.  And so this was about four years before Harvey.

Q.   And was this the last dam safety modification report sort of prior to Harvey?

A.   Yes, ma'am.

Q.   Okay.  Why don't we turn to the next -- sorry, PDF page 18.  Can you highlight for us if any of the probable failure modes here were at issue during the Harvey event?

MS. DUNCAN:  And if we can zoom in on the center of the page.

THE WITNESS:  So they were.  And so you've got the first one which is about seepage, flow along or beneath the outlet works, right?

BY MS. DUNCAN:

Q.   And what could happen if that occurs?

A.   Well, given enough time, it's possible that

you could erode the embankment and have failure at the primary outlet works.

Q.    And what would occur if there was failure at the outlet works?

A.    You would have the reservoir pools evacuated downstream at, you know, much higher flooding rates than happened.

Q.    Than happened during Harvey?

A.    Correct.

Q.    Okay.  What is -- are there any of the other of these probable failure modes that were at issue during Harvey?

A.    So the next one down is potential failure mode number 5, and that's the loss of the auxiliary spillways, which we've talked about as auxiliary or emergency, and breach of those spillways at high pools.

Q.    And how would that failure occur?

A.    So the failure actually occurs with uplift.  So there's water flowing over the slabs, and then one of the slabs will kind of start to rotate out, and then the water gets in there and starts to erode around, and eventually it kind of erodes the whole slab and washes it downstream.

Q.    Okay.  And if we look at DX 637, PDF 5, how does that relate to what you've just described?

A.    It's the low section of the concrete that you can see.

Q.    Okay.  And are there any of these probable failure modes that were at issue during Harvey?

A.    All right.  So PFM 21, the hydraulic pressure in the conduit exceeds the pressure outside the conduit which leads to seepage through the conduits and erosion along the conduits was also present.  We had -- like I said, we had done some interim risk reduction measures for this one as well.

Q.    Okay.  And are there any others?

A.    And so PFM 22 and 23 is instability of that parabolic chute slab that we talked about at the primary outlet works, and we had done some interim risk reduction measures for that as well.

Q.    Did you know the effectiveness of the interim risk reduction measures at the time of Harvey?

A.    So during the storm we spent a lot of time looking back at those plans and the work that we had done, and that gave us some confidence to help run those outlets, but we weren't sure exactly how well it would work until we did it.

Q.    Okay.  And if we move to -- let's go to PDF 198.

Okay.  And what are we looking at on

page 3-34 of JX 42?

A.    So this is the -- you know, we just talked about potential failure mode number 5.  This is the -- shows the system response.  So the probability of failure at different water levels --

Q.    Okay.

A.    -- with intervention or without intervention.

Q.    Okay.  And what if -- how does this -- what does this tell you about the likelihood of failure of the RCC spillways?

A.    We don't think that would be an acceptable probability of failure to run them at the spillway design flood.  So we would not want to run them at that spillway design flood if we could avoid it in some way.

Q.    Okay.  And what is the likelihood of failure at that spillway design flood?

A.    It says .14.

Q.    Okay.  Which is 14 percent?

A.    It is.

Q.    Okay.

A.    But I want to clarify, you know, these are based on the engineers' best estimates at the time.  So that's not an exact number.  It's based on our best experts' engineering judgment when they did this analysis.

Q.   Okay.  And you mentioned "we don't find that to be an acceptable level."  What do you mean by that?

A.   I don't think anyone would argue that you would want to take a 14 percent chance on anyone's life.

Q.   Okay.  And does the corps have a policy for the amount of risk that is acceptable to take?

A.   Well, we have the tolerable risk guidelines, if that's what you mean, and that relates back to the annual probability of failure, not the probability of failure as a function of water level.

Q.   Okay.  And what is the annual probability of failure policy for an acceptable amount of risk?

A.   That's 1 in 10,000.

Q.   Okay.  And 1 in 10,000 chance of failure?

A.   Per year.

Q.   Okay.  Per year.

Okay.  So you talked about, you know, risking people's lives.  Let's look at PDF 280.

MR. NOLEN:  Your Honor, I just have to object because we're way far afield here.  There's nothing in the Water Control Manual that indicates that there is any reference to any of these risk reduction issues or matters.  In fact, the Water Control Manual doesn't even tell you why it is you go to into induced

surcharges.  It never tells you that.  He'll admit that when I start cross-examining him.  But he doesn't have any idea as to why it is that the Water Control Manual has an induced surcharge provision or regulation.

THE COURT:  Yeah.

MR. NOLEN:  And it has nothing to do with this.  It does not reference any of this.  And so we're way outside the bounds of why they actually opened the reservoir gates and released the water.  There was none of this.  This was not a consideration, Your Honor.

THE COURT:  No, I think Mr. Thomas made that point, so I'm not sure why we're doing this.  I'll allow a little bit of it, but let's wrap him up by -- which I'm sure he would like to be wrapped up by then.  Let's say by 3:30 done with direct on Mr. Thomas.  So let's just -- we're getting into such peripheral areas.

MS. DUNCAN:  Well, Your Honor, if I may, Mr. Thomas noted that they could have deviated from the Water Control Manual.  And the reason this is relevant is this talks about some of the risks that were present at the time which counseled them back to why following the Water Control Manual was the safest course to follow.  So that's why it's relevant.

THE COURT:  But it was their manual.  The main reason, that was the manual, that they did.  They

might deviate if there was a reason to deviate. Obviously risk might have been a reason to deviate. I mean, obviously Mr. Thomas mentioned maybe the gates would break or something if you -- if the pressure was wrong. So that might be a risk in following the manual. But the manual seems to be the main -- and as you point out the risk, but risk is calculated for every aspect of the work the corps does. It's generally pretty safe because it does calculate risk, but risk is everywhere. And that wasn't the reason for opening the gates.

MS. DUNCAN: Your Honor, if I may?

BY MS. DUNCAN:

Q. Mr. Thomas, can you talk us through how during this event the -- how the decision-making and following the Water Control Manual relates to risk, if at all.

A. Well, I think like we just talked about, you know, we were looking at the potential failure modes, and the safest thing to do was to have, you know, lowest possible water level in the reservoirs within the limits in the Water Control Plan. So that's what it was telling us, hey, it's right to follow the Water Control Plan. It's correct.

THE COURT: Yeah, the safest would be then

when it wasn't raining and there's no water.  That would be perfectly safe.

MS. DUNCAN:  Before we leave that document, let's just touch very briefly on PDF 280.  And let's just zoom in on 3-25.

BY MS. DUNCAN:

Q.   Mr. Thomas, can you walk us through just very quickly how to read this chart and how it relates to both the spillway design flood and then any pool levels that were at issue during the Harvey event?

A.   So these are population at risk estimates by pool level for both nonfailure and the different potential failure modes that we talked about.  And you can see for Addicks, for example, at 115, you know, a nonfailure at night was 1,036,000 people, but a failure for the spillway is 1,105,000.  So an extra, whatever that is, 70,000 people at risk, for example.

Q.   And just for us, can you tell us how -- what's a nonfailure in this context?

A.   It's the dams operating exactly as intended at those elevations.

Q.   And why is there still that many lives at risk in that sort of pool?

A.   So because you've got such extreme flow rates over the emergency spillways during these big floods at

115 that there's a tremendous amount of water flowing everywhere.

Q.   Okay.

MS. DUNCAN:  Let's turn to DX 255.

BY MS. DUNCAN:

Q.   And, Mr. Thomas, I just want to focus on the very top part.  What are we looking at?

A.   This is an email I sent to the commander and the deputy commander and the deputy district engineer on the 29th of August in the evening related to some talking points that they were working on.

Q.   And what did you describe as the reason for the releases?

A.   You know, I said that we made these releases to protect the City of Houston from future flooding.

Q.   And what does that mean?

A.   Well, just like we talked about, you know, keeping the pools low prevents increased flow around the ends of the dams or over the dams and also helps us reduce the risk of failure to the dams.

Q.   Okay.  And let's keep going.

Why did you make releases quicker than you would have preferred?

A.   So we were losing the ability to control that Addicks outlet structure because of the water rising

and impacting the electrical system, and so we ended up opening it a little faster than we had wanted to.  You know, we were opening them slowly so that we could watch the outlets and make sure that they seemed safe. But we went a little faster than we were planning because we were about -- we were afraid we might permanently lose control of the structure, and we wanted to go ahead and open them.

Q.   Okay.  And can you keep going?  Was there any sort of gate failure or other issues during this time?

A.    During the day, then, we had already had two gate failures.  And we had quite a few gate failures throughout the emergency, and we -- our team on site was able to fix them all pretty rapidly, so that was okay.

Q.   Okay.  And then let's talk about -- in the middle here you're talking about being concerned that you wouldn't be able to actuate the gates and the risk being unacceptable.  What does that mean?

A.    Well, that's talking about that risk to that spillway, if it did, in fact, get, you know, a high flow like we talked about.

Q.   Okay.  And then can you -- is there anything else that you haven't discussed yet about this email that relates to the reasoning for the releases?

A.   I mean, I also talk about the fact that, you know, we had subject matter experts from around the country helping us the whole time, so...

Q.   Okay.

MS. DUNCAN:  We can take that down.

BY MS. DUNCAN:

Q.   And, Mr. Thomas, where was your family during this event?

A.   So my family was at home in League City.  I have two daughters, sir, so I have a -- at that point, it was a three and a seven-year-old.

THE COURT:  Oh, wow.

THE WITNESS:  So my wife was home alone with them.  And, you know, it didn't flood at my house.  But in League City, there was actually maybe 10 inches more rain.  A lot of rain in League City.

BY MS. DUNCAN:

Q.   10 inches more than what?

A.   Than at Addicks and Barker.  So it was like 44 or something.  It was in 40 inches of rain in League City.

Q.   You say your house didn't flood.  Was there flooding in the neighborhood?

A.   There was.  The street --

MR. NOLEN:  Your Honor, objection.  I'm

sorry, but that just has not one thing to do with what we're here to determine --

THE COURT:  Right.

MR. NOLEN:  -- in this case, so I object on relevancy, Your Honor.

THE COURT:  Yeah.

MS. DUNCAN:  Your Honor, I'm just trying to give you a little bit of color for where Mr. Thomas is coming from.

THE COURT:  Okay.  And I have a three-year-old and a seven-year-old grandchild among my various grandchildren.  The seven-year-old is a girl and the three-year-old is a boy.

But I think we've kept him on the stand a long time on direct.  Is there anything else that is relevant to his testimony on direct or can we move him to cross and take a break?

MS. DUNCAN:  Your Honor, there are a number of things.  Why don't we touch on one of those, and then we'll take a short break to sort of regroup, and then we will do our best to have him finished up as the court asked.

THE COURT:  All right.

MS. DUNCAN:  So why don't we move to the Emergency Action Plan, and that is JX 3.

BY MS. DUNCAN:

Q.    Okay.  Mr. Thomas, let's move to PDF 10.

MS. DUNCAN:  Okay.  And so let's zoom in on the top part, Section A.

BY MS. DUNCAN:

Q.    Mr. Thomas, what is the purpose of this Emergency Action Plan?

A.    So it's got two parts.  The first is to identify emergencies that could threaten dam failure, right?  And the second is to identify emergencies that are like these non-breach emergencies or uncontrolled spillway releases or surcharge releases, things like that.

Q.    Okay.  And what is the -- in terms of the second paragraph, what does the plan identify?

A.    Early signs of potentially dangerous conditions.

Q.    Okay.  And what are the procedures intended to do, looking to the second sentence?

A.    Protect lives and reduce property damage during a dam failure or an uncontrolled release of water from the reservoir.

Q.    And why is an uncontrolled release or water rising above the limits of government-owned land defined as an emergency in this plan?

A.    Because people are flooding and we need to do our best to help them understand the risk ahead of time.

Q.    Okay.

MS. DUNCAN:   Let's move to PDF page 11.   And let's zoom in on the implantation portion.

