IN THE UNITED STATES COURT OF FEDERAL CLAIMS

IN RE: DOWNSTREAM ADDICKS AND    ) Case No.

BARKER (TEXAS) FLOOD-CONTROL     ) 17-9002L

RESERVOIRS.                      )

_____)

Courtroom 8B

BOB CASEY UNITED STATES COURTHOUSE

515 Rusk Street

Houston, Texas 77002

Wednesday, October 30, 2024

10:00 a.m.

Trial Volume 4

BEFORE: THE HONORABLE LOREN A. SMITH

GARY SCHNEIDER, RMR, CRR, Court Reporter

678

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

RAND P. NOLEN, ESQ.

Fleming, Nolen & Jez, L.L.P.

2800 Post Oak Boulevard

Suite 6000

Houston, TX 77056

(713) 621-7944

rand_nolen@fleming-law.com

and

JACK EDWARD MCGEHEE, ESQ.

H.C. CHANG, ESQ.

McGehee, Chang, Landgraf, Feiler

10370 Richmond Avenue

Suite 1300

Houston, TX 77042

(713) 864-4000

jmcgehee@lawtx.com

hcchang@lawtx.com

and

RUSSELL S. POST, ESQ.

Beck Redden, LLP

1221 McKinney Street, Suite 4500

Houston, TX 77010

(713) 951-6292

679

rpost@beckredden.com

ON BEHALF OF THE DEFENDANT:

KRISTINE SEARS TARDIFF, ESQ.

LAURA DUNCAN, ESQ.

FRANCES MORRIS, ESQ.

AMBER DUTTON-BYNUM, ESQ.

U.S. Department of Justice

Environmental and Natural Resources Division

53 Pleasant Street, 4th Floor

Concord, New Hampshire 03301

(603) 230-2583

kristine.tardiff@usdoj.gov

laura.duncan@usdoj.gov

frances.morris@usdoj.gov

amber.dutton-bynum@usdoj.gov

680

                              I N D E X

                                                          Page

WITNESS:  ROBERT CHARLES THOMAS, III

Direct Examination (Cont.) By Mr. Nolen ...684

Recross-Examination By Ms. Duncan .........696

Redirect Examination By Mr. Nolen .........764

Recross-Examination By Ms. Duncan .........798


WITNESS:  LARS ZETTERSTROM

Direct Examination By Mr. Nolen ...........807

Cross-Examination By Ms. Morris ...........852

Redirect Examination By Mr. Nolen ........891

Recross-Examination By Ms. Morris ........915


                              EXHIBITS

| EXHIBIT | FOR ID | IN EVID |
|---------|--------|---------|
| PLAINTIFF: | | |
| PX 131 | | 805 |
| PX 208 | | 920 |
| PDX 408 | | 805 |
| PDX 409 | | 805 |
| | | |
| DEFENDANT: | | |
| DDX 2 | | 806 |
| DX 136 | | 806 |

681

Trial

Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

(EXHIBITS ADMITTED INTO EVIDENCE Continued)

| EXHIBIT | FOR ID | IN EVID |
|---------|--------|---------|
| DEFENDANT: | | |
| DX 223 | | 704/806 |
| DX 224 | | 806 |
| DX 245 | | 806 |
| DX 272 | | 806 |
| DX 289 | | 806 |
| DX 379 | | 875 |
| DX 602 | | 806 |
| DX 603 | | 806 |
| DX 608 | | 806 |
| DX 643 | | 806 |
| DX 646 | | 806 |
| | | |
| JOINT: | | |
| JX 18 | | 806 |
| JX 59 | | 806 |
| JX 76 | | 920 |

REPORTER'S NOTES:

QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT

NECESSARILY REFLECT A DIRECT QUOTE


PROPER NAMES ARE PHONETICALLY SPELLED UNLESS

STATED ON THE RECORD

P R O C E E D I N G S

-   -   -   -   -

(Proceeding called to order, 10:04 a.m.)

THE COURT:  Please be seated.

MR. NOLEN:  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Nolen.

And good morning, Mr. Thomas.

THE WITNESS:  Good morning, sir.

THE COURT:  And any word from Mr. Mithoff?

MR. NOLEN:  My understanding is that he should be assessed at 9:00 to see if they could proceed.

THE COURT:  Yeah.

MR. NOLEN:  And so that's my understanding. I don't have an update.

THE COURT:  Okay.  Well, if you do get one, you can let us know during the day if anything comes in.

MR. NOLEN:  I'll let you know.

THE COURT:  All right.  Anything that we need?  Any housekeeping matters today?

MR. NOLEN:  So, Your Honor, we finalized and they filed last night, the DOJ filed last night the itinerary for the trip -- or for the field trip tomorrow.

THE COURT:  Okay.

MR. NOLEN:  And so that's done.  We also discussed when we would resume with Dr. Nairn in Washington, D.C.  The folks at DOJ have told us multiple times that November is out and they can't do it in November.  We can.  And I understood the court could, but they have said that they cannot.  So I think we have agreed upon December 6th and 10th.

Is that what I said?

MS. DUNCAN:  Yes.

MR. NOLEN:  Yeah, 6 and 10 that we're all available and ready to come up and see you if you're ready for us on December 6th and 10th.

THE COURT:  Yeah, I don't think there's anything that we have scheduled.  I seem to remember we have one of the bid protests sometime around, but, again, usually with the bid protest, a day or two doesn't matter, so we can always reschedule for one of those days, one of the other days.  But I don't think we have anything major, a trial which would not easy to be reschedule, but I think it's all a motion hearing, so that would be relatively easy to move if it is one of those days.

So why don't we do this:  We'll get back late -- our plane will get back about 6:30 Friday, so

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

Monday I'll have time to call you with the -- the parties with the schedule if those days work.  Either one of days I think would likely be fine or both of them if we need both of them.  But we'll let you know Monday.  That will be an easy thing to check.

Actually, we may be able to even do it this afternoon.  But we'll call the two clerks who are in the office and find out what the schedule is and let you know about it.  Probably after lunch.  And I'd like to break for lunch at 12:30.  And so -- and be out until -- for an hour and a half.  Some of the Fifth Circuit judges are having lunch, so we'll go until then.  I don't think anything else we have, so let's get back I guess to the witness.

MR. NOLEN:  Mr. Thomas.  Yes.  So I believe I have ten minutes, Your Honor, so I'm going to try to do ten minutes.

THE COURT:  Okay.

Thereupon--

ROBERT CHARLES THOMAS, III was called as a witness and, after having been first previously duly sworn, testified as follows:

DIRECT EXAMINATION (Continued)

BY MR. NOLEN:

Q.  Good morning, Mr. Thomas.

Trial

A.   Good morning, sir.

Q.   All right.  I want to talk about the Water Control Manual for a second, and we've spent a lot of time talking about the Water Control Manual, and you did with opposing counsel also.

Just to be crystal clear on this, the Water Control Manual, nowhere in the Water Control Manual, in the whole manual, does it tell us the reason for going into induced surcharge; is that right?

A.   Yes, sir.

Q.   And so if we look at the Water Control Manual and study the whole thing, you find the schedule for induced surcharge for the regulation, but the motivation or the reason behind going into induced surcharge is not articulated in this document, right?

A.   That's correct.

Q.   So I want to pull up PX 131 and ask you about that.

Okay.  PX 131 is an email that you sent and you were having a conversation with Colonel Zetterstrom; is that right?

A.   Yes, sir.

Q.   All right.  And so the point that I want to direct your attention to is in your email which is in the middle of the page, and it says from Robert Thomas

to Lars Zetterstrom, and it's Wednesday, August 30th, 2017.

Do you see that?

A.   Yes, sir.

Q.   All right.  And just to orient ourselves, August 30th, 2017, is when the reservoirs are already in induced surcharge and I think y'all are ramping up to the maximum discharge that y'all are going to do, correct?

A.   I think at this point we've already reached the maximum discharge and we've hit the peak pools on the 30th, I think that's correct.

Q.   All right.  And so starting at the beginning of that email, it says -- and this is your email.  It says "We need that 300 million in funding for completing construction on all of the FRM projects.  We need it next year as a lump sum."

And then you say "Your list too."

So I presume that Colonel Zetterstrom has some things he wants funding for, right?

A.   Yeah.  I think it's at the bottom of the email, but I can't see the whole email right now.

Q.   Yes.

And then you write "Plus federal funding to buy all of the properties in the A&B reservoirs,"

that's Addicks and Barker Reservoirs, "and in the surcharge corridor."

Do you see that?

A.   Yes, sir.

Q.   And so just for our orientation purposes, and I've seen, you know, hundreds of your emails over the period of time, you typically refer to the downstream area along Buffalo Bayou as the "surcharge corridor," right?

A.   I don't know if that's typical, but that is what I'm talking about here.

Q.   Yes, sir.

And I think you've -- it's not a trick question.  I mean, I think you referred to it multiple times.

THE COURT:  Excuse me.  A little bit of congestion.  NyQuil didn't quite knock it out last night.

MR. NOLEN:  I'm sorry.  Do you need a moment, Your Honor?

THE COURT:  Yes.

Okay.  I think I'm fine.  Thank you.

MR. NOLEN:  Sure.

BY MR. NOLEN:

Q.   And so, Mr. Thomas, when we see the word

"surcharge corridor" in one of your emails, you're talking about the area along Buffalo Bayou which is the Buffalo Bayou watershed, and it's the -- really the homes that sit within fairly close proximity to the Buffalo Bayou channel, right?

A.  I think in this email what I meant was any home that might possibly flood during surcharge releases.

Q.  Okay.  And in your deposition, we talked about what I'm going to show you now, JX 018.

And JX 108 is from the Federal Register. It's Saturday, July 2nd, 1966.  And in your deposition, I asked you had you seen it, you said you had, and you were familiar with it.

Do you remember that?

A.  Yes, sir.

Q.  Okay.  And so if we look at Part 8 which is under "Title 43 - Public Lands: Interior," Part 8 says "Joint policies of the Departments of the Interior and the Army relative to reservoir project lands, June 28th, 1966."

Do you see that, sir?

A.  Well, I couldn't read that part while you were talking.  I missed it.

Q.  Oh, I'm sorry.

Okay.  So that's on the first column?

A.    Yes, sir.

MR. NOLEN:  I think he's -- it's on the first column.  So go down, please.

THE WITNESS:  There it is.  I see it.

MR. NOLEN:  Yes, sir.  That's it.

BY MR. NOLEN:

Q.    And so this document does not relate specifically to the Addicks and Barker Reservoirs.  In fact, I'll represent to you that they're not mentioned in this Federal Register document.  But if we go to Section 8.1 --

MR. NOLEN:  So I'll let you get there. Section 8.1 which is the other highlighted part.  There we go.

BY MR. NOLEN:

Q.    It says "Lands for reservoir construction and operation.  The fee title will be acquired to the following:"  And if we go to (b), it says "Lands below the maximum flowage line of the reservoir including," and then the very last sentence says "and to permit induced surcharge operation."

So let me just go ahead and read that so we have that complete in the record.

"Lands for Reservoir Construction and

Operation.  The fee title will be acquired to the following:  Lands necessary for permanent structures," and "(b) Lands below the maximum flowage line of the reservoir including lands below a selected freeboard where necessary to safeguard against the effects of saturation, wave action, and bank erosion and to permit induced surcharge operations."

Do you see that, sir?

MS. DUNCAN:  Objection.  Relevance and beyond the scope of the -- our exam.

THE COURT:  Mr. Nolen?

MR. NOLEN:  Well, Your Honor, the point of it is, the question was, was there an emergency, and we think that this document indicates that you can't create an emergency by simply not going and buying the land.  And so that is what we believe the Army Corps did, is they failed to follow their own regulation and go and purchase the land necessary for surcharge operations.

MS. DUNCAN:  Your Honor, this is a whole new theory that we're hearing on sort of their redirect after their direct of Mr. Thomas.  If this was an important theory for them, they should have raised it on direct, and they didn't.

THE COURT:  Well, it may be a theory, that

makes it relevant.  I don't think you have to necessary raise everything on direct.  That's obviously the goal.  But I'll allow the question since it is a federal document.

BY MR. NOLEN:

Q.    And, Mr. Thomas, I asked you in your deposition, I'll ask you again today, you know that the federal government and the Army Corps didn't go and purchase all of the lands in the surcharge area, correct?

A.    And I don't remember all my deposition on this, but I think what we talked about was that the Corps of Engineers believed that it followed the guidance at the time of the reservoir construction in the '40s and then didn't apply this retroactively later?

Q.    Right.

And so they didn't go and buy the land?

A.    We did not buy more land downstream, as you know.

Q.    Right.

And so had the Army Corps bought all of that land downstream, y'all could have opened up the reservoirs and gone to induced surcharge and the water would have flowed down and it would have been contained

on government land, right?

A.   So the original plan in the '40s was to have a bigger channel called the South Canal to convey that flow away from the City of Houston.  That part of the project was not ever constructed.

Q.   And so by 1966, when this became the policy for the Department of Interior and the Army Corps of Engineers, this issue was not revisited in the land downstream which is in the surcharge corridor, just was never purchased, right?

A.   There were no additional acquisitions downstream of the reservoirs.

Q.   Right.

So this falls within sort of a wrap-up question.  Is it true that when the reservoirs went into induced surcharge, the controlled releases through the outlet gates relieved the flooding upstream as water returned from the private property back on to government-owned land?

A.   Can you say it again, please?

Q.   Sure.

When the reservoirs went into induced surcharge, the controlled releases through the outlet gates relieved the flooding that was upstream as water returned from the private property that surrounds the

back of the Addicks and Barker Reservoirs back onto the government-owned land that are behind the reservoirs?

A.    I think that's true.

Q.    Right.

And so when you opened the gates, you're draining -- when you opened the gates, you're draining water out of the reservoirs.  And so if there's water that is backed up off government-owned land behind the reservoirs, as the water flows out through the gates, it relieves that flooding back there because that water that has migrated off government-owned land now returns back towards the reservoirs and back towards government-owned land, right?

A.    So it's clear, we opened the gates the morning of the 28th.  The pools continued to rise and continued to flood more property upstream as we're making the releases.  And as the inflow reduced and the rain stopped, then, just what you said, the waters came down off the private property and down Buffalo Bayou.

Q.    And so we went through some of this, again, because you and I have spent a few hours together, because the government had modeled the downstream and had done it many years in the past and had updated those models over time and had gone out and made studies of the topography, so the government was well

aware, the Army Corps was well aware that the induced surcharge area down below the reservoirs would be flooded when you opened the gates, right?

A.    We were aware, based on our modeling in the past and at the time, that there was going to be additional flooding downstream.

Q.    And so this is where we seem to have a little bit of an issue, but we're moving the water from the reservoirs, and even the water that had been backed up into private property upstream, we're moving that water downstream, and that water is ending up in people's homes and on their property, correct?

A.    In some cases.  It depends specifically on the exact property and the exact timing of the event.

Q.    Well, if they're in the surcharge corridor, they're getting inundated, correct?

A.    So we weren't -- we did not reach the maximum releases during Hurricane Harvey, so that corridor could be larger than it had been.

Q.    Right.

And that would have been the -- if the Army Corps of Engineers follows your recommendation on the 30th of August, 2017, you would purchase -- or you would have them purchase all of the property in the surcharge corridor even more property than were

inundated by the induced surcharge, correct?

A.   If we were allowed to do what my email says, then that is correct.

MR. NOLEN:  All right.  Thank you.

THE COURT:  Any redirect or...

MS. DUNCAN:  Yes, Your Honor.

Your Honor, I believe we need to switch the controls for the technology.  I believe Tanmay has that capability.  So if it's okay with Your Honor, we'll wait until he comes back so that we have the screens.

THE COURT:  Okay.

MS. DUNCAN:  Can we switch over the technology so that our slides will show?

THE CLERK:  Yes.

MS. DUNCAN:  Thank you.

Okay.  May I proceed?

THE COURT:  Yes.

MS. DUNCAN:  And can Your Honor see the screen?  We can put -- why don't we put up JX 3 up so we can test it.

THE COURT:  I can see.  I've got it here on the monitor, and I can also see it on the screen.

MS. DUNCAN:  Excellent.  Okay.

RECROSS-EXAMINATION

BY MS. DUNCAN:

Q.   Good morning, Mr. Thomas.

A.   Good morning.

Q.   Yesterday afternoon you were asked a number of questions by Mr. Nolen about whether notifications were made consistent with the requirements of the Emergency Action Plan.

Do you recall those questions?

A.   Yes, ma'am.

Q.   Okay.

MS. DUNCAN:  I'd like to turn to JX 3 at PDF 23.  And if we can zoom in on the Section B right here.

BY MS. DUNCAN:

Q.   Let me just ask you generally, who at the district is responsible for implementation of the EAP?

A.    In general, the dam safety officer, dam safety program manager, and the emergency management office.

Q.   Okay.  And during the Harvey event in general, who from the corps ensured that the EAP was being followed?

A.    Myself and the dam safety program manager.

Q.    And who was that dam safety program manager?

A.    It was Gary Chow.

Q.    Okay.  And if we look at -- this is PDF 23 of the Emergency Action Plan, you've described the ABECT group.

What is the ABECT group and who is a part of it?

A.    So it's the Addicks and Barker Emergency Coordination Team.  It includes the U.S. Army Corps of Engineers Galveston district, Harris County Office of Emergency Management, City of Houston Emergency Operation Center, Fort Bend County Emergency Operation Center, National Weather Service, Texas Department of Public Safety, and Harris County Flood Control District.

Q.    Okay.  And in the second-to-last sentence of the second paragraph up on the screen of Section B, what is being described there in terms of updates?

A.    So it says the "Galveston District Water Control Manager will issue periodic updates to the emergency coordination team during periods of reservoir impoundment."

Q.    Okay.  Did that occur during the Harvey event?

A.    Yes, ma'am.

Q.    Okay.  And what are the ways that that

occurred?

A.    Phone calls and emails mostly, I think.

Q.    Okay.  And can you describe for us those emails?  Was it just individual emails or something else?

A.    No.  They have an email list where they're sending the emails directly.

Q.    And what sorts of information is being sent through those emails?

A.    All of the corps water management system forecast, all of the information about the status of the flooding in and around the reservoirs.

Q.    Okay.  And if we move on to the next section, Section C, do you have a copy of this, Mr. Thomas?

A.    I do.

Q.    So we're looking at page 17 to 18.  There is a section describing "Responsibility for Evacuation."  Can you tell us about who -- what's being described in that section?

A.    So it says "Warning and evacuation planning are the responsibilities of local authorities who have the statutory obligation."

Q.    Okay.  And did -- so does the corps have a sort of statutory obligation to warn during an emergency?

A.    No, ma'am.

Q.    Okay.  And then if we look to page 63 and 64, that's Appendix C, I want to ask you about the specific kinds of actions that are required by the conditions. This is PDF 63.  Let's look at the bottom of PDF 63, and then we'll move quickly to 64.

Can you walk us through an Emergency Level 2 for expected flooding what kinds of notifications are required?

A.    It says "Notify State and Local Emergency Management officials of emergency situation so they can take action to protect lives and properties in areas upstream which will be flooded by increased reservoir levels."

Q.    Okay.  And then how about for the emergency condition on the next page, C-4, regarding Emergency Level 2 for uncontrolled releases?  What sort of notifications are required for that condition?

A.    It says "Notify State and Local Emergency Management officials of emergency situation so they can take action and evacuate areas upstream and downstream which will be flooded by increased reservoir levels and flows from the uncontrolled spillways.  If flooding is expected at the Addicks and Barker Incident Command Post relocate it to the Harris County Flood Control

District North Service Center Pavilion.  Monitor RCC spillway for erosion or displacement."

Q.   And during the Harvey event, were the notifications of the conditions described here in EAP made to the Addicks and Barker Emergency Coordination Team?

A.   Yes, ma'am.

Q.   Okay.

MS. DUNCAN:  If we can move to DX 213 briefly.  That's the CWMS compilation.  And I'd like to turn to PDF page 11.

BY MS. DUNCAN:

Q.   And so, Mr. Thomas, this is the page ending in 5379.

A.   I'm just going to try to read it on the screen.  These are hard to find.

Q.   Okay.  Now, Mr. Thomas --

MS. DUNCAN:  If we can zoom in, Mr. Jackson.

BY MS. DUNCAN:

Q.   -- what are we looking at here in DX 213 at PDF page 11?

A.   This is one of the emails from the water manager to the Addicks and Barker Emergency Coordination Team.

Q.   Okay.  And does it include individuals, for

Trial

example, from Harris County Flood Control District?

A.   Yes, ma'am.

Q.   Does it include individuals from City of Houston Emergency Management?

A.   Yes, ma'am.

Q.   And does this distribution include the individuals from, say, Fort Bend County Emergency Management?

A.   Yes, ma'am.

Q.   Okay.  And how frequently were these sorts of transmissions made pursuant to the EAP?

A.   Multiple times per day.  Some days -- usually at least once a day.

Q.   Okay.  And after these were sent, were there any calls to discuss these forecasts?

A.   Yes, ma'am.

Q.   Okay.  And can you just give us a high-level overview of those calls?

A.   The water manager would brief everyone on the ABECT of whatever was happening that day, you know, using the forecast generally as the guide to that.

Q.   And who was the -- who were the water managers doing those activities?

A.   I think it was mostly Mike Kauffman and Mario Beddingfield.  I think Charles Scheffler was in there

as well.

Q.   And they were within your chain of command for the emergency operations during Harvey?

A.   Yes, ma'am.

Q.   Okay.  Now, does the Emergency Action Plan require direct notifications to the public?

A.   I think so.

Q.   Okay.  And did the corps make notifications to the public about the types of conditions that are described in Appendix C of the EAP that we just went over?

A.   Yes, ma'am.

Q.   Okay.  And how did the corps make those sort of notifications of those conditions in the EAP?

A.   There were press releases and there were some media conferences.

Q.   Okay.  Now, do you remember being asked questions by Mr. Nolen yesterday about a press release?

A.   Yes, ma'am.

Q.   Okay.  So I'd like to put up on the screen DX 223, and we'll hand you a copy.

Now, do you recall being asked questions about whether the corps had described that releases were going to occur downstream?

A.   Yes, ma'am.

Q.   And do you recall being asked questions about whether you -- the corps communicated that there was an emergency situation?

A.   Yes, ma'am.

Q.   Okay.  So are you familiar with what DX 223 is?

A.   Yes, ma'am.

Q.   And what is it?

A.   It's a press release on August 23rd on --

Q.   Sorry to interrupt you.

What is the entirety of the document that's in front of you?

A.   This 223, is a -- it's the "Galveston District Prepares for Tropical Storm Harvey."  It's the first press release I think of the storm.

Q.   And is the entirety of the exhibit at 223 a compilation of the press releases sent during the storm by the corps?

A.   Yes, ma'am.

Q.   Okay.  And was there a public affairs officer within your chain of command for the emergency operations?

A.   Yes, ma'am.

Q.   And did you review these documents, these press releases before they went out?

A.   Yes, ma'am.

Q.   Okay.

MS. DUNCAN:  Your Honor, I'd like to offer DX 223 into evidence.

MR. NOLEN:  No objection.

THE COURT:  Okay.  That will be admitted.

(Admitted Exhibit No. DX 223.)

BY MS. DUNCAN:

Q.   Now, Mr. Thomas, I want to talk through not this whole thing but just a handful of these releases to just ask you a few follow-up questions for context. So why don't we start at the first page, PDF 1.

Can you talk us -- talk to us about the date of this press release and what is being communicated to the public here.

A.   So this one is August 23rd, 2017, and it's talking about that we've staffed up our crisis action team, we're communicating and we're getting ready, doing our emergency preparations for the storm.  It starts to talk about Addicks and Barker a little bit, saying that they're ready to provide flood risk protection.  It says that we're going to have -- you know, we have super sandbags that we have available that we can, you know -- to help protect Port Arthur.

Q.   Okay.  And in the very first sentence, what

Trial

is being described in relation to emergency operations?

A.   It says that "The Galveston District initiated emergency operations on Tuesday afternoon in preparation for Tropical Storm Harvey."

Q.   Okay.  And what is that relating to?  Does that relate to the declaration of emergency we've seen?

A.   That's right.

Q.   And who signed that declaration of emergency?

A.   Commander Zetterstrom.

Q.   Okay.  Now, you were asked -- if we move to PDF 6, you were asked questions about the press release dated August 27th, 2017, yesterday.

Do you recall that?

A.   Yes, ma'am.

Q.   Okay.  Now, if we go to the very next page, there is a press release that states it was posted on August 28th.

Do you see that?

A.   Yes, ma'am.

Q.   Now, using your timeline of events, when was this press release sent out?

A.   So I don't have the timeline in front of me.

Q.   Would it be helpful for me to show you a copy of DX 643?

A.   It would be.

Q.    Okay.

MR. NOLEN:  Your Honor, may I approach the witness?

THE COURT:  Yes, you may.

THE WITNESS:  I think she beat you to it.

MS. DUNCAN:  Excellent.  Okay.

BY MS. DUNCAN:

Q.    Okay.  So...

A.    I think this is the August 27th at 2336 press release.

Q.    And just so the record is ultra clear, what time is 2336?

A.    It is 11:36 P.M.

Q.    Okay.  And so I'd like to put up on the screen this DX 223, PDF 6, and ask you a couple of questions.

What is being communicated in this press release?

A.    So in the first paragraph, it says that "The Galveston District is starting water releases immediately from Addicks and Barker dams because the water levels in the reservoirs have increased dramatically in the last few hours."

The next paragraph says that residents near the reservoirs need to be vigilant because the water is

rising more rapidly and both reservoirs are rising more than half a foot per hour.

The next paragraph talks about the upstream homes, first home in the Addicks Reservoir will be impacted in two to four hours and the first home in Barker Reservoir will be impacted later that morning.

Q.   How about downstream?  Is there any indication about releases that would be made downstream?

A.   Right.  The next paragraph says "The corps will start releasing around 800 cubic feet per second from each reservoir for a total of 1,600 cubic feet per second.  Within the next 6 to 10 hours we will be releasing 4,000 cfs from both reservoirs, for a combined total of 8,000 cfs."

Q.   And can I ask you, then, a follow-up question?  If we go to the next page of this release, is there any context provided as to what the downstream public can expect in regard to flows?

What is the purpose of the first paragraph on the second page of the press release posted 8/28?

A.   Well, the first paragraph is talking about the Tax Day flood and saying that, you know, the Tax Day flood reduced the discharge in the bayou from 130,000 to 7,100 cfs.  But that's not talking about

Trial

discharge during Hurricane Harvey.

Q. Okay. Right.

But did downstream areas flood during the 2016 Tax Day Storm?

A. They did.

Q. Okay. And if we go back up to the first page and starting with the fifth paragraph, what is the sort of rationale provided for why these releases are going to begin?

A. So it says "If we don't begin releasing now, the volume of uncontrolled water around the dams will be higher and have a greater impact on the surrounding communities."

