# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| In re DOWNSTREAM ADDICKS AND BARKER (TEXAS) FLOOD-CONTROL RESERVOIRS | Sub-Master Docket No. 17-9002L<br><br>Senior Judge Loren A. Smith<br>(E-Filed February 17, 2026) |
| THIS DOCUMENT APPLIES TO:<br><br>ALL DOWNSTREAM CASES | |

## PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING *ABLAN V. UNITED STATES*

Rand P. Nolen
**KHERKHER GARCIA L.L.P.**
2925 Richmond Ave., Suite 1560
Houston, Texas 77098
Telephone: (713) 333-1030
rnolen@kherkhergarcia.com

Richard Warren Mithoff
**MITHOFF LAW**
500 Dallas Street, Ste. 3450
Houston, Texas 77002
Telephone: (713) 654-1122
mithoff@mithofflaw.com

Jack E. McGehee
**MCGEHEE, CHANG, LANDGRAF, FEILER**
10370 Richmond Ave., Suite 1300
Houston, Texas 77042
Telephone: (713) 864-4000
jmcgehee@lawtx.com
*Appointed Co-Lead Counsel for Plaintiffs*

*Of Counsel:*
Russell S. Post
Parth S. Gejji
**BECK REDDEN L.L.P.**
4500 One Houston Center
1221 McKinney Street
Houston, Texas 77010
Telephone: (713) 951-6292
rpost@beckredden.com

**I.      Introduction.**

The Court ordered supplemental briefing regarding the Federal Circuit's decision in *Ablan v. United States*, 162 F.4th 1364 (Fed. Cir. 2025).  Dkt. 594.  As the Court has observed, in *Ablan*, "the Federal Circuit affirmed the 2019 liability opinion in the *Upstream* docket which concluded that a taking occurred and defendant could not use the necessity doctrine as a defense."  Dkt. 594.

*Ablan* confirms Plaintiffs' arguments in this case.  Relevant passages of the *Ablan* opinion include the discussion of protected property rights (based on the prior the Federal Circuit decision from this case), 162 F.4th at 1373-75, the finding of a taking (both as a permanent *per se* taking and a temporary taking due to flooding), *id.* at 1375-78, and the rejection of the Government's necessity defense, *id.* at 1378-79.  The implications of these holdings are apparent for the downstream case.  The Government wrongly contends that *Ablan* is distinguishable from this case.  It is not.  The parties have provided extensive briefing to the Court on the issues noted above.[1]  Thus, instead of regurgitating that prior briefing, Plaintiffs provide a detailed overview of *Ablan* and cross-reference the relevant pages in Plaintiffs' prior briefing.

In *Ablan*, the Federal Circuit also addressed certain damages issues.  162 F.4th at 1380-83.  Because this Court has not made its liability findings yet, it would be premature to address those issues at this stage.  But given that *Ablan* confirms that liability exists in this case, this Court should issue a liability decision in favor of Plaintiffs and proceed to the damages phase of this case.  The Government took Plaintiffs' properties in 2017, during Hurricane Harvey, and these downstream property owners deserve to finally have their day in Court and receive just compensation.

---

[1] *See, e.g.*, Dkt. 175, 190 (Plaintiff's summary judgment briefing before *Milton v. United States* appeal); Dkt. 266, 281 (Plaintiffs' summary judgment briefing after *Milton* appeal); Dkt. 282 (Plaintiffs' brief regarding supplemental authority); Dkt. 451, 453 (Plaintiffs' supplemental briefing); Dkt. 535 (Plaintiffs' pre-trial brief); Dkt. 576, 580 (Plaintiff's post-trial briefing).

