**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| IN RE DOWNSTREAM ADDICKS AND BARKER (TEXAS) FLOOD-CONTROL RESERVOIRS | ) | Master Docket No. 17-9002 |
| THIS DOCUMENT RELATES TO: | ) | Senior Judge Loren A. Smith |
| ALL DOWNSTREAM CASES | ) | |

**THE UNITED STATES' MOTION TO CERTIFY THE COURT'S APRIL 22, 2026 OPINION AND ORDER FOR INTERLOCUTORY APPEAL**

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRIAN R. HERMAN
Assistant Section Chief
AMBER DUTTON-BYNUM
Trial Attorney
United States Department of Justice
Energy & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 532-3278
Brian.Herman@usdoj.gov

**TABLE OF CONTENTS**

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. Flooding History and the Addicks and Barker Dams and Reservoirs ........ 3

II. Hurricane Harvey ........ 4

III. Downstream Procedural History ........ 6

ARGUMENT ........ 8

I. The Court Should Certify Its April 2026 Opinion and Order for Interlocutory Appeal ........ 8

A. The Requirements of 28 U.S.C. § 1292(d)(2) ........ 9

B. Controlling Questions of Law are Involved ........ 9

C. There are Substantial Grounds for Difference of Opinion ........ 13

D. Immediate Appeal from the Court's Order May Materially Advance the Ultimate Termination of this Litigation ........ 19

CONCLUSION ........ 22

# TABLE OF AUTHORITIES

## Cases

*Ablan v. United States*,
162 F.4th 1364 (Fed. Cir. 2025) ........ 18

*Alford v. United States*,
961 F.3d 1380 (Fed. Cir. 2020) ........ 16

*Ark. Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012) ........ 10

*Ark. Game & Fish Comm'n v. United States*,
736 F.3d 1364 (Fed. Cir. 2013) ........ 14

*Baker v. City of McKinney, Tex.*,
84 F.4th 378 (5th Cir. 2023) ........ 17

*Bd. of Supervisors of Issaquena Cnty., Miss. v. United States*,
84 F.4th 1359 (Fed. Cir. 2023) ........ 19

*Caquelin v. United States*,
959 F.3d 1360 (Fed. Cir. 2020) ........ 10

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ........ 17

*Danforth v. United States*,
308 U.S. 271 (1939) ........ 16

*In re Downstream Addicks and Barker (Tex.) Flood-Control Reservoirs*,
181 Fed. Cl. 225 (2026) ........ passim

*John B. Hardwicke Co. v. United States*,
467 F.2d 488 (Ct. Cl. 1972) ........ 11

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ........ 17

*McFarlin v. Conseco Servs., LLC*,
381 F.3d 1251 (11th Cir. 2004) ........ 22

*Milton v. United States*,
36 F.4th 1154 (Fed. Cir. 2022) ........ 6, 7, 15

*Orr v. United States*,
166 Fed. Cl. 1 (2023) ........ 17, 18

*Sanguinetti v. United States*,
264 U.S. 146 (1924) ........ 14

*St. Bernard Par. Gov't v. United States*,
887 F.3d 1354 (Fed. Cir. 2018) ........ 7, 10, 14, 15

*Stueve Bros. Farms, LLC v. United States*,
737 F.3d 750 (Fed. Cir. 2013) ........ 16

*TrinCo Inv. Co. v. United States*,
130 Fed. Cl. 592 (2017) ........ 17

*United States v. Archer*,
241 U.S. 119 (1916) ........ 14

*United States v. Sponenbarger*,
308 U.S. 256 (1939) ........ 11, 14, 16

**Statutes**

28 U.S.C. § 1292(d)(2) ........ passim

**Rules**

RCFC 7.3 ........ 1

**Other Authorities**

1958 U.S.C.C.A.N. 5258 ........ 22

Restatement (Second) of Torts § 196 (1965) ........ 17, 18

The United States moves the Court, under Rule 7 of the Rules of the United States Court of Federal Claims, to amend its April 22, 2026 Opinion and Order (Dkt. No. 603) to certify its order for interlocutory appeal under 28 U.S.C. § 1292(d)(2). The United States conferred with Plaintiffs under RCFC 7.3, and Plaintiffs oppose this motion.