BY MS. DUNCAN:

Q.    And first, Mr. Thomas, there's been a lot of sort of deposition testimony played of you, and I just want to make sure that the court is crystal clear, was the Emergency Action Plan in effect during Hurricane Harvey?

A.    Yes, ma'am.

Q.    And at what level was the Emergency Action Plan in effect?

A.    It reached Level 2.

Q.    Okay.   And why did it reach Level 2?

A.    Because there were uncontrolled releases forecast because it was forecast to go off government-owned land and, in fact, did those things.

Q.    Okay.   Can you walk us through what the second sentence of this implementation portion of the EAP reads?

A.    It says "The procedures prescribed herein become automatically effective when actual or predicted

water service elevations within the reservoirs reach designated limits or when the dam safety officer declares an emergency."

Q.    Okay.  And how was this EAP implemented during the Harvey event?

A.    So we declared an emergency for the district, and then we immediately went into forecasting which said we now have an emergency, and we went about our notifications, and we went about staffing the dams and, you know, the way that we would according to the Emergency Action Plan.

Q.    Okay.  Now, did you personally ever make -- declare an emergency condition at the dam?

A.    I did not.

Q.    Okay.  And why not?

A.    Because we already declared an emergency.

Q.    And the first part of this sentence relates to predicted water surface elevations within the reservoirs reaching designated limits.

What does that mean?

A.    So it explains in here different elevations that trigger different things as well as conditions like releases above a certain amount or uncontrolled releases.

Q.    Okay.  And if we go to PDF 63 and -- 63, what

are we looking at here on this page?

A.   So this is an Appendix C, and it's helping to identify what those triggers might be for different action stages, either extended watch or emergency levels.

Q.   Okay.  And if we look at the bottom row here, what is the condition stated here?

A.   So this is if the reservoir looks like it's going to go off government-owned land, then we go about notifying state and local emergency management officials.

Q.   Okay.  And did you do these activities during the Harvey event?

A.   We did.

Q.   Okay.  And can you just describe at a high level how you went about conducting those?

A.   So we have a group that we train with, it's called the Addicks and Barker Emergency Coordination Team, and we had recurring engagements with them.  We sent them electronic information.  We had meetings with them to let them know the status of the dams at all times.

We also had local government liaisons staffed at many different partners, including at TranStar, where they were, you know, personally conveying

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                                    10/29/2024

information.  And then our emergency management office was reaching out individually as they needed to.

Q.  Okay.

MS. DUNCAN:  And then if we move to the next page, PDF page -- let's see.  Let's do the next page, yeah, C-4, and let's look at the top row.

BY MS. DUNCAN:

Q.  And very quickly, walk us through what the top observation is for this chart.

A.  This says that the reservoir levels are predicted to rise or at the point that water begins to flow around or over the reinforced -- or roller-compacted concrete spillway at the ends of the dams, it defines that as Level 2 uncontrolled releases.

Q.  Is that Emergency Level 2?

A.  That is Emergency Level 2.

And then it tells us how to go about notifying state and local emergency management offices.

Q.  And did these two conditions we've reviewed occur during the Harvey event?

A.  They did.

Q.  Okay.

A.  And that one also points out that, you know, we might need to move our instant command post, which, in fact, we did.

Q.    And why did you have to move the command post?

A.    Because it flooded.

Q.    Okay.  Now, how does making releases pursuant to the Water Control Manual impact these emergency conditions of the rising pools and the water flanking around?

A.    Well, there are triggers.  I mean, they're clearly emergencies, right?  So we need to make sure that we notify people appropriately.

Q.    Okay.  And does making -- how does making releases impact -- sorry, the surcharges releases pursuant to the Water Control Manual, how does making those releases impact the pool levels in the reservoirs?

A.    It ultimately will reduce them.

Q.    Okay.

MS. DUNCAN:  And while we're on this map, let's go to PDF 129.

BY MS. DUNCAN:

Q.    Now, Mr. Thomas, there was some testimony earlier in the trial about the purported capacity of the reservoirs, and I just want to ask you briefly while we're on this document, at page E-2 of the EAP, JX 3, according to this table, what is the sort of

storage capacity of the Addicks Reservoir?

A.   So do you mean the 100 percent storage capacity?

Q.   Yes, I mean 100 percent capacity on this table at E-2.

A.   So this table reports the capacity at the end of the dam, so that's the elevation 108 which is 199,000.

Q.   And how is capacity designed -- defined for this table with the footnote 4?

A.   Footnote 4 says "Percent capacity is determined by using the natural ground elevation at the end of the dams as 100 percent capacity."

Q.   Okay.  And what amount of capacity was reached during the Harvey event at Addicks Reservoir?

A.   More than 100 percent.

Q.   Okay.

MS. DUNCAN:  Your Honor, may we take a brief break?

THE COURT:  Okay.  Hopefully then we can -- you'll be done ten minutes after that?

MS. DUNCAN:  Well, I don't know about that. I'll do my very best, Your Honor.  We do have -- and, Your Honor, may I just note that there were lot -- there have been lots of topics that have been brought

up to date during trial that we do need to make our record on and address.  I will do my very best to be quick, and I will try to make a game plan during this break to be as efficient as possible.

THE COURT:  I'll give you a 15-minute break here to do that.

We'll stand in recess.

(Off the record from 2:51 until 3:11.)

MS. DUNCAN:  Your Honor, may I just speak briefly to the court's encouragement to be expedient?

THE COURT:  Yes.

MS. DUNCAN:  And while we were certainly will do our very best to be efficient, at this point, Your Honor, Mr. Thomas is the first kind of key fact witness that we've heard.

THE COURT:  Yes.

MS. DUNCAN:  And, you know, to this point, you know, the court has primarily heard from only an expert from the opposing side.

THE COURT:  Right.

MS. DUNCAN:  And we deliberately kept Mr. Maglio, for example, to a very short direct because the point was to cover the sort of context of the corps' actions with Mr. Thomas.  And we have always estimated approximately five hours.  So far we

calculate that we have been at just under two hours for Mr. Thomas.  And he, of course, is our key witness.

For context, in the first upstream trial, Mr. Thomas was on the stand for the better part of three days, and so we are really trying our best to ensure that we have the best record we can on the issues before the court and would just note that, you know, I think the -- there's really not a dispute here from the summary judgment briefs as to what the corps did in terms of the operating the dams during Harvey. And if it was just what the corps did that was the only relevant fact, you know, we wouldn't need a trial.

But we understood that we were here to explain the why, to provide the context for the actions and why the corps believed that there was an emergency that necessitated the opening of the reservoir gates.

THE COURT:  Right.  But he has testified for a long time about the why.  The why isn't that complicated, nor is the context.  I mean, we've been over context and context again and again.  I mean, I've been hearing the context, you know, there are concerns and there were other concerns.  But the bottom line was he was doing it because of the plan.  And he's elaborated all of the concerns and potentials.  And, I mean, there's just so much we've covered that it's hard

to -- I don't understand why it was three hours -- or three days, rather.  But, I mean, I am not hearing new things.  I am hearing the same stuff we're going over.  So let's see what else you've got, but try -- you know, you don't need to say things more than once or repeat the testimony again and again.

MS. DUNCAN:  Okay.  Your Honor, my plan will be to start with -- we haven't yet talked through the induced surcharge regulations with Mr. Thomas, so we'll talk about that in the context of the Water Control Manual.  Plaintiffs have touched multiple times on the 1962 manual.  We'll touch briefly on that.  And then I'd like to walk you through a timeline with Mr. Thomas as to sort of the events that led up to the various decisions in operating the reservoir during Harvey.

THE COURT:  Okay.  We've heard a little bit of that, though, too.  He explained that, I thought, a while ago, about how he got different calls and different events that occurred, so...

MS. DUNCAN:  Your Honor, we'll do our very best to be efficient here and touch on items that have not come up yet.

THE COURT:  Okay.

MS. DUNCAN:  Let's turn to JX 2.

BY MS. DUNCAN:

Q.   Now, Mr. Thomas, what is a Water Control Manual?

A.   It's a manual that documents how we regulate reservoirs.

Q.   Okay.  And if we move to PDF page 46, what are we talking about in this -- on this page of the Water Control Manual, page 7-1?

A.   The Water Control Plan.

Q.   And what is the Water Control Plan?

A.   That's what you do to make changes to the gates to effect, you know, water control changes.  So it's how you actually manage the reservoir in terms of water control.

Q.   Okay.  And what are the -- if we go to 7-05(a), can you walk us through what is 7-05(a)?

A.   It talks about spillway design flood impacts.

Q.   Excuse me.  I meant --

A.   Sorry.  7-05(a).  Sorry about that.

Q.   Yes.  Well, while we're at that, just quickly, we heard a lot about the spillway design flood in the last few days.

Just quickly, what is the spillway design flood?

A.   It's the flood that we use to design the

Trial

spillways.  In this case it's the probable maximum flood, the flood we don't think a bigger flood could occur then.

Q.   And what do you make of the supposition that there's not a dam safety emergency until you reach the spillway design flood?

A.   That's not consistent with our Emergency Action Plan.

Q.   Okay.  And can you walk us through what is the normal flood control regulation of the reservoir?

A.   So normal conditions are defined to exist when the reservoir pools are not in the range of the induced surcharge schedule.

Q.   Okay.  And how does this work at a high level, the normal flood control regulation?

A.   When there is flooding or predicted flooding downstream, we close the gates until the threat of flooding has passed.

Q.   Okay.  Does the corps use the phrase "ordinary operating procedure"?

A.   No, ma'am.

Q.   Okay.  How -- what is sort of the -- how frequently -- well, how about how -- is there another way that the reservoirs are managed besides normal flood control regulation?

Trial

A.   So...

Q.   Can we turn to 7-05(b).  Let's go to the next page.

Q.   What are we looking at here?

A.   Right.  So when not -- when you're in the range of induced surcharge, then the induced surcharge flood control regulation controls.

Q.   Okay.  Are these two provisions, 7-05(a) and 7-05(b), mutually exclusive?

A.   Yes, ma'am.

Q.   Okay.  Does an induced -- in general, does an induced surcharge schedule allow peak releases that exceed peak inflow during a flood?

A.   No, ma'am.

Q.   Okay.  During Harvey, which -- what were the provisions of the Water Control Manual that were followed?

A.   Both normal and induced surcharge.

Q.   Okay.  Has the corps ever operated under its induced surcharge regulation in the past?

A.   No, ma'am.

Q.   And how does the existence of a Water Control Manual relate to decision-making during an emergency?

A.   So the Water Control Manual covers how we manage the water in the reservoirs; the Emergency

Action Plan controls how we respond to the emergency. And the two go hand in hand in terms of all of the things that we're doing at the reservoirs during the emergency.

Q.   Okay.  Was there any risk present -- any dam safety risk to following the Water Control Manual during the Harvey event?

A.   There were dam safety risks present during the Harvey event.

Q.   Okay.  And so then why -- can you talk to us about why the corps started making releases when it did?

A.   In accordance with the induced surcharge schedules.

Q.   Okay.  And then why didn't the corps just keep the gates closed during the storm?

A.   Again, in accordance with the induced surcharge regulation.

Q.   Okay.  And were there any sort of dam safety reasons why the corps couldn't keep the gates closed during the storm?

A.   Well, like we talked about, we were also concerned about dam safety at both the primary outlet works and the emergency spillway which was telling us that it was, you know, correct to follow the Water

Trial

Control Manual.

Q.   Okay.  Are there releases described in the Emergency Action Plan?

A.   Yes, ma'am.

Q.   And what did those sorts of releases relate to?

A.   When you have some kind of imminent or progressing dam failure that you think you need to make releases to impact or reduce the possibility of dam failure.

Q.   During the event, were reservoir releases pursuant to the Water Control Manual necessary from a dam safety perspective?

A.   So like we talked about, following the Water Control Manual was the safest thing to do from a dam safety perspective.

Q.   Okay.  Okay.  Let's talk about the day-to-day event.

MS. DUNCAN:  Okay.  So let's pull up DX 289.