Q. Okay. And why is that an issue that has to be addressed through releases?

A. So I think at that time there would have been substantially more water going around the ends of the dam.

Q. You mean predicted to?

A. Forecast, right. But like I said, we don't make our decisions based on the forecast, but I think that was what we were talking about there.

Q. Okay. And then the second -- let's talk about the last two paragraphs on this first page. What is the rationale being provided here?

Trial

A.    So it says "It's going to be better to release the water through the gates directly into Buffalo Bayou as opposed to letting it go around the end and through additional neighborhoods and ultimately into the bayou."

Q.    And why do you say "it's going to be better"?

A.    Well, I think that's kind of like we've talked about before, we had some serious dam safety concerns, so it was more safe to follow the Water Control Manual.

Q.    Okay.  And then if we look at the very last substantive paragraph about public safety, what does it indicate about coordination with the local partners?

A.    So it says "Public safety continues to be our number one concern as we work closely with our partners - the City of Houston, Fort Bend County, Harris County and the Texas Department of Public Safety - to monitor the reservoirs."  It says "Residents should always listen to and follow instructions of local emergency management officials."

Q.    Okay.  And if we go to PDF 10.

I want to ask you some questions about this press release which describes this sort of -- some of the decision-making.  So can you talk to us about what this describes in regard to the decision-making and how

that was being conveyed to the public?

A.    So it talks through I think in the second paragraph -- well, the first paragraph says that "We made increased controlled release to maintain control of the Addicks and Barker Dams."

Q.    What do you mean "maintain control of them"?

A.    Well, that's where we talked about the outlets, the primary outlet structure at Addicks Dam where we had to open a little bit faster because the water was going to inundate the structure and we were afraid that we would lose the power.

Q.    Okay.

A.    And then it goes on the next paragraph to say that, you know, that decision was difficult but necessary.  And then it talks about what the discharges were at that point, which was around 13,000 cfs.

Q.    So that phrase "difficult but necessary" shows up in the second and third paragraph.

What does that mean?

A.    Well, this goes back to our dam safety concerns, right?  We felt like it was necessary to follow the Water Control Manual because we were concerned about dam safety for the corps' highest-risk dams.

Q.    Why did you decide that keeping the gates

Trial

closed was not as consistent with dam safety?

A.    Just like we talked about for the -- you know, we were concerned about both the primary outlet works and the emergency spillways.  And the higher the pool gets and the longer it stays there, you know, the greater the probability of dam failure.

Q.    And let's talk about, then, the fourth paragraph.  How does what you just described relate here to unacceptable risk?

A.    That's what that's talking about, where, you know, we're concerned that the spillways, the emergency spillways won't survive the spillway design flood.  So we wanted to make sure that we followed the Water Control Manual to do everything, you know, within our legal authority to help that not happen.

Q.    Okay.

MS. DUNCAN:  Let's talk about just one more. Let's go to PDF 16.  This is the release from September 5.

BY MS. DUNCAN:

Q.    So I've asked you about a release here on, you know, August 23rd, and now I want to you ask about a release on September 5.  But just for context for the court, I mean, why was the corps still sending out press releases as of September 5th?

A.   Well, we still had a flooding emergency.  You know, people were still flooding.

Q.   Okay.  And so why did the corps send the press release dated September 5th?

A.   So this was after a press conference that we had held where we were communicating to the public how the drawdown of the reservoirs would happen in the safest way possible that way they could have some sense of when homes would no longer be flooded.

Q.   Okay.  And when you say "drawdown," just can you define that for us?

A.   Right.  So we have to close the gates slowly to help prevent these rapid drawdown failures on the toes of the dam because the water was so high on the dam as well as on the downstream structures.  And so we don't just slam the gates closed.  We put a plan in place to gradually close the gates to prevent that rapid drawdown failure.

Q.   Was that rapid drawdown failure a concern during the Harvey event?

A.   Yes, ma'am.

Q.   And around what time frame was that a concern?

A.   That became a concern after the peak pools when we started closing the gates to reduce releases

because that's when the tailwater started coming down on the dam.

Q.   Okay.  And if we -- you mentioned that on September 5th there was still water in some homes?

A.   I believe so.

Q.   Okay.  And was there water in upstream homes?

A.   I believe so.

Q.   Okay.  And would that mean that the water is still beyond government-owned land?

A.   Yes, ma'am.

Q.   Okay.  So I'd like to ask you about the fifth and sixth paragraph here of the press release sent on September 5.

What's being described here?

A.   So the fifth paragraph says "The corps makes daily coordination calls with local government and stakeholders."  So that's referring in general to our Addicks and Barker Emergency Coordination Team.  And then it goes on to say that "We continue to work closely with our partners - the City of Houston, Fort Bend County, Harris County and the Texas Department of Public Safety - to provide them with the most current information available so they can make informed decisions."

Q.   Okay.  Now, the last two paragraphs on this

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

page describe a video.

What is this video?

A.    So our modelers created a video that shows how the flood progressed up to the peak pool and then a couple of days after that, and then it showed a forecast from there following this drawdown plan until when we would have gone back to normal operations.

Q.    Okay.  And in the last paragraph here it describes kind of the purpose of that video.

What is the purpose of it?

A.    It says that "The video can be seen at the link below along with a story map, used by first responders to determine where floodwaters may be in recuse operations."

Q.    Okay.  And how was if at all -- okay.

MS. DUNCAN:  So, Your Honor, at this time I would like to put up this video that's being described, DX 224.

And, Mr. Thomas, I'd like you to walk us through the video and have us stop just to orient us to what we're watching as we go.

MR. NOLEN:  Your Honor, I have to object only because we're now well into September.

THE COURT:  Yeah.

MR. NOLEN:  This is well after the decision

was made to open those gates.  It's well after the inundation has started and it's while it's continuing, and it's just not relevant to either of the two questions that the court has asked.

MS. DUNCAN:  Your Honor, may I respond?

THE COURT:  Yes.

MS. DUNCAN:  Mr. Nolen got up here and asked extensively about whether notifications pursuant to the EAP were made to the public.  He put up one cherry-picked press release, and we are providing the context for how the corps communicated throughout the entire emergency pursuant to the EAP about where the floodwaters were going and when they would be out of homes.  This is directly responding to what was raised yesterday.

MR. NOLEN:  Your Honor, if I may?

Ms. Duncan is I know aware that by the point in time that this press -- this information is being provided, the folks that I've shown you in canoes and kayaks have been evacuated from their homes because they can't live there because they've got five feet of water on their first floors if they have a two-story home, or five feet of water on their only floor if they're single-story home.  So, I mean, that's the issue, Your Honor, is that this is so far after the

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

event and after those folks have been evacuated from their homes because they've been flooded that it's just not relevant anymore.

MS. DUNCAN:  Your Honor, there's several reasons why this is relevant.

One, Mr. Thomas just testified at this point there are still people with water inside their homes and it's the upstream.  And plaintiffs want to just ignore the fact that by keeping the gates closed it would have flooded a lot more people and people were already flooded given how the corps operated the dams because there was so much water that it couldn't be prevented.  We do think it's relevant.

And, frankly, plaintiffs' modeler also presented information about duration.  And this also shows the duration of the flooding over time.  It's just a few-minute video as well, so...

THE COURT:  Yeah, I think there is marginal relevance, but it's relevant, so I'll allow it.

BY MS. DUNCAN:

Q.   So, Mr. Thomas, I'm going to ask Mr. Jackson to play DX 224, and I'd like you to walk us through, kind of have us stop to provide us context as to where we are in the reservoir operations during the event.

(Video played.)

A.   Okay.   So it starts with the reservoir is dry right before the rainfall arrived from Harvey.   You've already seen where the reservoirs -- you see Buffalo Bayou downstream.   So I think you can continue.

You can stop here.

So this is the 27th.   So this is before we started making the releases, the pools are starting to fill up.   You can see the blue in the reservoirs.   You can see that the green lines outline the watersheds. And so the center watershed is Buffalo Bayou.   The one to the south is Brays Bayou.   The one to the north is White Oak.   And you can see there's flooding everywhere.

THE COURT:   Well, let me ask a question here. It looks like at this point there are areas that -- of the reservoir that are still dry.

THE WITNESS:   Yes, sir.   The reservoirs are not filled yet.

THE COURT:   So did eventually all of the areas became inundated in the reservoir?

THE WITNESS:   Yes, sir.

THE COURT:   Okay.

MS. DUNCAN:   And --

THE COURT:   So this is early enough that the reservoir still isn't -- yeah, it looks like this is

all flooded; is that correct?

THE WITNESS:  That's right.  There was -- at this point we've had some pretty heavy rainfall in terms of, you know, the intensity of the rainfall, and so -- and much of that at this point has fallen kind of downstream of the reservoir.  So you see a lot of flooding throughout the City of Houston, down in League City where I live at, lots of flooding there.  Now you're starting to see the rain is moving up into the Addicks and Barker watershed, and you're seeing that now the pools are starting to fill.

MS. DUNCAN:  And --

THE COURT:  So this whole area that's flooded is not due to the reservoir surcharges?

THE WITNESS:  Correct.  Releases have not started yet.

THE COURT:  Okay.

MS. DUNCAN:  And can I ask a follow-up question while we're here?

BY MS. DUNCAN:

Q.    What's going on with the gates at the reservoirs at this point?

A.    The gates are closed.

Q.    Okay.  And what effect is that having on the upstream flows flowing into the reservoirs and their

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

impact on downstream properties?

A.    So right now we're providing flood risk reduction downstream.  There's no additional flooding from the Addicks and Barker watersheds into the Buffalo Bayou watershed yet.

Q.    Okay.  Okay.

MS. DUNCAN:  Your Honor, do you have any follow-up questions or should we keep going?

THE COURT:  No.

MS. DUNCAN:  Okay.

THE COURT:  Keep going.

BY MS. DUNCAN:

Q.    Let's keep going.

A.    So you can see they filled -- we can stop here.

So now by the morning of the 28th, Barker has reached government-owned land.  Addicks hasn't quite yet reached government-owned land.  And we're about to start making surcharge releases.  So if you watch carefully, the Buffalo Bayou, which is kind of the blue line in the middle of the Buffalo Bayou watershed, you'll see that it will start to grow as it gets both downstream rainfall and releases from the reservoirs.

THE COURT:  Is that around here?

THE WITNESS:  No.

Can I have my pointer, Charles?

THE COURT:  Is this the bayou?

THE WITNESS:  Yes, sir.  There you go. That's the one.  You can follow it all the way upstream.

THE COURT:  Okay.

MS. DUNCAN:  Your Honor, if you can give us just one moment, we'll get the witness a pointer that he can use to help.

THE COURT:  Okay.  So at this point, though, the reservoirs are all filled, I gather?

THE WITNESS:  So Barker has reached government-owned land.

THE COURT:  Yeah.

MS. DUNCAN:  You mean the limits of?

THE WITNESS:  The limits of government-owned land.

THE COURT:  Yeah.

THE WITNESS:  Addicks hasn't quite reached the limits of government-owned land yet.

THE COURT:  I mean around this area here?

THE WITNESS:  Right.  Addicks surcharge releases start at 101 feet and the government-owned land is at 103.

BY MS. DUNCAN:

Q.   And what is the pink line surrounding the back side of the reservoirs at this point?

A.   That is the extent of government-owned land.

Q.   Okay.  And on the 28th, what was the forecast for additional rain that the CWMS model assumed?

A.   So I don't have my cheat sheet anymore.  I think it was --

Q.   Would you like a copy of the summary exhibit on this?

A.   That would be helpful.

Q.   Okay.

A.   So on the 28th, that is another 25 inches are forecast.

Q.   And how much had already fallen at this point?

A.   25 to 28 during the day on the 28th.  So I think at this point we're probably -- yeah, that run was August 27th at 2300, so that should be accurate for what you're looking at right now.

Q.   So what does that mean?  So the forecast that you just described started on August 27th?

A.   Right.  That's what it says on our sheet here.

Q.   And at this point, what is forecast to flow

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                          10/30/2024

around the end of the dams?

A.   22,000 cfs around Addicks.

Q.   And that's the north end?

A.   Correct.

Q.   Okay.

THE COURT:  According to the forecast, we're halfway there to the 50 inches?

THE WITNESS:  According to the forecast at this point, yes, sir.

BY MS. DUNCAN:

Q.   Okay.

A.   So just a little -- let's see.  So this is the Addicks outlet, so it flows down here to connect to Buffalo Bayou.  And then this is the Barker outlet, and it flows directly into Buffalo Bayou.  And so this -- just like you saw, this is the bayou, and you can see that that's where you'll be watching for the surcharge releases.

MS. DUNCAN:  Does Your Honor have any further questions or should we keep going?

THE COURT:  No.

MS. DUNCAN:  Okay.

BY MS. DUNCAN:

Q.   Let's keep going, Mr. Thomas.

A.   So you can see there is some additional

flooding happening in this area now and this area.

Q.    What date are we on?

A.    We're on the 29th now.  It's also showing that flows started happening around the end of Addicks, and you can see that -- you know, this model is showing additional flooding here, but it's hard to discern, you know, whether that's from localized rainfall or from flow around the end.

Q.    And what's going on in terms of the pools in relation to government-owned land?

A.    So at this point both pools are off government-owned land.

Q.    And what are we seeing in terms of releases downstream?

A.    Let's see.  So I think at this point it's 2,600 to 4,000 cfs at Bark- -- well, no, sorry.  Barker says 3,100 to 4,000 cfs and Addicks says 26,000 to 4,000.  And then throughout the day on the 29th -- well, no, on the 30th, definitely on the 30th, we'll get to 7,500 or so at Addicks and maybe 6,000 at Barker or something like that.

Q.    Okay.  And why did it take from, you know, the very early morning of the 28th up through the 30th to reach full releases?

A.    Like I said, we want to really carefully

monitor the outlets to make sure that they were, you know, as safe as possible, so we opened them slower than, you know, we otherwise might have.

Q.   Okay.

MS. DUNCAN:  Does the court have any questions before we keep going?

THE COURT:  No.

BY MS. DUNCAN:

Q.   Keep going, Mr. Thomas.

A.   That's just a picture of the end of the dam there.  I think we can --

THE COURT:  Is this the maximum level the water reached or not?

THE WITNESS:  Not yet, sir.

THE COURT:  That was on the 30th?

THE WITNESS:  Yes, sir.  You can see there's some arrows here pointing to the increases in releases around the 29th.  And now you can see that there's a bigger flooded area.

Let's see.  There's a bigger flooded area around here.  You've been noticing this has been kind of growing now, so that's getting worse.

BY MS. DUNCAN:

Q.   Are the pools still rising at this point?

A.   The pools are still rising at this point.

And so you can go forward, I think, to the 30th.  So you can kind of see it's growing there.

THE COURT:  Mm-hmm.

THE WITNESS:  And now we're on the 30th.  Now we've reached peak elevations, and I think we're at peak discharges.  We can watch the video a little bit further and see if that area gets bigger or not, but I think we've reached peak discharges in this model.  So you can now kind of see that -- it looks like it's kind of steady state.  It looks like the flooding is about the same for a couple of days as the pools peak.  And then you can start to see the reservoirs are coming down.

And on the 3rd is when we started the drawdown plan.  We started closing gates on the 3rd.

MS. DUNCAN:  Okay.  And we don't have to watch the forecast for the future.  I think this gives our point.

Your Honor, do you have any follow-up questions as to this?

THE COURT:  No.  This is -- so this is the height of the water.  That's the maximum that --

THE WITNESS:  Well, we got to go back to see this.  It's come down a little bit at this point.  Around the 30th or the 1st is the maximum you'll see.

We kind of put it on the 30th, there, sir.

MS. DUNCAN:  Yeah, why don't we get there for the court.

THE COURT:  When did -- I know it began to fall more slowly than people I think had imagined because we're talking the middle of September before it had pretty much totally drained?

THE WITNESS:  Well, I think we had totally drained in October and November.  We got back to normal operation, so normal flows inside the bayou in the middle of September.

THE COURT:  Okay.  And so this area would have -- this area would have then drained by, what, mid-September?

THE WITNESS:  Yes, sir.  My notes say September 16th we got back to normal operations.

THE COURT:  Okay.  And these were where a lot of houses were for --

THE WITNESS:  I think --

THE COURT:  -- and the plaintiffs in this case?

THE WITNESS:  I think that the plaintiffs in this case, and somebody can correct me, is, you know, from this area down through here.  I think as you get further down here, I think the model shows that it was

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

about the same.

BY MS. DUNCAN:

Q.   When you say "down through here," what are you pointing at on the map?

A.   I'm pointing around here.  I'm not sure of the exact extent of the case, so I'm not sure I should answer this.  When you look at the modeling, it looks like around here is where you don't see any difference.  Somewhere in this area.

Q.   Is the map labeled "Piney Point Village"?

A.   Yes, ma'am.

Q.   And if we look back at Plaintiffs' Demonstrative 405 and we look down here at the legend for Piney Point gauge, Mr. Thomas, approximately where is Piney Point gauge on this map?

A.   It's the red triangle halfway or kind of in the center of the map.

MS. DUNCAN:  And so, Your Honor, for context, you can see that there's three plaintiffs downstream from that area and several more upstream.

THE COURT:  Where is -- is this the tiny village, tiny -- what is it called?

MS. DUNCAN:  Piney Point Village.

THE COURT:  Piney Point Village.  Is that where my pointer is?  Is that over here?

THE WITNESS:  Closer to where the green is at, sir.

MS. DUNCAN:  So why don't we move --

THE COURT:  Over here where you're --

MS. DUNCAN:  Not the green.  The green is -- yes, there we go.

Do you see where the green is now, Your Honor?

THE COURT:  Yes.  Oh, that's Piney Point Village.

MS. DUNCAN:  Yes.

THE COURT:  Okay.

MS. DUNCAN:  Okay.  Does Your Honor have any further questions?

THE COURT:  No.

MS. DUNCAN:  Okay.

BY MS. DUNCAN:

Q.   Mr. Thomas, do you recall being asked questions about whether you conducted internal notifications of the emergency conditions?

A.   Yes, ma'am.

Q.   Okay.  And did you report the conditions as described in Appendix C as Emergency Level 2 up your chain of command?

A.   I did report those conditions up my chain of

command.

Q.    Okay.  And what methods did you use?

A.    Emails and phone calls for everyone other than Colonel Zetterstrom who I talked to in person.

Q.    Okay.  And do you recall how early in the Harvey event those notifications began?

A.    I think that started on the 24th, I think.

Q.    Okay.

MS. DUNCAN:  And why don't we pull up DX 245.

BY MS. DUNCAN:

Q.    Mr. Thomas, when was this email?  When did you send this email?

A.    So the first one in the email chain is on August 25 at 4:00 P.M.

Q.    Okay.  And what are you -- what are you alerting or what are you writing about?

A.    So I'm informing the Southwestern division dam safety officer and dam safety program manager that there is a risk of activating surcharge releases or potentially the spillways.

Q.    And are those conditions described in Appendix C of the EAP?

A.    Yes, ma'am.

Q.    And if we -- can you remind us -- and then if we look at the very beginning of the email, was this

ever sent up the chain, do you know, to your headquarters?  Or were the conditions -- were the notifications made up the chain of command?

A.  Yes, ma'am.  This was notified all the way to both General Semonite and the dam safety officer, Mr. James Dolton.

Q.  Okay.  And do you -- and we can --

MS. DUNCAN:  Well, we can take that down.

BY MS. DUNCAN:

Q.  Do you recall being asked questions about whether you used the word sort of "emergency" in any of the communications?

A.  I remember being asked about emergency level too.

Q.  Did headquarters within the corps understand that this was an emergency situation?

A.  Yes, ma'am.

MR. NOLEN:  Objection.  Calls for speculation.

THE COURT:  Based on what -- how did you know that they considered this an emergency situation?

THE WITNESS:  Well, I talked to them, sir, and they sent me emails saying that this was an emergency.

THE COURT:  Okay.  I'll allow it, then.

MS. DUNCAN:  I'd like to put up on the screen DX 608.

BY MS. DUNCAN:

Q.  And, Mr. Thomas --

MS. DUNCAN:  Excuse me.  This is not the right email.  Let's take that down.  Let me get the correct.  Okay.  Let's go to DX 606.

And that should be in the same binder, Mr. Thomas.

BY MS. DUNCAN:

Q.  Mr. Thomas, when you say that you received emails indicating that headquarters was describing this as an emergency, how, if at all, does that relate to DX 606?

MR. NOLEN:  Objection, Your Honor.  This is the same document that was put up yesterday that Mr. Thomas was asked about that I objected to as hearsay because he was being asked about what this document says and you excluded it, Your Honor.

MS. DUNCAN:  Your Honor, may I respond?

THE COURT:  Yes.

MS. DUNCAN:  At the very least it is -- it goes to notice.  And it is also being offered for the truth of the matter it asserts because plaintiffs have raised the issue that notifications internally were not

made about the existence of an emergency.  This shows that notifications were made and that headquarters did consider this event to be an emergency at the time that the releases were occurring.

THE COURT:  So it doesn't go to the truth of the document, it goes to the fact that the document exists, that there was some notification to plaintiff that -- or to the witness, rather, that he got that.  So it doesn't go to the truth of what the document says.

MR. NOLEN:  Your Honor, this document is dated August 29th, and so it's after the releases began on the 28th and this -- nobody has disputed that they were having discussions internally at the Army Corps of Engineers.  They're having discussions.  There's a lot of email traffic back and forth about various things, but this is after the fact.  No emergency has been declared at all.

I've asked Mr. Thomas repeatedly about whether an emergency was ever declared.  He has said no.  And so this document doesn't add a single thing to our understanding with respect to the two questions at issue, Your Honor.

MS. DUNCAN:  And, Your Honor, if I may?

THE COURT:  Yes.

MS. DUNCAN:  First the releases are still increasing at this point.  And what Mr. Thomas has testified is that the EAP goes into effect automatically when certain triggers are hit.  And this shows that the headquarters knew that this was an emergency.  Moreover, I think we need to remember that --

THE COURT:  It doesn't really show what the headquarters knew.  It shows what they said and what language they were using.

MS. DUNCAN:  And they were using the word "emergency" which, you know, I think it's undisputed at this point that Mr. Thomas has testified the Emergency Action Plan was in effect and also there's a greater emergency for the legal standard.

THE COURT:  No, he hasn't admitted that that I've seen.  But there was clear there was some declaration of -- that there's a hurricane and kind of a general emergency which then allows resources to be diverted, used.  But that doesn't really deal with whether there was an emergency related to the dam that I can see here.

MS. DUNCAN:  Well, Your Honor, if we allow the witness to explain this document, I think this does show that there was an emergency related to the dam,

and I think that, you know, it is relevant not even --
I mean --

THE COURT: How can he explain it? He did not write this.

MS. DUNCAN: He was sent it.

THE COURT: He was sent it.

MS. DUNCAN: And, Your Honor --

THE COURT: I get a lot of letters that I can't explain sent to me.

MS. DUNCAN: What the witness testified to yesterday, and I can relist it if it is helpful, is that he was having regular meetings with Mr. Halpin and this is the kind of information that they were communicating as part of the dam safety emergency that was ongoing.

THE COURT: Yeah, I think that's pushing it too far. I'll exclude the document.

MS. DUNCAN: And, Your Honor, may we at least offer it for the purpose of notice that consistent with what Mr. Nolen questioned Mr. Thomas about claiming that there was no notification up the chain of command about an emergency this, at the very least, goes to notice.

THE COURT: Well, I don't know that that is a dispute that there was notice up the chain of command.

I think the one area that I know the plaintiffs had mentioned was there was no notice to the general public or to the -- so this doesn't necessarily deal with any of that.  So I don't think this is of any particular use on any issue that is at stake in the case unless I'm -- let me take a look at it more for a moment.

I don't know that this is in any way --

MS. DUNCAN:  Your Honor, may I --

THE COURT:  Yes.

MS. DUNCAN:  -- direct your attention to, for example, the paragraph numbered paragraph 2 --

THE COURT:  Yes.

MS. DUNCAN:  -- and the third bullet down, for example, it explains the decision for making the releases and why there was a sort of tradeoff in the risks that existed.  There was risk to following, there was risk to not following Water Control Manual and why they made that determination.

THE COURT:  "Probability of failure and consequences" --

MS. DUNCAN:  Yes.

THE COURT:  -- "remain high and we can't let a couple of days of nonfailure build false confidence." This is a -- go-go memo -- we got to keep -- it doesn't add anything except this is --

MS. DUNCAN:  Well --

THE COURT:  -- what would be typical of what would be going on in an organization.

MS. DUNCAN:  Well, Your Honor, I think the point is that this is not a typical event, and I can elicit that information from Mr. Thomas if helpful. And if we look at the third bullet under paragraph 2, it is talking about the decisions, the decisions that were made at the district level and approved all the way up at headquarters and why they were making that and the risk present when they had to make those releases.

THE COURT:  Well, that -- certainly that paragraph doesn't show that.  It shows that this was something ongoing that was a fairly big deal with normal corporate structure or organizational structure and there was just giving some general guidelines here, you know, like, keep up, keep up, we having won yet.

MS. DUNCAN:  Your Honor, might I note that the word "emergency" to describe the ongoing situation is utilized at the very -- in paragraph 2 at the very top here of the page.  The word "emergency" is also utilized right here in the second bullet under paragraph 2, and it's also used at the end of the email as well.

737

THE COURT:  Okay.  Well, but the emergency is qualified there because this is clearly in the early days when the emergency occurred.  So I assume this is referring to the fact of the general declaration of emergency which the corps made not with relation to the Addicks and Barker area but the entire Galveston area and the hurricane Tropical Storm Harvey, and that indicates that's what we're talking about.

MS. DUNCAN:  And --

THE COURT:  But it doesn't indicate anything about specific actions at that point at least on this particular area.

MS. DUNCAN:  And, Your Honor, I think that if we look at the subject line of the email, we can see that it is entitled "Risk and Operations at Addicks and Barker Dams."  So it is specific to the dams and how they're being operated and the risk present.

THE COURT:  Okay.  Yeah.  I see that.

MS. DUNCAN:  And so, Your Honor, you know, it references sort of the decisions made, the reasoning for the decisions.  It is calling it an emergency in multiple places, and it is relating directly to the issues here, not just sort a general emergency.  Therefore, we do believe it is relevant.

THE COURT:  Well, it says they're early in

the emergency which I assume means the whole emergency because this is not early in Addicks and Barker.

MS. DUNCAN:  Well, Your Honor, may I ask the witness to explain that?

THE COURT:  Okay.  I'll let you ask him ask.

MR. NOLEN:  Your Honor, if I may just before she asks a question?

THE COURT:  Yes.

MR. NOLEN:  We're getting a clear sense of Mr. Halpin's concerns.  There's no response back from this witness acknowledging those concerns that I'm aware of.  If there is, I don't think I've seen it. And he did not respond by saying, "Yeah, you're right, we're in an emergency and we made arrangements because we're operating under the emergency control plan." That's actually not anywhere in this document.