**II.     The Downstream Plaintiffs Hold Cognizable Property Interests in Flowage Easements.**

In *Ablan*, the Federal Circuit began its analysis by deciding whether the upstream plaintiffs "held cognizable property interests in flowage easements." 162 F.4th at 1374. Although the upstream plaintiffs owned private properties that were not previously subject to flowage easements, the Government argued that the property interests were "held subject to the background understanding of government police power and the Flood Control Act's limit on government liability." *Id.* Those are the same arguments that the Government has unsuccessfully made in this case and which were rejected in *Milton v. United States*, 36 F.4th 1154 (Fed. Cir. 2022).

*Ablan* cites *Milton*'s holding that the police power "doctrine does not allow private property to be 'subject to unbridled, uncompensated qualification under the police power.'" *Ablan*, 162 F.4th at 1374 (quoting *Milton*, 36 F.4th at 1162). *Ablan* also cites *Milton*'s holding "that the Flood Control Act does not render the government 'immune from suits alleging takings based on its flood control measures,' because the Tucker Act's waiver of sovereign immunity for takings claims was not withdrawn in the Flood Control Act." *Ablan*, 162 F.4th at 1374 (quoting *Milton*, 36 F.4th at 1160). Even though *Milton*'s holding regarding the Flood Control Act "was made in the context of jurisdiction," it still controls the analysis. *Id.*

Thus, *Ablan* held that the upstream plaintiffs "had a cognizable property interest in flowage easements on their land." *Id.* at 1375. Put simply, "'Congress may not override the provision that just compensation must be made when private property is taken for public use.'" *Id.* at 1374 (quoting *Scranton v. Wheeler*, 179 U.S. 141, 153 (1900)). This issue was decided in this case by *Milton*. *Ablan* faithfully follows *Milton* in determining the property interests of the upstream plaintiffs. This only goes to show that the analysis related to the upstream plaintiffs is highly relevant to the downstream plaintiffs.

### III. The Government Took the Downstream Plaintiffs' Properties.

Just as in the upstream case, the flooding of the downstream properties constitutes either a permanent taking or a temporary taking. *Ablan*, 162 F.4th at 1375-78.

### A. The flooding of the downstream properties constitutes a permanent taking under a *per se rule*.

*Ablan* confirms that the downstream plaintiffs' properties suffered a permanent taking. In *Ablan*, the Federal Circuit began by noting the Supreme Court's distinction between a permanent and temporary taking in the flooding context. "[I]ntermittent but inevitably recurring overflows … give rise to permanent takings." *Ablan*, 162 F.4th at 1375 (quoting *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012)) (cleaned up). Put simply, "[w]here 'land is not constantly but only at intervals overflowed, the fee may be permitted to remain in the owner, subject to an easement in the United States to overflow it with water as often as necessarily may result from the operation of the' dam." *Id.* (quoting *United States v. Cress*, 243 U.S. 316, 380 (1917)). And the Federal Circuit reaffirmed the rule that even one actual flooding is enough to establish a permanent taking. *Id.* (citing *Stockton v. United States*, 214 Ct. Cl. 506, 518-19 (1977)).

"[W]hether flooding is inevitably recurring turns not on mere frequency, but on whether there is a 'government action that will foreseeably produce intermittent invasions by flooding without identifiable end into the future.'" *Id.* at 1376 (quoting *Ideker Farms, Inc. v. United States*, 71 F.4th 964, 979 (Fed. Cir. 2023)). "When that is true, 'the government takes a permanent right of access, akin to an easement in gross, even if used only intermittently,' and has effected a per se taking." *Id.* (quoting *Ideker Farms*, 71 F.4th at 980).

By contrast, a taking is temporary when it is "temporary in duration … such as when a claimant [is] able to permanently reclaim[] most of his land which the government originally took by flooding." *Id.* at 1375 (quoting *Ark. Game & Fish*, 568 U.S. at 32-33) (cleaned up).