## INTRODUCTION

Hurricane Harvey was a historic storm. It is the largest rain event in United States history. The name "Harvey" has been retired because of the severity and impact of the storm. During that storm, the U.S. Army Corps of Engineers worked tirelessly to operate the Addicks and Barker Dams to minimize flooding and protect the areas downstream, including Houston, the fourth largest city in the United States. Unsurprisingly though, given that up to three *feet* of rain may have fallen in certain places in just four days, property throughout Harris County flooded. This included property downstream of the Addicks and Barker Dams, even though the Dams held back nearly 400,000 acre-feet of water. Thousands of landowners downstream of the Dams sued the United States, alleging that their properties flooded not because of the storm but because of the Corps' operation of the Dams. This has resulted in one of the largest takings cases, in number of claims (more than 3,000 downstream) and dollars at stake (possibly in the billions of dollars).

Befitting the historic nature of Hurricane Harvey and the extraordinary breadth of the resulting litigation, the downstream takings litigation is the exceptional case warranting interlocutory appeal under 28 U.S.C. § 1292(d)(2).

Earlier this year, the Court issued a decision on liability as to six bellwether plaintiffs. The Court resolved several controlling questions of law that governed its liability analysis. These include fundamental doctrinal questions about the proper baseline for both causation and relative benefits, and the nature and scope of the necessity defense. For each of these issues, there is substantial ground for difference of opinion. The extended discussion of these legal questions in the parties' briefs and the Court's decision show as much, as do the cases supporting the United States' arguments on each one.

An appeal would materially advance a resolution of this case. These issues are dispositive, as causation is an essential element that a plaintiff must prove and both the relative benefits doctrine and the necessity defense would render the United States not liable. Thus, a successful appeal by the United States would likely terminate the litigation. Even if the appeal were unsuccessful, it might well advance resolution because the appellate ruling would inform the parties and the Court, improving the parties' abilities to negotiate. It would also bear on any just compensation proceedings. This is especially so for causation, as the proper baseline informs the "before and after" valuation underlying just compensation. Thus, an appeal now may very well lead to an easier and more efficient resolution of the bellwether and non-bellwether claims alike. The alternative—attempting to litigate just compensation in this massive action through discovery and trial, possibly based on incorrect legal standards, with an appeal to follow later—will be lengthier, more costly, and more burdensome for all involved.

Thus, because of the significance of the case, including its potential impact on the public fisc (again, possibly billions of dollars), and the significance of the issues, and because an appellate answer now on these substantial questions may hasten resolution of the case, the Court should amend its order to make the findings required by 28 U.S.C. § 1292(d)(2), so that the United States can petition the Federal Circuit for interlocutory appeal.

## BACKGROUND

### I. Flooding History and the Addicks and Barker Dams and Reservoirs

Houston is flood prone. As the Court recognized, the city "experienced six major flooding events" between 1845 and 1935. *In re Downstream Addicks and Barker (Tex.) Flood-Control Reservoirs*, 181 Fed. Cl. 225, 234 (2026). Two twentieth century storms alone caused millions of dollars in damage and the loss of several lives. *Id.* Congress reacted by authorizing the construction of the Addicks and Barker Dams as part of the Buffalo Bayou and Tributaries Project. *See id.* It did so to provide flood control on the Buffalo Bayou watershed and to protect Houston and its shipping channel. *Id.; see also id.* at 249 ("Defendant explicitly built the Dams to protect downtown Houston from flooding.").

The Corps finished building the Dams in 1948. *Id.* at 235. The dams are located upstream and seventeen miles west of Houston. *See id.* While the Dams were initially built with mostly ungated conduits, by the 1960s the Corps had gated all outlets at both Dams, in response to increased urbanization, to reduce downstream flooding. *Id.* During normal dam operations, the two reservoir areas

behind the earthen dams are dry and the gates are set to allow water to pass through the Dams and flow downstream in Buffalo Bayou. US' Mot. for Summ. J. Under RCFC 56 (Corrected) ("US MSJ") Ex. 5 at 2274, Dkt. No. 262. But when the weather brings a risk of downstream flooding, the Corps closes the gates on both Dams to hold back water in the reservoirs, protecting downstream areas. *See id.*

The Dams have excelled at providing flood control downstream. As the Court observed, "[o]ver 80-plus years, the dams have reduced flooding and prevented billions in damage." *In re Downstream*, 181 Fed. Cl. at 233; *see also id.* at 252 ("Despite being located in a historical flood zone, plaintiffs largely did not know of any previous flooding that reached the inside of their properties."). As one plaintiff testified, the land downstream of the Dams "wouldn't have been developed without those dams." *Id.* at 252. The Corps estimated that as of fiscal year 2016, the Addicks and Barker Dams prevented flood damages of more than $16.5 billion. US MSJ Ex. 8 at 2573.