BY MS. DUNCAN:

Q.   Mr. Thomas, what is DX 289?

A.   It's a timeline of events and activities that happened during Hurricane Harvey.

Q.   And how was it created?

A.   I think I put together a draft and then got

comments from everyone that had worked on the storm around the office so we could try to get a consistent draft of what happened.

Q.   And when was it created?

A.   Sometime after Hurricane Harvey, within the next month or few.

Q.   Okay.

MS. DUNCAN:  And I'd like to now put up on the screen DX 643.

BY MS. DUNCAN:

Q.   What is --

MS. DUNCAN:  And, Your Honor, if I may approach the witness with a paper copy?

THE COURT:  Yes.

THE WITNESS:  This is a summary of the timeline you just showed me that was put together to make it easier to read.

BY MS. DUNCAN:

Q.   Okay.  And does it fairly and accurately display the information from DX 289?

A.   Yes, ma'am.

Q.   Okay.  And why don't we use a version of this timeline where we can do an animation.  Okay.

Mr. Thomas, I'd like you to walk us through this timeline of the events of the storm and the

operations of the reservoir.  And --

MR. NOLEN:  Excuse me.  Your Honor, I'd like to object on both of these DX exhibits.  They may be demonstrative, but they're both created for this litigation and they're both just demonstratives.  They're not evidence in this case.  They're totally demonstrative, both of these two things, the timeline that Mr. Thomas created and then the redo or reformulation, representation of the timeline.  They're simply demonstratives, and I just want to make that objection for the record.

THE COURT:  Okay.  I'll note that, and I'll decide after I've seen whether to allow them in or exclude them.

MS. DUNCAN:  And, Your Honor, if I might add some context.  DX 289, the timeline was created, you know, long before any trials, and it's been since offered in taking trials related to this event.  And plaintiffs had a chance --

THE COURT:  What was it created for?

MS. DUNCAN:  It was created I think just -- we can ask the witness.  I think --

BY MS. DUNCAN:

Q.   Mr. Thomas, what was the purpose of this timeline?

A.    We wanted to make a summary of everything we remembered that happened before we forgot it all.

THE COURT:  This was after the events?

THE WITNESS:  Yes, sir.

THE COURT:  Not in relation to this trial?

THE WITNESS:  I think at that point we knew about the litigation, so I don't -- I don't remember if it had any relation to the trial.  I wanted it for my memory.

THE COURT:  Okay.

MS. DUNCAN:  And, Your Honor, I'll note DX 643 is simply a Federal Rule of Evidence 1006 summary of DX 289, and that rule allows for the summary of evidence -- excuse me.  It is, you know, a summary to prove the contents of, you know, other voluminous writings that aren't conveniently examined in court. And the idea is that this condenses down the timeline into just a few pages.

THE COURT:  So this is a summary of a summary?

MS. DUNCAN:  It's a summary of a timeline.

THE COURT:  Which was a summary of Mr. Thomas' thoughts?

MS. DUNCAN:  Yes, Your Honor.  And pursuant to the rule, it is cited with the underlying source of

the evidence so that plaintiffs could check its
contents to confirm its accuracy if they had any
concerns.

THE COURT:  Well, let me see what it is.

MS. DUNCAN:  Okay.  And, Your Honor, I do
have a paper copy if that would be helpful for the
court.

THE COURT:  Probably, yes.

MS. DUNCAN:  Okay.

THE COURT:  Okay.

BY MS. DUNCAN:

Q.  Now, Mr. Thomas, before --

Okay.  What is the date that this timeline
begins?

A.  August 23rd, 2017.

Q.  Okay.

MS. DUNCAN:  Before we start walking through
these steps, can we put up on the screen DX 100.

BY MS. DUNCAN:

Q.  Mr. Thomas, what is DX 100?

A.  It's the declaration of emergency for
Hurricane Harvey.

Q.  Okay.  And what is sort of the purpose of
this document?

A.  It's to activate our emergency operation

center, allow us to start managing emergencies.

Q.   Okay.

MS. DUNCAN:  And I'll note for the record, this is also JX 1 in the record.

THE COURT:  Okay.

BY MS. DUNCAN:

Q.   And what is -- are you familiar with the conditions that led to this emergency being declared?

A.   Yes, ma'am.

Q.   How many declarations of emergency are typically issued during a storm event?

A.   One for our district.

Q.   Okay.  And can emergencies evolve over time?

A.   They do.

Q.   Okay.  Is -- why wasn't an additional -- or were there additional emergencies declared after this August 22nd declaration?

A.   Not that I know of.

Q.   Okay.  And why not?

A.   Specifically related to Addicks and Barker, we were following the Emergency Action Plan, had already begun making the notifications required in it. So we were carrying out the plan already.

Q.   And what is the Emergency Operation Center or EOC?

A.    It's the office in our district that managements the emergencies.

Q.    Okay.  And how, if at all, did you interact with EOC during the Harvey event?

A.    They help organize everyone's activities, so they helped coordinate everything.

Q.    Okay.  Mr. Thomas, when -- if you know, when did the emergency declared in JX 1 or DX 100, when did it end?

A.    I don't remember exactly when we closed the Emergency Operation Center.

Q.    Okay.  But what would mark the end the emergency?

A.    I think deactivation of our Emergency Operation Center.

Q.    Okay.  You mentioned that there was an emergency per the EAP, Emergency Action Plan, at Addicks and Barker Reservoirs; is that right?

A.    Correct.

Q.    And when did that emergency end?

A.    When we went back to normal operations.

Q.    Okay.  And approximately when was that?

A.    I have a timeline.  September 16th.

Q.    Okay.  And at what point was the reservoir finally drained?

A.    I think October or November.  I forget the date.

Q.    Okay.  So turning to DX 643, can you walk us through the first few days up until the closing of the gates?

A.    So we had our first CWMS, which is the Corps Water Management System, our first forecast of flooding on the 23rd.  We started our Addicks and Barker emergency coordination teams on the 24th.  That's as required by the Emergency Action Plan.  Another forecast on the 25th, which is when I deployed out to the dams along with the foundation observer teams in accordance with the Emergency Action Plan.  Closed the gates to prevent flooding downstream on the 25th.

Q.    Okay.  And if I might ask just a couple of follow-up questions very quickly.

You mentioned a CWMS forecast.

MS. DUNCAN:  Why don't we put up on the screen DX 213.

BY MS. DUNCAN:

Q.    Very briefly, what is that?

A.    We run a modeling system to help us predict based on NOAA's rainfall predictions how high the water in reservoirs will get.

Q.    And at a very -- just very quickly, can you

teach us how to read one of these?

A.   Yes, ma'am.  The first two paragraphs include some general information.  In this case, this is the August 23rd forecast, and it says that the reservoirs had been emptied, and then the seven-day quantitative precipitation forecast, the seven-day rainfall forecast is showing about 16 1/2 inches of rainfall.

Q.   Is that a lot of rain for the reservoirs?

A.   It is.  It's in line with the previous pool of record the year before, so it would be, you know, the biggest.

Q.   Okay.  And what is a QPF?

A.   It's rainfall forecast.  It shows how much rainfall is going to fall over an area.

Q.   What is contained in this CWMS report?

A.   It gives you some kind of context of what the forecast says with the next paragraph.  So it's going to be rainfall from Friday through Monday, and the pool elevations are going to go close to government-owned land, and it indicates that we're going to implement our extended watch in accordance with the Emergency Action Plan.

Q.   Okay.  And if we move to the -- if we zoom back out, at a high level, what does the remainder of this type of report contain?

A.    It gives the details of the forecast so you can find the peak forecasted level, some information about how the forecast was conducted, and then there's some charts that show the forecast over time.

Q.    Okay.

MS. DUNCAN:  And if we move to the next page.

BY MS. DUNCAN:

Q.    And I think you -- right here, what are we looking at?

A.    This is a plot of the seven-day rainfall forecast.

Q.    Okay.

MS. DUNCAN:  And if we move to the next two pages.  Let's put them side by side.

BY MS. DUNCAN:

Q.    And you may also have a copy in front of you, Mr. Thomas, if helpful.

And, Mr. Thomas, what is this last part of the CWMS forecast?

A.    So there's one page each for each reservoir. The top page shows the pool levels and the bottom page shows the flow rates.

Q.    Okay.  And if we zoom in on the top left chart for the Addicks Reservoir, can you at a high level teach us how to read this?

A.    So the red line is showing --

MR. NOLEN:  Excuse me, Your Honor.  I object. The CWMS data is really interesting too.  It actually has not one thing to do with the two questions that this court has asked.  We know that they closed the gates on Addicks and Barker when it started to rain. They did that based upon the fact that you had at that point a hurricane that was going to make landfall on the 25th.  They kept them closed for four days and then they opened.

And so the court asked two very specific questions, and you asked earlier how was it that Mr. Thomas was on the stand for three days.  That trial wasn't confined to two questions.  This trial supposedly was supposed to be confined to two questions, and so I keep making these objections on relevance because I don't see -- I cannot fathom how this information is relevant to the court's two questions.  So I object again on relevance, Your Honor.

THE COURT:  What's the relevance of this to the two questions?

MS. DUNCAN:  Well, so the red line up here, what I believe the witness will testify to is that because the red line crosses the blue line, that means water is expected to go off government-owned land.

That's the first time it's predicted and, therefore, that's when the Emergency Action Plan goes into effect at Emergency Level 2.

So that's where it relates back to the questions before the court.  Moreover, it goes to the why.  We are setting the stage that as of August 23rd, they're already at Emergency Level 2 as they are watching the pools rise before they have to make the releases.

THE COURT:  Let me ask the witness.

Mr. Thomas, what is that basis of you making the decision of the corps -- who made the decision that we're going to declare an emergency?

THE WITNESS:  The commander made the decision to declare an emergency, and it was based on everything in front of him in terms of a hurricane is approaching the coast and we know that we need to get ready to respond.

THE COURT:  So this wasn't the critical document here, this --

THE WITNESS:  I don't think so, sir.

THE COURT:  Okay.

MS. DUNCAN:  May I ask one follow-up question?

THE COURT:  Yes.

BY MS. DUNCAN:

Q.   Are there any -- are there any triggers in the EAP that are hit when water is predicted to exceed government-owned land?

A.   Yes, ma'am.

Q.   And what are those?

A.   It's Emergency Level 2, like we just covered.

Q.   So how, if at all, does this CWMS forecast relate to implementation of the Emergency Action Plan for Addicks and Barker?

A.   So this requires the extended watch teams to be ready, to get ready to go out, and it requires our notifications to begin for both ABECT and for the dam safety chain as we showed.

Q.   Okay.

THE COURT:  So it's sort of get ready because at least the prediction is you're going to get enough water to fill the reservoir or get up to the blue line?

THE WITNESS:  It's to get ready to deploy, sir, and it's to start sharing that information with the appropriate people.

THE COURT:  Okay.

BY MS. DUNCAN:

Q.   And just walk us through -- well, you talked about -- if we go back to 643, the timeline.

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/29/2024

On August 24th, you talk about the formal ABECT calls.  What is ABECT?

A.    It's the Addicks and Barker Emergency Coordination Team.

Q.    And why are you beginning calls with them?

A.    Because of forecast.

Q.    And how frequently -- and is there any sort of document that you're deploying at that point or implementing at that point?

A.    So like I said, we began implementing the EAP.

Q.    And how frequently did these calls occur?

A.    At least daily.

Q.    And how frequently did you send those forecasts around?

A.    At least daily.  Sometimes they were running multiple forecasts per day depending on the day.

Q.    Okay.  And just to --

MS. DUNCAN:  Your Honor, let's go ahead and put up on the screen DX 212.

THE COURT:  On the ruling on that --

MS. DUNCAN:  Oh.

THE COURT:  -- diagram, it doesn't seem to be relevant, so I will not admit the rain gauge because it seems to have a peripheral relation to this case.  Yes,

it was starting to rain.  They all knew there was a hurricane or then a tropical storm coming, but that isn't specifically what triggered what happened.