MS. DUNCAN:  Well --

MR. NOLEN:  And so they're still operating under their normal operations at this point because they're following the Water Control Manual.  So, I mean, again, I object to this as hearsay, Your Honor.

MS. DUNCAN:  And, Your Honor, thankfully we have the witness right here, so we can ask him.

THE COURT:  About what he did in response, did Mr. Thomas do anything in response to this memo,

like send back another memo saying we're doing that or...

THE WITNESS:  I don't think so, sir.  I think this was basically a summary of what we had already been talking about, so this was just him writing down things that we had already talked about.

THE COURT:  Okay.

BY MS. DUNCAN:

Q.   And, Mr. Thomas --

MS. DUNCAN:  May I ask a follow-up question, Your Honor?

THE COURT:  Yes.

BY MS. DUNCAN:

Q.   -- did you ever forward this to any members of your water control team?

A.   Yes, ma'am.

Q.   And why did you do that?

A.   So they would know that the headquarters knew, you know, what they were doing.

Q.   Okay.  And did the Water Control Manual -- excuse me.

Why did you want your water control managers to understand headquarter's position on the decision to release?

A.   I think everybody was, you know, stressed

about having to make these releases, and so it's -- I thought it was good for them to see that the headquarters agreed that it was the safest thing to do.

Q.   Okay.

THE COURT:  Kind of a morale memo.

THE WITNESS:  I definitely wanted them to feel good that they were doing their job appropriately.

THE COURT:  Okay.  I just don't think it's particularly relevant, so I'll deny its admission.

MS. DUNCAN:  Your Honor, we would like to make an offer of proof that if allowed to enter this email into evidence and ask additional questions about it, we would have elicited information that, you know, the headquarters of the corps at the time of the decisions and thereafter as the decisions had to continue throughout the life of the dam safety emergency during the Harvey event, that the headquarters understood that there was a tradeoff of risks and that the corps was doing all it could to operate safely in order to protect Downtown Houston and Houston generally.

THE COURT:  Again, I don't know what that adds to anything else in the record, the offer of proof is that they were good people, they were concerned with what was happening, which is presumably not an issue in

the case.

MS. DUNCAN:  Well, Your Honor --

THE COURT:  There's no challenge that they were good people.

MS. DUNCAN:  Yes.  Sorry to the extent it's not clear, that even the headquarters considered the circumstance to be an emergency which was -- you know, this email came after, of course, conversations with Mr. Thomas with headquarters.

THE COURT:  Okay.

BY MS. DUNCAN:

Q.   So, Mr. Thomas, yesterday there was suggestion that sort of the work you were doing during the event on the dam safety issues was somehow ordinary or normal.

How would you describe your work as the dam safety officer during the Harvey event?

A.   Certainly never done anything like that before or since.  It was exceptional.  It was an emergency.

Q.   Okay.  And were the dam safety-related you made with ABECT in the runup to having to utilize the induced surcharge regulation, was that a normal activity as your role as dam safety officer?

A.   So whenever there's a flood, we do ABECT

coordination.

Q.   Okay.  And have you ever had to communicate that induced surcharge releases were about to happen and the conditions related to them?

A.   Not that I know of, ma'am.

Q.   Okay.  And I'd like to ask you --

MS. DUNCAN:  Why don't we put up on the screen DX 290 at PDF 26.

BY MS. DUNCAN:

Q.   Can you -- just to put this into context, how much water was the corps having to manage during this event?  How did it compare to prior storms?

A.   So this figure shows -- it labeled "Top 10 Pools," it actually shows I think the top 11 pools, and it shows the storage at the max elevation for Harvey over 200,000-acre feet or so in Addicks compared to 100 and something, I can't read exactly off the graph.  So it's almost double for Addicks and it's more than double for Barker.

Q.   Okay.  Now, you were asked questions about how the operation of the gates impacted sort of flooding by Mr. Nolen this morning.

If the gates had never been closed on August 25th, when would water have reached the plaintiffs?

A.   So you mean if we had the gates all the way open --

Q.   Right.

A.   -- all the time?

Q.   And you never closed them pursuant to the Water Control Manual?

MR. NOLEN:  Objection, Your Honor.  That's not an issue in this case.  They didn't have the gates all the way open throughout this event.  In fact, that's not their Water Control Manual procedure and that's not the procedure they followed.  That's not a question the court has asked.

MS. DUNCAN:  And, Your Honor, the court has asked what would have happened if the corps had taken alternative action.  Plaintiffs are suggesting that the correct articulation of that is to just close the gates pursuant to the Water Control Manual and then never open them again even if the manual says to do it.  So it's relevant that Mr. Thomas has thought about the fact that -- and even thought about it at the time of the event, you know, sort of what would have happened if they had operated those gates differently.

THE COURT:  By "differently," what do you mean?  Do you mean --

MS. DUNCAN:  Keeping the -- well, my specific

Trial

question was keeping the gates open for the entire time, just disregarding the manual wholesale.

THE COURT:  Okay.  I'll -- that may reflect something, so I'll allow the question.

THE WITNESS:  Can you say the question again, please?

BY MS. DUNCAN:

Q.  Sure.

Based on what you knew at the time, what would have happened if you had kept the gates open for the entire event and had never closed them on the 25th?

A.  So we did talk about that during the storm.  Obviously decided not to do that.  But had we opened the gates and left them open from the beginning, the flooding downstream would have been worse and sooner.

Q.  Okay.  And the reason that you -- why did you close the gates?

A.  Following our Water Control Manual and to provide flood protection downstream.

Q.  And if the gates had remained closed for the entirety of the event based on what you know, what would have happened to the flooding upstream?

A.  The pools would have been higher upstream.

Q.  Would there have been additional flows going around the ends of Addicks Reservoir?

Trial

A.    Yes, ma'am.

Q.    Okay.  And just remind us, what is -- what sort of development exists upstream of Addicks Reservoir and around the end of the north Addicks Dam?

A.    So I think upstream is mostly residential. There are businesses, of course.  But then as you get to the north end, you start to see more commercial development as well.  But it's a lot of residential and commercial development all around the reservoirs.

Q.    Could the project have prevented all flooding upstream and downstream during the Harvey event by changing its operations?

A.    No, ma'am.

Q.    And why is that?

A.    Well, there was flooding downstream before we opened the gates and there was flooding, you know, upstream, obviously, separate from the project.  But, also, we can only release so much even with the gates all the way open, and so it doesn't have enough discharge capacity to prevent the pools, I think, from filling up.

Q.    Now, you were asked questions about a photo with water around the north end of the Addicks Dam.

Do you recall that?

A.    Yes, ma'am.

Q.   And you mentioned that -- you were asked whether there was a photo of water that might have existed on the other side of that building.

Do you recall that?

A.   Yes, ma'am.

Q.   Okay.

MS. DUNCAN:  I'd like to put up on the screen DX 646.

BY MS. DUNCAN:

Q.   You mentioned aerials.  So I'd like to show you something here.

Okay.  Was there aerial imagery from the event?

A.   Yes, ma'am.

Q.   Okay.

MS. DUNCAN:  And so why don't we move to PDF 2 of DX 646.

BY MS. DUNCAN:

Q.   And do you know what we're looking at here?

A.   This is the -- it's a NOAA website that has Hurricane Harvey imagery on it.

Q.   Okay.  And so you're familiar with this imagery?

A.   Yes, ma'am.

Q.   How so?

A.    I've looked at it.  I looked at it, you know, during the storm.  There was pretty good imagery during the storm, we were able to use it during the storm, and then I've looked at it since.

Q.    Okay.

MS. DUNCAN:  So let's go to page PDF 4.  Excuse me, PDF page -- let's do PDF page 4 first.  Well, sorry.

BY MS. DUNCAN:

Q.    Yeah, while we're on this exhibit, let me ask you, what are we looking at here just to orient us?

A.    So on the right side of the image, it shows which date is selected, so the August 30th, 2017, date is selected.  And this is the -- it's showing the Addicks outlet and the I-10 highway, Interstate 10.  It's a similar view to what we saw earlier in the trial but a little bit higher level.

THE COURT:  Where is the reservoir in this?

THE WITNESS:  Okay.  Hold on.  I'll get my little pointer out.  Maybe I'll get my pointer going.

BY MS. DUNCAN:

Q.    And perhaps while we're waiting for your pointer, we can describe it.

A.    Right.  So the big U is the cofferdam, sir, for kind of reference, and then the primary outlet

structure is just to the right of that cofferdam.  You can see the white water on the downstream side of the dam, and the upstream top part of the picture is the reservoir.

THE COURT:  So the reservoir is this area here or is it this area?

THE WITNESS:  That area, correct.

THE COURT:  Okay.  This area is the reservoir?

THE WITNESS:  Correct.

BY MS. DUNCAN:

Q.  Area to the north of the cofferdam?

A.  Right.  To the north or to the top of the picture.

Q.  Okay.

MS. DUNCAN:  And then if we zoom back out, let's look at the top sort of right side of the picture over by a road.

BY MS. DUNCAN:

Q.  Mr. Thomas, what are we looking at here?

A.  So that's a road.  I think that's Eldridge Parkway.  Don't quote me on that.  You can see our helicopter has actually landed on the road.  I think that's the helicopter that took me there to inspect the headwall when we had a concern about the headwall.

Q.   And what was the concern about the headwall?

THE COURT:  This is the helicopter?

THE WITNESS:  Yes, sir.

There had been a report that there was some cracks in the headwall.  We didn't really have any information at that time.  The team was still working on it.  But I happened to be on the helicopter, so they took me there.

THE COURT:  Is this area not flooded and the green area in the picture is not flooded at this stage?

THE WITNESS:  So where your pointer is at is flooded.  That's inside the reservoir.

THE COURT:  This area, I guess.

THE WITNESS:  That's the dam.  The green, that's the dam.

THE COURT:  Okay.

THE WITNESS:  And then just below that, sir, where you're kind of pointing out, is that a tennis court or a parking lot?  It's hard to see there.  That looks like it doesn't have water on it right now.

THE COURT:  That isn't flooded at this point?

THE WITNESS:  It doesn't look like it, sir. And this is the 30th, so this is as about as high as the flooding got.

BY MS. DUNCAN:

Q.   And what was -- you mentioned a crack in the dam.  What was the resolution of that issue?

A.   Well, I mentioned a concern over a crack in the headwall.  The resolution was that it was not an issue.  It was an older picture someone had found.  That our experts were able to go through and analyze it and realize that it wasn't an additional risk.

Q.   Did you have to run down other sorts of issues throughout the course of the event like that?

A.   Yes, ma'am.

Q.   Okay.  Now, just while we're talking about a helicopter, was there aerial sort of reconnaissance of the reservoirs?

A.   There was.

Q.   Okay.  Can you describe that for us?

A.   Well, in one case, for example, and I'm not sure who had ordered this, but there was a survey of the dams, and they saw -- I think they saw a -- what they reported was seepage.  They reported some seepage which we went and inspected and there was no seepage where they reported it at, so -- but we were getting -- different services were providing different information throughout the event.

Q.   Okay.  And monitoring the reservoirs and dams

by air?

A.   There was some of that ongoing, yes, ma'am.

Q.   Okay.

MS. DUNCAN:  Now, if we move to PDF page 8.

BY MS. DUNCAN:

Q.   Can you tell us what are we looking at in this picture?  And then we can zoom in.

A.   So the kind of diagonal line you see in the middle of the picture, that's the spillway.  And that building --

Q.   When you say "spillway," you mean the north Addicks Dam spillway?

A.   Correct.

THE COURT:  This is the spillway -- this is the picture of the building?

THE WITNESS:  Exactly, yes, sir, right there.

THE COURT:  And there is the spillway.

MS. DUNCAN:  Mm-hmm.

BY MS. DUNCAN:

Q.   Now, can we go to the next --

THE COURT:  And there's the puddle.  That's the puddle, I gather?

THE WITNESS:  It is.

THE COURT:  Okay.

MS. DUNCAN:  If we zoom back out,

Trial

Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                                    10/30/2024

Mr. Jackson.  Okay.

BY MS. DUNCAN:

Q.   Now we're on PDF page 9 of DX 646.  And, Mr. Thomas, can you just show us what we're looking at?

A.   So you can see the -- you can see what's wet in the photo.  And because you can see through it to the ground, you know that it's not very deep where you can see the ground through the water.  And you can see those vehicles driving on the road, and you can see the water kind of coming off of their tires.  So this is what I meant by it's -- it's hard to tell what's flowing around versus what's backing up by just being out there on the ground.  That's why, you know, the modeling is the best source we have for how much water flowed around.

THE COURT:  So it doesn't seem to have gone through the building.

THE WITNESS:  Right.  It kind of looks like the building slab might have been high enough.  It's hard to tell from the picture, sir.

MS. DUNCAN:  Okay.  Why don't we -- we can take that down now.

Unless Your Honor has any further questions?

THE COURT:  No.  I just want to -- so at least at this point, the spillway seems not to have

Trial

gone beyond that point ending in the puddle because the rest of the area looks green and at least not covered with water?

THE WITNESS:  What's the question again, sir?

THE COURT:  Oh.  I was just saying that my observation is the spillway seems to end before the building and the area on the other side of the building looks green and not covered with water.

THE WITNESS:  So I think you can see the water in the parking lot on the other side of the building.  So the other parking lot has got water on it, but you can't tell how deep it is.  I don't think it was very deep in that parking lot.

THE COURT:  Yeah, it looks like maybe mud.

THE WITNESS:  Right.

THE COURT:  It's gotten soaked, clearly.

THE WITNESS:  And I drove over there like the day after where those cars are seen on the road and it was, you know, 6 inches deep or so when I went over the day after.

THE COURT:  Mm-hmm.

MS. DUNCAN:  Okay.  We can take that down.

BY MS. DUNCAN:

Q.  So you were asked some questions yesterday about the 1962 Water Control Manual.

Do you recall that?

A.    Yes, ma'am.

Q.    Okay.  And you were asked questions about why you thought that the release regulations in '62 and 2012 were similar.  I just have a few follow-up questions for you on that.

What was the manual in effect after the 1962 Water Control Manual for the project?

A.    The 2012 Water Control Manual replaced the 1962 regulation manual.

Q.    Okay.  And you mentioned the release provisions in '62 and 2012 manuals were similar.  And why do you say that?

A.    I just compared the text in the '62 manual and the plates to the text and plates in the 2012 manual.

Q.    Okay.  And was there a datum change in between the two manuals?

A.    There was both a datum change and subsidence.

Q.    Okay.  And so when -- did you account for that when you observed the release regulations in those manuals were similar?

A.    So I tried to account for that by looking at the elevation of constant storage values to get a feel for how much the difference is between the numbers.

Q.   Okay.   And what was your ultimate determination about whether releases during the Harvey event, you know, would have been triggered around the same time under '62?

A.   Yeah, I believe they would have been triggered at the same time.

Q.   Okay.

THE COURT:  You said there was subsidence?

THE WITNESS:  Yes, sir.  So this part of Texas, the land is actually going down partly from water and oil withdrawal as well as just natural subsidence.  So that's why the north end of the Addicks Dam is lower than the west end of the Addicks Dam, for example.  So that's in the data as well as change in the datum.  It's really hard to tell.  You just can't look at the numbers and compare them easily.

THE COURT:  How much has it gone down and how much is the -- how large has the subsidence been?

THE WITNESS:  It depends on where you're at. There are some parts of area that have been 8 feet or so.  I think around the dams, it's a few feet.  It just depend -- and it depends exactly on where you are around the dam.

THE COURT:  Thank you.

MS. DUNCAN:  Okay.

BY MS. DUNCAN:

Q.   And why was there a need for the 1962 manual generally?

A.   That's when the last two conduits were gated on both reservoirs.

Q.   Okay.  And based on your review of the documents and historical documents, what was the motivation in 1962 for the imposition of the release schedule that you've said is similar to the 2012 manual?

A.   Can you say it again?

Q.   Yeah.

What's the motivation in the 1962 manual for the imposition of the release schedule that we described?

MR. NOLEN:  I'm going to object because that calls for speculation.  He's testified previously that he doesn't know.

THE COURT:  Yeah, I don't think he has any basis for knowing what -- why the '62 manual would change since he wasn't around in '62 here in the corps.

MS. DUNCAN:  And so let me ask another question.

BY MS. DUNCAN:

Q.   Based on what you know about Water Control

Manuals, when you read the release schedules in 1962, what is their purpose?

MR. NOLEN: I'm going to object on speculation again, Your Honor, because one thing that we learned about the Water Control Manual and the induced surcharge in this whole litigation, one thing we learned for certain, and we learned it from Mr. Thomas, is that the Water Control Manual itself doesn't tell us why you ever go into induced surcharge, and I just asked him about that, we just had a dialogue on that.

And, also, we've also learned that nobody knows who it is who ever added the induced surcharge regulation or how that came to be. It got added to the 2012. We don't know from 1962 why it was there in the first place, and we don't know why it got added to the Water Control Manual in 2012, but it did. So we know it did. We just don't have any idea who did it or why it was done. And Mr. Thomas told us in those -- one of those five depositions that he gave in this case that he didn't know.

THE COURT: Yeah, I don't think it's a body of historic knowledge like geology, Water Control Manual rating isn't quite in that zone. So the fact that he knows about water control doesn't necessarily

mean he knows why the '62 one was written.

MS. DUNCAN:  And I'm not asking about why it was written.  I'm just asking what is the effect, essentially, of the release schedule that we looked at for the 1962 manual on the operation of the reservoirs. I mean, he is a hydrologist.  He has -- he's, you know, a professional engineer.  He's studied these documents.

THE COURT:  Was there testimony about a release schedule in the '62?

MS. DUNCAN:  Yes, Your Honor, there is, and that's what I'm asking him about.

THE COURT:  I'll allow that.

THE WITNESS:  So I think what you're asking me is that in 1962, that there is a regulation schedule that makes releases while there is flooding downstream when you reach certain elevations and certain rates of rise.  And that's in the '62 manual just like it is in the 2012 manual.

BY MS. DUNCAN:

Q.   Okay.  Now, Mr. Nolen stated yesterday that he thinks that the 2014 EAP somehow modified the Water Control Manual from -- or EAPs generally modified the Water Control Manual from 1962.

Are you aware of the relationship between EAPs and Water Control Manuals?

MR. NOLEN:  Your Honor, I have to object because I don't think I said that yesterday.

THE COURT:  No, I think there was an indication whether the '62 manual was the same as the 2014 manual, and Mr. Thomas said he thought in so many words it was.  I guess neither one tell you when to use it, but they tell you if you're using it, you do X, Y, and Z; is that correct?

THE WITNESS:  Yes, sir, it tells you to make these releases at these times.  It doesn't tell you why to use it in the 2012 manual.

THE COURT:  Okay.  So your belief is that the two basically are saying the same sort of thing?

THE WITNESS:  My belief is that we would start making releases at the same time in both.  I believe that to be true.

THE COURT:  Okay.  Good.  Thank you.

BY MS. DUNCAN:

Q.    Now, does the -- so just thinking about the 2012 Water Control Manual which you were asked questions about yesterday and today, does the inclusion of the induced surcharge release schedule in the 2012 manual mean that its use during Harvey was not an emergency situation?

A.    Can you say it again?

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

Q.   Sure.  Perhaps let me ask it a little differently.

How can there be an emergency situation at the reservoirs if releases are made pursuant to the Water Control Manual and not pursuant to the EAP?

A.   So the EAP tells us what emergencies are and how we should respond to them and the Water Control Manual tells us how to make the releases.  And in these cases, following the Water Control Manual is also a nonbreach emergency because there's flooding.

Q.   Okay.  Mr. Nolen also asked you questions about whether the corps requested a deviation.

Do you recall that?

A.   Yes, ma'am.

Q.   Okay.  Why didn't the corps request a deviation from following the induced surcharge regulation to begin releases?

A.   Well, like I've said, we put a lot of thought into it, and we feel strongly that following the Water Control Manual was the safest thing to do.

Q.   Okay.  And was there ever a request during the entirety of the Harvey dam safety emergency when a deviation was requested?

A.   Yes, ma'am.  Like we talked about, there was a kind of verbal deviation, it may have been an email,

I don't remember, for testing the gates. And there was a deviation for the drawdown plan.

Q. Okay. Now, does the Water Control Manual from 2012 ever discuss its relationship to an Emergency Action Plan?

A. It does.

Q. Okay.

MS. DUNCAN: And if we go to JX 2 at PDF 52 very briefly.

BY MS. DUNCAN:

Q. What are we looking at here in 7-13, this section? Just at a high level. Is this sort of the reference you were describing?

A. Yes, ma'am.

Q. Okay.

MS. DUNCAN: I think we can take that down.

BY MS. DUNCAN:

Q. So yesterday you were asked questions from your deposition about whether the corps "Formally declared an Emergency Level 1, 2, or 3 emergency."

Do you recall those questions?

A. Yes, ma'am.

Q. Is declaring an emergency required for the Emergency Action Plan for Addicks and Barker to go into effect?

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

A.   Not according to the Emergency Action Plan.

Q.   Okay.  And as the dam safety officer in charge of the Addicks and Barker project, was the Emergency Action Plan in effect during the Harvey event?

A.   Yes, ma'am.

Q.   And was the EAP, Emergency Action Plan, in effect at the time that the induced surcharges -- surcharge releases began?

A.   Yes, ma'am.

Q.   And by what date was the Emergency Action Plan in effect for Addicks and Barker Reservoirs?

A.   I -- the cheat sheet.

So either the 23rd or the 24th.

Q.   Okay.

A.   Whichever those forecasts showed the triggers.

Q.   Okay.  Now, even beyond the Emergency Action Plan, did Hurricane Harvey present an emergency situation at the Addicks and Barker Reservoirs?

A.   Yes, ma'am.

Q.   Okay.  And can you describe that for us?

A.   We had surcharge releases.  We had flooding off government-owned property.  We had releases around the end of Addicks Dam that's clearly defined in the

Emergency Action Plan as an emergency.

Q.   Okay.  And even beyond the Emergency Action Plan, as the dam safety officer for the reservoirs and dams, would you characterize the event and the operations during it as an emergency?

A.   Yes, ma'am.

MS. DUNCAN:  May I have one moment?

THE COURT:  Sure.

MS. DUNCAN:  Your Honor, that concludes our questioning for the witness.  I don't know if Mr. Nolen has any more.  We do have some exhibits to offer.  A few were admitted throughout, but we will need to also offer additional exhibits we discussed.

THE COURT:  Do you want to do that now?

MS. DUNCAN:  Sure.

I mean, do you?

THE COURT:  Mr. Nolen, do you want to do any -- why don't we do the redirect first -- or recross.

MR. NOLEN:  Just one second, Your Honor.

Your Honor, are you ready for me to proceed?

THE COURT:  Yes.

MR. NOLEN:  All right.

REDIRECT EXAMINATION

BY MR. NOLEN:

Q.   Mr. Thomas, you still not familiar with this 2006 Emergency Action Plan?

A.   I don't remember reading it, sir.

Q.   You know that the 2012 Water Control Plan specifically refers to it, right?

A.   I actually saw that a second ago when I was looking at it.

Q.   Right.

And so you were testifying about the 2012 Water Control Plan -- or the Water Control Manual, you were testifying specifically about the Water Control Manual, and you told us yesterday you didn't know about the 2006 Emergency Action Plan, but you just testified that there were -- there's some sort of cross-reference between the Water Control Manual and the 2006 Emergency Action Plan, but you didn't know about it, right?

A.   Like I said, I don't remember reading that before.

Q.   All right.

MR. NOLEN:  I'm going to ask that we pull up DX 224 which was the video that we looked at earlier.

Oh, sir, I need you to switch us over.

BY MR. NOLEN:

Q.   Okay.   This is the video that the corps made.

MR. NOLEN:  So can you freeze that, please?
All right.  Just freeze it.

Back it up a little bit, if you can.

Okay.  Freeze, please.

BY MR. NOLEN:

Q.   All right.  So if we look at this and we see all of this water on the ground, we don't know what the depth is, do we?

A.   That's correct.

Q.   Okay.  And so you've been here a long time, right?  20-plus years in the Houston/Galveston area, right?

A.   Yes, sir.

Q.   Longer than that, actually?

A.   I think I moved here in 2001.

Q.   All right.  So 23 years, right?

A.   Correct.

Q.   So you know that in Houston and in Galveston, it's often common to get street flooding, true?

A.   It does flood frequently here.

Q.   Right.

And actually where the Army Corps of Engineers is located to get to that location from

Galveston, if you're driving out there, the street actually floods and becomes impassable before you get there if you get a heavy rain, doesn't it?

A.   A couple of times a year.

Q.   Right.

But the corps itself and, you know, the base out there, that doesn't flood, does it?

A.   Well, that's not exactly true.  It flooded during Hurricane Ike, for example, out there.  But not the same way.

Q.   So when a Category 3 hurricane hits it directly, it floods?

A.   It depends on the storm surge.

Q.   Right.

But when you get a heavy rain in Galveston and you get that flooding that makes it impossible to get out to the corps from Galveston, the base out there is not flooding, right?

A.   Not usually, sir.

Q.   Right.

And so when we look at a picture like this, it looks like all of this is inundated.  I mean, it's just flooded.  And all of these homes are just under water, but we can't tell that from this picture, can we?

A.   You can't tell the depth of flooding in a person's home from this picture.

Q.   Right.

And you were here for opening statement, right?

A.   Yes, sir.

Q.   Okay.  So you heard my opening statement, that according to the census bureau, there are 998,195 housing units in Houston.

Did you remember that?  Did that stick with you at all?

A.   Not the number, sir.

Q.   Okay.  Probably shows the effectiveness of my opening, but...

But the thing about that is, is you know that there were only 96,410 homes that flooded during Harvey, right?

A.   I'm tracking that about 10 percent of the homes in Harris County flooded.

Q.   And I've got 11 percent, so we're very close.

So although we've got a whole bunch of street flooding that's occurring all over here, all of these homes are not flooding, right?

A.   Well, I don't think I can say that.  There was especially in Brays Bayou very substantial

flooding.

Q.    And there always is, right?

A.    There is frequently flooding in Brays Bayou.

Q.    I mean, they just spent $600 million trying to improve that, right?

A.    I don't remember the dollar value offhand.

Q.    A lot.

And they have been trying to improve Brays Bayou since I was a child, true?

A.    Well, I don't know your exact age --

Q.    61.

A.    -- but I think that's true.

Q.    61.

A.    That sounds about right.

Q.    So a really long time?

A.    Yes, sir.

Q.    Okay.

But we can say with some degree of certainty that this water that we're seeing is not flowing into everybody's homes, true?

A.    I'm not saying that.  I understand that there was flooding on all of the major watersheds.

Q.    Yes, sir.

But we're not getting flooding in all of -- this entire thing right here is not flooding, true?