Applying this *per se* analysis, the Federal Circuit held that the CFC's findings that the flooding of the upstream properties "was foreseeable and would inevitably recur without identifiable end" were not clearly erroneous. *Id.* at 1376. As a result, the Federal Circuit concluded "that the 'permanent intermittent flooding' of Plaintiffs' properties was a 'physical taking subject to a *per se* rule,'" and held "that the government took permanent flowage easements in Plaintiffs' properties." *Id.* (quoting *Ideker Farms*, 71 F.4th at 980).

Similar findings should be made in this case. The Plaintiffs have extensively briefed why the Water Control Manual effected a permanent, categorical flowage easement. Dkt. 266 at 14-18; Dkt. 281 at 2-3. In short, Section 7-05(b) of the Water Control Manual, entitled "Induced Surcharge Flood Control Regulation," states that under certain conditions the floodgates will be opened. Dkt. 266-1 at 56 (A50). When the specified conditions exist, "reservoir releases will be made in accordance with the induced surcharge regulation schedules." Dkt. 266-1 at 56 (A50). And the flooding at issue unquestionably resulted from the Government's deliberate invocation of the regulation. Dkt. 266 at 7-10. Importantly, the Government knew what such induced surcharges would mean for downstream properties. Dkt. 266 at 8-10. And the Government admittedly intends to invoke the Induced Surcharge Flood Control Regulation when similar circumstances recur in the future. Dkt. 266 at 11-12.

In addition, "the Corps understood that 'storms of exceptionally large size were possible in the Houston metropolitan area'" and "the Houston area [is] prone to large storms." *Ablan*, 162 F.4th at 1376 (noting that Harris County has been subjected to 14 major storm events in the last 80 years). These facts establish that the flooding in this case was foreseeable and will inevitably recur without identifiable end, thus resulting in a permanent taking. In other words, the permanent intermittent flooding of the downstream properties is a physical taking subject to a *per se* rule.

### B. The flooding of the downstream properties constitutes a temporary taking as well.

"For cases involving 'temporary flooding,"' courts apply a 'multi-factor test for determining if temporary government induced flooding is a taking rather than a mere trespass.'" *Ablan*, 162 F.4th at 1376 (quoting *Ideker Farms*, 71 F.4th at 978). "These factors include 'time,' 'the degree to which the invasion is intended or is the foreseeable result of authorized government action,' 'the character of the land at issue' 'the owner's reasonable investment-backed expectations regarding the land's use,' and the '[s]everity of the interference.'" *Id.* at 1376-77 (quoting *Ark. Game*, 568 U.S. at 38-39).

Again, the Plaintiffs have extensively analyzed these factors and have briefed, in the alternative, why the intentional Government-induced flooding was a temporary taking of a flowage easement. Dkt. 266 at 18-26; Dkt. 281 at 4-6.

In *Ablan*, the Government did not contest issues related to the character of the land and severity of the interference. *Id.* at 1377. Instead, it contested the time, intent or foreseeability, and reasonable investment-backed expectations factors. *Id.* The Federal Circuit's analysis of each of these factors is illuminating here and persuasive; it compels finding a taking in this case.

In terms of the factor regarding time and duration, the Government argued that "Hurricane Harvey was an 'isolated trespass[]' and that the easement would be used 'during only the most extreme natural disasters.'" *Id.* But *Ablan* held that the CFC "reasonably found that the government 'reserves the right to repeat the impoundment' and that 'the likelihood of recurrent flooding is high,'" *id.*, and also that "the government has obtained a 'permanent right to inundate the property with impounded flood waters.'" *Id.* Thus, there was no clear error in the CFC's determination that this factor weighed in favor of the upstream plaintiffs. *Id.*

Similar findings should be made in this case, so this factor weighs in favor of the downstream plaintiffs. Again, the Government has openly admitted that it intends to invoke the Induced Surcharge Flood Control Regulation when similar circumstances recur in the future. Dkt. 266 at 11-12. And the likelihood of recurrent flooding is high given that storms of large sizes are a fact of life in Houston. *Ablan*, 162 F.4th at 1376. The Government has asserted a permanent right to inundate the downstream properties with its impounded waters. Dkt. 266 at 11-12.