## II. Hurricane Harvey

Hurricane Harvey made landfall in Texas late at night on August 25, 2017. *In re Downstream*, 181 Fed. Cl. at 237. It did so as a Category 4 Hurricane. *Id.* Before it struck, states of emergency had been declared. The Corps issued a Declaration of Emergency for Galveston County on August 22. *Id.* Among other things, this activated the Corps' Addicks and Barker Emergency Coordination Team. *Id.* The Texas Governor issued a disaster proclamation on August 23. *Id.* And

on August 25, before the storm made landfall, President Trump issued a federal disaster declaration. *Id.*

Leading up to Harvey's arrival, the gates at both Dams were open to allow inflows to pass through. Stipulations of Fact ¶ 75, Dkt. No. 548. On the night of August 25, as Harvey made landfall, the Corps closed the gates on both Dams to reduce downstream flooding. *See id.* ¶ 76. Over land, Harvey weakened to a tropical storm and stalled over the Houston area for four days. *Id.* ¶ 19. Stream gages in the Project area recorded rainfall between 27 and 36.3 inches in the Barker watershed in those four days, 29.6 to 33.2 inches in the Addicks watershed, and 29.7 to 35.4 inches in the Buffalo Bayou watershed. *Id.* ¶ 99; *see also In re Downstream*, 181 Fed. Cl. at 238 ("In total, Harvey poured around 32-35 inches of rain over Addicks and Barker's watershed.").

Because of all the rain, the reservoir pools behind both Dams rose, reaching Stage 2 Extended Watch elevations by August 27. Stipulations of Fact ¶ 77. On August 28, the Corps needed to begin releasing water from both reservoirs. *Id.* ¶¶ 80–81. Despite those releases, the pools kept rising. *Id.* ¶ 82. Water began flowing around the north end of Addicks Dam on August 29. *Id.* ¶ 83. Addicks Reservoir set a new, record-high pool elevation, peaking at 109.1 feet on August 30. *Id.* ¶ 84. At that peak, it held back 217,726 acre-feet of water. *Id.* ¶ 86. The Barker

Reservoir also set a new, record-high pool. It peaked at 101.6 feet, also on August 30, holding back 170,941 acre-feet of water.[1] *Id.* ¶¶ 87, 89.

Peak inflow into the Addicks Reservoir reached 70,000 cubic feet per second ("cfs"). *Id.* ¶ 90. Peak inflow into the Barker Reservoir reached 77,000cfs. *Id.* Peak releases from the Dams, however, were only 7,500cfs and 6,300cfs, respectively, for a total combined peak discharge of 13,800cfs. *Id.* ¶ 92.

Although the storm had passed by August 30, reservoir levels required the Corps to continue releases until September 16, when normal operations resumed. *See id.* ¶ 97. The reservoirs were not drained until mid-October 2017. *Id.* ¶ 98.

## III. Downstream Procedural History

Landowners in the Houston area began suing in the Court of Federal Claims shortly after Hurricane Harvey. They allege Fifth Amendment takings based on flooding, for which they seek just compensation, based on the Corps' operations of the Addicks and Barker Dams. The Court of Federal Claims combined the cases into a master docket, which it then divided into upstream and downstream sub-dockets.

In the downstream sub-docket, the Court initially granted the United States' motion to dismiss and related motion for summary judgment. *See* Dkt. No. 203. But in *Milton v. United States*, the Federal Circuit reversed and remanded. 36 F.4th 1154, 1158 (Fed. Cir. 2022). In doing so, the court of appeals directed this Court to

[1] In gallons, Addicks Dam held back almost 71 million gallons of water at peak elevation, while Barker held back almost 56 million gallons of water at peak elevation. *See* What is an Acre-Foot?, Texas Water Development Board, https://perma.cc/6374-59CL (last visited Nov. 4, 2026).

consider, among other things, both "whether Appellants have established causation when considering 'the impact of the entirety of government actions that address the relevant risk'" and "whether the Government can invoke the necessity doctrine as a defense." *Id.* at 1163 (quoting *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1364 (Fed. Cir. 2018)).