MS. DUNCAN:  Well, Your Honor, if I may, DX 213, and I should have led with this, it was already admitted through Mr. Bardol because he relied on the CWMS reports.  We offered a compilation of the CWMS reports for each day, and so that is --

THE COURT:  In the record already.  Okay.

MS. DUNCAN:  Yes, Your Honor, it is.  And I think the witness just testified that this was a prediction that showed that the EAP was in place as of that day.  So that's the position as to why it's relevant.

And to ensure that we are as fast as possible, I'd like to -- I put up on the screen DX 212. And I could offer a paper copy to the court if helpful.

BY MS. DUNCAN:

Q.    Mr. Thomas, what is DX 212?

A.    It's a summary of the CWMS forecasts from August 23rd to September 15th.

Q.    Okay.  And did you review this summary of the CWMS forecast for each day?

A.    Yes, ma'am.

Q.    Okay.  And does it fairly and accurately

depict the CWMS forecast for each day?

A.   Yes, ma'am.

Q.   Okay.

MS. DUNCAN:  Your Honor, we'd like to offer DX 212 as a Federal Rule of Evidence 1006 summary exhibit which is meant to summarize large amounts of information and we have provided the detailed sources and plaintiffs have all this information.

THE COURT:  I'll allow it as -- I don't know how relevant it is, but I'll allow it.

(Admitted Exhibit No. DX 212.)

THE COURT:  And let's move on.

BY MS. DUNCAN:

Q.   Let's move on.  So DX 643, we walked through the gates being closed.  Can you walk us through what happens after that?

A.   So on the 26th, we first start talking about surcharge releases with the ABECT team.  And later in that day it's showing 9,000 cfs of surcharge which we also shared with our local government liaisons and partners.

Q.   And what was going on that was leading to the prediction that surcharge was going to be required?  And by "surcharge," what do you mean by that?

A.   So I mean the releases that were made at the

primary outlet structures down Buffalo Bayou, and we were getting larger and larger rainfall forecasts that were starting to show greater and greater pools.

Q.   Okay.  And so then what happened next?

A.   So next we come down to the 27th where we continue to see surcharge forecasts which was also sent to all of our partners on the ABECT.  And we see both the surcharge releases and flow around the ends of both dams forecast on the 27th.  So later that morning on the 27th, we go ahead and test our gates to make sure they're going to work.

Q.   Why did you have to test them?

A.   Well, we had never operated them at such high pools, and certainly during surcharge, and we wanted to just get ready for the operation that was coming up.

Q.   Okay.  And then what happened after you tested the gates?

A.   So around 12:30, we made a press release to the public indicating that surcharge releases would begin around 2:00 o'clock in the morning.  By 3:00 o'clock, we sent another forecast of surcharge to our ABECT team.  And then by 6:00 o'clock, there was a discussion with the commander and the director of the Harris County Flood Control District, and they had a joint press teleconference talking about surcharge

releases to begin early the next morning.

Q. And we've talked -- I see an acronym on here called "flood DLL list" in a few places, including on the top of 26. What does that mean?

A. That refers to an email distribution list that includes everyone within the district that's engaging the flood response.

Q. Okay. At this point before releases are set to be made, is the corps sort of discussing any alternatives to releases?

A. We had been talking about the many different alternatives that might be possible.

THE COURT: What might be possible? I didn't...

THE WITNESS: So we were talking about things like should we leave the gates closed.

THE COURT: Yeah.

THE WITNESS: Should we open them sooner. Should we try to sandbag places. Things like that, trying to find maybe a safer option. But ultimately we decided that following the Water Control Manual was the safest option.

THE COURT: Okay.

BY MS. DUNCAN:

Q. How is making releases safer for downstream

properties?

A.    Like we said, there was some serious dam safety risks at both the primary outlets and the emergency spillways, and following the Water Control Manual resulted in the lowest possible reservoir pools without violating the plan.  And the lower the pools are, the lower the risk is for the structures.

Q.    And when you talk about the "lower the risk is for the structures," you know, what would -- well, we'll come back to that.

Why don't we move, if we go back to the timeline, we've gotten up to 6:00 o'clock in the evening.  Can you walk us through, then, the steps taken until the point when you do make the releases?

A.    So around 8:00 that evening we had a call with all of our district staff to just let everyone know that's what was happening and that they should make they're communicating with all of the public groups that they're working with, make sure everybody understands what's happening.

Q.    "Everybody," you mean local governments?

A.    Right.  We had local government liaisons.  We had our emergency management office on the staff.  We even had staff that were taking calls from the public, so people from the public were directly calling our

office, and we wanted to make sure everybody that was in the corps had the same information at 8:00 o'clock that evening.

Q.   Okay.  And let's keep moving.  What happened next?

A.   Around 11:00 that evening, we started to have flooding in the parking lot at the project office, and so we evacuated that office and moved over to the National Guard facility.

Q.   So were you driving around at this point?

A.   I was.

Q.   And why were you driving at this point?  What was going on?

A.   Well, there was a hurricane going on, or a tropical storm, and it was flooding, and, you know, we were driving so that we could continue to operate the projects.

Q.   Was it raining on the 27th?

A.   Yes, ma'am.

Q.   Okay.  And what were you observing as you were driving around?

A.   Flooding.  I had actually been -- I went and took a nap from 8:00 to 10:00, and the hotel we were at it started -- the parking lot started to flood there, and so we drove out of the flood to get over to the

project office.

Q.    Okay.  And so now walk us through, then, what happened then at the end of the night.

A.    So there around midnight, a little after midnight, the Water Control Manual and the rate of rise and the elevations dictated full discharge from both reservoirs at that point, and so we began initially making some releases from the outlets.

Q.    And how big were the releases at that point?

A.    Well, we started small, a few hundred cfs first, and we observed as we made progress.  At this point we had not decided yet to lift the interim risk reduction measure to limit the releases at each structure, but we ultimately did do that.

Q.    So at this point -- so why did you -- how much did the Water Control Manual call for at the beginning of the storm, at the beginning of this -- at this point on the early morning the August 28th?

A.    Full discharge, which is around 8,000 cfs per structure.

Q.    Okay.  So did the corps open -- explain why the corps didn't open the gates to 8,000 right away.

A.    Well, a few reasons.  It takes time to just open them.  Even if you wanted to open them quickly, you can't.  They don't open that fast.  And then you

want to open them slowly so that, you know, you don't send a wall of water downstream, right?  And then also we had this risk reduction measure in place to reduce our releases from the structures that we discussed earlier.

Q.   Okay.  Now, let's keep going through the timeline.  We've gotten up to the August 28th at about -- early in the morning, 12:15 in the morning. Can you tell us what are the next few items on the list?

A.   So at 2:00 o'clock, I spoke with Steve Fitzgerald who is an employee at Harris County Flood Control District, and he wanted to get a high-ranking district employee to come there to be on the news with him.  So we deployed our senior civilian to do that.

Q.   Okay.

MS. DUNCAN:  And I'd like to bring up DX 272.

BY MS. DUNCAN:

Q.   Okay.  Mr. Thomas, who sent this email?

A.   So the original email chain starts with James Dolton who is the headquarters dams safety officer.

Q.   And who sent the final item in the transmission?

A.   And I sent the response to his question.

Q.   Okay.  And when -- what is the timing of

this?

A.   So his question was at 2:00 P.M. on Sunday and my response was at 4:00 P.M. on Sunday.

Q.   Okay.  And then how does this relate to the timing of the releases?

A.   It is before the releases.

Q.   Okay.  And at a high level, what are you explaining here?

A.   I'm telling him that we do have this interim risk reduction measure in place, and that we were doing the hand calculations to decide if it would stay in place.  I told him that we have cofferdams at both structures but that they are excepted, and so we expect them to perform.

Q.   And just for context, why are you sharing this information?  What is he asking about?

A.   He's asking about dam safety concerns at the dams.

Q.   Okay.  And this is prior to the releases being made?

A.   That's right.

Q.   Okay.  Now keep going.

A.   I told him, you know, that we do have some new cutoff walls that were installed that were not accepted and we'd been having some trouble with.  But

we just kept an eye on those.  And I told him we have concerns with the stability of the roller-compacted concrete spillways, and we have not yet done the repairs that we intended.

THE COURT:  These are on what?  You hadn't made the repairs on?

THE WITNESS:  On the emergency spillway, sir.

THE COURT:  Okay.

BY MS. DUNCAN:

Q.   And --

MR. NOLEN:  Your Honor, if I may just object one more time on this relevancy issue here.

THE COURT:  Yeah.

MR. NOLEN:  Now, here's the situation we're in:  They had all these concerns.  They could have kept the reservoirs closed and not tested the gates and not tested the spillways and not tested any of the downstream things by just keeping them closed, but they didn't.  They overcame all of these concerns, all of these concerns that we're talking about in advance that Mr. Thomas, one of his jobs is to get paid to be concerned about things like this.  There's no doubt. Nobody disputes that.  And then they just followed the manual, Your Honor.

And so all of this is interesting and we know

all of this because we did a lot of discovery on these cases -- on this case, and so we know about these concerns.  And in every instance if I was questioning Mr. Thomas, I would end every question with, "And you overcame that concern and you went ahead and made the release anyway?"

"Yes."

He would say that because he said this before in deposition, and so we know the answer to these questions.  I just think that this is not relevant to the issues that are before the court.  So that's my objection, Your Honor.

THE COURT:  Ms. Duncan, any response?

MS. DUNCAN:  We think it's absolutely relevant.  He's talking about how these are active dam safety concerns before the releases are made, and you saw and heard the testimony about how those dam safety concerns continued throughout as the releases were being made at higher and higher levels and why that was a lower risk to take than it was to allow the pools to continue to rise and go around the ends of the dam with the uncontrolled flooding.  So it is absolutely relevant to the -- I mean why we're here.

THE COURT:  I think, isn't your position and the position of the corps there to assess safety risks

as you're always doing that?

THE WITNESS:  That's true, sir.

THE COURT:  Yeah.  I mean, that doesn't add anything to the corps.  That's the corps' job.  They do it well.  They assess safety risk.  They're always assessing safety risk.  So saying they're assessing them on this day or that day or before a storm doesn't add anything to the question of why the gates were raised.  They're raised because they felt the safety risks were not that great.

MS. DUNCAN:  Your Honor, I don't think that that is quite what the witness said here.  And to be clear, this is -- these are safety concerns being discussed hours before the releases are made.  This isn't just the sort of ordinary course of dam safety work.  This is a response in the middle of the greatest storm.  One of the reasons we wanted to put some facts in front you about the enormity of this storm and the enormity of the pool that the corps was dealing with is that it was unprecedented.  And so it is absolutely relevant that this witness --

THE COURT:  Well, the court knows obviously in its first opinion it focused on the enormity of the storm, so that's not necessary to add anything on that.  There's been a huge amount given on the enormity of the

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/29/2024

storm, and we know that.  And we also know the corps is always doing safety things.  They're always concerned about safety.  It's in part why they're created, to help keep the rest of us safe, and they do a good job. So that doesn't relate to the issue here which is a relatively narrow one, which is why were the gates raised and the plaintiffs flooded.

MS. DUNCAN:  Yes, Your Honor.  Well, and I will just note that I can also ask -- well, this goes to why there was a dam safety emergency that necessitated the releases.  And so this is context. Now, plaintiffs want to define that very narrowly to say, well, the dam didn't breach.  But what we're saying is that the corps and its documents and common sense says that dam safety is bigger than just a breach, and a dam safety emergency is more than that, and that necessitated the releases in this case.  And so we do think that this is relevant.

THE COURT:  Well, we've heard a lot of it, then.  What's --

MS. DUNCAN:  We'll keep moving through the timeline, Your Honor.

THE COURT:  The timeline, I don't know how relevant that is, but I'll give you another ten minutes on the timeline --

MS. DUNCAN:  Okay.

THE COURT:  -- and then we'll move on to try to finish this witness.