A.   I'm not trying to represent that every home in that whole area flooded.  This is the inundation map that we used.

Q.   Yes, sir.

And we know, for example, that eight of these homes right here aren't flooding because we've got your expert -- the corps' expert and our expert agreeing that eight of these homes aren't flooding at all until these releases occurred, true?

MS. DUNCAN:  Objection.  Foundation. Speculation.

MR. NOLEN:  He was here.

MS. DUNCAN:  Your Honor, he doesn't have knowledge of -- personal knowledge of what the experts have done.  He is sitting here as a fact witness, and asking him to comment on the details of those reports is highly inappropriate.

THE COURT:  Well, it may trigger something in his fact testimony if the experts are saying it's flooding or it hasn't flooded, so I'll allow the question.

MS. DUNCAN:  And, Your Honor, just so the record is clear, Dr. Nairn has not testified yet, and so we'll just note that all we're going on at this point is what Mr. Bardol has said about Mr. Nairn's

Trial

testimony.

THE COURT:  Okay.  Go ahead.

BY MR. NOLEN:

Q.  So my question was, we know or we have a really good idea that eight of these homes didn't flood until the reservoirs were open, right?

A.  So I did see Mr. Bardol's testimony on that, but I don't have my own opinion on it.

Q.  And that's something that I think I've talked to you about before.

In your position, you actually haven't -- you didn't attend any of the plaintiffs' depositions, right?

A.  No, sir.

Q.  Right.

And you didn't read any of the plaintiffs' depositions, right?

A.  Not unless one of the lawyers showed me something.

Q.  And you didn't go and investigate whether any of these homes along Buffalo Bayou flooded, did you, after the fact?

MS. DUNCAN:  Objection.  Relevance.

THE COURT:  What is the relevance?

MR. NOLEN:  Well, the relevance, Your Honor,

is that one of the things that you would probably want to know is what your -- whether your mapping and the projections that you had were, in fact, accurate because they were in the -- what he calls the inundation area downstream, and so one of the things that you would expect as part of an after-action report would be to go and confirm did we, in fact, inundate these homes when we made those releases.  And I don't think even to this day that Mr. Thomas in his capacity at the Galveston district has done that.

THE COURT:  Okay.  Any...

MS. DUNCAN:  Well, Your Honor, I mean, the purpose of showing this was to show that the corps was providing notification as part of its EAP and its sort of general admission to the public of the flooding conditions, including the ongoing flooding so that rescue workers could get to where they needed to be, so people would know how to get in and out of their houses.

He's always said that this was simply modeling.  So I guess I'm just not sure why he's being questioned about sort of an after-action report on the modeling.

MR. NOLEN:  So, Your Honor, just if I may respond just a little bit here, you see this picture,

somebody could look at this picture and say, gosh, all of these homes, they're all flooded.

THE COURT:  Yeah.

MR. NOLEN:  Everything's flooded.  And what the evidence is, and what the evidence with Mr. Bardol is and what the evidence will be from Dr. Nairn is, is these folks right here where you're seeing this, this what looks like flooding right here, before those gates were opened, before though reservoirs were opened, despite all of this and all of that, they weren't flooding.

THE COURT:  Mm-hmm.

MR. NOLEN:  And so what I was asking the witness about is, is did he go back and make a conclusive determination, which we've never seen, but a conclusive determination about whether their modeling was, in fact, accurate, so this is a model, whether it was, in fact, accurate and whether when they opened these reservoirs up, all of these homes that weren't flooded did flood.  That's what I'm asking him.

MS. DUNCAN:  And, Your Honor, the witness never testified about whether plaintiffs did or didn't flood.  This is well beyond the scope.  He's a fact witness.

THE COURT:  Well, but he's interested in

safety.  I think it's relevant to his general focus.
I'll allow the question.

THE WITNESS:  Can you say it again, please?

BY MR. NOLEN:

Q.    So the question was:  Is that with respect to all of this flooding that's occurring with regard to at least those eight homes until the reservoirs were open, despite what this model looks like, they actually didn't flood, and I'll represent that to you, and that's going to be evidence from Mr. Bardol, that's going to be the evidence from Dr. Nairn, but you haven't gone back and confirmed whether your modeling is accurate, have you?

MS. DUNCAN:  Your Honor, that's argumentative.  He's infused this question with his sort of presentation of the facts, and Mr. Thomas doesn't have intimate knowledge of what happened in each of these properties.  That's a question for Dr. Nairn if he's going to ask it at that point in the case.  This is a fact witness.

THE COURT:  Maybe.  But it seems to me it's a credible challenge, so I'll allow the question.

THE WITNESS:  Okay.

MS. DUNCAN:  And, Your Honor, may I further note that Mr. Nolen then needs to lay the foundation

for why Mr. Thomas would know what -- whether these particular properties were flooded in relation to this map, and I'll submit he would not have knowledge of that.  That needs to be established.

THE COURT:  We'll let him answer the question, then.

THE WITNESS:  I'm sorry, sir.  Could I have it one more time?

BY MR. NOLEN:

Q.   Let me try to lay a little foundation for this.

The corps spends millions and millions of dollars on mapping, true?

A.   The entire corps does, sure.

Q.   Yeah.

And y'all have spent millions of dollars on mapping downstream from Addicks and Barker; isn't that right?

A.   On modeling do you mean?

Q.   Yes, modeling.

A.   So as part of the Buffalo Bayou and Tributary Resiliency Study there's been an extensive modeling effort.

Q.   Right.  Going all the way back to the 1940s, true?

A.    Well, that particular effort started in 2018. There have been models before that, though.

Q.    Yes, sir.  I'm sorry, you qualified it was the Buffalo Bayou, really the study that's ongoing that the government is raising the privilege on.  But -- and I understand there's been a lot of new work because Congress allocated funds to do this Buffalo Bayou and Tributaries Reservoir Study, right -- Resiliency Study, correct?

A.    Correct.

Q.    Right.

But way before that, all the way back to the 1940s, '50s, '60s, '70s, '80s, y'all have maintained an updated mapping for the entire downstream area of Buffalo Bayou, true?

A.    Do you mean modeling?

Q.    Yes, your modeling.

A.    Modeling, yes.  The corps has been analyzing flow and flooding around the bayous and the reservoirs since they were constructed, and before.

Q.    So the 1940s?

A.    Correct.

Q.    Yes.  And so here's your opportunity with the controlled releases which had never happened before in the history of the reservoirs to find out whether, in

fact, your modeling was accurate, wasn't it?

I mean, this is your opportunity.  Y'all did these releases, these people were inundated for 19 or 20 days, and the corps never even went back to see if their modeling had been accurate, has it?

A.   I don't know that that's true.

Q.   Has it?

A.   I don't do the modeling, so I can't give you details about how the modeling has been calibrated and verified.  I think there's a lot of testimony in my deposition about this.  And I think it all comes down to the fact I didn't do the actual modeling.  But we did send hydrologic observers out during the storm.  We did have USGS doing calculating, measuring some flow data for us in different places.  So we did collect data during and after the storm, I just don't know how that's been included in different models because I don't do the modeling myself.

Q.   Well, let me ask you, then.  So we're going to hear from Dr. Nairn at some point, right?  I think $2 million has been paid to Dr. Nairn, but that will come out during his deposition -- I mean during his testimony.

Did the corps know which properties flooded as a result of opening those reservoirs before they

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

ever hired Dr. Nairn?

A.    So we talked about that we have those constant flow maps.  We had information, but we didn't have, you know, exactly which home was going to flood, you know, in front of us while we were making that decision.

Q.    Okay.  So I'm just trying to establish here what would have happened had the gates stayed closed because we say if the gates had stayed closed, those eight homes wouldn't have flooded, and Dr. Nairn agrees with that, we think.  We think that's going to be his testimony.  We heard Mr. Bardol testify that that's the case.  All right?

So the corps, though, knew that if it kept the gates closed, those homes wouldn't flood, right?  You knew that back when this was occurring when you made those induced surcharges, right?

MS. DUNCAN:  Objection.  Lacks foundation.

THE COURT:  Well, he's asking --

MS. DUNCAN:  -- he didn't analyze these specific houses.

THE COURT:  Well, this is foundation because he's asking him if he had that knowledge, so I'll allow the question.

THE WITNESS:  I didn't have specific

knowledge about specific houses when the decision was being made.

BY MR. NOLEN:

Q.   But your mapping is good enough to tell you to the street which residential properties will flood, right?

A.   You can see on the constant flow maps and on the inundation maps the area that's flooding, but I didn't look at specific houses.

Q.   Okay.  And so in your capacity and your position, you haven't gone back and made that analysis yourself; is that true, Mr. Thomas?

A.   So my position doesn't do that kind of analysis.

Q.   Do you know if the corps has done that?

A.   So like I said, we've done a really extensive modeling effort as part of the Buffalo Bayou and Tributary Resiliency Study, so we could look at that analysis.  It would include things like you're talking about, but I don't know if it would answer your exact question or not.

Q.   Okay.  So let's run this model a little farther.

MR. NOLEN:  Just hit play, please.

BY MR. NOLEN:

Q.   So now we're on the 28th, and the --

MR. NOLEN:  I'm sorry.  Well, it's fine.
Just leave it that way.

BY MR. NOLEN:

Q.   So we're now on the 29th.  Okay?  So this is
one day after the releases have begun, correct?

A.   Correct.

Q.   Because they started on the 28th, right?

A.   Correct.

Q.   Okay.  So here we are one day later, all
right?

Look at all this.  So all of this water is
starting to subside.  Now let's go to August 30th which
is when you -- I think you told me that you're getting
to maximum downstream inundation, right, on the 30th?

A.   I think that's about right.

Q.   Okay.

MR. NOLEN:  Let's run that to the 30th now.
Here we go.

BY MR. NOLEN:

Q.   All right.  So let's look at what we got
here.

So here we've opened these gates up and we've
got all this flow.  Now look at this.  These are all

those homes.  These are where those eight homes are, and then it goes all the way down and you see all of that.  But look at the rest of Houston.

And so I said in opening Houston is flat but it drains, right?  And that's true, isn't it, Mr. Thomas?  Houston is pretty flat but it drains?

A.   That sound true to me.

Q.   Right.

And so when we get a big rain and you got all of that -- all of this is blue up here, all of that is blue down there, when you're seeing all of that, that doesn't mean that all those homes are inundated with water, does it?

MS. DUNCAN:  Objection, Your Honor.  Asked and answered.  He's already stated he doesn't think this shows the levels of inundation.

THE COURT:  I'm not sure that it was asked, but it wasn't asked exactly the same way.  I'll allow it to be asked.

THE WITNESS:  Okay.  Could you ask it again, please?

BY MR. NOLEN:

Q.   Right.

So we're -- the point is, Houston is flat, it floods, and it drains.  And when I say "it floods,"

that means we get street flooding, we get -- sometimes you get flooding in your yard, but every home doesn't flood.  And so here we are on the 30th and we've got these folks, they're inundated because those gates, reservoirs are open, wide open, and all this area up here, it's drained.

And down here you've got some flooding, it looks like, but you still got -- you know, and I say "flooding," I don't know how deep it is, and neither do you because you just told me that, but you see you got all this drainage occurring, and this is on the 30th --

MS. DUNCAN:  Objection.

MR. NOLEN:  -- right?

MS. DUNCAN:  Compound and lacks foundation as to which specific properties are flooded at this point.

THE COURT:  Yeah, I think it's -- it is a general question if we're focusing on individual properties, which are an effect of the gates opening, then you should define the question a little more.

MR. NOLEN:  So, Your Honor, I'm not really trying to focus on right now these -- the fact that this is inundated.  I mean, we can all see this.

THE COURT:  Okay.

MR. NOLEN:  What I'm focusing on is here we are on the 30th, the gates are wide open because he's

testified that, you know, we're reaching maximum or reached maximum inundation at that point.  But all of this area that was blue on the 27th and the 28th and the 29th, it's drained, right?

THE COURT:  Okay.  Well, ask him that question.

THE WITNESS:  Okay.  So what's the question now?

BY MR. NOLEN:

Q.   It's drained?

A.   There has been drainage from the day before in other watersheds.

Q.   Right.

And so let me ask you this, then:  So if these homes didn't flood during this big rain event and these gates aren't open, they're not under water, are they?

MS. DUNCAN:  Objection.  Calls for speculation.  Lacks foundation.

THE COURT:  Well, I'll let him answer.  I mean, I think that's based on obvious data, so I don't think it's speculation.  I'll allow the question.

THE WITNESS:  What's the question again?

BY MR. NOLEN:

Q.   They're not under water because the gates

aren't open?

A.  I can't speak to specifics, but had the gates not been opened, you would see more drainage in the bayou than you see here.

Q.  Right.

MR. NOLEN:  Okay.  I'm going to go to JX 059.

BY MR. NOLEN:

Q.  And you were shown this earlier.  And I'm going to start at the back.

THE COURT:  Okay.  I'd like to end in about 15 minutes.

MR. NOLEN:  Yes, sir.  And I'm going to do it.  I will get there.

MS. DUNCAN:  And, Rand, what's the DX number?

MR. NOLEN:  It's JX 059.  You showed it as the DX number.

MS. DUNCAN:  Oh, okay.

BY MR. NOLEN:

Q.  So looking at this and starting at the back, it starts with an email from you, Robert Thomas, on August 25th, 2017.

And, again, we're three days before the reservoirs' release, right?  Three days early, the 25th?

A.  Correct.

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                                   10/30/2024

Q.   Okay.  And it says -- it's from you, "Good afternoon.  Our forecast shows a risk of activating surcharge releases or potentially the spillways.  With the crazy weather planned, I pre-deployed to the dams this afternoon just in case weather prevents being able to get up here later in the weekend."

Do you see that?

A.   Yes, sir.

Q.   And you testified with Ms. Duncan about that, right, about yourself pre-deploying?

A.   Yes, sir.

Q.   Okay.  So if we go forward to the next page and we look at a response that was ultimately sent up to you from Mark Mazzanti -- how do you say that?

A.   I think he says it Mazzanti.

Q.   Mazzanti.  Okay.

It says "We should discuss the timing conditions under which we release this... saying we knew and didn't pass along will not be good."

And that's also on August 25th, 2017.  Do you see that?

A.   Yes, sir.

Q.   And then at the very top, you're sending this out.  You send it out to the group, and it's from you, and it's on the 25th again, or at 9:05 P.M.  And it

says "FYI, I'll let Mike Z know what we are doing and he passed up to Mark and Pete.  Email chain below."

Do you see that?

A.   Yes, sir.

Q.   All right.  So you're just forwarding the email chain, right?

A.   Yes.  So in this case, Mark Mazzanti and Pete Perez are the senior executive service members that lead our organization at Southwestern division, and so I was letting the district's commander and senior civilian know, you, what those two people knew.

Q.   Okay.  And did you agree with the notion that you should discuss timing and conditions under which we release, saying we knew and didn't pass along will not be good?  Did you agree with that?

A.   Probably.

Q.   Right.

I mean, that's not controversial, right?  You want to let people know if you're going to have these big releases and potentially inundate them, right?

A.   Yes, sir.

Q.   Okay.  And so I wanted to just ask you one more thing about something you said earlier about the Water Control Manual versus the 1962 manual.

You said that you thought releases would have

occurred about the same point in terms of when you made the releases during Harvey even if you were under the 1962 manual?  Is that what I understood?

A.   That's my understanding.

Q.   Okay.  So I want to be clear, you have in 1962, you've just -- the corps has just added the gates to the reservoirs, right?

A.   Correct.

Q.   All right.  So now all of the conduits are gated, true?

A.   True.

Q.   Okay.  So in the 1980s, they raised the reservoirs, right?

A.   Correct.

Q.   All right.  And they hardened the spillways, true?

A.   Let me go back.  I said correct.

We raised the top of the embankments and we left the spillways at the same elevation they were before, so we didn't actually raise the reservoir.  We made it so that the dams would survive a new spillway design flood.

Q.   All right.  So they could hold more water?

A.   Without failing.

Q.   Right.

And so -- and you hardened the spillways, true?

A.   True.

Q.   And you did that by putting concrete on them, correct?

A.   Correct.

Q.   And sometimes I see that as armoring the spillways, but you're armoring it with rolled concrete, right?

A.   Roller-compacted concrete, correct.

Q.   Yes, sir.

And so now you have increased the capacity of the reservoirs, right?

A.   We've increased the capacity they can survive.

Q.   Right.

The safe capacity of the reservoirs have been increased in the 1980s, true?

A.   True.

Q.   And yet -- and yet we still have the same release when water backs up behind the reservoirs?  Is that what your testimony is?

A.   Yes, sir.

Q.   All right.  So we did all that work, we spent a bunch of money doing it, and yet we're going to

release at the same level that we were going to release back in 1962?

A.   Yes, sir.

Q.   All right.  Okay.

So just getting back to important to tell people, I'm going to pull up DX 223.  And this was a document that was put into evidence a moment ago when it was called up on by Ms. Duncan.  And it's the compilation of press releases that were put out by the U.S. Army Corps.

Do you remember testifying about this earlier?

A.   Yes, sir.

Q.   Okay.  Starting with the first one, which was posted on August 23rd, 2017, which is now five days before the releases, right?

A.   Yes, sir.

Q.   Okay.  It says "Posted 8/23/2017."

Do you see that?

A.   Yes, sir.

Q.   All right.  And this is the information that you were sending out to the public and to your partners, the Harris County Flood Control District and the City of Houston and Fort Bend County, right?

A.   Well, I think these are the public releases.

There were additional information that went to our partners.

Q. Okay. But this is what you're telling the public, right?

A. These were press releases to the public.

Q. Okay. So look at what it says. "Galveston, Texas, August 23rd, 2017," and it starts "The U.S. Army Corps of Engineers, Galveston District, initiated emergency operations on Tuesday afternoon in preparation for Tropical Storm Harvey."

Do you see that?

A. Yes, sir.

Q. Okay. And then it goes along and it talks about all of the things that the Army Corps does in the Galveston district. And so I want to be clear on this because I'm afraid there may be a wrong impression. You've been deposed multiple times. You've spent a lot of time with the lawyers upstream and downstream. You've been treated respectfully, haven't you?

A. I think so.

Q. Yes, sir.

And nobody has suggested that the work y'all do is not extraordinarily important, right?

A. I don't think so.

Q. Right.

Well, nobody has suggested that, and I'm not suggesting it now.  But the point that I'm making, though, is that if we look at this press release, it says "The Addicks and Barker Dams which provide flood risk reduction to the Houston area are operating as designed."

Do you see that?  That's highlighted for you.

A.    Yes, sir.

Q.    Okay.  Now, if we go down in this document just a little bit, it says nothing more about the Addicks and Barker Reservoirs, does it?

A.    I don't think so, sir.

Q.    Right.

So that's the information that were given to the public on the 23rd, just that they're operating as designed, right?

A.    Yes, sir.

Q.    Okay.  And if we go to the next document, which is one of the press releases, it says "Posted 8/25/17."

Do you see that, sir?

A.    Yes, sir.

Q.    All right.  And it says "Galveston, Texas. The U.S. Army Corps of Engineers Galveston District issues the following updates in preparation for

Trial

Hurricane Harvey."

Do you see that, sir?

A.   Yes, sir.

Q.   All right.  And that's in anticipation of a Category 4 hurricane hitting Texas, true?

A.   I think so.

Q.   Right.  That's Hurricane Harvey.  And it was a tropical storm, then it ramped up to a hurricane level 4, big, big hurricane.  And then when it came and sat over Houston, it went back to a tropical storm status, right?  Correct?

A.   I think so.

Q.   Right.

And so if we look at this document and we read it right here, it says "When a rain event occurs, the gates are closed on the Addicks and Barker dams to reduce flooding impacts to residents downstream.  When downstream runoff recedes to nondamaging stages, reservoir operations resume and the gates are reopened to release water back to normal levels."

So that's what the Galveston district is telling the public on the 25th; is that right?

A.   That's true.

Q.   Right.

And so if we go back down here, you tell them

a little more.  It says "Both dams are normally operated with the gates open to allow free flow of stormwater.  However, when a rain event is forecasted, the reservoir gates are closed to reduce flooding downstream.  The gates are reopened when the storm has passed and the threat of flooding downstream has passed."

That's what the Galveston district is telling the public on August 25th, 2017, right?

A.   Yes, sir.

Q.   Okay.  If we go to the next document, it's another press release that is dated -- or posted 8/25/2017.

Do you see that?

A.   Yes, sir.

Q.   And it says "Galveston, Texas, August 25th, 2017."  So this is a little later, but it's another press release.  It says "The Addicks and Barker Reservoirs are currently empty and are functioning under normal conditions where natural flows are being released through the system and into Buffalo Bayou."

Do you see that, sir?

A.   Yes, sir.

Q.   And then we go down to the rest of the highlighted part, it says "We have full faith and

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs          10/30/2024

confidence in the entire dam structure to include the cofferdams.  We do not anticipate any overtopping of the dams with the current forecast of 10 to 15 inches of widespread rainfall."

Right?

A.    Yes, sir.

Q.    That's on the 25th.

Now, if we go forward to the 27th, this is the one that we looked at yesterday that you and I spent about 15 minutes talking about.

Do you remember that?

A.    Yes, sir.

Q.    All right.  And we agree that at the end of it that it does not tell downstream property owners that there's going to be flooding in the downstream.  It does not directly say that anywhere in this press release, right?

A.    Correct.

Q.    All right.  So now we can go to the very next one which you just looked at with Ms. Duncan.

And it is dated or posted August 28, 2017.

Do you see that?

A.    Yes, sir.

Q.    All right.  And it says "The U.S. Army Corps of Engineers, Galveston District, is starting water

releases immediately from Addicks and Barker Dams because water levels in the reservoirs have increased dramatically in the last few hours."

Do you see that?

A.    Yes, sir.

Q.    What time were those releases made?

A.    They started around a little after midnight.

Q.    A little after midnight on the 28th, right?

A.    Yes, sir.

Q.    So the Army Corps released this press release posted August 28th, 2017, at, like, 12:01 in the morning; is that right?

A.    My notes said 11:30 the day -- right before that, but around that time, sir.

Q.    All right.  So within 30 minutes or 40 minutes of what I just said, within 40 minutes of the water just rushing out, correct?

A.    Well, it wasn't just rushing out.  It started slowly.  But within 30 minutes of making the releases, sir.

Q.    Okay.  So you said a minute ago in response to Ms. Duncan that had the gates just stayed completely open and y'all had never closed them, you weren't following the Water Control Manual at all, you just left them open, got a big heavy rain event coming, but

you're just going to leave those things wide open.

Do you remember that?  Do you remember that testimony?

A.  I remember the questions about that.

Q.  Yes, sir.

MR. NOLEN:  So can we put up the map on the big screen there?

Yes, sir.

BY MR. NOLEN:

Q.  So this is the same as this.

All right.  And you were asked those questions about would flooding have been worse in the downstream had that occurred, had y'all just left the gates open from the very beginning.

Do you remember that?

A.  Yes, sir.

Q.  Okay.  And so if there was flooding over here or over here, right, and the gates are just wide open, would the flooding have been worse?

A.  So I don't have explicit modeling on that case.

Q.  Yeah.

A.  But what I mean by "worse" is flooding would have been worse downstream of the dams had we left them open on the Buffalo Bayou.

Trial

Q.   So is it your testimony that if you just left the gates open and water just was flowing from the upstream and it was flowing downstream, that the folks along Buffalo Bayou would have been worse off than they were by impounding it for four days, letting it build up to maximum levels and then sending it out at 13,800 cubic feet per second and releasing 125 billion gallons of water like a firehose?  Is that your testimony?

A.   So like I said, I don't have explicit modeling, but my guess is that it would have been worse if we had left them open the whole time.

Q.   So that was your guess, right?

A.   Right.

Q.   Right.

But you didn't tell us that earlier when you were being asked by Ms. Duncan?

A.   I didn't use that word, but it's the same thing.

Q.   Well, it's really not, sir, because you're just guesstimating at this point.  You don't really know the truth, do you?

A.   I haven't modeled that.  I don't have an analysis showing how much worse or better it would have been.

MR. NOLEN:  All right.  Thank you.

I'll pass the witness, Your Honor.

THE COURT:  Okay.  I think we are at the time that I said we would adjourn for lunch.

MS. DUNCAN:  And --

THE COURT:  You can decide if there's any recall you want to have with Mr. Thomas.

MS. DUNCAN:  And I certainly can wait, but I only have a handful of questions.  I don't know how hard your lunchtime is, Your Honor, but I could finish up with this witness in just less than five minutes, I think.

THE COURT:  Well, it's sort of the time now, I think.  When we come back -- Mr. Thomas as the representative of the government on the case will be here I assume for the whole day, the rest of the day.

THE WITNESS:  I was planning to go have meetings after lunch, sir.  I wasn't planning to come back today.

THE COURT:  Oh.

THE WITNESS:  But I will obviously stay if you need me to, sir.

THE COURT:  Yeah, if it's more than -- I can do two minutes, but it's -- I want to adjourn at 12:30, so...

MS. DUNCAN:  Okay.  Let's just try and make this happen, Your Honor.

THE COURT:  Okay.

RECROSS-EXAMINATION

BY MS. DUNCAN:

Q.    Okay.  Can we very quickly put up JX 59.

While we wait for JX 59 to come up, which is DX 245, let me ask you a few questions.  You were asked a few questions about the increased capacity at the dams or the occurrence in the 1980s when the dams were raised and the spillways hardened.

What do you mean by they could detain more without failing?

A.    I mean, we armored the spillways and raised the crest so that the dams would not fail during the new spillway design flood.

Q.    And were the ends of the dams raised?

A.    No, ma'am.

Q.    Okay.

MS. DUNCAN:  And if we look here at JX 59, which is also DX 245, let's look just at the top half of the first page.

BY MS. DUNCAN:

Q.    Now, Mr. Nolen only asked you about the first sentence or the first sort of transmission here.

But can you tell us what you're talking about in the second transmission?

A.   Just that we're going to continue coordinating.  The models were very uncertain at that point.  We really didn't know how much rain we were going to get.

Q.   And was National Weather Service having any communication with communities at that point?

A.   Yes, ma'am.

Q.   Okay.

MS. DUNCAN:  And we can take that down.

BY MS. DUNCAN:

Q.   You noted in that email "no secrets here." What does that mean?

A.   I was just trying to keep everyone informed.

Q.   Okay.  Now, you were showed the video of DX 224 where there was inundation modeling and lots of inundation shown throughout the course of the event. And Mr. Nolen was asking you questions about Houston being flat and suggesting that it drains well.

My question for you is, if Houston is so flat and drains so well, why was Addicks and Barker dams and reservoir built?

A.   They were built to reduce flood risk for the City of Houston and the Houston Ship Channel.

Q.   And during the Harvey event, did Addicks and Barker save downstream properties from more intense flooding than would have occurred if the dams hadn't been built?

MR. NOLEN:  Objection, Your Honor.  That's outside the scope of this entire proceeding.