Moreover, the Government-induced flooding was not a fleeting episode but lasted for several days. Dkt. 266 at 11. It resulted in the loss of use and enjoyment of private property for several months. Dkt. 266 at 11.

In terms of the factor regarding intent and foreseeability, the Federal Circuit held that the CFC did not clearly err in finding that the Government "foresaw the invasion of the Plaintiffs' properties and intentionally took flowage easements on them." *Ablan*, 162 F.4th at 1377. The Government argued that the "'urban development' of the land was unanticipated." *Id.* But the Federal Circuit rejected this framing: "the inquiry is whether '*the* invasion is intended or is the foreseeable result of authorized government action.'" *Id.* (quoting *Ark. Game*, 568 U.S. at 39). The inquiry is "not whether the extent of the damage from the invasion was foreseeable." *Id.*

Applying that test, this factor also weighs in favor of the downstream plaintiffs. The Government made a deliberate choice to open the floodgates as authorized by Section 7-05(b) of the Water Control Manual, i.e., the Induced Surcharge Flood Control Regulation, and it was aware that doing so would flood the downstream properties. Dkt. 266 at 7-8, 23. Indeed, while *Ablan* makes clear that the inquiry is whether the invasion was intended or the foreseeable result of authorized government action *and* does not depend on the foreseeability of the extent of damage, the evidence in this case goes even further than what is required by the standard.

The Government in this case possessed precise flow maps that indicated, with startling precision, the particular properties that would be flooded if the floodgates were opened at various flow rates. Dkt. 266 at 8, 23. Thus, the flooding of the Plaintiffs' properties was not just foreseeable—it was actually foreseen, and it occurred precisely as predicted by the Government's flow maps. Dkt. 266 at 8, 23.

Finally, in terms of the factor regarding reasonable investment-backed expectations, the Federal Circuit held that the CFC did not clearly err in finding this factor favored the upstream plaintiffs. *Ablan*, 162 F.4th at 1377-78. "A takings claim is 'not barred by the mere fact that title was acquired after' the government has acted." *Id.* (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 630 (2001)). The Government argued that the upstream plaintiffs "should have known that their land was susceptible to flooding." *Id.* at 1378. But the Federal Circuit affirmed the CFC's finding that the upstream plaintiffs did not have this knowledge based on several facts. *Id.*

For example, the Federal Circuit noted that the upstream plaintiffs "'did not know their properties were located within the reservoirs and subject to attendant government-induced flooding,'" that "'average homeowner[s] do[] not generally know' how to 'read and understand' government maps that indicated the [upstream] properties were within the dams' reservoirs," and that "'it would take an uncommonly attentive eye to notice' the 'miniscule details' in 'subdivision plats, which indicate[d] that land was subject to controlled inundation." *Id.*

Obviously, this inquiry is a fact-bound inquiry about the level of knowledge of the affected property owners. But the record presented in this case is just as compelling as the record presented in the upstream case. In short, the Plaintiffs all acquired their properties in reliance on the expectation that the Government would not flood downstream properties. Dkt. 266 at 5-6. Their reliance was entirely reasonable.

The "Normal Flood Control Regulation" provides that the gates will remain closed "as long as necessary to prevent flooding below the dams." Dkt. 266-1 at 55 (A49). The Government followed this official policy for decades. Dkt. 266 at 3-5. In 2009, the Government assessed the risk of upstream and downstream flooding in light of increased development in the area and stated that "[t]he dams are operated strictly to prevent downstream flooding; ***therefore, the gates remain shut even if pool levels increase and flood upstream properties***." Dkt. 266-1 at 187 (A181) (emphasis added). In 2016—just one year before these events—the Government published an unequivocal reassurance to citizens in the most widely-read newspaper in Houston: "***We will not open the dam to a point where it will cause flooding downstream.***" Dkt. 266-7 at 358 (A3332) (emphasis in original); *see also* Dkt. 266 at 5.