On remand, as relevant here, the Court issued a bellwether liability decision on April 22, 2026. Dkt. No. 603. First, the Court considered whether the United States had temporarily taken the bellwether plaintiffs' property. *In re Downstream*, 181 Fed. Cl. at 245. It concluded that the United States had, and granted summary judgment to the bellwether plaintiffs on the question and denied the United States' motion for summary judgment relating to this issue. *Id.* at 252. Second, the Court also found the United States to have permanently taken the bellwether plaintiffs' property and likewise granted summary judgment to them and denied the United States' motion for summary judgment on the issue. *Id.* at 256. Third, even though the Court had purported to resolve the takings questions, it considered causation. *See id.* The Court concluded that "the proper baseline for the Court to analyze causation is a world in which Defendant kept the gates closed during Hurricane Harvey." *Id.* at 257 (capitalization altered). It thus found "in favor of plaintiffs as it relates to Question 3." *Id.* at 256–63. The Court also rejected several other arguments and defenses the United States raised, including the necessity defense and the doctrine of relative benefits. *See id.* at 263–68, 269–71.

The Court then held a status conference on May 19, 2026, to discuss next steps. Dkt. No. 604. Because the time for the United States to seek certiorari in the upstream *Ablan* decision had not yet run, the Court ordered the parties to file a joint status report by July 14, addressing certiorari and any next steps in the downstream case. *Id.* The Supreme Court extended the United States' time for seeking a writ of certiorari, so the Court later ordered the parties to file a joint status report by September 8, updating it on certiorari and proposing a schedule for next steps. Order, Dkt. No. 608.

The United States did not seek certiorari in *Ablan*, and following a September 9 status conference, the Court ordered the parties to file a joint status report proposing a schedule for resolving just compensation for "a proposed number of properties." Order, Dkt. No. 619. The parties did so on October 23, 2026, providing opposing positions on how to move forward. Dkt. No. 643. The Court adopted Plaintiffs' proposed schedule on November 3. Dkt. No. 644.

## ARGUMENT

### I. The Court Should Certify Its April 2026 Opinion and Order for Interlocutory Appeal.

The Court should amend its April 2026 Opinion and Order to add the language of 28 U.S.C. § 1292(d)(2), certifying its order for interlocutory appeal. The Court's Order, and an appeal of it, meet each of the statute's requirements. More broadly, the significance and scope of the case and the issues involved warrant an appeal of these issues now so the parties and Court do not waste extensive resources on further proceedings that may not be necessary. If the United States

succeeds on an appeal of the controlling questions of law, the litigation will end. Alternatively, even if the United States is not fully successful, the parties would then have certainty on central aspects of the legal framework moving forward, which could clarify issues relevant to just compensation and would increase the chances of a negotiated resolution. Thus, the Court should amend its decision to allow the United States to petition the Federal Circuit for interlocutory appeal.

### A. **<u>The Requirements of 28 U.S.C. § 1292(d)(2)</u>**

The Court may certify its bellwether liability decision so that, even though it is interlocutory, the United States can seek to appeal to the Federal Circuit. The governing statute, 28 U.S.C. § 1292(d)(2), allows judges of the Court of Federal Claims to include in their interlocutory orders a statement that:

> (1) A controlling question of law is involved;
>
> (2) With respect to which there is a substantial ground for difference of opinion; and
>
> (3) That an immediate appeal from the order may materially advance the ultimate termination of the litigation.

28 U.S.C. § 1292(d)(2).

If the Court includes that statement in its order, then the Federal Circuit "may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days." *Id.*

### B. **<u>Controlling Questions of Law are Involved</u>**

The Court's April 2026 liability decision involves several controlling questions of law: (1) the applicable causation standard; (2) the proper framework for considering relative benefits; and (3) the proper framework for the necessity

defense. These questions satisfy the statute's first requirement. *See* 28 U.S.C. § 1292(d)(2).

Central among these controlling questions of law is the proper standard for determining causation. Causation is a necessary threshold element in all takings cases. *See, e.g.*, *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 34 (2012); *St. Bernard Par.*, 887 F.3d at 1362–64; *see also Caquelin v. United States*, 959 F.3d 1360, 1371 (Fed. Cir. 2020) (causation is "a fundamental principle of takings law"). As the Court recognized, the bellwether plaintiffs "*must show* 'what would have occurred' if the government had not acted." *In re Downstream*, 181 Fed. Cl at 256 (quoting *St. Bernard Par.*, 887 F.3d at 1362) (emphasis added).