MS. DUNCAN:  Okay.

BY MS. DUNCAN:

Q.  Mr. Thomas, we are now on August 28th.

MS. DUNCAN:  Let's go to the next page of the timeline, Mr. Jackson.

BY MS. DUNCAN:

Q.  Okay.  Now, can you walk us through the day of the 28th and what happened here, and in particular with a focus on how it relates to the dam safety concerns that were driving release decisions.

A.  So by 4:00 o'clock, we had made some releases at this point, and the observers at the outlets were concerned about what they were seeing.  So myself and the mission manager, we got out and drove out to the outlets and looked at them so we could see for ourselves.  And they were making some kind of popping sounds and, you know, it was very turbulent flow.

So we went back to the office and called some other expert in the corps and they said, okay, well, let's slow down the releases and start having some discussions.  So we did that.  And we engaged some other dam safety experts to help us conclude that it

was, in fact, safe to continue opening the gates.

Q.   Okay.  Just to follow up on some questions that were brought up a moment ago, could you have -- or what would have occurred with flooding if you would have left the gates closed the entire time?

A.   So the pool levels would have been higher and the releases downstream would have been lower.

Q.   And what would have happened to the uncontrolled releases around the ends of Addicks Dam if the gate had remained closed?

A.   Now that we know the full history of the flood, they would have increased around the end.

Q.   Okay.  Now, at the time of the event, did you -- I guess you didn't know that?

A.   During the event we don't know how much it's going to rain.

Q.   Okay.  So if we pick back up here, can you finish walking us through the 28th?

A.   So around 9:30 in the morning, we had a call, I think that was some headquarters folks and me and dam safety folks from SWD.  At that point we had gotten some expert elicitation on what we were seeing in the outlet structures, and we agreed, again, then to go ahead and follow Water Control Manual but continue to engage our experts and continue to open the outlets in

624

accordance with the Water Control Manual so long as it was safe to do so.

Q.   And if it wasn't safe to do so, what would you have done?

A.   We would have stopped opening them and may have closed them.

Q.   Okay.  Let's keep moving.

A.   So 11:00 we had our ABECT meeting, the Addicks and Barker Emergency Coordination Team, and talked to them about the full discharge, 16,000 cfs release, and, you know, that we were working through the dam safety restrictions and were planning to go ahead and follow the Water Control Manual completely, assuming the calculations turned out correct.

Q.   Okay.  So I just want to follow up on that. So in deciding, you know, how to follow the Water Control Manual, what was playing into that decision?

A.   Well, in this case it was the release restrictions we had in place because of the concerns about the uplift on the spillway.

Q.   Okay.  Let's keep moving.

What happened next?

A.   So by 2:00 o'clock, we were done working with all of those experts, and we had officially updated that to say that we would, based on the calculations

including the tailwater, and that we could go ahead and continue opening the gates in accordance with the Water Control Manual as long as it was safe to do so.

Q.   Okay.  And let's keep moving.  And what happened the next day?

A.   By 4:00 we stopped making releases because at that point, you know, we're concerned enough about the structures that we didn't want to continue opening them overnight.  We wanted to watch them during the day where we could see them better.  So we stopped that at 7:00 o'clock --

Q.   And when you said "concerned about the structures," what does that mean?

A.   Well, it's this outlet parabolic spillway concern that we talked about.  We want to be able to observe as best as possible to make sure that the releases aren't causing harm to the structure.

Q.   Okay.  Let's keep moving.

A.   So the next morning we started -- or increasing our releases at 7:00 o'clock.  The reservoirs had rose faster overnight than we thought they were going to.  And that becomes important as we start to look at the Addicks structure and we see the water level is getting close to that control platform.

Q.   Okay.  So what happened on the -- moving

through the 29th?

A.   So there around lunchtime, 11:30 on the 29th, myself and Mr. Maglio went on site, I think he went to Addicks, I went it Barker, to watch it go past the 4,000 cfs.  And then we stayed with the structures throughout the releases the rest of the day.

Q.   Okay.

A.   And as we mentioned earlier, it looked like we were going to lose the ability to control the Addicks outlet because we didn't want our staff to get electrocuted, and so we ended up opening the Addicks structure a little bit faster than we had planned.

By noon, we did have an issue where we couldn't get in communications with the district office, so I sent that information directly to Dr. Russo.  Directly thereafter, we got back into communication with the district office.  And then by 1:00 o'clock, a gate broke on Barker, so we ended up not opening Barker for a couple of hours, which worked out well so that -- although we were opening a little faster on Addicks, we opened a little slower on Barker so the total releases downstream were about the same rate as the otherwise would have been.

And then by 4:00 o'clock, we turned off the power to Addicks to help prevent electrocution, but we

had been able to open the structure all the way at that point.  So the timing worked out in that regard.

Q.   Okay.  I want to ask you just a couple of questions about the forecasts around this time.

THE COURT:  We'll stop at 4:02.  We'll turn the witness over or we'll do that tomorrow.  We'll see. But I figure this is -- we've had enough direct examination.  I think I've allowed him everything that has any relevance to this incident, and so my ruling is that we end the rest of the testimony in five minutes.

MS. DUNCAN:  Okay.

BY MS. DUNCAN:

Q.   Let me ask you just about a handful of more questions.

On the morning of the releases, the releases were made, when the corps got the forecast for, you know, expected operations, what was being forecast in terms of the rain and flow around the ends of the dams?

A.   So I think that morning I think we still had substantial rain left in the forecast, I'm going kind of off memory and a little bit on this sheet, surcharge, full surcharge had been forecast, and I think there was releases, uncontrolled releases around both dams forecast at that point.

Q.   And of what amount was forecasted to go

around Addicks Reservoir?

A.    I don't have it in front of me.  I think it was 20,000 cfs.

Q.    Okay.  And if I offer you DX 212...

A.    That would help.

Q.    And what was the amount that was forecast to go around the end, you know, in the hours just after the releases began?

A.    So the 22,000 cfs for Addicks.

Q.    Okay.  And what was the -- what was the forecast rainfall on that date?

A.    So we had already received 25 to 28 inches, another 25 was forecast, so 50 to 58 was forecast.

Q.    Okay.  Let me ask you just one high-level question on the 1962 manual.

Would the induced surcharge releases have been triggered at a different time under the 1962 manual than they were under the 2012 manual?

A.    Not as far as I know.

Q.    Okay.  And, Mr. Thomas, as the dam safety officer managing the emergency situation during the Harvey event at the time, were the releases necessary from a dam safety perspective?

A.    So I think just like we've said, we had serious dam safety concerns.  We made the releases

following the Water Control Manual, and we thought that was the safest thing do from a dam safety perspective.

Q.   Okay.  I've heard in press releases and things that the corps has said the project operated as intended.  And my question for you is how could the project operate as intended if it flooded -- if it sort of -- the gates were opened and flooded downstream?

A.   So unfortunately the project does not offer perfect flood protection, and so it does include both these induced surcharges and flow around the spillways and over the emergency spillways during floods that are big enough.

Q.   Okay.  And ultimately did the project work to reduce flooding for the downstream property?

A.   Yes, ma'am.

Q.   Okay.  Was there anything ordinary about operating this project during the Hurricane Harvey event?

A.   No, ma'am.

Q.   Okay.  And why do you say that?

A.   Well, it was an emergency.  You know, we were up there in the middle of a hurricane, many of us actively risking our lives while we were doing it, you know, one of us having to be rescued.  Two people losing their personal vehicles.  It didn't feel very

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/29/2024

ordinary to me.

THE COURT:  Yeah.

MS. DUNCAN:  Okay.

THE COURT:  And no one lost their lives, fortunately?

THE WITNESS:  None of our staff.

MS. DUNCAN:  Your Honor, may I have one moment?

THE COURT:  Yes.

MS. DUNCAN:  Your Honor, would you like us to offer any remaining exhibits at this point or should we wait until the conclusion of Mr. Thomas?

THE COURT:  Why don't we wait until the conclusion.

MS. DUNCAN:  Okay.  We'll pass the witness.

THE COURT:  Okay.

Mr. Nolen.

REDIRECT EXAMINATION

BY MR. NOLEN:

Q.  Mr. Thomas, the nature of cross-examination is to try to keep up some things that may have gotten confused during the prior testimony.

Do you understand that?

A.  Yes.

Q.  And you've given five depositions in this

case; is that right?

A.   It's a lot, sir.

Q.   And you've given -- you testified in both upstream trials, right?

A.   Yes, sir.

Q.   And so you understand that you need to try to be consistent with your prior testimony, right?

A.   Yes, sir.

Q.   In advance, did you go back and reread all of your prior testimony to get ready to come here today and testify?

A.   I didn't read it all, sir.

Q.   So one thing that just -- we just had was you talked about the 1962 reservoir manual.

Do you remember that?

A.   Yes, sir.

Q.   It did not have an induced surcharge regulation, did it?

A.   It has a reservoir regulation schedule that has the same kind of gate openings.  It doesn't use those words, but it looks the same to me.

MR. NOLEN:  Objection.  Nonresponsive.

BY MR. NOLEN:

Q.   It does not have --

MR. NOLEN:  I'm sorry, Your Honor.  You need

to rule.

THE COURT:  Okay.  Well, go ahead and reask the question.

BY MR. NOLEN:

Q.    Mr. Thomas, the 1962 manual does not have an induced surcharge regulation, that's true, correct?

A.    Could I have a copy of it?

Q.    Sure.

MR. NOLEN:  Sorry, Your Honor.  We had utilized it with an earlier witness, and so we thought a copy was sitting up here and we're not seeing it.

THE WITNESS:  Big, gray cover sheet.  That one.  There you go.

MR. NOLEN:  Okay.

THE WITNESS:  Thank you, sir.

So what I'm reading is on page -- let's see. We'll do page 24.  And under 2(b), it says "Keep gates closed and under surveillance as long as needed to prevent over flooding of the dam, then releases should be started in accordance with 3 below, or until the Regulation Schedule, plate 14, dictates releases, and continue these operations until a peak pool stage is attained."

And that plate 14 -- where is that.  And the plate 14, you know, shows discharge, you know, while

Trial

the pools are rising.

BY MR. NOLEN:

Q.   Right.

It actually is part of the Emergency Action Plan, correct?

A.   No, sir.  This just says "Regulation Schedule" on it.

Q.   Right.

But there was no Emergency Action Plan at the time that the Buffalo Bayou Reservoir regulation manual existed, correct?

A.   I don't know, sir.

Q.   You don't know?

A.   I don't know if there was an Emergency Action Plan back then or not.

Q.   Have you ever seen one that predates 2014?

A.   Not until you showed me them today, I don't think.

Q.   And you've never seen a Buffalo Bayou Texas Reservoir regulation manual that predates the 2012 Water Control Manual which is what -- if what -- if this is what that became that had something called "induced surcharge" in it, right?

A.   Well, I've seen this 1962 regulation schedule, sir.

Q.    And the words "induced surcharge" do not appear anywhere in the manual, do they?

A.    They don't use those words, but my understanding is it's the same effect.

Q.    Your understanding, though, is you're reading the words from the 1962 manual, correct?

A.    Correct.

Q.    And you are attaching "induced surcharge" to those words, right?

A.    Right, because that's what the effect of this operation is.

Q.    Right.

And from 1962 forward, there were the changes to the reservoirs in the 1970s and the 1980s, correct?

A.    That's true.

Q.    Right.

And some of the schedule from the 1962 manual were -- was placed into the Emergency Action Plan, right?

A.    In 2012?

Q.    No.  In 2014.

A.    Okay.  Say that again, sir.

Q.    Some of the procedures from the 1962 plan were placed into the Emergency Action Plan in 2014, right?

A.    Which ones, sir?

Q.    Well, you tell me.

A.    I'm not following that, sir.

Q.    The induced surcharge did not exist in 1962, correct?

A.    As far as I know, it did, sir.

Q.    Except it doesn't say it anywhere in the 1962 reservoir regulation, right?

A.    Right.  It doesn't use those words, but it has the same effect.  It's opening the gates while the pools are rising.  It includes a rate of rise pool for the dam tender to use.