THE COURT:  Yeah, there's no basis -- that's a major question.  I'll sustain the objection.

MS. DUNCAN:  Okay.

BY MS. DUNCAN:

Q.   So let me ask you this:  Did the operations of the Addicks and Barker Reservoirs during the Harvey event by shutting the gates when they did and opening the gates when they did, did it reduce flooding for downstream properties compared to if the corps had simply left the gates open?

MR. NOLEN:  Objection, Your Honor.  He said he didn't have modeling on that.  He was just guesstimating.

THE COURT:  Yeah, I think I'll sustain the objection.

MS. DUNCAN:  Okay.

BY MS. DUNCAN:

Q.   And then was -- you also saw in a press release that the corps was reporting that the

reservoirs operated as intended.

And did they continue to operate as intended throughout the course of the Harvey event?

A.   Generally, ma'am, subject to all those many things that we did throughout the process.

Q.   Sure.

And even with the releases that -- during the event, how can you say that they still operated as intended?

A.   That's the Water -- we followed the Water Control Manual.

Q.   Yeah.

And then what was the ultimate effect of that on downstream properties?

A.   The releases during the flood.

Q.   Okay.  And ultimately what would -- how much water was being held back behind the reservoirs as compared to how much was released?

A.   If you're talking about inflow, we released about -- the 13,000 cfs that we released is around 10 percent of the peak inflow.  I think we talked about that before.

Q.   Okay.

MS. DUNCAN:  No further questions, Your Honor.

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

THE COURT:  Okay.

MR. NOLEN:  Nothing further, Your Honor.

THE COURT:  Nothing further.

I will excuse the witness and thank him for his testimony and wish him well since he won't be back.

THE WITNESS:  Not today.

THE COURT:  Not today.  We'll see you in Washington, I guess --

THE WITNESS:  Thank you, sir.

THE COURT:  -- Mr. Thomas.  Thank you.

(Witness excused.)

THE COURT:  And we'll stand in recess until 2:00 o'clock.

(Off the record from 12:34 until 2:16.)

THE COURT:  Please be seated.

Sorry for the delay.  We had a rain delay. The rain really was pouring down for about a good ten minutes of sheet rain that swept across and then it totally turned to sun in about another ten minutes.  It was bright sun.  So I don't know if the dam got wet at all, but I assume it got wet.  But hopefully that won't occur tomorrow so we will be able to see it.

MS. DUNCAN:  And we do have one of the corps Addicks and Barker rangers who will be driving us out sort of just checking to make sure that things are

Trial
10/30/2024

still safe.  If anything changes, we'll let you know.

THE COURT:  Okay.  I was planning to wear very informal clothes, so if they get messy, I can take them and wash them quickly.

All right.  Mr. Nolen.

MR. NOLEN:  We both have some exhibits to admit, Your Honor.

THE COURT:  Okay.

MR. NOLEN:  So plaintiff would move to admit PX 27.

THE COURT:  Okay.

MR. NOLEN:  PX 131.  JX 18.  JX 59.  And then we have two demonstrative exhibits that we would like to admit.  One was the opening statement which would be PX 408.  It's just a print-off of the opening.  And then the other would be PX 409 which was a demonstrative that Mr. Mithoff used yesterday with the witness.

THE COURT:  Okay.

MS. DUNCAN:  May I ask which demonstrative?

MR. NOLEN:  This one.

MS. DUNCAN:  Okay.

THE COURT:  Okay.

MS. DUNCAN:  And the only -- is that it, Mr. Nolen?

MR. NOLEN:  Yes.

MS. DUNCAN:  Okay.  And the only objection we have relates to PX 131.  This was the email exchange about funding for future potential purchases in areas around the surcharge corridor.  We don't think that's relevant to the issues before the court.

THE COURT:  It seems to me it might be.  I'm not sure if it is, but it looks like there's a potential.  I mean, and one of the issues in the most famous court case to get to the Supreme Court, U.S. versus Cosby, one of the central issues was whether the Air Force should have bought the Cosbys' farm which was at the end of the B-52 runway, and the Cosbys were complaining they -- they couldn't live in their house because B-52s would go over at about 100 feet, and so the issue was whether the government should have bought that.

And I remember I actually met the judge who was Chief Judge Colin who later became chief judge of the court of claims.  He told me he had gone out to the Cosbys, and when one of the planes flew over, he said everything shook.  Dishes were falling off the racks and -- and it was -- definitely that decided the case for him easily.  But so the issue of whether other things should be is relevant at least in theory.

MS. DUNCAN:  May I note for the record that this trial, Your Honor, we understood was limited to two very narrow questions.  And so if that question is in play or -- well, we don't think it's properly in play, and so we just want to note that when the court is to consider that sort of question, we would have a more fulsome defense on that issue.

THE COURT:  Okay.  The court, as I said, is not focused on that as an active defense or unclear where the issue is.

(Admitted Exhibit No. PX 131.)

(Admitted Exhibit No. JX 18.)

(Admitted Exhibit No. JX 59.)

(Admitted Exhibit Nos. PDX 408 and 409.)

MS. DUNCAN:  And then the United States has several exhibits to offer.  We have DX 223, 224, DX 2, DX 136, DX 603, DX 608, DX 602, DX 643, DX 224, DX 245, which is also the version of JX 59 Mr. Nolen has already offered, it's just I think the duplicate version, DX 646, DX 289, DX 643, and DX 272.

MR. NOLEN:  I have a question, Your Honor.

THE COURT:  Yes.

MR. NOLEN:  Were all of those ones that you used with the witness?

MS. DUNCAN:  Yes.

Trial

MR. NOLEN:  Okay.  And but for the one that was excluded?

MS. DUNCAN:  The one -- DX 606 was excluded and the United States made an offer of proof on that, and so that one is not in this list.

MR. NOLEN:  Okay.  Then no objection, Your Honor.

THE COURT:  Okay.  We'll admit those all.

(Admitted Exhibit No. DX 223.)

(Admitted Exhibit No. DX 224.)

(Admitted Exhibit No. DDX 2.)

(Admitted Exhibit No. DX 136.)

(Admitted Exhibit No. DX 603.)

(Admitted Exhibit No. DX 608.)

(Admitted Exhibit No. DX 602.)

(Admitted Exhibit No. DX 643.)

(Admitted Exhibit No. DX 245.)

(Admitted Exhibit No. DX 646.)

(Admitted Exhibit No. DX 289.)

(Admitted Exhibit No. DX 272.)

THE COURT:  What's our next witness?  Who is our next -- I shouldn't say what is our next witness. Who is our next witness?

MR. NOLEN:  At this time, Your Honor, the plaintiffs call Colonel Lars Zetterstrom.

Trial

THE COURT:  Okay.  Colonel, welcome.

Thereupon--

LARS ZETTERSTROM

was called as a witness and, after having been first duly sworn, testified as follows:

THE COURT:  Thank you very much, Colonel.
Please be seated.

THE WITNESS:  Thank you, sir.

DIRECT EXAMINATION

BY MR. NOLEN:

Q.  Good afternoon, Colonel.

A.  Good afternoon, sir.

Q.  So I'm going to start by asking you because I don't know the protocol, do you prefer -- I know you're retired.  Do you prefer to be called colonel or do you like to be called Mister?  Which do you prefer?

A.  Most people call me Lars now, but I defer to whatever you're comfortable with, sir.

Q.  Okay.  Well, I'll call you colonel because I've been calling you that since the beginning of this case.

Colonel Zetterstrom, are you retired from the U.S. Army Corps of Engineers?

A.  Yes.

Q.  You currently work for a company called

Lockwood Andrews Neiman, Inc., LAN; is that right?

A.  Can I correctly pronounce the name, sir?

Q.  Oh, absolutely.

A.  It's a Newnam.  It's an easy mistake.  But everything else is correct, yes, I work for Lockwood Andrews Newnam, sir.

Q.  You are you the vice president, federal program manager?

A.  Yes, sir.

Q.  You hold a bachelor of science in civil engineering from the U.S. Military Academy at West Point?

A.  Yes.

Q.  You have a master's of science in civil and environmental engineering from the University of Missouri; is that correct?

A.  University of Missouri-Rolla where now it's University of Missouri Science and Technology, yes, sir.

Q.  And you have a master in science in strategic studies from the U.S. Army War College; is that right?

A.  Yes, sir.

Q.  26 years in the U.S. Army?

A.  If you round up, yes.

Q.  You were the district commander for the

Trial

Galveston district of the Army Corps of Engineers during the Addicks and Barker releases; is that true?

A.    Yes.

Q.    You had command over all of the military and civilian personnel assigned to Galveston district; is that right?

A.    Yes.

Q.    Robert Thomas who has been here on the stand just before you was actually under your command, right?

A.    Yes.

Q.    During Harvey, you were the person for the Army Corps of Engineers directing operations at the Galveston district?

A.    Yes.

Q.    And is it true that the Galveston district's area is approximately 50,000 square miles?

A.    Yes.

Q.    Is it true the prescribed water management policy for the Addicks and Barker Reservoirs is to hold back runoff that otherwise would flow downstream when there's a large rain event?

A.    Yes.

Q.    The prescribed water management policy is to use those reservoirs to hold back runoff to mitigate against flooding for Downtown Houston and the Port of

Houston; is that correct?

A.   Yes.

Q.   Those are the purposes of the Addicks and Barker Reservoirs, correct?

A.   I think that's accurate, yes.

Q.   The Water Control Manual is the document that governs the water control decisions that are made by the corps?

A.   Yes.

Q.   For Addicks and Barker?

A.   Yes.

Q.   Yes.

Okay.  Now, the word "surcharge" is a term that is used to describe optimizing the capacity of the reservoirs and minimizing risk to the structures; is that true?

A.   I don't recall.

Q.   Well, is that -- what's your best recollection of what the purpose of surcharge is with relation to the Addicks and Barker Reservoirs?

A.   I recall more the term "induced surcharge" than "surcharge," sir.

Q.   Had you not followed the induced surcharge procedure and kept the reservoir floodgates closed during Harvey, you would have not been acting in

accordance with the Water Control Manual, would you?

A.    No.

Q.    Had the reservoir gates stayed closed and the reservoirs never been put into induced surcharge, you would have had some amount of water spilling around the north end of Addicks; is that true?

A.    Water flowed around the end of -- the north end of Addicks even with the releases, so, yes, I think I guess your statement is true, yes, sir.

Q.    Yes.

Closed or open, you were getting some amount of flowage across the spillways, correct?

A.    Around the end of the dam.

Q.    Right.

During Harvey while the reservoir gates were closed, water only spilled around the northern end of Addicks; is that true?

A.    Yes.

Q.    And the truth is, is that there was really no calculation of the amount of water that was flowing around the northern end of Addicks, right?

A.    No.

Q.    No, it's not true or that is true?

A.    It is not true.

Q.    As I understood it, the calculation was made

by an estimate because there's no gauge there.

Is it true that it was just an estimate and there was no measurement because there was no gauge?

A.   You asked -- I understood your question that there was calculations, and so, yes, there was calculations.  If -- was there a rain gauge or a flow gauge at that location?  Not to my knowledge.

Q.   Right.

But the calculations were basically guesstimates, correct?

A.   There --

MS. MORRIS:  Objection.  Vague and argumentative.

THE COURT:  Well, guesstimate isn't particularly vague.  It's almost a regular term meaning it's sort of a rough estimate but not based on any specific indicators or mechanical devices, so I'll allow the question.

BY MR. NOLEN:

Q.   So Mr. Maglio came and testified already for us, Colonel, and my understanding, and you tell me if I'm wrong, is that he looked at the flowage up there, the puddle that was at the northern end of Addicks, and he made an estimate.

Is that your understanding?

A.    My recollection is it was impossible to accurately calculate the flow based off the type of flows that were combining at that location.  The estimate was based off of a calculation from the models that the Army Corps of Engineers was utilizing to manage the structures.

Q.    Okay.  And you've not -- you have -- have you received any reports about the testimony that's occurred in this case?

A.    No.

Q.    You don't know which neighborhoods would have been affected by water going around the northern end of Addicks, do you?

A.    No.

Q.    On August 28th, 2017, you publicly stated that if the floodgates were not open, the release -- and releases begun, the volume of uncontrolled water around the dams would be higher and have a greater impact on surrounding communities.

Do you remember making that statement?

A.    Can you reread the statement, please, sir?

Q.    Sure.

You made a public statement that the volume of uncontrolled water around the dams will be higher and have a greater impact on the surrounding

communities.

A.    What was the date of that?

Q.    That was on August 28th, the day y'all opened the reservoirs.

A.    I recall making a statement similar to that, yes.

Q.    And that actually ended up being wrong because the rain didn't keep falling after the 28th, right?

MS. MORRIS:  Objection.  Argumentative as to whether it was wrong or not.  It was a forecast.

THE COURT:  Well, but the estimate based on the forecast was what I gather was the right or wrong, so I'll allow it.  I think it's...

THE WITNESS:  Can you restate the question, please, sir?

BY MR. NOLEN:

Q.    Yes.

So what you had said, and you had said it publicly, was, is that if the floodgates were not open and releases had not begun, that the volume of uncontrolled water around the dams would be higher and have a greater impact on the surrounding communities. And when you made that comment, you were relying on forecasts about additional rain that would be

forthcoming, but it never came, right?

A.    The final CWMS forecast was less than the earlier -- the forecast that was made at the time of the releases.  If we hadn't made releases, then the waters that would have flowed around the northern end of Addicks would have been higher.

But I think -- I guess I should ask, I mean, I'm trying to understand your question and answer it, sir.  The water was forecasted to go around both ends of Barker Reservoir, and that did not occur because less rain was actually received than what was forecasted.

Q.    Right.

And so on the 28th, the rain actually stopped.  Y'all had opened up the floodgates and the water was flowing out of Addicks and Barker.  But when the morning came -- y'all did that right after midnight.  When the morning came, the sun came out; is that right?

A.    I don't recall.

Q.    Do you recall that the amount of rain stopped falling in the Addicks and Barker watershed on the 28th?

A.    I do not.

Q.    So let me ask you this:  As of the

August 27th, is it true that you stated publicly "These structures continue to protect against flooding in Downtown Houston and the Houston Ship Channel."

Do you remember that?

A.    I do not.

Q.    All right.  Have you reviewed your deposition for your testimony today?

A.    I received my deposition, and I reviewed some of it.

Q.    Okay.  So I'm going to hand you your deposition so I can see if we can kind of take ourselves back to 2018 when I deposed you previously and you knew some of these -- or you remembered some of these answers.  Maybe this will help.

MS. MORRIS:  Objection, Your Honor.  There's no reason to be showing the witness' deposition yet.  There's no question pending.  There's no contrary answer.  This would be improper impeachment.

THE COURT:  Well, he did ask a question which the witness did not remember his answer -- or did not remember the facts, so I think that makes it proper.  So I'll allow it.

MS. MORRIS:  Mr. Nolen, if you wouldn't mind restating the question that you've asked Colonel Zetterstrom.

Trial

MR. NOLEN:  Okay.  And as of August 27th, is it true that you publicly stated "These structures continue to protect against flooding in Downtown Houston and the Houston Ship Channel."  There's my question.  He didn't remember he made it.  So I'm going to -- can I approach, Your Honor?

THE COURT:  You may.

BY MR. NOLEN:

Q.  I'm going to give you a copy of your deposition, and you can just keep it up here because you're going to probably need to look at it a little bit.  And I conveniently highlighted for you the portions where I'm asking questions, so maybe that will help too.

MS. MORRIS:  May I just get the page number, please, so I can follow along?

MR. NOLEN:  I'm going to call it out.

MS. MORRIS:  Okay.  Thank you.

BY MR. NOLEN:

Q.  Okay. Colonel, if you could look at page 28, lines 5 through 21.

Just tell me when you're ready.

A.  You said page 28, lines 5 through 21, sir?

Q.  Yes, sir.

A.  I'm ready.

Q.   Okay.  And so as of August 27th, is it true that you publicly stated "These structures continue to protect against flooding in Downtown Houston and the Houston Ship Channel"?

A.   The statement says "These structures continue to perform as they were designed to do, which is to protect against flooding in Downtown Houston and the Houston Ship Channel."

Q.   So the answer is "yes"?

A.   I did make that statement, yes, sir.

Q.   Okay.  And although the weather prediction that additional rain would fall to the point that water was flowing around both ends of Barker as well as the northern end of Addicks didn't turn out to be right, it just didn't continue that way because the rain just stopped falling; is that right?

A.   The forecasted rainfall turned out to be less than the maximum forecasted rain.

Q.   Right.

It didn't fall, and so the water didn't flow around both ends of Addicks ever, correct -- I mean both ends of Barker, correct?

A.   That is correct.

Q.   All right.  Now, you know that controlled releases through the reservoir gates, the outlet

structures, caused damage to properties in Buffalo Bayou or along Buffalo Bayou, don't you?

A.    I can't answer that question as yes or no, sir.

Q.    Well, if you'll look at page 29, 11, 29:11, through 30:13, back in 2018, you were able to answer that question.

A.    What was the number, sir?

Q.    29:11 through 30:13.

A.    To page 30:13.

Q.    Yes, sir.

A.    So saying from 29:11 to 30:13.

Q.    Yes, sir.

A.    Yes, sir.  I understand.

I state that I can't answer the question.  I do not know the answer to that question.  And then you asked again -- I believe you're Mr. McGehee, correct, sir?

"You do not know if the induced surcharge damaged properties?"

And there's an objection from Mr. Shapiro.

"I do not know that induced surcharge damaged these particular properties, sir."

And then you said, "Fair enough."

Q.    Okay.  And so my question now is a little

broader than that because you qualified that back then about these particular properties, and I think you were asked about these properties, these properties that are on this map right here.

So you recognize this, right?  This is, Addicks, Barker, Buffalo Bayou, and then there were individual properties.  There was this map that was actually set up, or a version of this map, an earlier version, and we had identified specific properties along the way.

MS. MORRIS:  Objection.  Foundation.

BY MR. NOLEN:

Q.    That --

THE COURT:  He's laying a foundation now.

MR. NOLEN:  I'm trying to, Your Honor.

THE COURT:  Go ahead.

BY MR. NOLEN:

Q.    So we had a version of this for you to look at, and you qualified that answer by saying that you couldn't say with regard to particular properties, but my question now is broader than that because I think ultimately you get to it.

You do understand that there were properties that were inundated on the Buffalo Bayou channel as a result of the induced surcharge and the reservoir

releases, right?

A.   I guess I -- I'm not sure I agree that the releases are what led to the flooding, sir.

Q.   Okay.  So as you sit here today in this courtroom, you don't know that any properties downstream flooded as a result of Addicks and Barker reservoir releases; is that true?

A.   Can you restate that?

Q.   As you sit here right now in this courtroom in 2024, seven years after the Harvey event, you don't know even now that any properties downstream of Addicks and Barker were inundated with water because of the reservoir releases?

A.   I don't -- I don't view that the releases are what caused the flooding.

Q.   The flooding of any individual home, you don't think that the releases caused water to go into any person's home?

MS. MORRIS:  Objection.  Asked and answered.

THE COURT:  No, it wasn't clearly answered, so I'll allow it.

THE WITNESS:  I view the excessive rainfall that fell at Addicks and Barker Reservoirs are what caused the flooding.

BY MR. NOLEN:

Q.   Okay.  Colonel Zetterstrom -- I don't want to mispronounce your name.  I know I did that a couple of times and I had to apologize every time because I don't mean to.  It's not intentional.

Your position is, as I understand it, your understanding as the former commander for the Galveston district, is that you're not aware that the reservoir releases, the release of the water, the controlled releases through the reservoir gates caused any flooding downstream in people's homes that would not have occurred but for the reservoir releases?

MS. MORRIS:  Same objection.  This has been asked and answered.

THE COURT:  It hasn't been answered.  I'll allow it.

THE WITNESS:  I view the rainfall that fell during Hurricane Harvey as the proximate cause of the flooding.

BY MR. NOLEN:

Q.   So when we talk about controlled releases, that means that water has been captured behind the reservoirs and is collected behind the reservoirs and then is released through the outlet structures which are the reservoir gates; is that right?

A.   I would agree to that.

Q.   And at one point at least, and we see it in multiple emails, you actually refer to that water that had been captured in the reservoirs, you called that "federal water."

Do you recall that?

A.   I don't recall using that term in an email, but I recall the district and myself using that term, yes.

Q.   Okay.  According to your testimony in this case, the term "federal water" implies that upon detention of the water, the Army Corps of Engineers is managing the water; is that fair?

A.   Is that in my deposition, sir?

Q.   Yes.  It's page 216, lines 5 through 12.

MS. MORRIS:  Your Honor, this is -- if he's refreshing the witness' recollection, the witness can refresh his recollection by reading his deposition testimony and then counsel can ask him the same question again.  But reading his testimony straight from the transcript is improper.

THE COURT:  If the witness does not remember and indicates he doesn't remember, reading the transcript is the best way to let the court see what he does remember, so I'll allow the process.  The

procedure seems to be appropriate.

THE WITNESS:  Sorry.  Could you repeat the question?

BY MR. NOLEN:

Q.  Sure.

According to your testimony in this case, "federal water" implies that upon detention of the water, that the Army Corps of Engineers is managing it; is that true?

A.  Yes.

Q.  Okay.  And the Army Corps had modeling that showed that there were water impacts caused by induced surcharge releases; is that right?

A.  There was inundation mapping that was performed that showed where water was flowing, yes.

Q.  All right.  And there was inundation mapping that the corps had prior to the induced surcharge releases, right?

A.  My recollection is that inundation mapping was being run numerous times.

Q.  Before Hurricane Harvey ever hit the state of Texas, true?

A.  Yeah, I believe it was done.

Q.  And so before the Harvey event ever occurred, the corps knew with some degree of certainty where

Trial

water would flow once it was released out of the reservoirs; is that true?

A.   Yes.

Q.   And it was understood that the induced surcharge controlled releases would cause impacts on properties downstream.  And by "impacts," I mean it would flood those properties, true?

A.   The modeling would show where floodwater could potentially inundate structures, yes.

Q.   And when you're saying "floodwater" in this context, I'm talking about the impounded floodwater that was released.

Can we agree on that?  That's what we're talking about?

A.   Yes.

Q.   Okay.  And on August 22nd, 2017, you signed off on a declaration of emergency for the Galveston district.

Do you remember that?

A.   What was the date, sir?

Q.   August 22nd, 2017.

A.   Yes.

Q.   And that's Joint Exhibit JX 1.

MR. NOLEN:  And I'm going to ask that get put up.

Trial

BY MR. NOLEN:

Q.   Okay.  Colonel Zetterstrom, this is the "Memorandum for Commander, Southwestern Division.  Subject: Declaration of Emergency: August 2017 Tropical Event Harvey, Galveston District."

Do you see this document, sir?

A.   Yes, sir.

Q.   And that's you at the bottom, correct?

A.   That is me.

Q.   And when you signed this document, the purpose was -- the purpose of this document is before Harvey ever makes landfall, right, because you know that Harvey doesn't make landfall until the 25th, correct?

A.   Yes.

Q.   Right.

And so this is the 22nd.  And so the purpose is really to get the corps ready for this Category 4 hurricane; is that right?

A.   In part.

Q.   Well, the purpose of it was to have the authority to activate your Emergency Operations Center and to begin charging the labor required for any staff that would begin performing functions for an emergency management, true?

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

A.    In part.

Q.    Well, let me ask you to take a look at page 87 of your deposition there.  Start on line 10 through 17.  10 through 17.

A.    You said page 87, 10 through 17, sir?

Q.    Yes, sir.

A.    Yes, sir.

Yes, sir, that's an accurate statement.

Q.    Yes.

And so let me ask it again so we can make sure we're understanding.  The purpose of this declaration of emergency before Harvey has made landfall was for you to have the authority to activate your Emergency Operation Center and to begin charging the labor required for any staff that would begin performing functions for emergency management; is that true?

A.    That is true.

Q.    Okay.  To be clear, as of August 22nd, 2017, the Addicks and Barker Reservoirs were not under any sort of emergency; is that true?

A.    Not on the 22nd, no.

Q.    As of August 22nd, 2017, the reservoirs were not operating under the Emergency Action Plan; is that true?

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                                    10/30/2024

A.    Not on the 22nd, no, sir.

Q.    As of August 22nd, the reservoirs were not -- they didn't even have water in them, did they?

A.    On that date, I can't confirm.  I can confirm that there was no water being detained in the reservoirs when Hurricane Harvey made landfall to specific data.  But I would agree, sir, that they were essentially empty of detained water and we had the maximum volume in the reservoirs, yes.

Q.    And so it's -- just for our purposes for understanding, when you say "we had the maximum volume in the reservoirs," that means you had the maximum capacity at that point because you could -- they were basically empty and so there wasn't anything filling them up, right?

A.    Correct.

Q.    Okay.  So during the entire time that induced surcharge releases were occurring, the corps was operating under the Water Control Manual, right?

A.    Yes.

Q.    Yeah.

Y'all were following the Water Control Manual, correct?

A.    Yes.

Q.    And is it true that it was sort of a joint

decision between you and Mr. Thomas about following the Water Control Manual?

A.    You can characterize it as joint.  I mean...

Q.    Ultimately he reports to you, I understand, correct?

A.    Yes.

Q.    All right.  But when the decision was being made to follow the Water Control Manual and go into induced surcharges, that was something that you and Mr. Thomas conferred with each other on and made the decision to follow the Water Control Manual, correct?

A.    Correct.

Q.    Okay.  Now, as the commander, you had to authorize news releases for the Army Corps; is that right?

A.    During Hurricane Harvey, I reviewed all the news releases and approved them.  As a commander, I don't have to review all of them.

Q.    But you did?

A.    But in Harvey, yes.

Q.    Okay.  And we looked at with Mr. Thomas PX 027.

MR. NOLEN:  Which I'm going to ask to pull up.

BY MR. NOLEN:

Q.   And so this PX 027 which is an exhibit and a press release or news release dated August 27, 2017.

Do you see that?

A.   Yes, sir.

Q.   All right.  And this is one of the releases that you would have approved; is that true?

A.   Yes.

Q.   And so looking at this news release, do you see anywhere in the news release, and I spent some time with Mr. Thomas, and I would like to avoid having to go line by line with you, so I'm just going to let you take a look at it because it's probably been a while since you've seen it.

But do you see anywhere in this news release where you advise anyone of the public, any member of the public in this Army Corps of Engineers release about downstream flooding caused by the induced surcharges?  You can just go ahead and read it to yourself and let me know when you're ready to answer.

A.   I've read it, sir.

Q.   Okay.  So can we agree, Colonel, that nowhere in this news release do you advise any member of the public that there's going to be some downstream flooding caused by the surcharge releases?

A.    That's correct.

Q.    And, in fact, what the document says is "These structures continue to perform as they were designed to do, which is to protect against flooding in Downtown Houston and the Houston Ship Channel."