In the upstream case, the upstream plaintiffs' lack of knowledge was not an issue given how hard it would have been to comprehend that the upstream properties were within the reservoirs of the dams and thus subject to flooding. But, in this case, the downstream plaintiffs were actively misled into believing that there would be no flooding of their downstream properties, and they relied on their understanding that the reservoirs existed to protect downstream properties.

The Federal Circuit also noted that "'there is no evidence that [public] meetings [conducted by the Corps and local governments] were heavily attended or particularly well publicized,'" and "that a regular flow of people moving in and out of the community meant that many new residents would not know of the risk of flooding." *Ablan*, 162 F.4th at 1378.

Again, the evidence is even more compelling here. As to downstream plaintiffs, the Government did not publicize its intention to flood downstream properties under certain circumstances pursuant to its Induced Surcharge Flood Control Regulation, and it had never used that procedure before Tropical Storm Harvey. Dkt. 266 at 7-8.

The uncontested evidence is that none of the test property owners was aware of the Water Control Manual or the possibility that the Government might flood their properties by releasing water from the reservoirs. Dkt. 266 at 6-7. In short, this factor also weighs in favor of the downstream plaintiffs, and *Ablan* confirms that analysis.

As a result, *Ablan* teaches that the flooding at issue here is either a permanent, *per se* taking or a temporary taking (or both). The Federal Circuit's affirmance of the liability decision in the upstream case should result in a finding of liability in this case as well.

## IV. The Government's Taking Caused the Plaintiffs' Injuries.

*Ablan* does not undertake a meaningful analysis of causation. And the causation analysis is necessarily different between upstream and downstream plaintiffs. Plaintiffs have extensively briefed the causation standard in this case and the correct baseline to use in conducting the causation analysis. Dkt. 266 at 33-49; Dkt. 281 at 6-12; Dkt. 451 at 2-4; Dkt. 453 at 1-2; Dkt. 576 at 18-20; Dkt. 580 at 14. Plaintiffs stand on that briefing, which establishes that but-for the opening of the floodgates, Plaintiffs' properties would not have flooded.

## V. The Government's Necessity Defense Should Be Rejected.

Finally, the Federal Circuit rejected the necessity defense for a variety of reasons. *Ablan*, 162 F.4th at 1378. *First*, the upstream case was "not a case where the government prevented a landowner from activities 'akin to public nuisances.'" *Id.* (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1022 (1992)). *Second*, the case was not "one where the government's actions were in response to an unforeseeable exigency, such as where urgent action was taken 'to prevent the spreading of a fire.'" *Id.* (quoting *Lucas*, 505 U.S. at 1029 n.16). *Third*, "the government did not build and operate the Addicks and Barker Dams for the benefit of" the upstream plaintiffs. *Id.* (citing *Nat'l Bd. of YMCA v. United States*, 395 U.S. 85, 90-93 (1969)).

Instead, the Federal Circuit reasoned that "the government, as it does in every flooding case, allocated the location of water between private citizens. In doing so, it aided some property owners (downstream residents) and harmed others (upstream residents)." *Id.*

Again, Plaintiffs have extensively briefed why the necessity defense does not apply to the downstream properties. Dkt. 266 at 63-65; Dkt. 281 at 13; Dkt. 576 at 1-17; Dkt. 580 at 3-13. Moreover, the Court conducted "a limited evidentiary trial to resolve critical, outstanding questions of fact that [were] necessary to determine liability." Dkt. 514. Those questions were: "(1) Was there an emergency that necessitated the United States Army Corps of Engineers … opening the Addicks and Barker reservoir gates, or were the gates opened as a matter of ordinary operating procedure; and (2) What would have happened if the gates had remained closed?" *Id.* The evidence, including the evidence and testimony at the evidentiary trial, established that: (1) the gates were opened to comply with the Water Control Manual, Dkt. 576 at 3-6; (2) no emergency ever existed and none was ever declared for the dams, Dkt. 576 at 6-10; (3) the Government's effort to construct an "emergency" defense was a sham, Dkt. 576 at 11-14; and (4) the true purpose of the induced surcharges was to avoid takings liability. Dkt. 576 at 14-17.