Because causation is a necessary element of a takings claim, the legal framework, including the baseline, for assessing causation is a controlling question of law. The Court's opinion reflects as much: the Court considered the parties' "dispute [about] what 'but-for world' the Court should compare defendant's actions against." *In re Downstream*, 181 Fed. Cl. at 256. Then, as a matter of law, the Court concluded that the correct legal framework for assessing causation was a baseline world in which the Dams exist but were operated differently. *Id.* at 257–58. That legal conclusion, in turn, framed and controlled the Court's consideration of the facts and its ultimate finding on causation. *Id.* at 261. The legal standard for causation is thus a controlling question of law for this litigation because it dictated how the Court weighed and resolved a necessary and critical element of the bellwether plaintiffs' claims.

The Court's interpretation of the so-called *Hardwicke* exception also shows that its decision involves a controlling question of law on causation. After the Court discussed the causation baseline, it found that legal principles the Court drew from *Hardwicke* provided an exception to fundamental causation principles, altering the legal analysis in this case. *See In re Downstream*, 181 Fed. Cl. at 258–61 (discussing *John B. Hardwicke Co. v. United States*, 467 F.2d 488 (Ct. Cl. 1972)). Whether the Federal Circuit's case law provides an exception to general causation principles is a legal question. And because the Court relied on that exception to exclude several risk-reducing actions (and thus their benefits) from its analysis of causation, a necessary element in the bellwether plaintiffs' claims, it is a controlling one. It too qualifies the Court's order for interlocutory appeal.

The Court's decision on relative benefits also involves a controlling question of law. The relative benefits doctrine looks to whether "governmental activities inflict slight damage upon land in one respect" but "actually confer great benefits when measured in the whole." *United States v. Sponenbarger*, 308 U.S. 256, 266 (1939). To measure that, the Court necessarily needed to determine "the whole" of government activities. And the Court "appl[ied] the same baseline as it used in its causation analysis." *In re Downstream*, 181 Fed. Cl. at 271. The baseline framing then, just like for causation, set the legal framework that governed how the Court considered the evidence and weighed the United States' arguments. Thus, the question of the proper baseline lens for analyzing government action—for both

causation and for relative benefits—is a controlling and pivotal question of law for this case.

The Court's decision also involves another controlling question of law: the legal framework for the necessity defense. The Court's rulings on this issue, too, controlled its analysis of the facts and arguments. The Court rejected the United States' arguments because it believed the circumstances of Hurricane Harvey did not reflect an "imminent danger or actual emergency." *See, e.g.*, *id.* at 264–68. But to reach that conclusion, the Court necessarily gave meaning to those terms and made legal determinations that governed the Court's decision-making on this dispositive issue. For instance, the Court found no "actual emergency" or "imminent danger" because it concluded that the Corps acted "*before* imminent [dam] failure." *Id.* at 266. The Court held that the Corps' actions were mere "precautionary steps" because there was no "proof that the Dams were failing." *Id.* at 265. Those holdings required the Court to decide the legal boundaries of the necessity defense. The threshold legal question of what qualifies as a "necessity" controlled the analysis and led the Court to reject the United States' defense.

The Court also resolved controlling questions of law about the vantage point and temporal frameworks of the necessity defense and thus the evidence it could consider. The Court held that its legal analysis of the necessity defense was a "subjective, case-specific inquiry [for] the Court [to] undertake," and that the Court would do so "with hindsight." *Id.* at 264 & n.15. Based on that holding, it looked to a post-storm Report of Performance about the Dams' functioning during the storm to

reject the claim of necessity. *Id.* at 266. The Court also ruled that no emergency existed despite finding that "Corps personnel uniformly believed that conditions amounted to an emergency" and that the bellwether plaintiffs never disputed the reasonableness of the Corps' actions. *See id.* at 264–66. Thus, both the necessity defense's legal standard generally, and its temporal and point-of-view frameworks more specifically, were vital and controlling questions of law involved in the Court's decision on a defense that would be dispositive.

Each of these issues—causation, relative benefits, and necessity—turns on threshold, outcome-determinative legal questions. They are not disputes about the facts or evidence. They satisfy the first criterion in § 1292(d)(2).