Q.    Which became part of the Emergency Action Plan?

A.    Well, not in 2014, sir.

Q.    When did it become part of the Emergency Action Plan that you don't know existed before 2014?

A.    So the rate of rise curves that you see here, and I talked to the person in the Galveston district that made the 2012 Water Control Manual years ago.  And what he told me was --

        MR. NOLEN:  Objection.

BY MR. NOLEN:

Q.    I'm not asking for hearsay, sir.

A.    Well, okay.  My understanding is that the

surcharge regulations in the 2012 Water Control Manual mimic those in the '62 manual.

Q.    So what's in the Appendix C-12 of the Emergency Action Plan?

A.    Can I look at it?

Q.    Sure.

A.    Thank you.

So are you -- do you mean C-14, sir?  Or do you mean this whole "Reservoir Regulation" section?

Q.    The appendix at C-12 has emergency procedures, correct?

A.    Well, you see operating procedures on page C-13 and C-14.  Is that what you mean?

Q.    Yes.

A.    Okay.  So you're talking about I think the table --

Q.    Yes.

A.    -- on page C-14?

Q.    Yes.

A.    Okay.  Let me read this real quick before I talk to you about it.

Okay.  So this is talking about we've got an emergency level here, and condition 2, the dam safety program manager has determined that corrective measures are ineffective, so he's saying a corrective measure to

a dam failure.  And he's saying that the gates of the reservoir experiencing the problems shall be open in accordance with the following table.  And so basically it's saying you're going to open five gates 6 feet each over a course of a set of amount of time, which is not what was in the '62 manual and it's not what we talked about in the 2012 manual.

Q.   Well, I don't think we're going to agree on this because that's -- we think that's a modification of the manual from '62 that appears in the EAP after they made the changes to the reservoir structure in the 1970s and the 1980s.

You don't concede that, right?

A.   So what this is, is that if there is a dam safety breach emergency where the dam is going to fail, then we have the authority to open the gates to prevent dam failure.  And that's what that is talking about.

Q.   Right.

And you had that authority back in 1962, correct?

A.   As far as I know, we would have, but that's not what we talked about in the regulation manual.

Q.   Well, in 1962, in that reservoir regulation manual, you had the authority, the Army Corps of Engineers had the authority to open the gates to

protect the structure, correct?

A.    So what we were talking about in table I think it's 9 and 10 are the operations, and they include this plate 14 and 15 which are effectively induced surcharge.  They may not have used that term then, but that's what that is.

Q.    And induced surcharge is part of normal operations in the Water Control Manual, correct?

A.    So can I have the manual again?

Q.    Which one?

A.    The 2012, please.

Do I have it already?  I've got the EAP and then I've got the '62, I think.  Yes.  I think it was one of those bound copies, I think.

Q.    Yeah, that's what I thought too.  Well, I'll give you my copy.

A.    Thank you, sir.

Q.    We know it's in evidence already, and I'm not sure why we're not seeing it.

A.    Sorry about that.

Q.    Here, I'll trade you.

A.    I like yours.  It's highlighted.

So 7-05 Flood Control covers how we operate the gates.  7-05(a) is normal flood control regulation.  And that's exclusive to 7-05(b) which is induced

surcharge flood control regulation.

Does that answer the question?

Q.   Not exactly because if it's an emergency measure, it would be in the Emergency Action Plan, correct?

A.   Emergency measures are in the Emergency Action Plan.

Q.   That's true.

And you've agreed to that previously too, haven't you?

A.   Probably.

Q.   You have.

And so let me see if I can make a little short work of this because that's always the goal, is to try to get to the point.

The reason the gates were open was because of the induced surcharge regulation as prescribed and set forth in the Water Control Manual; is that correct?

A.   Correct.

Q.   And there was no other reason, right?

A.   That's correct.  But I have to highlight that once I saw your opening comments, I know we've had all this discussion, you know, there were dam safety issues telling me that was the right thing to do, but that was the reason they were opened.

MR. NOLEN:  All right.  I'm going to object to the nonresponsive part of his answer, Your Honor.

THE COURT:  Well, it wasn't totally nonresponsive, so I will allow it.

MR. NOLEN:  Okay.

BY MR. NOLEN:

Q.  Now, I'm going to go back through some of the exhibits that you went through earlier just to ask some specific questions about them.

MR. NOLEN:  Please pull up DX 136.

BY MR. NOLEN:

Q.  Do you remember this document you spoke to a moment ago?

A.  Yes, sir.

Q.  All right.  And you were discussing DX 136 in conjunction with the Harvey event that happened in August of 2017, correct?

A.  I think the questions were about generally what's an emergency.

Q.  Right.

This DX 136 that was introduced into evidence is dated October 1st, 2020.

Do you see that?

A.  Yes, sir.

Q.  And it says "Expires 01 October 2022.

Inundation Maps and Emergency Action Plans and Incident Management for Dams and Levee Systems."

Do you see that?

A.   Yes, sir.

Q.   And if you'd go to page 53, please.  This is the part you were talking about earlier about a non-breach emergency.

Do you recall that?

MS. DUNCAN:  Objection.

MR. NOLEN:  This was shown to the witness.

MS. DUNCAN:  The witness did not speak to this particular page.

MR. NOLEN:  You introduced this document into evidence.

MS. DUNCAN:  You can ask questions, but he represented this is the page that was discussed, and it's not.

BY MR. NOLEN:

Q.   Have you ever seen this page, page 53 of this document before?

A.   I've read the document.

Q.   And it says "Notifications Required for Emergency Condition."

Do you see that?

A.   Yes, sir.

Q.   And for non-breach, it has "Flows, high" and then it's "watch" and "warning" under "Signal," and then it says "External Notification Required, yes, yes, and yes," correct?  Internal and external, correct?

A.   Correct.

Q.   All right.  Do you know if this was in effect in 2017?

A.   So we did those things in 2017, but this EC was not in effect in 2017.

Q.   Okay.  So when we were talking about this earlier and you were talking about this with Ms. Duncan, this regulation was not even in effect during Harvey; is that right?

A.   This regulation was not.

Q.   Okay.  And did you tell the court that?

A.   I think I did.  I think I said this has been superseded.

Q.   Okay.  When you say "this has been superseded," I agree with you, this was superseded in 2022.  It said that right on the first page.

In 2017, was this regulation regarding non-breach emergencies in effect?

A.   No, sir.

Q.   And you didn't tell the court that, did you?

A.   I don't think so.

Q.    No.

And you weren't asked, were you?

A.    Not that I know of.

Q.    All right.  And you said you gave notice.

Do you remember that part?  You just said you did -- you went ahead and gave notice like you were supposed to, correct?

A.    Yes, sir.

Q.    All right.  So let's go to page 54, please. And so if we look at page 54, it gives you a template for how to give notice.

Do you see that?

A.    Yes, sir.

Q.    And I'm sorry, I think I'm on the wrong page. Page 57.  Page 57 which is the one that he put up.

So if we go to page 57, it's got a heading, and it gives it a template for how to give that, and it says "Alert non-breach Incident," and they're giving you an example.  This one said "Westville Dam, Southbridge, Massachusetts."

Do you see that?

A.    Yes, sir.

Q.    Did you ever give any sort of notice to anyone, and I'm talking about any state, local, government, or the public about something called a

non-breach incident or a non-breach emergency during Hurricane Harvey?

A.   So we didn't use this format, but we did publish notices.

Q.   All right.  Let's look at one of those.

MR. NOLEN:  Pull up PX 027.  There it is.

BY MR. NOLEN:

Q.   So is this the notice you were talking about, PX 027?

A.   This is one of them, sir.

Q.   Right.

And this one is made on August 27th, 2017.

Do you see that?

A.   Yes, sir.

Q.   And the heading on it is "USACE Galveston District to make intermittent releases at Addicks and Barker Dams."

Do you see that?

A.   Yes, sir.

Q.   Then it says "Galveston, Texas - Because of the extreme nature of the ongoing weather event in the Houston area, Army Corps of Engineers officials have determined that they will likely have to release intermittent amounts of water from both Addicks and Barker reservoirs to reduce the risk to Houston

metropolitan area."

Do you see that?

A.   Yes, sir.

Q.   All right.  So you're going to release 125 billion gallons of water on Houston to reduce the risk to the Houston metropolitan area; is that right?

MS. DUNCAN:  Objection.  Argumentative.

THE COURT:  Well, I don't think the question is argumentative.  It's stating a statement which is either right or wrong, so I'll allow the question.

THE WITNESS:  So we did follow the Water Control Manual to reduce risk to the Houston area.

BY MR. NOLEN:

Q.   I'm just asking about this news release.

And so in here, you say you're releasing this water to reduce the risk to the Houston metropolitan area, and in this particular instance with this induced surcharge, the way you're reducing the risk to the Houston metropolitan area is by flooding the downstream properties along the Buffalo Bayou channel; is that right?

A.   Releasing the water was to reduce the risk following the Water Control Manual.

Q.   So let's look at the rest of this.  It says "These structures," talking about Addicks and Barker

Reservoirs, "continue to perform as they were designed to do, which is to protect against flooding in downtown Houston and the Houston Ship Channel, said Colonel Lars Zetterstrom," and we'll talk to Colonel Zetterstrom either today or tomorrow, "Galveston District commander."

Do you see that?

A.   Yes, sir.

Q.   And it says "However, we do expect to release late this evening into early tomorrow morning."

Do you see that?

A.   Yes, sir.

Q.   Okay.  Now, do you see anywhere in this news release -- which I think you were part of drafting, correct?

A.   Correct.

Q.   Right.

Do you see anywhere where it says that there's going to be flooding in Houston as a result of the releases for -- from the Addicks and Barker Dams?

A.   Can you zoom back out again?

Q.   Sure.

A.   So it talks about the releases but doesn't specifically talk about flooding downstream.

Q.   Right.

647

And so if we just go on and so we have a complete record, because this is pretty short, it says "It is also likely that water will go over the uncontrolled spillways at the ends of both dams, as designed for large floods.  If this happens, it will mostly like start around the northern end of Addicks Dam, and both ends of Barker Dam, he added.  This flood event will exceed the 2016 tax day flood elevations. Structures will be impacted upstream from both locations; the number of structures affected will depend on weather conditions, Zetterstrom said."

Q.   Do you see that?

A.   Yes, sir.

Q.   All right.  He's talking about upstream. He's not talking about inundation downstream here, is he?

A.   He's talking about both, sir.

Q.   Where?

A.   With this document.

Q.   Okay.  In the sentence that I just read, does he reference anything about flooding downstream?

A.   He does not, sir.

Q.   All right.  So let's go forward.

"Zetterstrom explained that all roads within the Addicks and Barker area will be flooded and closed

for an extended period of time until the corps can release sufficient quantities of water and make them passable.  The corps expects to have to retain water for approximately one to three months after the rains subside.  Homes upstream will be impacted for an extended period of time while water is released from the reservoirs."

Do you see that?

A.  Yes, sir.

Q.  All right.  He's only talking about upstream flooding.  You agree with that, don't you?

A.  Those words highlight upstream flooding.

Q.  Right.

And then it goes on to say "Public safety is our number one concern as we work closely with our partners - the City of Houston, Fort Bend County, Harris County and the Texas Department of Public Safety - to monitor the reservoirs, said Zetterstrom. Residents should always listen to and follow instructions of local emergency management officials."

Do you see that?

A.  Yes, sir.

Q.  All right.  So we can agree looking at this press release, this news release that went out from the Army Corps of Engineers on August 27th, 2017, that

nowhere in this press release does it tell people downstream that these releases are going to flood the people along the Buffalo Bayou channel.  We can agree on that, can't we?

A.   It doesn't explicitly say what you just said, sir.

Q.   Right.

And nobody even reading this who is not somebody who works for the Army Corps of Engineers or somebody who works for the City or somebody who works for the Harris County Flood Control District would have any idea what that meant, would they?