That's a quote from you that is contained in the release, right?

A.    Yes.

Q.    And when you say "However, we do expect to release late this evening into early tomorrow morning," then it goes and says "It is also likely that water will go over the uncontrolled spillways at the ends of both dams as designed for large floods.  If this happened, it will most likely start around the northern end of Addicks Dam and both ends of Barker Dam," you added -- or "he added."

Do you see that?

A.    Yes.

Q.    All right.  And then we when talk about what the effect of that is in this news release, at least, it says "Structures will be impacted upstream from both locations.  The number of structures affected will depend on weather conditions."

Do you see that?

A.    Yes.

Q.   And then the next paragraph talks about the extended period of upstream flooding, but it does not reference -- in fact, it says "Homes upstream will be impacted for an extended period of time while water is released from the reservoirs," but nowhere in here does it speak to downstream; is that right?

A.   No.

Excuse me.  That is correct.  Yes.

Q.   Okay.  Is it true that August 28th, 2017, which is the day of the releases, was the first time ever that Addicks and Barker Reservoirs had been placed into induced surcharge?

A.   I believe so, yes.

Q.   Okay.  And you don't know whether Army Corps of Engineer personnel ever went to any public meeting before Harvey and explained to the public about induced surcharges, do you?

A.   I do not know.

Q.   And is it true that Richard Long, who is with the corps, was the person responsible for interfacing with the public during Hurricane Harvey?

A.   I mean, he and others, yes.  I mean, he was not the only one, but he was interacting, yes.

Q.   And you don't know if Mr. Long ever went at any point, including up to the date of the releases,

and explained to any group what the effect of downstream -- the effect on downstream flooding would be by induced surcharges; is that fair?

A.   I do not know.

Q.   Right.

You personally never had any discussions about reservoir releases and induced surcharges with somebody at the Harris County Flood Control District, did you?

A.   No.

Q.   All right.  I'm going to show you what we've marked as JX 76.

MR. NOLEN:  If we can pull that up.

BY MR. NOLEN:

Q.   And JX 76 is an email to you.  Do you see that?

A.   Yes.

Q.   And the subject is "RE: LTG," which I understand is lieutenant general; is that right?

A.   Yes.

Q.   Lieutenant General Semonite update #5: Hurricane Harvey response, August 29th, 2017.

Do you see that?

A.   Yes.

THE COURT:  Semonite is the chief judge, I

take it, the head of the corps?

THE WITNESS:  Lieutenant General Semonite was the chief of engineers and the commanding general of the Army Corps of Engineers, sir.

THE COURT:  Usually the head of the corps is a lieutenant general?

THE WITNESS:  Yes, Your Honor.

BY MR. NOLEN:

Q.   And if we go back to the second page of this document, we have numbered paragraphs which is because there is a -- really a report here, and I'm looking at No. 6 which has to do with the Addicks and Barker Reservoirs.

Do you see that?

A.   Yes.

Q.   And so what was this document?  I understand it's an email, so I understand that part.

But what was the purpose of this document?

A.   Could you revert back to the first page, sir?

Q.   Sure.

A.   So this is an email from the commanding general of the Army Corps of Engineers to Honorable Mr. McCarthy who I believe at the time was the secretary of the Army and General Milley was the chief of staff of the Army and a lot of other senior leaders

that are listed in the "to" and "CC" line.  So I would characterize this as a situation report from my commanding general to senior Army military and civilian leadership.

Q.   And before your commanding general forwarded this, you reviewed it, didn't you?

A.   No.

Q.   You didn't review this at all?

A.   No.

Q.   Did you report to the general about what needed to go in the report?

A.   No.

Q.   So how did the general come up with -- or if you know, how did the general determine what he was going to put in this report?

A.   You're asking me to give my understanding of how he received the information?

Q.   That's all I can ask for.  Just your understanding.

A.   It would be from the Emergency Operation Center at the district level through division to headquarters.

Q.   All right.  And so who is reporting -- the general is not on the ground, is he?  He's not at Addicks or Barker; is that true?

A.    At this time, no.

Q.    Right.

And somebody is having to give him the information so that he can put it into his report.  You understand that?

A.    Yes.

Q.    And I guess what I'm asking is, is who is that person?  Who is the person who is giving the information to the general, if you know?

A.    It would be the operations officer within my engineer -- Emergency Operation Center, sir.

Q.    So would that be Mr. Thomas?

A.    No.

Q.    Who would it be?

A.    In the EOC, it would have been at that time Alicia Rea or Lieutenant Colonel Luckritz that was on the top of this email, sir.

Q.    Okay.  And so did you -- when you reviewed this document, did you have any qualms or worries or concerns about it?

MS. MORRIS:  Objection.  Mischaracterizes his testimony.  The witness stated he did not review this email.

THE COURT:  Did you review this email?

THE WITNESS:  Not prior to it being sent, no,

sir.

THE COURT:  Did you review it when you got it?  You probably read this when you got it?

THE WITNESS:  I read it after it was sent by the commanding general to his senior leadership, sir.

THE COURT:  And that was in -- what was the date?  So you haven't seen it since 2017?

THE WITNESS:  No, sir.  And I believe that what Mr. McGehee [sic] is asking is did I see this before it was sent by General Semonite to his leadership, sir --

THE COURT:  Yeah.

THE WITNESS:  -- Your Honor.  And, yeah, I did not.

THE COURT:  Okay.

BY MR. NOLEN:

Q.   But after it was sent, you saw it because you got a copy of it and you actually forwarded it, right?

A.   I do not recall if I forwarded it.

Q.   Okay.  So if we'll go back to the first page there and we look under the words "Nice map sir," it says "Original message, From: Zetterstrom, Lars N, Sent: Tuesday, August 29, 2017, To: DLL-CESWG-FLOOD."

Do you see that?

A.   I see that, yes.

Q.   For our understanding and record, who is DLL-CESWG-FLOOD?

A.   It was a distribution list of district staff.

Q.   And so you sent it to everybody in the Galveston district, right?

A.   No.

Q.   Okay.  You sent it to a subset of people in the Galveston district; is that true?

A.   Yes.

Q.   Okay.  And so when you forwarded it, before you forwarded it, you did review it, correct?

A.   Yes.

Q.   All right.  And you would have done that.  I mean that would be ordinary course for you, correct?  If you're going to send out something to this distribution group, you're going to review it before you forward it to them, right?

A.   I would generally agree with that, yes, sir.

Q.   All right.  And when you reviewed it, did you see something that you thought was wrong or inaccurate or that you disagreed with?

A.   I do not recall.

Q.   Well, I'm going to point you back to No. 6 which pertains directly to the Addicks and Barker Reservoirs.  And this document says "These two

reservoirs have operated per design to collectively retain over 125 billion gallons of water in the last four days that would have otherwise flowed into Houston."

Do you see that?

A.   Yes.

Q.   All right.  And so when you reviewed this back in 2017, did that appear to be accurate to you?

A.   Yes.

Q.   "The USACE personnel are conducting 24-hour on-site monitoring and assessment (16 PAX)," which I believe is 16 personnel, right?

A.   Yes.

Q.   "Controlled releases from the dams are required to mitigate risk to the structure.  Addicks Reservoir is releasing between 5,000-6,000 cubic feet per second and Barker Reservoir is releasing greater than 6,000 cubic feet per second.  Minimal water flanking the north end of Addicks Reservoir began flowing early today," and then it says August 29, "this is a normal condition for the reservoir when it begins this stage of pool elevation.  Water flanking the west end of Barker Reservoir may begin tomorrow, 30 August."

Do you see that?

A.   Yes, sir.

Trial

Q.   All right.  So in this entire report from General Semonite, at least as to that Addicks and Barker Reservoir, No. 6, you agreed with that, correct?

A.   I agree with that, yes, sir.

Q.   Okay.  And so there wasn't anything in there that you thought, "Well, that's just incorrect"?

A.   I didn't see anything in there that warranted correcting to the staff I forwarded it to.

Q.   And so do you agree that when the reservoirs were finally opened for induced surcharge that the amount of water that was released was 125 billion gallons that began flowing through the outlet gates?

A.   I mean, I would say that eventually more than that flowed through the gates.

Q.   And when it flowed through the gates, and we've got the maps and we've had the testimony, it flows into the channel that we call Buffalo Bayou, right?

A.   Yes.

Q.   Right.

And that's what it's designed to do, is it's designed to -- when you open those gates, it's designed to flow into that channel, correct?

A.   Yes.

Trial

Q.    And then Harvey, when the induced surcharges began, you knew as the commanding -- the commander of the Galveston district, you were aware and you knew that the water flowing into the channel could not -- the channel didn't have the capacity to take all that water.  It was going to actually flow out of the banks of Buffalo Bayou, correct?

MS. MORRIS:  Objection.  Compound.

THE COURT:  Yeah, restate that.

MR. NOLEN:  All right.

BY MR. NOLEN:

Q.    Did you know when you opened the gates that water would not be contained in the channel itself?

A.    I knew that water would not be contained in the tributary and that it would then flow into the watershed.

Q.    Right.

And the watershed is where the homes are located, right?

A.    Yes.

Q.    All right.  And the businesses, true?  There's homes and businesses downstream?  You knew that?

A.    Yes.

Q.    Okay.  Now, during the four days that the

125 billion gallons were collecting and being detained, did the corps tell anyone that there should be evacuations downstream?

A.   No.

Q.   And I want to be clear about this.  There was never any indication that Addicks or Barker would fail, correct?

A.   Can you restate that question, sir?

Q.   Right.

There was never any indication that Addicks or Barker would fail, that the reservoirs would fail or collapse or breach?

A.   There were indications that there was signs of issues with the dams.

Q.   All right.  I'm going to ask you to look at page 142 in your deposition, 142, line 1.

MS. MORRIS:  Your Honor, objection.  This is improper impeachment.  He can ask the witness if he recalls being asked the question in his deposition and that specific question and he has not yet done that.

THE COURT:  Okay.

Mr. Nolen?

MR. NOLEN:  I'm just directing him to where he needs to look.

THE COURT:  Okay.  I assume the next question

will be...

MR. NOLEN:  Yes.

BY MR. NOLEN:

Q.   So I'm asking you to look at 142:1, 142, line 1, through 143, line 8.

A.   Yes, sir.

Q.   All right.  Now, when you were asked that question in your deposition, you answered "no," correct?

MS. MORRIS:  Your Honor, could...

We still object that this is improper impeachment.  He hasn't pointed to the specific question that he believes the testimony today is contrary to.

THE COURT:  Well, he didn't have an answer and we're looking to see what the answer is --

MS. MORRIS:  Yeah, but --

THE COURT:  -- so I don't know if it's contrary or not, so we have to wait for the answer to see.

MS. MORRIS:  And I think we need the question to --

THE COURT:  He didn't remember.  Well, he had the question.  He didn't remember what the answer was, so Mr. Nolen then will ask him to look at his

deposition.

What did your deposition say, the section that Mr. Nolen gave you?

THE WITNESS:  I think he's referring to my answer "So their indications of failure I don't recall seeing.  Surcharge operations is twofold, to optimize capacity and minimize risk to the structures."

BY MR. NOLEN:

Q.  And so I'm going to refer you to page 143, lines 4 through 6.

"Question:  Was there ever a determination made that either Addicks or Barker would fail?

"Answer:  Not to my recollection."

Is that still true?

MS. MORRIS:  Objection.  This is improper impeachment.  That's not the question that he asked the witness just a few moments ago to the extent there was a question asked of the witness.

THE COURT:  No, this is a different question, I understand.  Is that right?

MR. NOLEN:  Well, the question that I asked, there was never any determination that either Addicks or Barker were going to fail.

THE COURT:  Okay.  So with that question, do you have an answer for that?

THE WITNESS:  For that question?

I would say that my deposition was correct in I don't recall that there was a determination that they would fail.

BY MR. NOLEN:

Q.   Okay.  During the time that the --

THE COURT:  Go ahead.

MR. NOLEN:  Thank you, Your Honor.  I'm sorry.  I didn't mean to step on you.

THE COURT:  No.  That's okay.

BY MR. NOLEN:

Q.   During the time the reservoirs were holding water, observations to the structures that required investigations about whether conditions posed a risk to the structures didn't reveal that the conditions posed risk or concern; is that true?

A.   So that was a lengthy question, sir.  Could you please repeat it?

Q.   Sure.

During the time that reservoirs were holding water, observations of the structures that required investigations about whether conditions posed a risk to the structures didn't reveal that the conditions posed risks that were a concern, right?

A.   There was observations made that caused

concern at the time.

Q.   Right.

And y'all checked them out, and it turned out that there really wasn't a concern.  Y'all were assured that the structures were holding, true?

A.   Yes.

Q.   All right.  Through Harvey and during the releases, you didn't actually have any structural breaches of the reserve -- or reservoirs, correct?

A.   Correct.

Q.   Okay.

MR. NOLEN:  Okay.  I'm going to pull up PX 208.  PX 208 is up on the screen now.

BY MR. NOLEN:

Q.   And so PX 208 is another Army Corps news release that you would have approved, right?

A.   Yes.

Q.   Okay.  And the part that I want to direct you to is the second paragraph where it says "The decision to make the increased controlled releases was a difficult, but necessary one, according to Corps officials.  The current discharge rates are approximately 7,000 cubic feet per second and 6,000 cubic feet per second, respectively, for a combined total discharge of 13,000 cubic feet per

second."

And then it goes on to say "The decision to make the increased controlled releases was a difficult, but necessary one that we did not take lightly, said Edmund Russo, Galveston District deputy engineer."

Do you see that?

A.   Yes.

Q.   All right.  Now, it's true, isn't it, that that wasn't deliberative, that the making of the releases wasn't deliberative; it was following the Water Control Manual, true?

MS. MORRIS:  Objection.  Argumentative.

THE COURT:  It isn't an argument.  He's giving alternatives.  I'll allow the question.

THE WITNESS:  I think we made deliberations, but ultimately our decision was to follow the Water Control Manual.

BY MR. NOLEN:

Q.   Right.

And so for our purposes, y'all considered the Water Control Manual to be a standing order, correct?

A.   Yes.

Q.   Yes.

And you can get a deviation from it if you need to.  But otherwise, it's the rule, the regulation,

the order that you have to follow in order to manage the reservoirs, true?

A.   Yes.

Q.   All right.  And so that's what y'all did, y'all followed the order that was in the Water Control Manual to make the induced surcharge releases, right?

A.   Yes.

Q.   And when we talk about, well, it was a difficult decision, the only difficult decision was the decision whether we're going to follow the manual or we're going to deviate from the manual, and y'all chose to follow the manual, right?

MS. MORRIS:  Objection.  That's a compound question.

THE COURT:  I don't think it was a compound question.  There were two choices in there.

So what is the answer that you reached?

THE WITNESS:  I think it was a difficult decision, but we ultimately followed the Water Control Manual.

THE COURT:  Okay.

BY MR. NOLEN:

Q.   Is it true that no impounded water ever overtopped the auxiliary spillways anywhere in the Addicks and Barker embankments during or after Harvey?

Trial

A.    That is true.

Q.    Is it true that no impounded water flowed over the auxiliary spillways during Harvey or after?

A.    I don't -- that sounds like the same question.  I don't...

Q.    Well, I'm asking about auxiliary spillways versus the embankments.

They didn't flow over the embankments?

A.    I'm sorry.

Q.    Yeah.

A.    The first question I thought -- I was thinking you were referring to the emergency spillways.

Q.    Okay.  So you just said "emergency spillways."

Y'all refer to them in both ways, didn't you, "auxiliary" and "emergency"?

A.    Yes.

Q.    Right.

So if somebody says "emergency spillway," you know that's auxiliary spillway, somebody says "auxiliary spillway," you may think, well, I call that the emergency spillway.  It was referred to both ways by the corps, right?

A.    That's my recollection.

Q.    Right.

Okay.  And so the first question, just so we're clear, is that it's true that no impounded water ever overtopped the auxiliary spillways anywhere in the Addicks and Barker embankments during or after Harvey?

A.    True.

Q.    Right.

Is it true that the dams were never overtopped before, during, or after Harvey?

A.    True.

Q.    And you recall testifying before the Congressional Committee in Cypress, Texas, in 2018?

A.    Yes.

Q.    And do you recall testifying during that proceeding that the Addicks and Barker dam structures performed exactly as designed during the incident?

Do you remember that testimony?

A.    I don't recall my exact testimony.

Q.    All right.  I'm going to refer you, then, to page 262 of your deposition, line 1.

THE COURT:  How much time do we have left?

MR. NOLEN:  This is my last question.

THE COURT:  Okay.  That's fortuitous to asking him.

THE WITNESS:  I'm ready, sir.

BY MR. NOLEN:

Q.   All right.  And starting on 262, you were basically asked do you remember traveling to Washington, and you didn't remember that because you actually had the hearing in Cypress.

Do you remember that?

A.   Yes, sir.

Q.   Okay.  And you testified during that hearing that the dam structures performed as designed during Hurricane Harvey; is that correct?

A.   Can you say that again?  I'm sorry.  I was trying to read.

Q.   I'm sorry.  Do you want to take a second to read it?

A.   Go ahead, sir.

Q.   All right.  Is it true that you remember -- is it true that you testified that during Hurricane Harvey the structures performed as designed?

A.   I would agree to that statement, yes.

Q.   Yes.  And that's still true, right?

A.   Yes, sir.

MR. NOLEN:  Okay.  Thank you.

I pass the witness.

THE COURT:  Okay.

What's the likely time for your cross or

direct of the witness?

MS. MORRIS:  Your Honor, I estimate about 45 minutes.

THE COURT:  Okay.  Why don't we then -- we've been going about an hour and a quarter now, so we'll take a break now and come back in 15 minutes.  We'll stand in recess.

MS. MORRIS:  Sure.

(Off the record from 3:20 until 3:40.)

THE COURT:  Please be seated.

Okay.  Would you like to begin with the cross or redirect or whatever we're calling this.

MS. MORRIS:  I can't keep it straight either.

THE COURT:  It's a little confusing.

MS. MORRIS:  May I proceed, Your Honor?

THE COURT:  Yes, you may proceed.

MS. MORRIS:  Okay.  Thank you.

CROSS-EXAMINATION

BY MS. MORRIS:

Q.    Good afternoon, Colonel Zetterstrom.

A.    Good afternoon.

Q.    You talked a little bit about your 26 years in the military.

Have you ever deployed?

A.    Yes.

Q.   How many times?

A.   Two times to Afghanistan and three times to the Balkans.

Q.   Can you give us an overview of your service when you were deployed to those locations?

A.   Two deployments to Afghanistan, I -- the first one I essentially was the director of public works for the entire theater of operations in Afghanistan.  The second time I was responsible for the transition of all contracts and facilities, infrastructure of the Dutch government to both U.S. and Australian forces in Afghanistan.

THE COURT:  The Dutch government?

THE WITNESS:  Yes, Your Honor.

THE COURT:  They had a number of forces in Afghanistan and they gave all of their facilities --

THE WITNESS:  They did, Your Honor.  The Dutch, they had an election, and with the new prime minister, they had made the decision to remove their forces from Afghanistan, and so the U.S. and Australian forces had to occupy their base camps, take responsibility for all of their infrastructure, water, waste water treatment plans, things of that nature, Your Honor.

THE COURT:  A piece of history I didn't know.

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

THE WITNESS:  Yes, sir.

BY MS. MORRIS:

Q.   Colonel Zetterstrom, did you receive any recognition for your military services?

A.   I did.  I received the Legion of Merit for my almost 26 years in the Army.

Q.   In the course of your military service, including deployments, did you plan for emergencies?

A.   Yes, always.

Q.   By planning for certain circumstances or scenarios, does that mean that when those scenarios actually take place, they can't be an emergency?

A.   No.  It means that you have a pre-coordinated plan of what to do if those emergency conditions arise, and so your unit and staff and the people around you know what actions you would take in those situations.

Q.   How stressful was the Harvey event compared to, say, your service or your deployments?

A.   It was the most stressful and traumatic experience of my life.  When it was happening, I was -- a little selfish, but I wished I was in Afghanistan.

THE COURT:  I hope, though, that in Harvey there weren't people shooting at you, I hope.

THE WITNESS:  Fortunately, Judge, no.  We had some shootings near the dams, and we requested local

law enforcement to so make sure that the USACE employees were protected.

BY MS. MORRIS:

Q.   Colonel Zetterstrom, when did you assume command of the Galveston district?

A.   8 July, 2016.

Q.   And when did your command end?

A.   The 2nd of July, 2019.

Q.   Okay.  Is it common to serve three-year terms?

A.   That's the standard duration for an O6, a colonel district command, yes.

Q.   And I know Mr. Nolen asked you about -- a little bit about the Galveston district and the size of it.

Could you remind us how big is the Galveston district?

A.   Area of 50,000 square miles.  It's the entire coastal region of Texas and then portions of four small parishes of Louisiana.  And if you -- about 100 miles inland, but the entire coastal side of Texas.

Q.   And as commander, were you responsible for all corps actions and projects within those 50,000 square miles?

A.   Yes.

Q.    Are you familiar with the Addicks and Barker Reservoirs?

A.    Yes.

Q.    And what is the purpose of the Addicks and Barker Reservoirs and Dams?

A.    Addicks and Barker Dam reservoirs were studied and designed and constructed after the 1920 and '30s flooding of the City of Houston.  It was the only civil works project that was funded during World War II because the Port of Houston and all the industry was so critical to the war effort that the project was funded to reduce the risk of flooding to the City of Houston and the Port of Houston.

Q.    All right.  Let's briefly take a look at DX 602.  We'll put it up on the screen for you.

Colonel Zetterstrom, I just want to ask you a few questions about the chain of command structure. When you were in command of the Galveston district, who reported to you with respect to operation of the Addicks and Barker project during Harvey?

A.    So as the commander, I delegated authority to Mr. Robert Thomas.  He was the engineering construction division chief and also the dam and levee safety officer for the district.

Q.    And who did you report to during Harvey?

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

A.    I reported to then-Colonel Paul Owen, the Southwestern division commander.

Q.    And who did then Colonel Owen report to?

A.    He reported to Lieutenant General Semonite.

Q.    And can you explain how you interacted with what is on the right side of the screen, the technical chain of command?

A.    So the Army Corps of Engineers, you have your chain of command, and then you have community of practice.  They're the experts in various functions.  In this case, it's depicting the dam and levee safety officers at each level of command at the Army Corps of Engineers, and those experts advise the commanders.

THE COURT:  So you would then interact with Mr. Thomas who is your technical expert?

THE WITNESS:  Yes, sir.

THE COURT:  And then under him, would he have a staff?

THE WITNESS:  He has the largest staff of the district.  It's about two-thirds of the district.  But within that, he has a hydrologic and hydraulic section and a water control section that's responsible for the modeling and analysis behind the decisions of the operation of the dams.

THE COURT:  Okay.  So the military would be

the command of the system, but then the civilian is different bureaucracies in your --

THE WITNESS:  The number of actual active duty Army engineer officers in the district is small. You know, a handful of officers and NCOs.  The majority are all Army civilians that have the continuity.  The commanders are replaced every three years, Your Honor. But the civilian staff, many of them serve in a district their entire professional careers.

THE COURT:  Thank you.

BY MS. MORRIS:

Q.   And was it your understanding that Mr. Thomas was -- would have been conferring up his technical chain of command as well?

A.   Yes.

Q.   And that would include Mr. Zalesak?

A.   Yes.

Q.   And Mr. Halpin?

A.   Yes.

Q.   And what is Mr. Halpin's role?

A.   He's the most senior and experienced dam and levee safety officer in the Army Corps of Engineers.

Q.   How does Mr. Halpin's role relate to Mr. Dolton?

A.   So Mr. Dolton was the director of civil

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                10/30/2024

works.  Within the Army Corps of Engineers, they have different functions, three primary functions, military construction, international interagency support, and civil works.  Mr. Dolton was General Semonite's senior civilian leader responsible for all civil works operations.

Q.  And when you first learned about the threat of Harvey, where was the area of concern?

A.  Initially the concern was the landfall of the hurricane in -- it made landfall in Rockport, so our concern was more the Corpus Christi area.

Q.  And I want to ask you about the declaration that you issued that opposing counsel asked you some questions about.

MS. MORRIS:  So if we could pull up JX 1.

BY MS. MORRIS:

Q.  Colonel Zetterstrom, what is the purpose of this declaration?

A.  It really changes the way that the district operates.  It establishes and activates the Emergency Operation Center.  It does have language about financial and chargeability and expenses.  But in nonemergency situations, the way that the district operates is through that chain of command.

Once an emergency is declared and the EOC is

activated, then the control of the district flows through the EOCs at the various levels as opposed directly by me and my division chiefs or the ordinary civil works staff.  It also starts the process of deploying various personnel to man the EOC as well as personnel to go to the field sites.  It also allows the Army Corps of Engineers to start providing support to local governments for their emergency response operations.

Q.   And I know the Army Corps likes to use acronyms, probably all of the government does that, but what is the EOC?

A.   EOC is the Emergency Operation Center. That's where all of the district's operations are controlled out of.  The reporting goes through the EOCs.  The command always remains with me.  And initially I operated out of the EOC, but later I moved out to Barker Dam.

Q.   And is it the Emergency Operation Center typically staffed under nonemergency circumstances?

A.   It is not.

Q.   Did the corps coordinate with local authorities on the emergency?

A.   Yes.  We had three liaisons embedded with Harris County, the facility called TranStar.  We had

Trial

Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                                    10/30/2024

liaison embedded with the Texas Department of Emergency Management at the state level.  And then in Corpus and Port Arthur, we also had local staff there embedded with the Port Authorities.

Q.  And having local staff embedded -- let me restate that.

Having corps staff embedded with local authorities, is that something that happens outside of an emergency?

A.  It is not.

Q.  And turning back to JX 1, the declaration of emergency, did this declaration apply to Addicks and Barker?

A.  It did.

Q.  And now on August 22nd, 2017, was the corps concerned about rainfall in the area of Addicks and Barker?

A.  We were not.

Q.  Okay.  Did you issue any subsequent declarations specific to the Addicks and Barker dams?

A.  I did not.

Q.  Why not?

A.  This declaration covered the entire district area of operations and applied to Addicks and Barker as well as in the Port Arthur area for the hurricane flood

protection project there.

Q.    I just want to ask you a few questions.

You mentioned deploying to Addicks and Barker.  And it may be helpful to look at a timeline.  I know it was a long time ago.

MS. MORRIS:  So let's pull up DX 183.

THE COURT:  You were deployed yourself?  You went to the Barker Dam?

THE WITNESS:  Yes, Your Honor.  Initially all of the staff, not -- we sent a team of dam safety monitors and experts out in advance of the landfall of Hurricane Harvey, or at the time Tropical Storm Harvey, in the Houston area out and prepositioned them there.