Thus, just as in the upstream case, the opening of the floodgates was not an action by the Government to prevent a public nuisance on the downstream properties. *Ablan*, 162 F.4th at 1378. Moreover, it was not an action in response to an unforeseeable exigency. *Id.* Finally, although the Government built the Addicks and Barker dams for the benefit of downtown Houston, it did not operate the dams in a manner to benefit the Plaintiffs' properties. *Id.* Rather, the Government opened the floodgates in accordance with its Induced Surcharge Flood Control Regulation without any need to do so and did so because it wanted to prevent even more liability to other upstream property owners who had not been flooded yet.

In other words, the Government aided the as-yet-unflooded upstream property owners and harmed the Plaintiffs involved in this case. *Ablan*, 162 F.4th at 1378.

## VI.     Conclusion.

*Ablan* is squarely on-point, and it supports a finding of liability in favor of the Plaintiffs. With the benefit of *Ablan* and the Federal Circuit's earlier decision in *Ideker Farms*, which dictates the legal framework for both causation and the relative benefits defense under these circumstances, *see* Dkt. 451 at 1-5; Dkt. 453 at 1-2, this Court should enter a liability decision finding that the Government took Plaintiffs' property and rejecting its necessity and relative benefits defenses, then conduct a bench trial on damages.

In rendering this decision, the Court should be mindful of the distinct procedural postures of the upstream and downstream cases. Plaintiffs acknowledge that *Ablan* was decided after trial, so many of the factual determinations upheld by the Federal Circuit were reviewed for clear error. Here, by contrast, the Court has pending motions for summary judgment on most elements of the Plaintiffs' takings claims (aside from the two questions upon which it held a bench trial last year). That difference should be no impediment to a liability judgment for downstream property owners because the material facts are undisputed—as Plaintiffs explain in the summary judgment briefs which are cross-referenced in this document—and to the extent there were any factual disputes on the issues this Court identified for trial, the Court may now make factual findings on those issues that will be entitled to the same "clear error" review as *Ablan*. With respect to those factual issues, Plaintiffs have cross-referenced their post-trial briefing in this brief to call attention to the evidence developed at trial on those issues. Thus, Plaintiffs believe this Court can follow the legal principles announced in *Ablan* and *Ideker Farms* to enter a liability judgment on the existing record.

Respectfully submitted this 17th day of February, 2026.

/s/ *Rand P. Nolen*
Rand P. Nolen
**KHERKHER GARCIA L.L.P.**
2925 Richmond Ave., Suite 1560
Houston, Texas 77098
Telephone: (713) 333-1030
rnolen@kherkhergarcia.com

/s/ *Jack E. McGehee*
Jack E. McGehee
**MCGEHEE, CHANG,
LANDGRAF, FEILER**
10370 Richmond Ave., Suite 1300
Houston, Texas 77042
Telephone: (713) 864-4000
jmcgehee@lawtx.com

*Of Counsel:*
Russell S. Post
Parth S. Gejji
**BECK REDDEN L.L.P.**
4500 One Houston Center
1221 McKinney Street
Houston, Texas 77010
Telephone: (713) 951-6292
rpost@beckredden.com

/s/ *Richard Warren Mithoff*
Richard Warren Mithoff
**MITHOFF LAW**
500 Dallas Street, Ste. 3450
Houston, Texas 77002
Telephone: (713) 654-1122
mithoff@mithofflaw.com

*Appointed Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a true and correct copy of the foregoing instrument was served on all counsel of record registered for electronic service via CM/ECF on February 17, 2026.

/s/ *Rand P. Nolen*
Rand P. Nolen