**C. <u>There are Substantial Grounds for Difference of Opinion</u>**

The second factor in certification is whether, for the controlling questions of law, "there is a substantial ground for difference of opinion." 28 U.S.C. § 1292(d)(2). Here, there is. As the Court itself acknowledged, Supreme Court precedent supports the United States' position on the proper causation baseline. *In re Downstream*, 181 Fed. Cl. at 257. Case law also supports the United States' position on the baseline for relative benefits. And as to the necessity defense, the long-standing common-law doctrine allows the United States to act reasonably to avert threats to lives and property from dam failure (or from flooding or other dangers) before "it's almost impossible to stop" the "ultimate [dam] failure." *Id.* at 266 (quoting Col. Zetterstrom's testimony). For these reasons, the Court's opinion satisfies the second prong for certification.

Start with causation. The Court held that the baseline for causation was not "a world without the Dams" but a world with the Dams "in which the floodgates remained closed." *In re Downstream*, 181 Fed. Cl. at 257. Yet governing precedent supports the United States' position that the comparison should be to a world without the Addicks and Barker Dams.

As the Court discussed, the Federal Circuit on remand in *Arkansas Game* noted that "the proper comparison would be between the flooding that occurred *prior to the construction of Clearwater Dam* and the flooding that occurred during the deviation period." *Ark. Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1372 n.2 (Fed. Cir. 2013) (emphasis added); *see also In re Downstream*, 181 Fed. Cl. at 257. Likewise, this Court recognized that three Supreme Court cases "adopted [the United States'] preferred but-for world." *See In re Downstream*, 181 Fed. Cl. at 257 (citing *United States v. Archer*, 241 U.S. 119, 128 (1916), *Sanguinetti v. United States*, 264 U.S. 146, 147 (1924), and *Sponenbarger*, 308 U.S. at 262). In *Sponenbarger*, for example, the Supreme Court held that "the Government ha[d] not taken respondent's property" because it "ha[d] not subjected respondent's land to any additional flooding, above what would occur if the Government had not acted" by building levees and other flood control works under the 1928 Flood Control Act. *See* 308 U.S. at 266.

The Federal Circuit's decision in *St. Bernard Parish* is to the same effect and supports that the legal baseline for causation should be a world without the Addicks and Barker Dams. In the mandate here, the Federal Circuit quoted that case in

directing this Court to "consider[] 'the impact of the *entirety* of government actions that address the relevant risk.'" *Milton*, 36 F.4th at 1163 (quoting *St. Bernard Par.*, 887 F.3d at 1364) (emphasis added). In *St. Bernard*, the Federal Circuit reversed the Court of Federal Claims for failing to consider the effect of a related government project directed toward the same risk, flooding. Here, there is no question that the construction and operation of the Addicks and Barker Dams were directed toward the same risk, as their only purpose is to protect against flooding. *See, e.g.*, *In re Downstream*, 181 Fed. Cl. at 249. Thus, there is substantial ground for a difference of opinion over whether the correct legal analysis for causation should be a baseline without the Addicks and Barker Dams or the alternative operation urged by the bellwether plaintiffs and adopted by the Court.

Similarly, there is a substantial ground for difference of opinion on whether any *Hardwicke* exception to general causation principles exists, and, even if it does, whether it applies here. As the Court acknowledged, in *St. Bernard Parish* the Federal Circuit questioned the value and application of *Hardwicke*, and in a storm-based flooding context rejected its application. *See St. Bernard Par.*, 887 F.3d at 1367 n.14; *In re Downstream*, 181 Fed Cl. at 258–60. That the court of appeals may have considered *Hardwicke* differently in *Ideker* than in *St. Bernard Parish*, and that the Court here needed to undertake a "careful review" on this point, *In re Downstream*, 181 Fed. Cl. at 259, shows a substantial ground for difference of opinion on application of any such legal exception.

There is also substantial ground for difference of opinion on relative benefits for many of the same reasons as causation. The Court adopted the same baseline: not a world without the Dams (or where the Corps never closed the gates), but a world with the Dams in which the Corps did first close the gates on August 25, benefiting downstream landowners, but then did not open them on August 28.[2] This excluded from the analysis the benefits of the Dams' construction and operation, both before and during Hurricane Harvey. Yet "if governmental activities inflict slight damage upon land in one respect and actually confer great benefits *when measured in the whole*, to compensate the landowner further would be to grant him a special bounty." *Sponenbarger*, 308 U.S. at 266–67 (emphasis added). Courts must assess the government's program "measured in its entirety." *Id.* at 266.