A.   I can't speak to what others know.  We do struggle with the public understanding risk communication.

Q.   Right.

And it's true, isn't it, because you testified earlier about this notion that there was some sort of Level 1, Level 2, or Level 3 emergency declared, it's true, isn't it, that you can't produce a single document to the City of Houston or to the Harris County Flood Control District or to any media outlet indicating that Addicks/Barker were in emergency 1, 2, or 3; isn't that true?

A.   I don't think you're going to find those

words in a document, but you will see that we communicated to all of those folks the conditions that represent Emergency Level 2.

Q. You didn't tell any of them that there was an Emergency Level 1, 2, or 3; is that right?

A. We didn't use those words, but we told them exactly what was happening the best that we could which meets the condition of Emergency Level 2.

Q. You talked about the ABECT team, correct?

A. Correct.

Q. And that stands for -- tell us what it stands for.

A. Addicks and Barker Emergency Coordination Team.

Q. Right.

And that includes the City of Houston and the county, correct?

A. Correct.

Q. And it includes -- does it include Fort Bend?

A. Yes, sir.

Q. All right. And so if we go and we look at every one of the more than 500,000 documents that have been produced in this litigation, we will not find one email, not one notice, not one piece of paper that says that there was a Level 1, 2, or 3 emergency at Addicks

and Barker, will we?

A.   Again, I don't think we used those words, but we -- it clearly expressed what was happening, communicated the risk, communicated all of the event that was going on which meets the definitions of that document.

Q.   Do you know that John Rick Flanagan from the City of Houston designated by the City of Houston testified in this case that the City of Houston was unaware that Addicks and Barker were having any sort of an emergency?

A.   No, sir.

Q.   Do you know that Steve Fitzgerald who is the Harris County Flood Control District testified that he didn't know what even the import was of induced surcharges?  Did you know that?

MS. DUNCAN:  Objection.  Calls for hearsay. Lacks foundation.

THE COURT:  Well, he's asking about his knowledge of these events.  Whether indeed there were any events or not is not put on for the truth of the matter.

MS. DUNCAN:  Right.  But, Your Honor, it's also assuming facts not in evidence.  Mr. Fitzgerald or Mr. Flanagan could have been called and they weren't.

This sort of line of inquiry is improper.

THE COURT:  I'll allow it.

THE WITNESS:  No, sir.

THE COURT:  You're asking the witness about his knowledge.

BY MR. NOLEN:

Q.   You don't know about their testimony, right?

A.   I don't know about their testimony.

Q.   Right.

And if they came into this courtroom and did testify that the Army Corps of Engineers didn't advise them of an emergency at Addicks and Barker, you couldn't refute that, could you?

MS. DUNCAN:  Objection.  Calls for speculation.

THE COURT:  Well, it is speculative as to what he would or would not be able to refute.  From his own knowledge, you might -- defined as his own knowledge, I'll allow the question.

THE WITNESS:  So from my own knowledge, I'm aware that certainly Steve Fitzgerald knew exactly what was happening at the reservoirs during the hurricane because I talked to him during the hurricane.

BY MR. NOLEN:

Q.   Right.  But let me just change that question

just a little bit.

If Mr. Fitzgerald or Mr. Flanagan from the city came in and testified in this case that they did not know that there was a Level 1, 2, or 3 emergency at Addicks/Barker because they never received any document telling them that, you wouldn't be able to produce a piece of paper saying, "We did tell them," would you?

MS. DUNCAN:  Objection.  Calls for speculation.  Assumes facts not in evidence.

THE COURT:  Yeah, is there any basis for you believing these people were notified?

THE WITNESS:  So I know that they were notified about the conditions.  They're part of the Addicks and Barker Emergency Coordination Team, and we were communicating exactly what was happening.  I don't know that we used those words in our communications, but we absolutely communicated this is what's going to happen downstream, this is what's going to happen at the ends.  We were doing inundation mapping together in some cases.  So we were communicating what was happening.

THE COURT:  Okay.

BY MR. NOLEN:

Q.   So just a moment ago I asked you about your prior depositions.

Do you remember that?

A.    Yes, sir.

Q.    I'm going to hand you one so that you have it because I think you're going to need to refer to it some.

MS. DUNCAN:  Mr. Nolen, what day of the deposition are you talking about?

MR. NOLEN:  I'm about to say that.  Let me hand this to him and then I'll tell you.

THE WITNESS:  Thank you.

BY MR. NOLEN:

Q.    All right.  The August 3rd, 2018, deposition, Volume II.  So you've got that in front of you.  And I'm not asking you to sit here and read the entire thing at this point.  I'll direct you if you need to look at anything.

So I want to start here at the -- because you testified about that just a moment ago about the north end of Addicks and what we have called "the puddle." And the court has seen this picture numerous times.

Is this what you refer to as shallow depth low velocity sheet flow?

A.    I'll believe you if that's what it says. That seems reasonable to me.

Q.    All right.  And you've testified before that

what that is, and that is the full extent of what is shallow depth low velocity sheet flow at the north end of Addicks, that's it, correct?

A.    Well, like I said, it also goes on the other side of the building.

Q.    Where is that?  Do we have a picture of that?

A.    I don't have a picture in my hand.

Q.    Right.

There is no picture of it, is there?  When you say "it's on the other side of the building," that's great.

Do we have any documentation of that?

A.    There are aerials of that day, sir.

Q.    Mm-hmm.

A.    Aerial photography.

Q.    Yeah, there was aerial photography.

And you know that Coraggio Maglio assessed that was all there was, correct?

A.    Did he?

Q.    Yes.  He's already come and testified to it.

MS. DUNCAN:  Objection.  Mischaracterizes the testimony.

THE COURT:  Well, what is the testimony?

MR. NOLEN:  Mr. Maglio's testimony.

THE COURT:  Yes.

MR. NOLEN:  That he took a picture of the low flows that were occurring at the north end of Addicks, and he assessed as best he could the depth and the velocity and it was completely an estimate on his part.

THE COURT:  Yeah.

MR. NOLEN:  And this was it.

THE COURT:  Okay.

MR. NOLEN:  And the court has already heard that.  And now this witness has just told me there's water on the other side of the building that we do not have captured in a photograph, and I would also represent we don't have it captured in a document either.  The only thing that we have is this testimony that we just got from Mr. Thomas.

BY MR. NOLEN:

Q.   So is it documented anywhere that there was water on the other side of the building that was part of this puddle at the north end of Addicks?

MS. DUNCAN:  Objection.  As to the characterization and the puddle.

THE COURT:  Well, "a puddle" is a term with a lot of meanings, so I will allow it, Mr. Nolen's meaning as well any other meanings.  But go ahead with the question.

BY MR. NOLEN:

Q.   Is there any other -- so we've got this picture, and we've got another picture that was taken at 9:00 o'clock at night.  And we have Mr. Maglio's testimony who came into this courtroom.

Is there any picture of any flow anywhere else that was flow over the auxiliary spillway on the north end of Addicks?  Is there any photograph that we have where we can say that that water came from the reservoir?

A.   So there is inundation modeling that I think you can look at to get a feel for an estimate of water that might have been going outside of the reservoir there.

Q.   Okay.  So let me ask you about that because that -- unfortunately, I didn't ask about modeling, I asked about photographs and documentation.  And we don't have any, do we?

A.   There are aerial photos, sir.

Q.   There are aerial photos that show water on the ground because it's been pouring rain, right?  That's correct, right?

A.   So it's hard to tell.  I've said this before, it's hard to tell what's going around versus what's backing up over there.  So I'm not attempting to

delineate.  I'm just saying that I think there's some going around that building as well.

Q.    And it's true that you don't know what the maximum flow rate was around the north end of the north auxiliary spillway of Addicks, do you?

A.    We only have estimate, sir.

Q.    Right.

Because there's no gauge up there, is there?

A.    There is not.

Q.    Right.

So the Army Corps doesn't have a gauge to measure the flows around the north end of Addicks, right?

A.    Correct.

Q.    And during this particular event, this Harvey event and the events leading up to the releases which we've just heard a lot about, the piezometers on the reservoirs and throughout Harvey presented regular responses to the rising pool and no sudden or unusual rises were recorded throughout the entire event; is that true?

A.    I think that's true, I am assuming you're reading from the report.

Q.    I'm reading from your testimony.

A.    Okay.  That sounds right.

Q.   And it's also true that during Harvey the Addicks and Barker Reservoirs performed exactly as expected, correct?

A.   Correct.

Q.   And there was never, ever -- and we kind of get a little confused because I heard a lot about this emergency and that emergency.  But there was never, ever, ever an imminent or immediate dam failure concern or considerations during Harvey, was there?

A.   So there was never an imminent or progressing towards an imminent dam failure.

Q.   Right.

And it was not really one of your concerns when you saw how the reservoirs were performing, was it?

A.   Well, that's not true at all.  I was very concerned about dam safety.  And we didn't really know how they were performing.  Those comments come from our after action analysis, like once we had seen it.  As we were doing it, we were very concerned about the risks as documented in our dam safety modification report.

Q.   Sir, you didn't say, "We have an emergency situation because we are about to have immediate dam failure," at any point during Hurricane Harvey, did you?

A.   That's correct.

Q.   Now, with respect to the history of Addicks and Barker Reservoirs, there has never been a formal declaration of a Level 1 emergency under the Emergency Action Plan; is that true?

A.   Not that I know of, sir.

Q.   In the history of Addicks and Barker Reservoirs, there has never been a formal declaration of a Level 2 emergency under the Emergency Action Plan; is that true?

A.   Not that I know of, sir.

Q.   In the history of the Addicks and Barker Reservoirs, there has never been a formal declaration of a Level 3 emergency under the Emergency Action Plan; is that true?

A.   Not that I know of, sir.

Q.   And if there had been, people downstream would have become -- would have been evacuated, right?

A.   We don't make evacuation orders, the Corps of Engineers.

Q.   You would have told the state and the city and the county to start evacuating people from the area that y'all were about to inundate, true?

A.   We don't make those decisions, sir.

Q.   Level 3 does not require the corps to

announce that there is a need to evacuate?

A.    We communicate with our partners, and the state and local officials make evacuation notices.

Q.    Right.

And you would be recommending it if it was a Level 3 emergency, correct?

A.    So we talked to them during Harvey and let them know exactly what we knew about the flooding, and they made decisions about evacuation notices.

Q.    And I want to be crystal clear here that during the induced surcharge operations on August 28th, 2024, the corps didn't deviate from the manual, correct?

A.    We followed the Water Control Manual.

Q.    Right.

And you didn't go request a deviation, did you?

A.    We had a -- not to make those releases, sir, but there was a verbal deviation to test the gates beforehand and in the drawdown plan was a formal deviation.  So there were deviations during the storm, but not to make the initial releases.

Q.    There was communication between the Army Corps of Engineers, Galveston district, all the way up to the White House; is that true?

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/29/2024

A.   I don't think I talked to anyone at the White House.  I don't remember that part.

Q.   You think somebody -- somebody did, though, with the Army Corps, correct, in the Galveston district?

A.   Did they?

Q.   Yes.

A.   I don't remember that part, sir.

Q.   All right.  You don't remember getting buy in from the people above you before you-all made those reservoir releases?

A.   Within the corps we did, sir.  Absolutely. But I don't remember going to the White House.

Q.   Okay.  You remember going up to a three-star general?

A.   General Semonite was engaged in that discussion.  I don't remember exactly.  But, yes, I didn't talk to General Semonite until after releases were made, but Colonel Zetterstrom may have.

Q.   In that entire time, you-all never requested a deviation, correct, from the Water Control Manual?

A.   To do which things, sir?

Q.   To either keep them closed or to open them quicker or to do anything.  You just followed the manual, right?

Trial

A.   Based on implementing the induced surcharge, that's correct.

Q.   Now, you talked with Mr. Mithoff a little bit about this, and then with Ms. Duncan you went through quite a bit about this Level 2 watch and Level 2 emergency.