At the time, we made the decision -- I made the decision to go to my headquarters in Galveston, we had staff that was there.  I lived in the headquarters.  So I when I say "deployed," I mean from my home to my headquarters and went there with the understanding that I would remain there throughout the duration of the emergency until after --

THE COURT:  Normally do you live in Galveston?

THE WITNESS:  Your Honor, at the time I lived in League City.

THE COURT:  League City.

THE WITNESS:  It's about halfway between Houston and Galveston, Your Honor.

THE COURT:  I think that's where Mr. --

MS. MORRIS:  Mr. Thomas.

THE COURT:  Mr. Thomas --

MS. MORRIS:  Yeah.

THE WITNESS:  Yes, Your Honor.

THE COURT:  -- lives too.

THE WITNESS:  Yes, Your Honor.  So I believe on or about the 25th of August when we reported to duty for that day, the emergency staff necessary, when they went to the Jadwin Building, they went there with the intention that they would stay there for an indetermined period of time.  And then I believe on or about the 27th of August is -- went out.  There was a lull in the rain, and I was able to go from Galveston and travel by ground out to the Barker Dam.

THE COURT:  Is there a building there?  Where were you staying in --

THE WITNESS:  The project office at the Barker Dam actually was inundated and was no longer functional, so at that time the staff moved to a Texas Army National Guard base further south along the dam and we operated from a modular facility that they allowed us to use.  And then later on, deployable

tactical operation centers were sent that we worked from.

BY MS. MORRIS:

Q.   I just wanted to follow up.  What is the Jadwin Building?

A.   The Jadwin Building is the -- Lieutenant General Jadwin was a commander of the Galveston district and became chief of engineers and the building is named after him.  It's the headquarters of the Galveston district.

Q.   And where is it located?

A.   It's on the eastern tip of Galveston Island.

Q.   Okay.  Was it normal for you to deploy to a project office?

A.   Not as a commander, no.

Q.   What was your role when you deployed to Addicks and Barker during Harvey?

A.   Army doctrine, commanders are taught that you should be colocated with what we would call the main effort.  So initially we thought that the threat of Hurricane Harvey was a storm surge and a wind hurricane event, and so we chose -- I chose to operate from Galveston.  Our alternate Emergency Operation Center is actually the project officer -- office at Barker that flooded.

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                          10/30/2024

So when it became clear that the emergency was more critical at Addicks and Barker, I went to Addicks and Barker as soon as the weather allowed me to.

Q.   And how long did you stay at Addicks and Barker?

A.   I remained there until the 31st of August.

Q.   Okay.  What type of hours were you working?

A.   I was working approximately 20 hours a day. The dam monitors, we had shifts, so they were able to have reduced hours to make sure that they were being safe when out on the dams and monitoring them.

Q.   Where did you sleep?

A.   On an air mattress during the duration.

Q.   And why were you sleeping there?

A.   I had no means of transporting anywhere else. We were basically stuck at that location.

THE COURT:  Because the roads were flooded?

THE WITNESS:  Yes, Your Honor.  When I traveled from Galveston to Barker, I actually at one location had to have a police escort because the roads were impassable.  And without the law enforcement officer, I would not have been able to make it to Barker Dam.

THE COURT:  Did the water get up to your --

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                                 10/30/2024

your normal home was Leawood, you said?

THE WITNESS:  League City, Your Honor.  My home did not flood.  The water, and we rented the home, it made it to the threshold of our door.

THE COURT:  That area had a lot of water.

THE WITNESS:  About half of my neighborhood flooded.

BY MS. MORRIS:

Q.   Colonel Zetterstrom, are you familiar with the Water Control Manual?

A.   Yes.

Q.   Whose role is it to implement/understand the Water Control Manual?

A.   I would say -- well, first and foremost, Rob Thomas as the dam safety officer, but water control also would have the training and knowledge to apply the Water Control Manual depending on the level of operations in -- would determine who had the authorization to make decisions.

Q.   And during Harvey, who had the authorization to make decisions?

A.   Mr. Thomas.

Q.   Okay.  Are you familiar with induced surcharges in the Water Control Manual?

A.   Yes.

Trial

Q.    And what are they?

A.    Generally they're when the amount of water detained in the reservoirs can't be detained and are going around the ends of the dam and necessitate controlled releases from the outlet structures.

Q.    Are releases under the induced surcharge provision of the Water Control Manual considered normal flood control operations?

A.    They are not.

Q.    Do you consider releases under the induced surcharge provision to be ordinary operating procedure?

A.    No.

Q.    Why not?

A.    I view that as part of that emergency planning, that contingency planning that's pre-analyzed in emergency conditions to guide the appropriate actions when those emergency conditions transpire.

Q.    And what is the purpose of induced surcharges?

A.    My recollection is twofold.  One is to restore storage capacity in the reservoirs; and the other is to reduce risk of failure to the structures.

Q.    Okay.  Was there any risk of dam failure during Harvey?

A.    I would say the entire time that -- when it

became clear that the amount of rainfall that had fallen would far exceed any of the prior pools of record, that we were concerned about the structural risk to the dams.  There were active construction projects.  A dam safety study had been previously completed, and we were in the process -- the corps was in the process of replacing those outlet structures at Addicks.  The dam itself had been completely deconstructed and a cofferdam had been constructed.

On Barker, in the dam safety study, they had found a half-mile segment of the Barker Dam that indicated increased risk of seepage, and so we were in the process of constructing a concrete slurry cutoff wall, and at that location the dam embankment had been excavated and benched and the contractor had started the process of installing the cutoff wall.

So it was an active construction site in the middle of the biggest rain event in the U.S. history.

Q.    And did you evaluate risks to the dams during the storm?

A.    I was advised by my staff of the risks.  I think when I was there, it seemed clear that the risk was severe.  It's -- we had never been -- the dams had never been operated to that extent previously.  And so they're 70 years old, actively trying to reduce the

risk and the stability of the structures, and we had this massive amount of rainfall that was being detained by them.

Q. And how were the risks to the dam evaluated during storm?

A. It was through modeling, the CWMS model, the Corps of Engineers water management system are what -- the rainfall data was input into it and would indicate the water levels, the water is going around the end of the spillways. But beyond the modeling, we had staff on the ground that was driving along the dams, walking along the dams looking for any signs of potential dam failure.

Q. Did you have to request any outside assistance in evaluating the risks to the dams?

A. We did. I had requested aviation assets. Ultimately they were from the Department of Navy. For two days they flew over the dams with ground-penetrating radar looking for any indications of seepage or piping that could cause a dam failure.

Q. How does making releases under the induced surcharge provision help minimize the risk to the structures?

A. The water behind the dams are placing forces upon the dams. They're earthen dams, so they can

become saturated and water can begin seeping through the dams.  There was potential piping risk where the outlet structures meet with the earthen dams and the underlying soils beneath it also.

Also the emergency spillways were another element of the dams that were determined to be at risk for failure.  The roller-compacted concrete on the spillways was cracking and the concern could be that they could be eroded away.

Q.   And earlier you had testified something to the effect about the dams performing as intended.

Do you recall that?

A.   Yes.

Q.   Okay.  And the dams' performance, is your understanding is that that included making the releases?

A.   It did.  I mean, ultimately the dams did what they were designed to do, but they were doing it in these emergency conditions that we had never encountered before, and we were extremely concerned about the safety of the structures.

Q.   Do you recall discussions about the possibility of water flowing around the ends of the dams?

A.   Yes.

871

Q.    And is water flowing around the ends of the dams considered a risk to the structures?

A.    Yes.

Q.    Why?

A.    Because at the ends of the dam, the possibility of that water could start the process of eroding the embankment and causing a failure at the ends of the dams.

Q.    Are those risks considered acceptable to the corps?

A.    They are not.

MS. MORRIS:  Can we briefly pull up JX 76, please?

Thanks, Mr. Jackson.

BY MS. MORRIS:

Q.    Colonel Zetterstrom, opposing counsel asked you about this email.

Do you recall that?

A.    Yes.

Q.    Okay.  And specifically about the language that related to the water flanking the north end of Addicks Reservoir.

Do you see that?

A.    Yes.

Q.    And you were specifically asked about the

statement "This is a normal condition for the reservoir when it reaches this stage of pool elevation."

Do you recall that?

A.   Yes.

Q.   Does "normal condition" mean that it was a normal operating condition, a normal procedure?

MR. NOLEN:  Objection, Your Honor.  I don't understand the question.

THE COURT:  Yeah, I'm not --

MS. MORRIS:  I didn't ask -- I mean, we can see if the witness understands my question.

THE COURT:  Well, what is "normal"?  What -- are you defining "normal" for him?  Why don't you do that.  That's what I was a little unclear on.

MS. MORRIS:  Well, the text of this document that opposing counsel asked Colonel Zetterstrom about stated this is a normal condition for the reservoir. Opposing counsel asked Colonel Zetterstrom essentially the same question, and I'm asking Colonel Zetterstrom to clarify what he meant by "normal."

THE COURT:  Okay.  That's fine.

THE WITNESS:  I believe that my commanding general's use of "normal" was indicating that was how the structures are designed to operate.  I don't think that the use of the word "normal" was the most precise,

but I believe that at that stage he was trying to indicate to the Secretary of the Army and the Chief of Staff of the Army that this was the way that these structures were designed to operate.

BY MS. MORRIS:

Q.    And is water going around the ends of the dam a normal occurrence?

A.    No.

Q.    Okay.

MS. MORRIS:  All right.  Let's switch over to DX 379, please.

BY MS. MORRIS:

Q.    Colonel Zetterstrom, I'll give you a second to look at this.  And when you've had a chance, let me know if you recognize this document.

A.    Yes.

Q.    Who sent this email?

A.    I did.

Q.    And what is the date of the email?

A.    This would be 3:00 A.M. in the morning on the 28th of August.

Q.    And who did you send it to?

A.    I sent it to the Harris County Flood Control District director, Mr. Russ Poppe.

Q.    What is this email telling Mr. Poppe?

A.   I would summarize that it's telling Mr. Poppe that the amount of flows going around the northern end of Addicks Dam were more than we had previously expected.

Q.   And do you see the second sentence, what was the amount that was -- that this email is conveying that is expected to go around the ends of the dam?

A.   22,000 cubic feet per second.

Q.   Okay.  And then the very last sentence, do you see where it says "People are calling constantly"?

A.   Yes.

Q.   Do you know why people were calling constantly?

A.   To find out the likelihood that their structure would be inundated.

Q.   And why, again, would you -- why again were you concerned about uncontrolled flow in the amount of 22,000 cfs?

A.   Because at least my recollection is that the inundation mapping I was shown is that that amount of flow would also begin flowing into White Oak Reservoir and that it was more than we expected and the structures downstream for the northern end of Addicks were -- would be more at risk.

MS. MORRIS:  Your Honor, we move to admit

DX 379 into evidence.

THE COURT:  Okay.

Any objection?

MR. NOLEN:  No, Your Honor.

THE COURT:  Okay.  It will be admitted.

(Admitted Exhibit No. DX 379.)

BY MS. MORRIS:

Q.  All right.  Let's go back.  We were talking about the two purposes of induced surcharges.  We talked about the risks to structures.

You also mentioned optimizing storage; is that right?

A.  Yes.

Q.  Okay.  Why is it important to optimize storage?

A.  The value of the reservoirs is having capacity to store and temporarily detain rainwater to help reduce the flooding downstream.

Q.  And let's talk about that storage just for a second.

MS. MORRIS:  And we can flip back, sorry about this, to JX 76 again.

BY MS. MORRIS:

Q.  Colonel Zetterstrom, do you recall being asked about the 125 billion gallons of water that --

A.   Yes.

Q.   -- were stored?

A.   Yes.

Q.   Where would that 125 billion gallons of water have gone if the corps hadn't closed the gates to the dams at the beginning of Harvey?

A.   The Buffalo Bayou tributary and watershed.

Q.   And where is that?

A.   Downstream of Addicks and Barker Dams.

Q.   And did the corps release all 125 billion gallons of water at one time?

A.   No.

Q.   Were you concerned about future storms?

A.   Yes.  There was a report of an Atlantic storm forming as well as half of the prior pools of record in Addicks and Barker Reservoirs occurred outside of hurricane season from a more regularly recurrent rain event that we experience in Harris County.

Q.   With 125 billion gallons of water in the reservoirs, what level of rainfall would be required to pose a risk to the storage capacity had the corps not made the induced surcharge releases?

A.   I can't give a numerical example, but any additional rainfall or a significant amount of additional rainfall would have ended up refilling the

reservoirs or potentially causing the water to go around the northern end of Addicks again.

Q.    Would it have required a hurricane?

A.    No.

Q.    Colonel Zetterstrom, were you the commander during the Tax Day Storm in 2016?

A.    I was not.

Q.    Okay.  Were you able to witness the conditions at the Addicks and Barker project office in the days and weeks preceding the Tax Day event?

A.    Yes.  Prior to assuming command, Colonel Pannell, my predecessor in the district, hosted me to prepare for the transition and we toured Addicks and Barker Dams, saw the dam safety teams in operation and the gate structures, as well as toured the Emergency Operation Center and was briefed on how they functioned during an emergency situation.

Q.    Do you recall, based on your observations, how long it took for the corps to drain the reservoirs after the Tax Day Storm?

A.    What I was briefed is that there were three separate rain events, and it took three months before the reservoirs were emptied.

Q.    How did the Tax Day Storm flood pools compare to the Harvey flood pools?

Trial

A.    My understanding, that they were about half the amount of the Harvey flood pools.

Q.    Colonel Zetterstrom, are you familiar with the Emergency Action Plan?

A.    Yes.

Q.    And what is it?

A.    It's a document that in combination with the Water Control Manual would give guidance as to what actions to take in certain emergencies.

Q.    What is the relationship between the Water Control Manual and the Emergency Action Plan?

A.    My understanding is the Water Control Manual is a part of the Emergency Action Plan and subordinate to it.  It's a subset of the Emergency Action Plan.

Q.    Was the Emergency Action Plan in effect at the time of Harvey?

A.    I think the -- I mean, the Emergency Action Plan is always in effect.  Whether I think it always applies, I guess I should have asked you to restate your question to make sure I understand it.

Q.    Well, let me ask you a better question.

Was the Emergency Action Plan implemented during Harvey?

A.    My recollection is parts of it were.

Q.    Do you know if the dam safety officer of

Addicks and Barker issued an emergency declaration during Harvey?

A.   Not to my knowledge.

Q.   And you don't know or you --

A.   I do not know, but I don't think it would be necessary.  As the commander, I have the authority and responsibility to declare the emergency.

Q.   And without a declaration from the dam safety officer, does that mean that Harvey was not an emergency?

A.   No.

Q.   Colonel Zetterstrom, we talked briefly about the chain of command.  I want to ask you a few questions about the correspondence regarding the surcharges.

MS. MORRIS:  Let's pull up DX 394, please.

I have a paper copy for you as well.

May I approach the witness?

THE COURT:  Yes, you may.

MS. MORRIS:  Thank you.

I still like reading on paper, so I like to give the witness a choice.

THE COURT:  It definitely is preferable to screens especially if you're reading something.

MS. MORRIS:  Yes.

THE COURT:  After two or three screens, pages on the screen, you're happy to have paper.

MS. MORRIS:  Exactly.

BY MS. MORRIS:

Q.  Colonel Zetterstrom, this appears to be an email chain, so I'm going to give you a minute to look at it, and then let us know if you've seen it before.

A.  Yes, ma'am.

Q.  What is the subject line of this email?

A.  "Risk and Operations at Addicks and Barker Dams."

Q.  Okay.  And let's actually find the place where you are first forwarded this email.

All right.  Colonel Zetterstrom, who sent you this email?

A.  Mr. Pete Perez.  He was the civilian executive service, civilian leader from the Southwestern division.  He was Colonel Owen's deputy for programs and -- excuse me, for business programs, and he had formerly been the dam safety officer for the Galveston district as well as its senior civilian.

THE COURT:  So the division is above the district?

THE WITNESS:  Yes, Your Honor.

THE COURT:  It's the next --

881

Trial

THE WITNESS: This would be from the civilian deputy of my supervisor, sir.

THE COURT: Okay.

BY MS. MORRIS:

Q. And on what date did you receive this email?

A. The evening of August the 29th.

Q. What was Mr. Perez forwarding to you?

A. He forwarded an email from Mr. Halpin who was the Corps of Engineers' dam safety officer.

Q. What does an email from Mr. Halpin indicate or suggest to you?

A. What this suggests to me is that the dam safety technical chain was communicating about the risk and operations at the Addicks and Barker dams.

Q. Would you have reviewed an email from Mr. Perez that had forwarded an email from Mr. Halpin?

A. Yes.

Q. If we scroll up in response to Mr. Perez, what did you say?

A. I stated that I agreed with him, implying Mr. Halpin, but that I think we should wait until after the immediate emergency is over.

Q. What did you mean by "the immediate emergency"?

A. This was the day after the controlled

releases began, and we were still very much in the midst of the emergency and concerned about the ability of the dams to continue to withstand the forces of the water.

Q.   And you say that you agree with him.  What were you agreeing with him on?

A.   Well, I made an agreement and he made many points.  I think -- I was agreeing that increasing the releases more would have posed even greater risk.  He mentions that we're actively replacing them and it was the number one priority dam out of 714 dams.

MR. NOLEN:  Excuse me, Your Honor.  Objection.  I think this is that same document that they offered a moment ago when they made their bill of exception or their offer of proof.  It's Mr. Halpin's email now that they're getting the witness to read and agree with.  So, you know, we continue to object to that as this is hearsay as to his opinion and he hasn't been called to come to give testimony.

MS. MORRIS:  May I respond?

THE COURT:  Yes.

MR. NOLEN:  It's the same email, it's just a larger chain.

THE COURT:  Okay.

MS. MORRIS:  Sure.  It's not the same email.

This email was specifically forwarded to Colonel Zetterstrom who is on the stand testifying about it. He's testifying that he read it, and he's testifying that he agreed with it. And I can lay a foundation for why it's not hearsay.

THE COURT: Okay. Let me hear the foundation.

BY MS. MORRIS:

Q. Colonel Zetterstrom, did you receive this email, DX 379, in the ordinary course of business?

A. Could you please define "ordinary course of business"?

Q. Is email -- was it regular practice -- was it regular practice to communicate by email about ongoing situations in the corps?

A. Yes.

Q. Okay. And so is email one of the ways you were communicating with corps employees during Harvey?

A. Yes.

Q. And you received this email as part of your ongoing duties as commander during Harvey?

A. Yes.

Q. And does the corps regularly maintain emails as part of a typical business practice?

A. Yes.

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

MS. MORRIS:  Your Honor, this is a record of a regularly conducted business activity under 803(6) and it is an exception to hearsay.

THE COURT:  Well, it is, but it really isn't. I mean, what you have underlies the business exception. It's a regular thing that's going on.  The documents are trustworthy because they're in a regular chain of documents.  Each one is like a receipt for lunch could be a regular course of business.  You have thousands of receipts that the company is getting, so each one is a guarantee of the system.

This is not from a system.  This is an email dealing with a somewhat extraordinary thing which is not in the regular course of business.  All of the discussion has indicated this is sort of a one-time thing.  You don't have a hurricane every month and monthly hurricane information.

So it seems to me it's not a business record in the basic meaning of that concept, and, therefore, it's hearsay.  And the fact he's saying he agrees with it doesn't make it not hearsay; it reinforces it.  So I'll sustain the objection.

MS. MORRIS:  Very well, Your Honor.  But in terms of just asking the witness on the stand right now what he agreed with, that is not hearsay.

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

THE COURT:  Well, asking him if he agrees with it, if we're using it for the truth of the thing that he agrees with, then it does become hearsay.  It's only hearsay if he's using it for some other purpose like I'm using it because I knew he was alive still because I got an email from him.  That would not be hearsay because you're using it, not to prove what it said, but to prove a fact that its existence showed.  This would be not hearsay to show that there was someone in the central office still sending mails, but it doesn't show anything about the truth of the email which is the only thing that would be relevant if you're asking him if he agrees with it.

If it isn't inherently true, his agreeing with it has no more validity than the thing has, so that's why it's hearsay.  So I'll -- my decision is that, again, it's not admissible.

MS. MORRIS:  May I ask the witness why he agrees with it?

THE COURT:  Well, no, because that's -- you're still getting the thing which is hearsay that he is agreeing with which has no guarantee of truth itself.  He's agreeing with this, you know.  Unless there's some connection for something that is already established that -- from Mr. Halpin, that is not

probative of anything.  So I'll -- let's move on to some other topic.

MS. MORRIS:  Very well, Your Honor.  And the United States would just offer this document, DX 394, as an offer of proof as to the chain of command and why the corps was making decisions that it did which goes to the heart of the question of the court's questions for this trial.

THE COURT:  Well, you can offer it as an offer of proof, but it's proof of hearsay, so I don't know that it's proof of anything.

So anyway, let's move on.

BY MS. MORRIS:

Q.   Colonel Zetterstrom, do you recall conversations regarding whether the Water Control Manual called for releases in accordance with the induced surcharge provision?

A.   Yes.

Q.   Whose decision was it to make induced surcharges?

A.   The dam safety officer's decision, ma'am.

Q.   Did you have to approve that decision?

A.   As the commander, I had the ability to countermand his decision, so I -- by agreeing with him, I upheld it.  If I disagreed with him, I could have

challenged it.  But knowing the guidance I had received from my division commander and his civilian deputy, I also knew that they -- I was told the night that I arrived at the dam that we should follow the Water Control Manual.

So I guess to summarize it, I didn't see any reason to contradict the decision, and I knew that my commander agreed with the decision.

Q.   Did you report that decision above in your chain of command?

A.   My chain of command knew of the decision and concurred with it.  The ultimate decision was reported through the Emergency Operation Centers to the higher headquarters.

Q.   I believe opposing counsel asked you about deliberations about whether to follow the Water Control Manual.

Do you recall that?

A.   Yes.

Q.   Can you describe the deliberations that were ongoing about that decision?

A.   I recall some email conversations with Southwestern division, specifically Mr. Zalesak, the dam safety officer, that we were looking for some possible solutions to -- for potentially constructing a

berm upstream of the reservoirs or some type of sandbag structure upstream of reservoirs to reduce the amount of water that was flowing into the reservoirs.  That was the main.

I also recall Doc Sterling was an engineer in division headquarters that was doing calculations about the controlled releases to make sure that those releases with the interim risk reduction measures in place would be safe.

Q.    Why didn't you take those other actions?

A.    Those other actions that were considered were infeasible within the time frame that we had and the environmental conditions that existed with all of the extensive flooding surrounding the projects.

Q.    Did you blindly follow the Water Control Manual?

A.    We did not.

Q.    Now, were there risks associated with opening the gates to make the induced surcharge releases?

A.    There were.  That dam safety study that I referred to earlier, one of the main areas of risk was to the outlet structures themselves which is why they were being replaced.  But as an interim risk reduction measure, the corps had installed steel plating on the sluices in the gate structure to prevent uplift as well

Trial

as grouting within the gate structures to prevent seepage and piping.  Those were actions that could be implemented more quickly than fully replacing the outlet structures.

Q.    And were there risks associated with keeping the gates closed?

A.    Yes.

Q.    How did the risks of opening the gates to make surcharge releases compare to the risks of keeping the gates closed and not making the releases?

A.    The risks of keeping them closed was outweighed by the risks of opening them.  We -- the primary thing that led us to make the decisions of the controlled releases was the rate of rise of the pools in the reservoirs had -- was not even on the hydrograph of the Water Control Manual, and so we were extremely concerned that the inflows of the reservoirs would far exceed any reasonable outflows and place the dam structures at risk for failure.

Q.    As commander, why did you support the decision to make controlled releases when you knew it would increase flooding downstream?

A.    I supported the decision because dam safety is public safety.  These structures have to be operated in a way that will guarantee their structural

integrity, and the consequences of their failure to my recollection could have led to a worst-case failure. The Emergency Action Plan estimates 36,000 fatalities and more than $60 billion worth of damages.  The risks of those consequences being realized far outweighed any risk of the controlled releases.

Q.    And why couldn't the corps wait to open the gates until dam failure was imminent?

A.    Once dam failure is imminent, it's almost impossible to stop that sequence and the ultimate failure.  And with the rainfall and the conditions around it, our ability to have performed a flood flight to try to potentially fill the breach of a dam failure or any other type of flood-fighting actions that are -- would be typical for an earthen dam were unfeasible in the conditions.

Q.    How did the gravity of the decision to open the gates compare to decisions that you've had to make in your military service?

A.    I've never had that level of responsibility in my life.  It was, again, the most stressful and traumatic experience in my life.  And the thought of the possible failure of the dams and the people downstream of them with a catastrophic failure was not something that I could entertain occurring.

Q.   Colonel Zetterstrom, given the rainfall that fell during Harvey, was there any way to operate the project that would have prevented both flooding upstream and downstream of the dams?

A.   There was not.

MS. MORRIS:  Your Honor, just one moment.

THE COURT:  Okay.  Sure.

MS. MORRIS:  We have no further questions.

THE COURT:  Okay.  Thank you.

Mr. Nolen, cross-examination?

MR. NOLEN:  I have some, Your Honor.

REDIRECT EXAMINATION

BY MR. NOLEN:

Q.   Colonel, we agree, don't we, that there was never a potential for dam failure?  You've already testified to that.

Do we agree with that?

A.   I don't agree with that.  I don't believe I testified to that, sir.

Q.   All right.  Was there ever an assessment that the dams were about to fail?

A.   I mean, I don't understand, sir.

Q.   You don't understand was there ever an assessment that the dams were about to fail?

A.   I don't know how to answer your question,

sir.

Q.   All right.  You don't remember answering earlier when I was asking you questions that there was never an assessment that the dams were about to fail?

A.   I don't recall the use of the term "assessment," no, sir.

Q.   You don't recall earlier that you testified that y'all never made an assessment that the dams or the reservoirs were about to fail?

A.   I don't recall, sir.

Q.   So is it your testimony today and now that you opened the gates, the reservoir gates because you made the assessment that the reservoirs were about to fail?

MS. MORRIS:  Your Honor, this has been asked and answered.

MR. NOLEN:  He says he doesn't remember answering something he answered less than an hour ago, Your Honor.

THE COURT:  I think that's appropriate, an appropriate question.  I'll allow it.

THE WITNESS:  I think my testimony was that you -- if I am understanding you correctly, now, sir, the assessment of them about to fail.  I think my testimony was we were concerned about the risk of

failure, and we had seen there was things that we had observed that caused concern.

BY MR. NOLEN:

Q.   But there was never an assessment that the reservoirs were going to fail, was there?

A.   I'll say no, sir.  I mean...

Q.   No, there wasn't, right?

MS. MORRIS:  Objection, Your Honor.  That's asked and answered, and he's badgering the witness and mischaracterizing his testimony.

THE COURT:  No, he's just clarifying it. I'll allow the question.