The Federal Circuit has held likewise, finding that the construction of a flood control project would give rise to "a taking only if the construction 'would put upon this land a burden, actually experienced, of caring for floods greater than it bore prior to the construction.'" *Stueve Bros. Farms, LLC v. United States*, 737 F.3d 750, 753 (Fed. Cir. 2013) (quoting *Danforth v. United States*, 308 U.S. 271, 286 (1939)); *see also Alford v. United States*, 961 F.3d 1380, 1385–86 (Fed. Cir. 2020) (rejecting narrow approach to relative benefits and considering what would have occurred absent any government action). Thus, because there is substantial ground for

[2] When or how the Corps would again open the gates to drain the reservoirs in the Court's "before" scenario the Court does not say.

difference of opinion on how to assess the scope of relative benefits, this issue satisfies the second factor for certification.

The proper legal framework for the necessity defense also provides substantial ground for difference of opinion. For one, while the Court found it could assess the necessity defense in hindsight and from its own point of view, the common law doctrine immunizes invasions undertaken when "it is, or if *the actor reasonably believes it to be*, necessary for the purpose of averting an imminent public disaster." Restatement (Second) of Torts § 196 (1965) (emphasis added); Restatement (Second) of Torts § 196 cmt. d ("A reasonable belief on the part of the actor in the necessity of the entry for the prevention or mitigation of a public disaster is sufficient to justify the entry."); *see also Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160–61 (2021) (citing this section of Restatement when discussing necessity). Other judges of the Court of Federal Claims have explained that the legal framework for necessity turns on the reasonableness of the government actor's judgment and a "temporal framework" measured at the time of the alleged taking, "not in hindsight." *TrinCo Inv. Co. v. United States*, 130 Fed. Cl. 592, 600–01 (2017); *see also Orr v. United States*, 166 Fed. Cl. 1, 76 (2023).

What's more, while the Court found the necessity defense inapplicable "[a]bsent proof that the Dams were failing," *In re Downstream*, 181 Fed. Cl. at 265, the defense applies to actions that "*forestall* . . . grave threats to the lives and property of others." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 n.16 (1992) (emphasis added); *see also Baker v. City of McKinney, Tex.*, 84 F.4th 378, 388 (5th

Cir. 2023) (necessity defense applied when "it was objectively necessary for officers to damage or destroy . . . property in an active emergency *to prevent imminent harm*" (emphasis added)), *cert. denied*, 145 S. Ct. 11 (2024); Restatement (Second) of Torts § 196 (privilege applies if "necessary for the purpose of *averting* an imminent public disaster (emphasis added)). Judge Horn in *Orr*, in similar circumstances—a dam with a rapidly rising reservoir behind it, within inches of the top of the operational pool despite releases and which risked overtopping the gates—found the United States immunized by the necessity defense. 166 Fed. Cl. at 71–76. And in *Ablan*, in rejecting the necessity defense there, the Federal Circuit highlighted that the Corps "aided some property owners (**downstream residents**) and harmed others (upstream residents)." *Ablan v. United States*, 162 F.4th 1364, 1378 (Fed. Cir. 2025) (emphasis added).

Thus, the necessity defense forecloses any takings liability as a matter of law, under the facts as found by this Court in its liability decision. That conclusion is grounded in precedent and longstanding common law principles, and therefore there is substantial ground for difference of opinion.

As a result, all three issues, which present controlling questions of law, present substantial ground for difference of opinion, supporting certification for interlocutory appeal.

### D. Immediate Appeal from the Court's Order May Materially Advance the Ultimate Termination of this Litigation

The final element in the certification statute is that an immediate appeal of the interlocutory order "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(d)(2). Interlocutory appeal here will do so.

Causation is a necessary element of all takings claims, and no plaintiff can prevail absent proof that but for the United States' actions, he or she would have possessed the allegedly taken property interest. *See, e.g.*, *Bd. of Supervisors of Issaquena Cnty., Miss. v. United States*, 84 F.4th 1359, 1365–66 (Fed. Cir. 2023). The evidence is uniform that without the Dams, landowners downstream would have been worse off. Among other things, even at peak release the Dams held back about 90% of the water flowing into the reservoirs. And the bellwether plaintiffs presented no evidence of a world without the Addicks and Barker Dams to support causation. So reversal on the proper legal standard for causation—a Federal Circuit decision that causation requires consideration of the world without the Addicks and Barker Dams, not consideration of a world with an alternative operation of the Dams—would be dispositive.