Do you remember that?

A.   Yes, sir.

Q.   All right.  And so I want to be clear again on this.  When we go and look -- and I'm going to get one of the boards.  Just a second.

When we look at this document, which is already in evidence, JX 053, Memorandum from Commander, Southwestern Division, and it's signed off by you, nowhere in this entire document is there any indication of a Level 1, Level 2, or Level 3 emergency, is there?

A.   That's correct, sir, as discussed earlier in terms of this is the, you know, report after the fact related to the structural integrity.

Q.   But after the fact is when you would know, right?  You would know for sure what you did during it, when you were writing it up in your after action report, correct?

A.   Like I said, this report is about documenting the integrity of the structures after a new pool of

record.  That's what's documented here.

Q.  And so if there had been a Level 2 action by the Army Corps of Engineers, that would have to do with the integrity of the structure, true?

A.  Well, like we talked about, there's two scenarios under Level 2.  One is for breach and one is for non-breach.

Q.  And this was not a breach?

A.  Correct.

Q.  And so, therefore, anything that the Army Corps of Engineers was doing as far as emergency watch is entirely prophylactic, right?

A.  I don't think I understand that word in this context.

Q.  Well, it's entirely for the purpose -- it's not reacting to an emergency.  When you're doing your emergency watch, you're just sitting back and looking and watching and observing how the reservoirs are performing, correct?

A.  So I think this part is not true.  The notifications are an action.  Talking to our partners is an action, and we did those things.

Q.  Well, now that -- we just covered this.  The notification never went out, right?  We do not have a piece of paper that we can find in any of the 500,000

Trial

documents that says that there is an Emergency Level 2 being declared at Addicks and Barker at any time during Hurricane Harvey.  So that notification didn't occur, did it?

A.    We talked about that we communicated exactly what was happening at the reservoirs, all of those conditions, and those clearly meet the requirements of the Emergency Action Plan for Emergency Level 2.

Q.    So I understand that you are not a military officer, but you're a civilian, and I think you're the highest ranking civilian at the Galveston district, right?

A.    No, sir.

Q.    Okay.  Where do you come in as far as civilians are concerned there in terms of your supervisory and manager responsibility?

A.    I'm on our corporate board, so -- but there is a senior civilian who is our highest ranking civilian, and I'm not that person.

Q.    So one person above you?

A.    He's kind of sideways to me.

Q.    Okay.  All right.  And you know that if you are going to declare some sort of an emergency 1, 2, 3, that somewhere you're going to put that in writing, correct?

A.   That's not what the Emergency Action Plan says.

Q.   I'm sorry, I did not ask you what it says.  I asked you -- you've been there 20 years, correct?

A.   Around that.

Q.   Right.  Around 20 years.

And if you were going to go as far as to declare a 1, 2, or 3 emergency, something that had never happened in the history of Addicks and Barker, you were going to put that in writing somewhere, weren't you?

A.   Well, like I said, we declared an emergency. Colonel Zetterstrom signed it on the 22nd.  And then we communicated the -- you know, the outcome, what was happening.

Q.   But you don't know where we could go to look to find that the corps said "we have a Level 1, 2, or 3 emergency," do you?

A.   Just like I said, sir, I don't know that we used those words.

Q.   Let's take a look at Colonel Zetterstrom's declaration.

All right.  I'm showing you the Zetterstrom declaration of emergency.  Do you see that?

A.   Sort of.  I'm trying to get closer to it.

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/29/2024

Q.   Well, he's got it up.  Yeah, he's got it up now, so I'll look this way.

So you see this says "Memorandum for Commander, Southwestern Division," right?

A.   Right.

Q.   "August 22nd, 2017," right?

A.   Correct.

Q.   All right.  So that's three days before Hurricane Harvey makes landfall as a Category 4 hurricane, right?

A.   That sounds about right.

Q.   Right.

And it's before it weakened to a tropical storm that was sitting over Houston, right?

A.   That's true.

Q.   Okay.  And it says "Subject:  Declaration of emergency August 2017 Tropical Event Harvey, Galveston District," right?

A.   Correct.

Q.   Right.

And it doesn't say one word about the Addicks and Barker reservoirs, does it?

A.   It doesn't.

Q.   Nowhere in this entire document does it talk about the Addicks and Barker reservoirs, right?

Trial

A.    That's correct.

Q.    All right.  It talks about staffing, right?  It talks about how expenses incurred will be reimbursed.  It talks about overtime.  It talks about personnel and what they're required to do to respond to the emergency called Tropical Storm Harvey, right?

A.    That's what it says.

Q.    Right.

It doesn't say a word about Addicks and Barker being in any sort of emergency, correct?

A.    That's correct.

Q.    Right.

And we just spent a little time on this.  I can't find in 500,000 documents that have been produced a single document that looks anything like this that says "Declaration of emergency Addicks and Barker Reservoirs," can I?

A.    Not that I know of, sir.

Q.    Right.  Because none exist, right?

A.    Not that I know of, sir.

Q.    Right.

MR. NOLEN:  Your Honor, is it all right if we take about ten minutes?

THE COURT:  Will you be able to wrap this witness up then if we take ten minutes?  What time is

it?

MR. NOLEN:  Well.  It's almost 5:00.  I probably have about 20 more minutes, so maybe we should just wrap for the day.

THE COURT:  And then do redirect tomorrow.

What else do we have tomorrow?

MR. NOLEN:  Well, we have Colonel Zetterstrom, and we -- he should be relatively short.  I am guessing about an hour and ten minutes for me, Your Honor.  And we had Mr. Kauffman who was a corps employee.  I advised Ms. Duncan earlier that we are most likely not going to call him, and I now have made the decision that we're not.

THE COURT:  Okay.

MR. NOLEN:  I was told by I think Ms. Duncan, I think she's the one who told me that they may wish to call him as part of their case, but we're not going to call him.  And so the next witness after Zetterstrom I believe would be Mr. Long who is also with the corps.

MR. McGEHEE:  About one hour for Long, Judge.

THE COURT:  Okay.  Not long.

MR. NOLEN:  We're trying to be short.

THE COURT:  Mr. Short is not being called, is he?

MR. NOLEN:  Right.

Trial

THE COURT:  Okay.  Okay.  I think we can get through, then, tomorrow productively.  And then we'll have one witness left that we'll do by Zoom or more?

MS. DUNCAN:  Well, I think, Your Honor, that we would like to perhaps confer with the plaintiffs.  I mean, I think this morning we presented an idea to perhaps come to D.C. to do it in person with you and perhaps have a hybrid version for anybody else that couldn't make the trip or didn't want to make the trip.  Would that be acceptable?

THE COURT:  Sure, that would be no problem with that.  So why don't the two of you confer tonight about what we're going to do in the morning so we are all set in the morning.

MR. NOLEN:  Okay.

THE COURT:  And come up with essentially a schedule for tomorrow and then we'll get ready for Thursday to go see the dam.  I was actually looking at the weather.  I have a weather radar map on my phone to see what it was like, if there are any storms coming to Houston, they're sticking out, in the middle of the phone was Addicks and Barker.

MR. NOLEN:  So, Your Honor, we've had a pretty rainy spring, and we had some rain in the summer, but we have now been in a drought for about

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/29/2024

almost a month and a half.  So these rains will be the first rains we've had in about a month and a half.

THE COURT:  So there was some rain last night I guess.  I don't know how heavy it was.

MR. NOLEN:  I didn't know about it.  I'm sorry.

MS. DUNCAN:  I didn't either.

THE COURT:  Tanmay told me he saw it out his window.  But it was fairly light, I think.

So we'll see you-all tomorrow at 10:00.

MS. DUNCAN:  Your Honor, may we ask about scheduling of the additional day of testimony?  Would Your Honor -- how would you like to proceed?  Would you like us to propose some dates that work on our side to the court or vice versa?

THE COURT:  For the back in Washington --

MS. DUNCAN:  Yes, Your Honor.

THE COURT:  -- component?

Yeah, I think that would be -- I think it's relatively clear except the Thanksgiving week.  But other than that, it's -- our schedule has got a few oral arguments, but they're generally easy to move around since the -- a number are by telephone and a number are people who are in town, it's attorneys in town.  So I think it's flexible, fairly flexible.

There's no more trials this year, so November will be relatively easy to do.

MS. DUNCAN:  Well, and, Your Honor, I'll note, based on filings we made to the court in prior months, we do have some existing scheduling conflicts we'll have to schedule around.  But --

THE COURT:  Okay.

MS. DUNCAN:  -- we'll work -- that may make November difficult.  We'll do our best to find a few days, but it may ultimately be early December.

THE COURT:  Okay.

MS. DUNCAN:  We can confer with plaintiffs.

THE COURT:  That's all right and works with the court's schedule.  I mean, the one thing that we have the unknown which hasn't occurred very often recently, but injunctive -- preliminary injunctions to -- for bid protest cases, and those need to be heard pretty quickly.  But so far all of them -- the one we had this morning as an example, the government is willing to wait until March to issue the contract.  And so they said, you know, as long as we finish it up by March, which is relatively easy, then there wouldn't be a need for an emergency hearing.  So they don't happen real often, but once in a while.

So anyway.  We'll see you all tomorrow.

673

Trial

Downstream Addicks and Barker (Texas) Flood-Control Reservoirs

10/29/2024

MR. NOLEN:  Thank you, Your Honor.

THE COURT:  We'll stand in recess.

(Proceedings recessed at 5:00 p.m.)

674

Trial

C E R T I F I C A T E

I, Gary Schneider, a shorthand reporter, do hereby certify that the foregoing proceedings were taken down and transcribed under my direction to the best of my ability.

DATED: November 13, 2024         s/Gary Schneider

                                 Gary Schneider, RMR, CRR

675

ADMITTED EXHIBITS

| PX | PAGE | DESCRIPTION |
|----|------|-------------|
| 004 | 487 | Apr-62 U.S. Army Corps of Engineers, Galveston District, Buffalo Bayou, Texas Reservoir Regulation Manual for Addicks and Barker Reservoirs, Buffalo Bayou Watershed ("1962 Reservoir Regulation Manual") |
| 009 | 487 | 8/30/2018 The United States' Designation of Witnesses and Objections to Downstream Plaintiffs' RCFC 30(b)(6) Amended Notice |
| 360 | 487 | 7/10/1993 Emergency Operation Plan Addicks and Barker Reservoirs 1993 |
| 361 | 487 | 6/22/1977 Emergency Operation Plan Addicks and Barker Reservoirs 1977 |
| 362 | 489 | 8/18/2006 Emergency Operation Plan Addicks and Barker Reservoirs 2006 |
| 363 | 487 | Aug-00 Emergency Operation Plan Addicks and Barker Reservoirs 2000 |
| 404 | 487 | 3/15/1996 USACE (1996): Engineer Regulation; Engineering and Design; Reporting of Evidence of Distress of Civil Works Structures, ER 1110-2-101; March 15, 1996 |

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/29/2024

| DX  | PAGE | DESCRIPTION |
|-----|------|-------------|
| 212 | 610  | Harvey Event CWMS Forecast Summary, 8/23/17 to 9/15/17 |
| 290 | 522  | 5/1/2018 Buffalo Bayou and Tributaries Flood Control Project; Addicks and Barker Dams and Reservoirs Hurricane Harvey - USSD Dam Safety Presentation |

| JX  | PAGE | DESCRIPTION |
|-----|------|-------------|
| 002 | 487  | 11/1/2012 Water Control Manual (2012) |
| 038 | 487  | 10/1/1995 Reconnaissance Report - Section 216 Study, unredacted |

| JDX | PAGE | DESCRIPTION |
|-----|------|-------------|
| 042 | 487  | 5/1/2013 "DSMR - U.S. Army Corps of Engineers, Addicks and Barker Dam Modification Report (May 2013)" |
| 110 | 487  | 8/29/2017 "Email from Maglio to DLL-CESWG-FLOOD with subject "Image of the Addicks emergency spillway" |