BY MR. NOLEN:

Q.   There wasn't that assessment, right?

A.   No, sir.

Q.   And y'all opened the gates because you followed the Water Control Manual, correct?

A.   No, sir.

Q.   No, that's not correct?  That's a stipulated fact in this case, but go ahead.

MS. MORRIS:  Objection.  That is not a stipulated fact in this case.

MR. NOLEN:  That you followed the Water Control Manual?

MS. MORRIS:  We've stipulated that the corps

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

did follow the Water Control Manual, but we did not stipulate as to why the corps followed the Water Control Manual.

BY MR. NOLEN:

Q.   So do you believe you followed the Water Control Manual because there had been an assessment that the reservoirs were about to fail?

A.   I believe we followed the Water Control Manual because the conditions we observed met the water control precoordinated action to begin the releases, sir.

MR. NOLEN:  Can you show DX 379 again, please?

BY MR. NOLEN:

Q.   So this DX 379 is dated 8/28/2017.

Do you see that?

A.   Yes, sir.

Q.   And down here it says "Russ, attached is a table that depicts combined flow and flow around the dam and over the spillway.  Mario misspoke.  You can see it is actually more like 22,000 cfs of uncontrolled flow."

Do you see that?

A.   Yes.

Q.   And is that the flow over the north end of

Addicks?

A.   The flow around the northern end, yes, sir.

Q.   Okay.

MR. NOLEN:   So can you pull up JX 110, please.

BY MR. NOLEN:

Q.   So this is the flow that Mr. Maglio says "it's barely moving."

Do you remember this?

MS. MORRIS:   Objection.   Foundation.

BY MR. NOLEN:

Q.   Have you seen this before?

A.   I do not recall.

Q.   Well, you're part of the DLL-CESWG-FLOOD group, aren't you?

A.   I do not recall.

Q.   You don't know if you're part of this group that receives the messages that you send out to them and they send to you?

A.   No, sir.

Q.   Okay.   Have you ever seen the picture that's attached?   It's the second page.

MR. NOLEN:   If you can go to the second page, please.

Trial

BY MR. NOLEN:

Q.   Is that the 22,000?  Have you ever seen that before?

A.   That -- my recollection is that was the first photo sent when water began going around the end of the dam.

Q.   Do you have a photograph of 22,000 cfs flowing around the north end of Addicks?

A.   I do not know.

Q.   Right.  Because you don't.

You do know you don't have one, do you?

MS. MORRIS:  Objection.  Argumentative.

THE WITNESS:  Sir, I don't have any photos --

THE COURT:  He was bringing out the fact.

MR. NOLEN:  I'm sorry.  What did you say?

THE COURT:  That's permissible.

MR. NOLEN:  I apologize.

THE COURT:  Permissible.  That was permissible.

MR. NOLEN:  Oh, permissible.  Yes.  Thank you.

BY MR. NOLEN:

Q.   You have no photographs, right?

A.   No, sir.

Q.   Okay.  I'm going to show you JX 053, and it

talks about emergency spillway performance.

Are you familiar with this document at all?

A.   I do not recall.

Q.   Well, do you agree with this, "The north end emergency spillway of Addicks Dam was flanked by a shallow depth low velocity sheet flow from the reservoir pool.  This uncontrolled release is illustrated in figure 6.  The full capacity of the emergency spillway was not reached with only the end scour pad going under water.  This is observed with the emergency spillways during the event.  The emergency spillways of the south end of Addicks Dam, and both Barker Dam -- and both at Barker Dam did not see any flows."

Do you see that?

MS. MORRIS:  Objection, Your Honor.  Foundation.  The witness stated he has not recalled this document.

THE COURT:  Well, he was showing him the document to see if there was a foundation.

THE WITNESS:  Your Honor, I cannot see it from here or have my reading glasses.

THE COURT:  We can bring it --

MR. NOLEN:  We've got it up on the board now.

THE COURT:  Can you see that?  It's got the

print in front of it.  Can we --

MR. NOLEN:  Yeah, you can remove that, if you want.

THE COURT:  Can you see that?

THE WITNESS:  Yes, Your Honor.

BY MR. NOLEN:

Q.  So is your recollection that the -- that it was a low flow sheet flow that was minimal?

MS. MORRIS:  Objection.  We still have an objection for foundation for this document with the witness.

THE COURT:  Well, showing the photo and the witness' prior testimony is adequate foundation, so I'll overrule the objection.

You can answer.

THE WITNESS:  How would you define "low," sir?

BY MR. NOLEN:

Q.  Well, you couldn't measure that because you told me earlier you didn't have a gauge up there, right?

A.  I did say that, yes, sir.

Q.  Right, because you didn't have a gauge.

And you know that Mr. Maglio went up there and took that picture, right?

MS. MORRIS:  Objection.  Again, foundation. Assumes facts not in evidence.  The plaintiffs invoked the rule here.  Colonel Zetterstrom wasn't here for Mr. Maglio's testimony.

THE COURT:  Right.  But I assume he's asking about prior to the case.

Did you know -- or receive Mr. Maglio's picture?

THE WITNESS:  I did see this picture, Your Honor.

THE COURT:  Okay.  Well, that's adequate foundation.

BY MR. NOLEN:

Q.  And did you know that Mr. Maglio took the picture?

A.  I did not.

Q.  Okay.  But you've seen the picture?

A.  Yes.

Q.  All right.  And you know that you can't quantify anything there because you didn't have a gauge there, right?

A.  You don't -- you can quantify through modeling, sir.

Q.  All right.  And so we should go with Mr. Maglio's testimony on this, right, because he's the

one who went up there and took this picture and saw it?

MS. MORRIS: Objection. Again, Colonel Zetterstrom has no knowledge of Mr. Maglio's testimony.

THE COURT: Well, he doesn't need knowledge of the testimony. It's whether the picture itself is evidence of that fact.

I mean, based on this picture, is there any need for a gauge to measure that amount?

THE WITNESS: I don't know if there's a need for a gauge to estimate hydraulic information.

BY MR. NOLEN:

Q. Okay.

A. Models are used frequently in hydrology and hydraulics.

Q. Colonel, let me ask you this: Did you go physically take that picture?

A. I did not take this picture.

Q. Okay. So you didn't take this picture of a puddle on the north end of Addicks, right?

A. I flew over the north end of Addicks and saw the amount of flooding that was in that area once the day -- the first day that it was safe to fly, we flew over and the entire area was inundated.

Q. Right.

You didn't quantify this yourself, did you?

A.    No, sir.

Q.    All right.  You would have to defer to somebody else who physically went there in order to quantify it; is that true?

A.    Yes, sir.

Q.    All right.  And if that person was Mr. Maglio, that was the only person who went up to the north end of Addicks and took this picture, that would be the person we would have to defer to for that answer?

A.    If it's specific to this picture, yes, sir.

Q.    Okay.  Thank you.

MR. NOLEN:  Okay.  Pull up JX 053, please.  JX 053.

THE COURT:  What's the exhibit number?

MR. NOLEN:  JX 053.  It's already been admitted, Your Honor.

THE COURT:  Okay.  All right.

BY MR. NOLEN:

Q.    Colonel, we see that JX 053 is an exhibit of a memorandum for commander, Southwestern Division, to Michael Southern.

Do you see that?

A.    Yes.

Q.    And you've seen this document before,

Trial

correct?

MS. MORRIS:  Objection.  Mischaracterizes his testimony.

MR. NOLEN:  He hasn't testified about it yet. He's not given any testimony about this document yet.

THE COURT:  He's asking him about the document.  I'll allow it.

BY MR. NOLEN:

Q.    You've seen this document before?

A.    I believe I did, yes.

Q.    Yes, sir.

And Mr. Thomas is under your command, right?

A.    Yes.

Q.    Okay.  And so this is a report from Mr. Thomas, Memorandum for Commander, correct?

A.    It's not for the commander.  It's within the parenthesis.  It's actually to Mr. Michael Southern.

Q.    Yes, sir.

And you would have reviewed this document at some point, correct?

A.    I reviewed -- my recollection is that I saw this after it was sent.

Q.    Okay.  And so you have seen documents like this before because it's an after-action report; is that right?

A.    It states it's about new pools of record.

Q.    Right.

So it's after action.  It's after the fact.

The new pools of record have happened, and now Mr. Thomas is reporting as to how the Addicks and Barker Dams performed, right?

MS. MORRIS:  Objection, Your Honor.  This is beyond the scope of the United States' direct or cross or whatever we're calling it.  But this is an after-the-fact report, and this is beyond the scope.

MR. NOLEN:  Your Honor, they just elicited a whole lot of testimony about his concerns about this dam and these reservoirs and it's the most traumatic thing that's ever happened, and so I'm trying to establish what was actually reported up about --

THE COURT:  Yeah, it certainly is related to that, so I'll allow that.

BY MR. NOLEN:

Q.    All right.  So I'm going to direct your attention, since you've seen this document before. This is October 27, 2017.

Do you see that, sir?

A.    Yes, sir.

Q.    Okay.  And what Mr. Thomas reports up is, he says in No. 2, looking at No. 2 so you can follow

along, "The embankment, outlet structures, and emergency spillways functioned as intended."

Do you see that?

A. I do.

Q. All right. "Piezometers, settlement pins, and alignment surveys for the outlet structures do not shown any alarming trends from this pool of record."

Do you see that?

A. Yes.

Q. All right. "There were no observations of seepage, or critical distress areas located on the dams."

Do you see that?

A. Yes.

Q. "What areas located on the downstream embankment toe were monitored but showed no signs of flow."

Do you see that?

A. Yes.

Q. "Erosion of the dam and cofferdam crest became an issue for inspection teams trying to transverse them."

Right?

A. Correct.

Q. And it says "Overall conclusion is that the

project was performing as expected with no significant problems during this pool of record event."

Do you see that?

A. Yes.

Q. All right. So all of those concerns that you just talked about with Ms. Morris didn't come to fruition, right?

A. Correct.

Q. Right.

Because the reservoirs and the dams performed exactly the way they were supposed to, correct?

A. Yes.

Q. All right. And so if, in fact, if, in fact, the reservoirs were opened so that the reservoirs could perform as they were designed to perform, that is -- that is a procedure that is contained in the Water Control Manual that is an ordinary operating procedure; isn't that true?

A. No.

Q. It's contemplated by the Water Control Manual, right?

A. Yes.

Q. Right.

And it isn't something that is an emergency action because it's not contained in the Emergency

Action Plan, correct?

A.   No.

Q.   No, it's not contained in the Emergency Action Plan?

A.   No, sir, it's -- it doesn't -- because it doesn't have to be in emergency action to make it an emergency, sir.  It was not normal operations.

Q.   Okay.

A.   It was induced surcharge operations.

Q.   And induced surcharge operations are part of the Water Control Manual and are not considered an emergency, right?

A.   That is not correct.

Q.   So where would I find that in the Emergency Action Plan?

A.   I do not know.

Q.   Because it's not in there, right?

A.   I do not know.

Q.   Okay.  Now, is it true that you and Mr. Thomas would have been the people who would have had to determine whether or not Addicks and Barker would operate under the Emergency Action Plan; is that true?

A.   I do not recall.

Q.   Please refer to page 89 of your deposition.

And if you start with number 6 and read down, and you can read it to yourself.

A.    To what point, sir?

Q.    To 24.

A.    Yes, sir.

Q.    All right.  Now, so is it true, now that you've had a chance to look at your testimony, your prior testimony, that it would have been you and Mr. Thomas who would have determined whether or not the reservoirs were going to operate in accordance with the Emergency Action Plan?

A.    My final statement is based off of the questions you asked, is that I assumed that it would be both -- I -- I.  All of my prior ones I stated I did not know.

Q.    Right.  You said it would be you and Mr. Thomas, correct?

A.    That's what I said, yes.

Q.    Yes, sir.

And to your knowledge, you were asked to your knowledge -- so if Addicks/Barker were ever operating under the EAP, Emergency Action Plan, that would have been something that Mr. Thomas would have decided or determined.  Your answer was:

"We would have determined that together."

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs                    10/30/2024

And I said:  "And to your knowledge, did that ever occur?"

And what was your answer?

A.    No, sir.

Q.    No, it was never -- it was never operating under the Emergency Action Plan?

MS. MORRIS:  Objection.  Argumentative.

THE COURT:  No, he's completing the answer.

THE WITNESS:  My recollection when I read the testimony is later on I stated that I don't know if this -- the fact that it was never operating under the EAP was true.

BY MR. NOLEN:

Q.    Is there somewhere I can look in this deposition and find that?

A.    I --

Q.    I mean, seriously.  I don't know where that is.  And so if you could point it out to me --

A.    I don't have that.  It would take a while to do that.

Q.    I mean, I'm happy to try to let you find it.

MR. NOLEN:  I'm sorry, Your Honor.  If the court would like to take a break and let him look at that deposition, he's welcome to do it.

THE COURT:  We've been going for almost for

an hour, so we can take a 15-minute break.

MR. NOLEN:  All right.  Thank you, Your Honor.

THE COURT:  We'll stand in recess if you think you can do it.

(Off the record from 4:59 until 5:20.)

THE COURT:  Please be seated.

Mr. Nolen, you may proceed.

BY MR. NOLEN:

Q.   Colonel Zetterstrom, before we took the break, I had asked you to review your deposition testimony that I provided you earlier to see if you could find somewhere where you had told me that you weren't sure whether or not the reservoirs were operating under the emergency control plan -- or the Emergency Action Plan.

Were you able to locate anything?

A.   Yes.

Q.   Okay.  Where did you locate it?

A.   Page 89, line 2.

Q.   All right.

MR. NOLEN:  Let's take a look at that. Page 89, line 2.

THE COURT:  Can we put that on the screen or...

MR. NOLEN:  We can.  I'll put it on the ELMO, Your Honor.

THE COURT:  Okay.  I've got it.  It was on and it's gone.

MR. NOLEN:  So let me back up and get the question.

THE COURT:  Okay.

MS. MORRIS:  Your Honor, just for completeness, I think Mr. Nolen is doing -- we would just ask that page 88 is also displayed so we can see the question that precedes the answer.

MR. NOLEN:  Yes, that's fine because I think we're seeing it now through the thing and not on the ELMO.

THE COURT:  Okay.

MR. NOLEN:  Okay.  So page 88.  So go up to 88, please.

BY MR. NOLEN:

Q.   We will start at line 8 on 88.  It says:

"Question:  All right.  During the entire period of time that the reservoir release is occurring in August and September, the reservoirs were operating under the Water Control Plan, correct?"

And your answer was:

"We did operate the structures in accordance

with the Water Control Manual except when a deviation was authorized.

"Question:  And you have a separate manual for emergency situations, correct?

"Answer:  I believe you're referring to the document known as the Emergency Action Plan.

"Question:  That's right.

"Answer:  Yes, sir.

"Question:  Okay.  And the reservoirs were never being operated under the Emergency Action Plan during the Harvey reservoir releases, correct?

"Answer:  I don't think that's completely correct."

Is that what you're referring to?

A.   That, yes, sir, and then my answer for the next question.

Q.   All right.  So the next question is:

"Well, what part of the question is incorrect?

"Answer:  Without referring to the EAP, I can't know for certain, but I believe that there are components of it that influenced the actions and decisions made for the operations of the Addicks and Barker Dams during Hurricane Harvey."

And so the next question is:

912

Trial

"Would somebody have to make a formal determination that Addicks and Barker would operate under the EAP?

"Answer:  I do not know.

"Question:  Well, would anybody other than you be the person who would make that determination?

"Answer:  I do not know.

"Question:  Who would know?

"Answer:  I would recommend that it would be Mr. Rob Thomas.

"Question:  All right.  And so if -- and Mr. Thomas will be further deposed tomorrow.  Did you know that?

"Answer:  I was aware he had a deposition this week, sir.

"Question:  So if Addicks/Barker were ever operating under the EAP, that would have been something that Mr. Thomas would have decided or determined?

"Answer:  We would have determined that together, sir.

"Question:  And to your knowledge, did that ever occur?

"Answer:  No, sir."

Right?  And so the equivocation part or the part where you think you may not have known for sure

was the earlier part that we just read?

A.   Yes.

THE COURT:   Okay.

BY MR. NOLEN:

Q.   Now, Colonel, you were talking earlier about some of the components of the reservoirs and your concerns about components of the reservoir.

Do you remember that testimony?

A.   Yes.

Q.   Okay.  And so is it true that the corps utilizes verbal descriptors in order to describe what the level of concern is?  Is that something you're familiar with?

A.   I don't understand your question.

Q.   So if we look at JX 42, which is already in evidence, that's the Addicks and Barker Dam Safety Modification Report, Buffalo Bayou and Tributaries, Houston, Texas, May 2013.

And so all I'm asking about is, are you familiar with the verbal descriptors that are utilized by the corps for risk assessment?

A.   Can you please describe the "verbal"?

Q.   Yes, I can.

So virtually impossible is .001, very unlikely .01, unlikely .1, neutral .5, likely .9, very

likely .99, virtually certain .999.

Have you ever heard of these verbal descriptors utilized to assess risk?

A.   No, I have not.

Q.   Oh, there is one thing.

Colonel Zetterstrom, I'm finished asking you questions that are substantive to this.  I do have to ask you this and it's not to in any way be rude to you or any member of your family.

Your wife is part of the defense team, correct?

A.   My wife is counsel for the Army Corps of Engineers.

Q.   And she's in this courtroom, correct?

A.   Yes, sir.

Q.   At counsel table for the Army Corps?

A.   Yes.

MR. NOLEN:  Okay.  Thank you.

THE COURT:  Any further government questions?

MS. MORRIS:  Just about two or three questions.

THE COURT:  Okay.

MS. MORRIS:  It will be quick.

RECROSS-EXAMINATION

BY MS. MORRIS:

Q.   Colonel Zetterstrom, on that last point, did you discuss anything about this case with Ms. Zetterstrom?

A.   No, ma'am.

Q.   Okay.  And you were shown an after-action report about the performance of the structures, correct?

A.   Yes.

Q.   Okay.  Did you have that report at the time of Harvey?

A.   No.

Q.   Does that after-action report eliminate the concerns you had during Harvey with respect to the emergency of the dams?

A.   No, ma'am.

MS. MORRIS:  No further questions.

THE COURT:  Okay.  Thank you.  Anything further from the plaintiffs?

MR. NOLEN:  No, Your Honor.

THE COURT:  Okay.

Well, the court, Colonel, wants to thank you. I'm curious, you said you had also been in the Balkans. Was that for the -- in Kosovo, in that area?

THE WITNESS:  Yes, Your Honor, both in Kosovo and Bosnia and Sarajevo.

THE COURT:  Was that -- I didn't remember we -- did have a peacekeeping force there for the U.S.?

THE WITNESS:  We did after the Balkan War. The U.N. resolution and NATO deployed forces there as peacekeepers to keep the formal war infractions from going back into conflict.

THE COURT:  That was after the bombing was all over and the conflict ended -- it formally ended, I guess.

THE WITNESS:  For Kosovo, Your Honor.  The earlier in Bosnia, there was the two separate conflicts.

THE COURT:  I was an election observer in the Serbia election which was about eight years before the -- or maybe it was four years before -- or maybe it was before Vanosavich got in.  And had realized the tensions in that area were extreme to the point that, you know, it was very difficult than Americans are generally used to where we have a multiethnic society that's sort of merged together whereas their hates go back 400 years or longer.

THE WITNESS:  I agree, Your Honor.

THE COURT:  It was probably more dangerous

than in Afghanistan.  Well, thank you for your service to the country and to obviously the court.

THE WITNESS:  Thank you, sir.

THE COURT:  And at this point, you're excused.

(Witness excused.)

THE COURT:  And so we obviously don't have much time for any more witnesses.  Do we have any who are -- any additional witnesses or --

MR. McGEHEE:  Your Honor, we were going to call Mr. Long as our next witness.  And my -- as I've told the court before, and I told opposing counsel, I think mine is going to be about an hour.  I could give an overview in 10 minutes, 15 minutes with Mr. Long, and that would be a logical break point.  But I would also defer to the other side.  We were going to recommend reconvening Friday, but I've talked to opposing counsel and they're all going home.

MS. DUNCAN:  Well, and we also have confirmed that the witness is not available on Friday either --

MR. McGEHEE:  Okay.

MS. DUNCAN:  -- since we talked.

THE COURT:  So we're not going to do anything more tonight then, and Friday we can't do anything either.  So Mr. Long will have to be when we reschedule

for December.

MR. McGEHEE:  Sir, that's okay with us.  The other option was use some time for -- of some of tomorrow's time.  And if we do that, I could start now and hopefully finish in the morning.  But I would defer to the court and opposing counsel.

MS. DUNCAN:  Well, I think part of our team is also heading out in the morning, including the attorney assigned to handle Mr. Long who has been working on his materials, right?  And so I don't think that we can do that.  We also haven't confirmed with the witness, although we could.

THE COURT:  Right.  Yeah, and we're not a hundred percent sure when the site visit will end.  I mean, it may also -- I don't know if there is any likelihood, I haven't checked the weather, of rainstorm like we had today.  We had about, I don't know, 15 minutes of fairly intense rain, but it was -- it would leave the ground a little bit muddy.

Why don't we then --

MR. McGEHEE:  Do we have the courtroom in the morning by any chance?

THE COURT:  I don't think they're kicking us out in the morning.  I think they've been generous with this.  We have the courtroom I think through Friday,

but that doesn't mean the witnesses or the attorneys can do Friday is the problem.

MS. DUNCAN:  Your Honor, perhaps the parties could confer on dates.  I mean, one concern we have is for the December dates, we didn't pick -- or we didn't propose two dates that are back to back.  And if we have two witnesses, one being an expert, we can certainly try to get it all done in one day.  But it does seem possible that it might extend into part of the second day.

THE COURT:  Yeah, I was going to recommend that, that whatever the two days when we're talking two days, we have two days together, so we could finish then with the maximum amount of efficiency.  We finish one and if we need to go a little extra time for the one, we could go an extra hour even into 6:00 or 7:00 o'clock so we can get them done by the -- before the next day.  But here we don't have quite the luxury or control of the hours which we do in our own court.

So let's plan on a conference Tuesday, this next week, by then we'll have checked the schedule for Monday and gone through what we have in December and we can lay out all of the dates.  I think, as I said, we're pretty open for December other than there's one bid protest hearing that.

MS. DUNCAN:  Your Honor --

THE COURT:  Yes.

MS. DUNCAN:  -- Tuesday is Election Day.  I don't know.

THE COURT:  Oh, that's right.  That's right. Probably we'll check in.  I think maybe let's see if we can get it all sorted out on Monday, then, I think we can sort it out on Monday then as to what a good date will be.  Everybody has their dates and we'll have the court's dates on Monday.  It isn't a big job to find the dates, so -- and then we can set those up Monday so we would be ready to go when they come.

Okay.  Anything else that we need to do?

MR. NOLEN:  I just need to admit two exhibits from the last witness, Your Honor.

THE COURT:  Okay.

MR. NOLEN:  Plaintiff's Exhibit PX 208.

THE COURT:  Okay.

MS. DUNCAN:  No objection.

THE COURT:  Admitted.

(Admitted Exhibit No. PX 208.)

MR. NOLEN:  And JX 76.

MS. DUNCAN:  No objection.

THE COURT:  Admitted.

(Admitted Exhibit No. JX 76.)

MR. NOLEN:  Thank you.

THE COURT:  Okay.  That's all the documents that I need to admit?

MS. DUNCAN:  Your Honor, may I ask about the printed copies of the exhibits, I assume you'd like us to take back the paper or --

THE COURT:  Yes.

MS. DUNCAN:  -- would you like us to ship you a copy?  Do you have an electronic copy.

THE COURT:  Yeah, electronic copy is much, much better for hauling back.  I don't want to have to haul back.  I don't know that we the ability.  I don't want Tanmay caring 50 boxes.  He probably could do it, though, he is strong.

MR. McGEHEE:  Judge, can we broach the bench, just the two of us.

MS. DUNCAN:  Briefly, Mr. McGehee, Your Honor, do you want us to ship one to the clerk and court copies or both back to D.C. for you or do you want just want us to basically get rid of them?

THE COURT:  I think if we an electronic version, anything that we want to really see we could print out.

MS. DUNCAN:  Okay.  So --

THE COURT:  We don't have to print out

Trial
Downstream Addicks and Barker (Texas) Flood-Control Reservoirs          10/30/2024

everything, but we can easily can print out, you know, if you have 20 or 50 pages of something.  We can print them out.

MS. DUNCAN:  Okay.  We'll just plan to get rid of these exhibits.

THE COURT:  Yes.

MS. DUNCAN:  Okay.

THE COURT:  Yes.  We are adjourned.

(Proceedings recessed at 5:38 p.m.)

923

C E R T I F I C A T E

I, Gary Schneider, a shorthand reporter, do hereby certify that the foregoing proceedings were taken down and transcribed under my direction to the best of my ability.

DATED: November 13, 2024        s/Gary Schneider

Gary Schneider, RMR, CRR

ADMITTED EXHIBITS

| PX | PAGE | DESCRIPTION |
|---|---|---|
| 131 | 805 | 8/30/2017 Email from Edmond Russo to Col. Lars Zetterstrom with Draft Potential New Legislation attached |
| 208 | 920 | 08/30/2017 USACE News release regarding Control of Releases from Addicks and Barker Dams |

| PDX | PAGE | DESCRIPTION |
|---|---|---|
| 408 | 805 | Opening statement |
| 409 | 805 | Demonstrative |

| DX | PAGE | DESCRIPTION |
|---|---|---|
| 136 | 806 | 10/1/2020 EC 1110-2-6075: Inundation Maps and Emergency Action Plans and Incident Management for Dams and Levee Systems |
| 223 | 704/806 | Press Releases Compilation Exhibit |
| 224 | 806 | 9/4/2017 HarveyVid -PR-20170904 - FinalV3.mp4 |
| 245 | 806 | 8/25/2017 Email string regarding risk of activating surcharge releases and spillways |

272      806     8/27/2017 Email String from Robert Thomas to Edmond Russo with subject "RE:SWG Prove Status: Addicks and Barker Reservoirs Condition"

289      806     Predecisional Hurricane Harvey Timeline

379      875     8/28/2017 Email from Col. Lars Zetterstrom to Russ Poppe, et al. with subject "Fw: Addicks Releases"

602      806     USACE Dam Safety Org Chart

603      806     10/10/2024 USACE Galveston District – Emergency Operations

608      806     8/28/2017 Email from Eric Halpin to Rob Thomas, et al., about the attached white paper, "Operational Decisions and Risks in Post Hurricane Harvey"

643      806     Timeline of events from Rob Thomas

646      806     Excerpts of Imagery from DX 638

DDX      PAGE    DESCRIPTION

2        806     Demonstrative

JX       PAGE    DESCRIPTION

18       805     7/2/1966 Federal Register Vol. 31, No. 128

59       805     8/25/2017 "Email string regarding risk of activating surcharge releases and spillways"

926

76          920      8/30/2017 Email string regarding Semonite's
                              report