The same is true for relative benefits. As discussed above, the Court used the same baseline for relative benefits as it did for causation. But if the proper baseline is the world without the Dams, then the Dams and the Corps' actions made the bellwether plaintiffs better off on the whole, even with the releases. So a reversal on this legal baseline question would be dispositive in the United States' favor on this defense.

So too for necessity. If necessity turns on government officials' reasonable, contemporaneous assessment of imminent public emergency, rather than a court's hindsight evaluation, and allows the United States to act before the harm it is trying to prevent occurs, then reversal will be dispositive. This is so because the evidence shows an emergency, "Corps personnel uniformly believed that conditions amounted to an emergency," the Corps acted to prevent dam failure during the largest rainfall event in United States history, and the bellwether plaintiffs conceded the Corps' actions were reasonable. *In re Downstream*, 181 Fed. Cl. at 264–65. Reversal on the legal framework for necessity would thus also likely lead to a dispositive resolution.

But even if appeal might not immediately and automatically lead to judgment for the United States, interlocutory appeal would likely still "advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(d)(2). Each issue is dispositive on the question of the United States' liability. If the Federal Circuit disagrees with the Court's holdings on any one or more of these issues, this Court could address the matter on remand quickly and efficiently. Discovery on liability has closed and no further discovery would be needed. The Court likely could resolve any remaining issues on summary judgment. And given the issues and the evidence, the likely result of a reversal with further proceedings would be judgment for the United States, resolving the case rather than proceeding with a costly and time-consuming just compensation phase.

Interlocutory appeal "may materially advance the ultimate termination of the litigation" in other ways too. The baseline for the "before" or "without government action" world is relevant to just compensation. If the parties need to litigate just compensation, then knowing how to value the world without government action will be vital. Knowing the court of appeals' answer to that legal question would thus advance resolution of just compensation. If the parties proceed with just compensation on a disputed and possibly incorrect "before" framing, then the parties will go through expert work, discovery, and trial while preserving their arguments under different framings, complicating each stage of the remaining litigation. And if any party later appeals and the parties learn that they proceeded under an incorrect legal framing, then several stages may need to be repeated (or may have been for naught). Interlocutory appeal would give the parties a necessary answer before proceeding with complex and expensive just compensation proceedings.

The Court has also repeatedly emphasized an interest in a negotiated resolution. It has pointed to the upstream docket in comparison. But the upstream cases proceeded with an appeal to the Federal Circuit and a petition for rehearing en banc. That is a much different position than this case, with only an interlocutory decision on liability. Interlocutory appeal might thus advance the termination of the litigation because an answer from the Federal Circuit (or Supreme Court) on these essential legal questions would provide definitive guidance to the parties, put the

case in a more similar posture to the upstream docket, and inform the parties' ability to potentially negotiate a resolution.

In short, because each of these issues raises fundamental legal questions about the United States' liability, interlocutory appeal may materially advance the ultimate termination of this extraordinary case.

* * *

Interlocutory appeal is intended for "exceptional cases where a decision of the appeal may avoid protracted and expensive litigation." *See McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1256 (11th Cir. 2004) (quoting 1958 U.S.C.C.A.N. 5258, 5260–61 (report of the Judicial Conference committee on § 1292(b), adopted by Congress verbatim)). The Hurricane Harvey litigation is just such an exceptional case, involving fundamental questions about the Fifth Amendment, including how to assess causation in the context of federal flood control projects during natural disasters, and how to weigh relative benefits and the need to act in an emergency. These weighty and doctrinal issues are well suited for interlocutory appeal.

## CONCLUSION

For the reasons above, the Court should amend its order to find that it meets the requirements of 28 U.S.C. § 1292(d)(2) to allow the United States to petition the Federal Circuit for interlocutory appeal.

Respectfully submitted this 6th day of November, 2026,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

*/s/Brian R. Herman*

BRIAN R. HERMAN
Assistant Section Chief
AMBER DUTTON-BYNUM
Trial Attorney
United States Department of Justice
Energy & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 532-3278
Brian.Herman@usdoj.gov